**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **21-mj-71 (BAH)** |
| | ) | |
| ERIC MUNCHEL | ) | |

### DEFENDANT'S OPPOSITION TO THE GOVERNMENT'S REQUEST TO OVERTURN THE LOWER COURT'S RELEASE ORDER

Defendant Eric Munchel, by and through counsel, respectfully opposes the government's request to overturn the release order issued by the Magistrate Judge on January 22, 2021 pursuant to the Bail Reform Act, 18 U.S.C. § 3142.

Mr. Munchel is charged by complaint with committing civil disorders, in violation of 18 U.S.C. § 231(a)(3); entering a restricted building, in violation of 18 U.S.C § 1752(a); violent entry and disorderly conduct in Congress, in violation of 40 U.S.C. § 5104(e)(2); and conspiring to commit these offenses with his mother, Lisa Eisenhart. Each of these alleged offenses stem from the events at the U.S. Capitol on January 6, 2021.

Mr. Munchel has no history of violence and no felony convictions; he is not a member of any anti-government group, or hate group, or militia-style group; the government presented no evidence that he planned in advance to enter the Capitol building, or that he used violence or threatened any person in the Capitol or on the Capitol grounds on January 6, 2021; he did not vandalize anything in the Capitol, or engage in any destruction of property, and he encouraged others not to vandalize; he did not use force or violence at the Capitol; he did not chant or shout in the building, except to exhort others not to vandalize anything; he did not search for Members of Congress; he did not harass any police officer; he did not bring zip ties to the Capitol, and he did

not use zip ties at the Capitol; he reached out to the FBI when he learned he was sought, and then turned himself in;[1] he voluntarily gave the FBI his cell phone for the purpose of providing his video of the events on January 6, 2021; and he did not intend to return to Washington, D.C. for the inauguration, or for any rallies.

At a detention hearing held on January 22, 2021, Magistrate Judge Jeffrey S. Frensley, Middle District of Tennessee, Nashville Division, heard testimony from FBI Special Agent Angelo Defeo and defense witnesses, and received documentary and video evidence. At the conclusion of the hearing, the Judge found that the government had failed to provide a preponderance of evidence that Mr. Munchel posed a flight risk, and had failed to provide clear and convincing evidence that no combination of conditions could assure the safety of a person or the community. Therefore, the law required Mr. Munchel's release with conditions: "Based upon the totality of the circumstances, giving due consideration to all the factors that the Court must consider in this case, . . . there are conditions that I can impose that will reasonably assure the safety of the community:"[2]

1) home detention;

2) at the home of and in the third-party custody of Ms. Miller, a Nashville resident who testified at the hearing about her understanding of the role of a third-party custodian and her willingness to undertake that role;

3) electronic GPS location monitoring;

4) not possess a firearm, destructive device, or other dangerous weapon;

---

[1] Mr. Munchel learned that he was sought by the FBI at 11:00 a.m. on Sunday, January 10, 2021. Even before he turned himself in two-and-a-half hours later at 1:30 p.m., he had called the FBI agent.

[2] The government requested specific conditions if the Magistrate Judge did not detain Mr. Munchel: a GPS tracking device, stay away from Washington, DC except with regard to this case, advise Pretrial Services of any travel outside the Middle District of Tennessee, not travel outside the United States, and participate in all future proceedings. Government's Memorandum in Support of Pretrial Detention at 23. The Magistrate Judge's release order was far more restrictive than the government's proposed conditions.

5) refrain from traveling to the District of Columbia, except regarding this case;

6) remain within the Middle District of Tennessee, and not travel outside the United States;

7) avoid all contact, directly  or indirectly with any person who may be a victim or witness in this case, including his co-defendant mother;

8) submit to the supervision by and report for supervision of the Pretrial Services office, and call Pretrial Services at least weekly;

9) submit to home visits by Pretrial Services;

10) continue or actively seek employment;

11) not use alcohol excessively, and not use or possess any controlled substance;

12) submit to drug testing if required by Pretrial Services; and

13) participate in substance abuse therapy if directed by Pretrial Services.

Tr. at 185-189.[3]

The government now asks this Court to reverse the Magistrate Judge's release order, and to detain Mr. Munchel until this case is resolved. Notably, the government's motion before this Court is nearly identical to its motion before the Magistrate Judge; it fails to include much of the testimony, documentary and video evidence on which the Magistrate Judge relied, and fails to address the Judge's findings or argue that his findings were clearly erroneous.

## STATEMENT OF FACTS

### a.  The Prologue

Beginning in 2020, parts of the United States government—first and foremost the President of the United States of America—told the public that the only way President Donald Trump could

---

[3] Citations to "Tr." followed by a number, e.g., "Tr. at 93," refer to the transcript of the detention hearing held on January 22, 2021, which is attached to this motion as Exhibit 1.

lose the presidential election was if the election was rigged. Trial Memorandum of the United States House of Representatives in the Impeachment Trial of President Donald J. Trump at 6.[4] After President Trump lost the election, he and other government officials said that the presidency had been stolen from him by widespread election fraud.[5] President Trump invited Americans to come to Washington, D.C. on January 6, 2021, for his "Save America" rally. On the day of his rally, he invited the citizens who had gathered to go to the Capitol: "We're going to walk down to the Capitol, and we're going to cheer on our brave senators, and congressmen and women" and "We're probably not going to be cheering so much for some of them because you'll never take back our country with weakness. You have to show strength, and you have to be strong." *Id.* at 14. The next day, President Trump changed course; he conceded that Joe Biden would be the next U.S. President, denounced the entry into the Capitol building and violence, and urged a peaceful transition.

The evidence at the detention hearing demonstrated the following:

b. **Mr. Eric Munchel's Personal History**

---

[4] The Trial Brief can be found at https://judiciary.house.gov/uploadedfiles/house_trial_brief_final.pdf.

[5] *See id.,* Donald J. Trump (@realDonaldTrump), Twitter (Nov. 21, 2020 3:34 PM) (Watch: Hundreds of Activists Gather for 'Stop the Steal' Rally in Georgia https://t.co/vUG1bqG9yg via Breitbart News Big Rallies all over the Country. The proof pouring in is undeniable. Many more votes than needed. This was a LANDSLIDE!"); Donald J. Trump (@realDonaldTrump), Twitter (Nov. 24, 2020 10:45 PM) ("Poll: 79 Percent of Trump Voters Believe 'Election Was Stolen' https://t.co/PmMBmt05AI via @BreitbartNews They are 100% correct, but we are fighting hard. Our big lawsuit, which spells out in great detail all of the ballot fraud and more, will soon be filled. RIGGED ELECTION!"); Donald Trump Speech on Election Fraud Claims Transcript, December 2, Rev (Dec. 2, 2020) (But no matter when it happens, when they see fraud, when they see false votes and when those votes number far more than is necessary, you can't let another person steal that election from you. All over the country, people are together in holding up signs, "Stop the steal."); Donald J. Trump (@realDonaldTrump), Twitter (Dec. 19, 2020 9:41 AM) ([Joe Biden] didn't win the Election. He lost all 6 Swing States, by a lot. They then dumped hundreds of thousands of votes in each one, and got caught. Now Republican politicians have to fight so that their great victory is not stolen. Don't be weak fools!).

Mr. Munchel is a 30-year-old man who has lived in Nashville, Tennessee for the past two years. He grew up in Georgia, and lived in Florida immediately before moving to Tennessee. At the time of his arrest, he was employed as a server in a bar/restaurant where he was considered a reliable and good employee, a hard worker, helpful, and a team leader. Tr. at 80, 99-100. A person who has known him for several years described him as a person who is protective of others and kind. Tr. at 80. He appreciates law enforcement and supports former President Trump. Tr. at 69, 80. As a young person, he hoped to join the Marines, but that dream was thwarted by a serious childhood injury. Tr. at 81. He was active in the Boy Scouts of America, just a few requirements short of the Eagle Scout rank. He played sports in high school and enjoys camping. Tr. at 83. He is a gun collector, as are millions of Americans for whom magazines are published, conventions organized, and clubs formed. *See* e.g. https://www.nrablog.com/articles/2017/11/gun-collecting-introduction-and-types-of-collecting; Garden and Gun (www.gardenandgun.com); Gun Digest (www.gundigest.com); Shooting Times (www.shootingtimes.com); www.gunshows-usa.com; https://clubs.nra.org/clubsonline/Home/Index/1. He is a reliable friend. Tr. at 84.

Mr. Munchel has two misdemeanor convictions for possession of marijuana that are seven and eight years old. In one, he was briefly charged with failure to appear but the charge was dismissed because Mr. Munchel had not received the notice and appeared within the month. Tr. at 83.

### c.  **January 4, 2021**

Mr. Munchel agreed to accompany his mother, Lisa Eisenhart, to President Trump's "Save America" rally to be held on January 6, 2021. Tr. at 20. The day they left, on January 4th, Ms. Eisenhart made a reservation at the Grand Hyatt Hotel in Washington, D.C. The government presented no evidence that Mr. Munchel and his mother planned any further in advance than

January 4th to attend the rally, or that they planned to enter the Capitol building. Tr. at 35, 64. The government presented no evidence that Mr. Munchel is affiliated with any militant groups or hate groups or anti-government groups, or any groups who planned to do anything on January 6th beyond attending a rally to protest what they perceived as "the steal." Tr. at 58-59, 68.

### d.  **January 5, 2021**

Mr. Munchel and his mother arrived in Washington, D.C. in the early morning hours of January 5, 2021. On the evening of January 5th, Mr. Munchel walked on a crowded street near his hotel. Passing a group of officers from the Metropolitan Police Department, he said to them, "Thanks for what you do." Exhibit 2 at 1:10-15.[6] Moments later, a group of officers approached him, inquiring whether the taser in a holster on his hip was a gun. Tr. at 36; Exhibit 2 at 2:03-09. Mr. Munchel politely explained that it was a taser, not a gun. Tr. at 36. He did not attempt to evade the police in any manner. Tr. at 37. When bystanders approached in a hostile manner, Mr. Munchel diffused the situation by telling them, "It's okay, I'm okay, they're doing their job, it's okay, it's okay." Tr. at 38; Exhibit 2 at 3:33-42. The officers did not seize Mr. Munchel's taser, which was legal to possess in Washington, D.C. *See* D.C. Code § 7-2502.15.[7] Tr. at 38.

### e.  **January 6, 2021**

---

[6] The Magistrate Judge placed Exhibit 2 (a video from January 5, 2021), Exhibit 3 (a 12-minute excerpt from Mr. Munchel's 50-minute video from January 6, 2021), and Exhibit 4 (a screenshot of the social media page of a person who placed Mr. Munchel's personal information on social media) under seal. They will be provided to the Court's chambers, and to the government.

[7] Tasers are considered a defensive device that can be used only "in the exercise of reasonable force in defense of person or property." D.C. Code § 7-2502.15. The law permits possession of a taser in Washington, D.C. except in D.C. government buildings, penal institutions, schools, or buildings clearly posted to prohibit them. *Id.*

On January 6th, Mr. Munchel and his mother left the Grand Hyatt Hotel at midday to walk to the rally. Tr. at 39-40. Mr. Munchel again wore his taser in a holster on his hip, and he wore what has been described as a "tactical vest" with USA and Tennessee "thin blue line" patches,[8] black and brown fatigue pants and shirt, a cap, and a gaiter. Tr. at 26. He wore his cell phone in a pocket of the vest, and recorded the events. Tr. at 41. He preserved the video and later voluntarily provided it to the FBI. Tr. at 41.

During much of the video, Mr. Munchel is seen following his mother, and holding on to her by a strap on the back of her vest. Tr. at 42. As Agent Defeo testified, it appeared that he was "trying not to let her get lost in the crowd or too far ahead of him." Tr. at 43. On the Capitol grounds, his mother spoke briefly to a few men in the crowd identified as "Oathkeepers" an anti-government, militia-style organization, and Mr. Munchel fist bumped one individual before moving on. Tr. at 24-26, 44. Bystanders can be heard to say that Congress had closed, or "shut down." Tr. at 43. Ms. Eisenhart talked about going inside the Capitol building, but commented that, "We're going straight to federal prison if we go in there with weapons," to which Mr. Munchel replied, "Yeah, that's why I'm not going in there." Tr. at 43, 64. His mother suggested that they "put 'em in the backpacks" they had stored nearby. Tr. at 43. Mr. Munchel said "take my weapons off before I go in there." Tr. at 43. Mr. Munchel had a pocket knife that he put in the backpack, but the video does not depict what else, if anything, was put in the backpack. Tr. at 43, 109. Later, still on the Capitol grounds, Mr. Munchel can be heard to say "We ain't playing f-----g nice no g-d---n more," and that they were "f---king ready to f---k s--t up," and "I guess they thought we

---

[8] "A tactical vest is a heavy duty vest that can be worn over regular clothing in order to provide both protection and a way to carry gear." https://www.blauer.com/dispatch/the-many-uses-of-military-tactical-vests/.

were playing." Tr. at 73. Mr. Munchel is heard to say that this would be the last time he would be able to enter the Capitol with armor and weapons. Tr. at 73.

Mr. Munchel and his mother entered the Capitol building with Mr. Munchel holding tight to the strap on her back, and remained there for 11-12 minutes. Tr. at 46; Exhibit 3.[9] They walked into the Capitol through an open door. Tr. at 46; Exhibit 3 at 00:03-06. Law enforcement officers stood to the right of the door, allowing people to enter. Tr. at 46; Exhibit 3 at 00:03-06. The officers did not tell Mr. Munchel or anyone else not to enter or to leave, or suggest that the building was restricted at that time. Tr. at 46; Exhibit 3 at 00:03-06.

Inside the Capitol, Mr. Munchel attempted to limit his mother's movements, and to keep tabs on her. Tr. at 47, 55. He followed her up a flight of stairs to the Rotunda, Exhibit 3 at 00:12-39, then out of the Rotunda, following a crowd. Exhibit 3 at 1:27-38. At that point, after one and a half minutes inside the building, Mr. Munchel asked his mother, twice, "What's your goal here, Mom?" Tr. at 47; Exhibit 3 at 1:38-48. Half a minute later, Ms. Eisenhart turned away from a rowdy crowd, saying to Mr. Munchel, "Okay, let's go upstairs," and Mr. Munchel followed her up another flight of stairs. Exhibit 3 at 2:22; 22:28-52. Others were yelling and chanting, but Mr. Munchel was quiet. Exhibit 3 at 1:49-2:01. When Ms. Eisenhart wandered down a hallway, Mr. Munchel told her, "We don't want to get too split off. We don't want to get stuck in here, so this is not a place for us," which caused Ms. Eisenhart to turn around. Tr. at 47; Exhibit 3 at 3:13-32. They followed another crowd down a different hallway. Exhibit 3 at 3:40-4:03. When Mr. Munchel saw others knock on doors, he loudly said, "Don't vandalize anything. We aren't Antifa." Tr. at 48; Exhibit 3 at 4:03-08. Half a minute later, Mr. Munchel again told those around him, "Don't

---

[9] Exhibit 3 is a 12-minute excerpt from the 50 minute video created by Mr. Munchel, beginning at their entry into the Capitol building.

break shit." Tr. at 48; Exhibit 3 at 4:37-39. A few seconds later he shouted, "Hey, easy, easy, easy, no vandalizing shit. We ain't no g-d---n Antifa, motherf---kers," then shouted, "You break shit, I break you." Exhibit 3 at 4:45-58. The crowd came upon a person who had opened a cabinet in which were stored zip ties (flexicuffs), and was distributing them. Tr. at 56; Exhibit 3 at 4:59-5:07. Ms. Eisenhart took one, and Mr. Munchel took several, saying "Zip ties! I need to get me some of them motherf----kers." Tr. at 56, 74; Exhibit 3 at 5:00-05. Others also took the zip ties. Exhibit 3 at 5:05-15. Munchel briefly lost contact with his mother when she went off in a different direction, and called out to her, saying, "Wait, Mom. Mom!" Exhibit 3 at 5:11-13. Others screamed their messages off a balcony, but Mr. Munchel was quiet. Exhibit 3 at 5:20-27. When Ms. Eisenhart wandered off again, Mr. Munchel went after her, saying "Mom, where are you going, Mom, focus, don't lose me." Tr. at 49-50; Exhibit 3 at 5:35-40.

Ms. Eisenhart walked through the open doors leading to the visitors' gallery of the Senate chamber, one floor above the floor of the Senate chamber, and Mr. Munchel followed. Tr. at 50; Exhibit 3 at 5:49-6:13. The floor of the Senate chamber was empty. Exhibit 3 at 6:25-32; 7:55-57. Again, Mr. Munchel did not join the chanting and screaming. Exhibit 6:25-48. Mr. Munchel lost his grasp on Ms. Eisenhart, again. She and others stepped over the railings that separate one section of the visitors' gallery from other, and Mr. Munchel followed, asking, "Mom, where are you going, what are you doing?" Tr. at 50, 52; Exhibit 3 at 6:54-7:19. They tried to exit the gallery, but the door did not open. Exhibit 3 at 7:20-27. Mr. Munchel yelled at the others in the visitors' gallery, "Hey, be careful!" Exhibit 3 at 7:58-8:01. They tried another exit, but it was also locked. Exhibit 3 at 8:30-36. Mr. Munchel said to his mother, "I want that f-----g gavel," which would have been on the floor below, but took no action toward that end. Exhibit 3 at 8:39-41. They found an open door and left the gallery. Exhibit 3 at 8:48-51. Mr. Munchel followed his mother down and then

up another flight of stairs, down a hallway to a non-functioning elevator, at which point Mr. Munchel said, "Alright, we need to find the exit." Tr. at 53; Exhibit 3 at 9:13-10:11. On their way out, Mr. Munchel said to police officers they passed, "Sorry, guys, I still love you." Tr. at 53, 74, 78; Exhibit 3 at 10:43-46. Back on the Capitol grounds, Mr. Munchel made statements to the media expressing his distrust of the election process and the need to "fight" the steal.

Mr. Munchel did not engage in any violence or force at the Capitol grounds or in the Capitol. Tr. at 45, 54. He did not vandalize anything, or engage in any destruction of property. Tr. at 49. There is incontrovertible evidence that he did not bring the zip ties to the Capitol, there is no evidence that he intended to use the zip ties that he was given, and in fact he did not use them. Tr. at 56-57. He was polite to the police officers he encountered, and did not yell at or harass them. Tr. at 54. He never chanted or shouted in the Capitol, except to admonish others not to vandalize. There is no evidence whatsoever to support the government's claim that Mr. Munchel "marched throughout the Capitol searching for Members of Congress who he believed had committed 'treason.'" There was no evidence that Mr. Munchel intended to return to Washington, D.C. for the inauguration or for any other rallies. Tr. at 66.

On the evening of January 6th, MPD officers at the Grand Hyatt hotel again saw Mr. Munchel's taser on his hip, and again wondered if it was a gun. Tr. at 27. Given the events earlier that day, the officers asked for the taser, and Mr. Munchel gave it to them.[10]

---

[10] Based on Twitter, the government now asserts that Mr. Munchel "assaulted" a reporter at the hotel when Mr. Munchel asked the reporter to delete the unauthorized video he had taken of a Grand Hyatt guest. Mr. Munchel was polite in his request, and when he put his hand out, the reporter bulldozed ahead, hitting Mr. Munchel's hand. Neither Mr. Munchel nor the reporter filed charges, or even alerted the police officers standing in the lobby. The Magistrate Judge had no opportunity to make factual findings regarding this alleged encounter because the government produced no evidence or proffer. Therefore, this allegation is not part of this Court's review.

### f.  January 7, 8 and 9, 2021

Mr. Munchel returned to Nashville on Thursday, January 7th, and went to work on Friday, January 8th. When he got off work at approximately 1:00 a.m. on January 9th, he learned that internet sleuths had published his personal information, including his phone number and address, on social media. Tr. at 60, 103; Exhibit 4. His cell phone was "blowing up," mostly from strangers who were harassing him and people who "wanted him dead." Tr. at 61, 91, 94, 103. News media constantly called his phone, texts were streaming in, and people were posting on his Facebook account. Tr. at 104. News media vehicles were at his apartment building. Tr. at 62. For those reasons, instead of going home, he went to the home of his friends, Ms. Miller and her two adult daughters. [11] Tr. at 22, 69, 90. They advised him to turn off his cell phone, which he did, and he deleted his Facebook account. Tr. at 104. He gave his phone to Ms. Miller's daughter for safekeeping, telling her that he wanted to ensure that the video of his activities at the Capitol on January 6th was preserved, and not destroyed or manipulated. Tr. at 22, 61. Mr. Munchel returned home briefly on the morning of January 9th, and told the Millers he was going to work. Tr. at 105. They advised him that he should not go to work and should try to find a lawyer. Tr. at 96, 105. He heeded their advice. Tr. at 105.

### g.  January 10, 2021

The next morning, on Sunday, January 10, 2021, FBI agents executed a search warrant at Mr. Munchel's apartment. Tr. at 14-15. Mr. Munchel's brother was present, and advised the agents that his brother and mother had not planned to cause trouble at the DC rally. Tr. at 15, 59. He advised that Ms. Eisenhart was upset by the perceived election fraud, and that Mr. Munchel

---

[11] The Millers' full names were not used at the hearing to protect them from harassment. Tr. at 79-80.

accompanied her to Washington, D.C. to protect her. Tr. at 15, 59-60. The agents seized a "tactical vest" with patches, a cap, a shirt, pants, boots, and packaging for a taser, all of which Mr. Munchel's brother identified as belonging to Mr. Munchel. Tr. at 17-27. The agents collected four or five white zip ties (flexicuffs), which Mr. Munchel's brother told the agents Mr. Munchel had brought home from Washington, D.C. Tr. at 16-17. The agents found a safe in which was locked Mr. Munchel's gun collection—approximately 15 firearms of all types (pistols, AR-style, a long rifle used for long distance targets with a tripod that the agent termed a sniper rifle), many rounds of ammunition, a drum magazine, and 20-30 other magazines. Tr. at 17-19. All of the weapons were legal, and Mr. Munchel was licensed in Tennessee to possess them. Tr. at 19, 65. The agents took the guns and ammunition.

At the conclusion of the search, an agent left his phone number for Mr. Munchel's brother to provide to Mr. Munchel, which he did. Tr. at 60, 95. At about 11:00 a.m., Mr. Munchel and the Miller family learned of the search for the first time, and learned that the FBI was looking for Mr. Munchel (although an arrest warrant had not yet issued). Tr. at 106, 115. With the blessing and encouragement of the Miller family, Mr. Munchel called the FBI agent and made arrangements to go to the FBI office at 1:30 p.m., just a few hours later. Tr. at 60, 63, 69, 106. He tried to find a lawyer to accompany him, but was unable to do so; he turned himself in without an attorney. Tr. at 70, 107-108. He instructed Ms. Miller's daughter to give his cell phone to an attorney, Mr. Bean, and for Mr. Bean to give the phone to the FBI, which he did that day. Tr. at 63, 92, 94-95, 108-109.

### h.  Defense Witness Testimony Regarding Third Party Custody

Ms. Miller testified at the detention hearing. She met Mr. Munchel when they worked together in Florida, and has known him for approximately four years. Tr. at 86. Their relationship was close; he called her "mom" and she called him "son." Tr. at 86.

Ms. Miller executed a Declaration Under Penalty of Perjury stating her willingness to serve as a third party custodian for Mr. Munchel in her home, and stating her understanding of the obligations of a third party custodian. Tr. at 79. She was "absolutely" willing to do so. Tr. at 87. She understood that she would need to make sure that Mr. Munchel follows all the "protocols," does everything he is ordered to do, and appears in court. Tr. at 87. She understood that if Mr. Munchel failed to follow the rules she would "need to report at any time should I feel that he is not or that I know that he's not truthful or done anything [indiscernible] probation officers or law enforcement . . . ." Tr. at 87-88. Asked whether she would report Mr. Munchel if he did not follow the rules established by the court, Ms. Miller answered, "Yes, absolutely I would. Without a shadow of a doubt, I would." Tr. at 88. Ms. Miller's two adult daughters live with her, and there is room for Mr. Munchel as well. Tr. at 89. She is willing to install a landline phone to facilitate electronic monitoring. Tr. at 89. Ms. Miller does not have any guns in her home. Tr. at 94.

Ms. Miller's adult daughter, who has also known Mr. Munchel for approximately four years and worked with him in Florida and in Nashville, testified about her willingness to keep an eye on Mr. Munchel, and to ensure that he follows the Court's rules. Tr. at 98-101.

### i.  The Tension Between the Emotional Reaction to the Events at the Capitol on January 6th and Application of the Law

At the conclusion of the evidence, the Magistrate Judge acknowledged the tension between his "emotional" response to the events on January 6th and the law as it applied to Mr. Munchel's release or detention:

> I have to say that from an emotional standpoint, [the government's] arguments have a lot of appeal. Seeing the conduct of fellow citizens on January the 6th and what happened at the Capitol is – is difficult to watch. It's something that I'm not sure that there are many of us who ever thought we would see in this country.
>
> And there's an obvious visceral reaction to it that I think is natural and reasonable for individuals to have, and the Court has to give that the appropriate consideration but also has to be guided by the law in this case and has to consider the factors that the law requires to be considered in this case.

Tr. at 173-74. Likewise, at the detention hearing for Ms. Eisenhart, the Magistrate Judge noted that,

> [p]rotecting the rights of the accused is often difficult and unpopular. But when we disregard those rights based on anger and fear, we damage the very constitution and democracy that we seek to protect….
>
> Even as I talk about the events on January the 6th and what happened at the Capitol, I feel my own emotion in dealing with this issue. But that's why it's so important to make decisions based only on the law and the evidence….

January 25, 2021 Detention Hearing Transcript at 162-63.

## ARGUMENT

## THE COURT SHOULD DENY THE GOVERNMENT'S MOTION TO OVERTURN THE LOWER COURT'S RELEASE ORDER

### A. The Applicable Legal Standard

The Bail Reform Act requires courts to release defendants who are pending trial on personal recognizance or on an unsecured appearance bond unless the government has presented clear and convincing evidence that there are no conditions that will "reasonably assure the appearance of the person as required or . . . the safety of any other person or the community." 18 U.S.C. §§ 3142(b), 3142(f)(2)(B). In other words, "the default position of the law . . . is that a defendant should be release pending trial." *United States v. Taylor*, 289 F. Supp. 3d 55, 62 (D.D.C. 2018) (quoting *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010)).

If the case involves a felony that is *not* a crime of violence but that involves the alleged possession of a dangerous weapon, upon motion by the government, the Bail Reform Act requires the court to hold a hearing to determine whether any condition or combination of conditions will reasonably assure the defendant's appearance in court and the safety of persons and the community, 18 U.S.C. § 3142(f)(1)(E); 18 U.S.C. § 3142(f)(2)(A). When imposing a condition, or combination of conditions, the court must select the "least restrictive" conditions. 18 U.S.C. § 3142(c)(1)(B).

Defendants who are charged with certain specified offenses are subject to a rebuttable presumption that no condition, or combination of conditions, can assure the defendant's appearance or ensure the safety of the community, *see* 18 U.S.C. § 3142(e), *but no such presumption exists here*. Rather, the presumption here is that the defendant will be released pending trial unless the government can prove by clear and convincing evidence that pretrial detention is the *only* means by which the community's safety can be assured, 18 U.S.C. § 3142(f)(2)(B); *United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996), or can prove by a preponderance of the evidence that no conditions of release can assure the defendant's appearance at future court hearings. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988); *United States v. Hassanshahi*, 989 F. Supp. 2d 110 (D.D.C. 2013).

In determining whether the government has defeated the presumption for release by clear and convincing evidence proving that no combination of conditions can protect a person or the community, or by a preponderance of evidence that no combination of conditions can assure the defendant's appearance, courts consider four factors: (1) the nature and seriousness of the offense charged; (2) the weight of the evidence; (3) the defendant's character, including his physical and mental condition, family and community ties, past conduct, drug and alcohol abuse, and criminal

history; and (4) the nature and seriousness of the danger posed to any person by release. 18 U.S.C. § 3142(g). Here, the Magistrate Judge also considered the COVID-19 pandemic, and "its impact, particularly in custodial situations." Tr. at 172.

The defendant agrees that this Court has the authority to review the Magistrate Judge's release order pursuant to 18 U.S.C. § 3145(a)(1). The Court interprets the Bail Reform Act and any terms therein *de novo*. *United States v. Hanson*, 613 F. Supp. 2d 85, 88 (D.D.C. 2009). The lower court's factual findings, including the findings that the government failed to prove that no combination of conditions can assure a defendant's appearance in court or the safety of the community, are reviewed for clear error. *United States v. Smith*, 79 F.3d 1208 (D.C. Cir. 1996); *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987) (court "satisfied that [lower court's] finding that no condition or combination of conditions will assure the safety of the community is supported by clear and convincing evidence and is not clearly erroneous"; "Whether the release of a particular individual will pose a danger to the community is a question of fact to be determined by the judicial officer following the detention hearing . . . ; we will sustain that determination unless clearly erroneous."); *United States v. LaFontaine*, 210 F.3d 125, 130 (2d Cir. 2000) (whether a package of bail conditions will prevent danger to the community is reviewed for clear error). In other words, this Court's "task is to determine" whether the Magistrate Judge clearly erred when it found that the government failed to present clear and convincing evidence that no combination of conditions of release can protect the safety of a person or the community, and found that the government failed to present a preponderance of evidence that no combination of conditions of release could assure Mr. Munchel's return to court. *Simpkins*, 826 F.2d at 96.[12]

---

[12] In *United States v. Manafort,* 897 F.3d 340, 345 n.2 (D.C. Cir. 2018), the D.C. Circuit observed that:

**B.** **The Lower Court's Factual Finding that the Government Failed to Provide a Preponderance of Evidence that No Combination of Conditions Can Reasonably Assure the Defendant's Appearance in Court Was Not Clearly Erroneous**

In support of his finding that the government had failed to provide sufficient evidence that no combination of conditions can reasonably assure Mr. Munchel's appearance in court, the Magistrate Judge made the underlying factual findings that, contrary to the government's assumption, the fact that Mr. Munchel deactivated his facebook account on January 9th, gave his cell phone to his friend, did not return home after work on the evening/early morning of January 8-9, did not go to work on January 9th, and did not tell his brother where he was on January 9th, did not indicate a risk of flight. Tr. at 175.

---

[a]lthough we have previously characterized a finding of dangerousness in a detention determination as a finding of fact to be reviewed for clear error, *United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996) (per curiam) (citing *Simpkins*, 826 F.2d at 96), we have never addressed detention based upon a finding that the defendant was unlikely to abide by conditions of release. Other circuits have taken varying approaches to review of detention orders. Some treat the ultimate determinations of dangerousness, risk of flight, or likelihood of abiding by conditions of release as factual findings to which a clear error standard of review applies. See *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011); *United States v. Clark*, 865 F.2d 1433, 1437 (4th Cir. 1989) (en banc); *United States v. Gotti*, 794 F.2d 773, 779 (2d Cir. 1986). Others have applied what has been described as "independent review" with some deference to the district court. *United States v. O'Brien*, 895 F.2d 810, 814 (1st Cir. 1990); *United States v. Portes*, 786 F.2d 758, 762 (7th Cir. 1985). Still other courts defer to the district-court factual findings, but treat "conclusions based on such factual findings," including the necessity of detention, as mixed questions of fact and law, reviewed de novo. *See United States v. Howard*, 793 F.3d 1113, 1113 (9th Cir. 2015) (citing *United States v. Hir*, 517 F.3d 1081, 1086-87 (9th Cir. 2008) ); *accord United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) (reviewing "the ultimate question whether detention is warranted" de novo). We leave resolution of these thorny questions for another day when they are fully presented and briefed.

The Magistrate Judge found that Mr. Munchel "was receiving threatening communications, harassing communications, . . . a lot of media interest in him," and "there was a large contingent of individuals after this event on the 6th who were engaged in detective activity . . . on social media platforms, attempting to identify individuals, attempting to locate them," and that "those are legitimate and reasonable considerations for why an individual might take actions of deactivating social media and passing off their cell phone to another individual." Tr. at 175-76. The Magistrate Judge found as a factual matter that Mr. Munchel gave his cell phone to his friend for the purpose of "preserv[ing] the information contained on it and to assure that it could be utilized and . . . provided to the authorities . . . ," which he did. Tr. at 176.

Most importantly, according to the Magistrate Judge, when Mr. Munchel became aware that the FBI was searching for him "by way of the search warrant executed at his house . . . he voluntarily turned himself in. He communicated, reached out to the FBI, made arrangements to surrender and did, in fact, surrender." Tr. at 176. The Magistrate Judge found that "until there was the existence of a warrant, there really wasn't anything for Mr. Munchel to turn himself in on. Once he knew for certain that there was law enforcement interest in him by way of the search and indication that there would be a warrant forthcoming, he turned himself in." Tr. at 177. The court found that "[c]ertainly in the time period between that Friday evening [of January 8, 2021] and the Sunday [of January 10, 2021] when he surrendered, if Mr. Munchel were inclined to flee, he had ample opportunity to do so, and he didn't." Tr. at 177. The Magistrate Judge "accept[ed] and credit[ed]" the testimony from Ms. Miller and her daughter, and found that "there is no risk of flight by Mr. Munchel." Tr. at 177. Finally, the court found that Mr. Munchel's "prior experience with the criminal justice system" in the two misdemeanor cases "suggest that he'll stand up and

answer to his charges, and there's no reason to believe that imposing conditions of release would not also reasonably assure his appearance at future court proceedings." Tr. at 177.

The Magistrate Judge's findings were not clearly erroneous, and the government makes no attempt to argue that they were.

C. **The Lower Court's Factual Finding that the Government Failed to Provide Clear and Convincing Evidence that No Condition or Combination of Conditions Can Reasonably Assure the Safety of Persons and the Community Was Not Clearly Erroneous**

The Magistrate Judge properly considered the § 3142 factors and his factual findings were not clearly erroneous.

i. **The Nature and Circumstances of the Offenses Charged, Including Whether the Offenses Are Crimes of Violence**

The offenses charged are not crimes of violence. The Magistrate Judge found, however, that being part of a mob was dangerous conduct:

> . . . [M]obs are dangerous. They're inherently dangerous. Whether it's a mob at a sporting event or a mob at a concert or a mob at a political protest or a mob intendant upon doing damage, anytime you choose to be part of a mob, there is a mob mentality and you automatically connect yourself to that dangerousness.
>
> In this case it appears . . . that Mr. Munchel chose to be a part of that mob. He chose to be a part of this group that engaged in the conduct that's outlined in the criminal complaint and that is captured by numerous videos and photographs and the like. It's conduct that bore out itself to be dangerous in this incident.

Tr. at 178. The court condemned the actions on January 6th, but affirmed that "the consequences of those actions is for another day. What's for today is whether or not there are conditions that can reasonably assure the safety of the community between now and the time those consequences happen with regard to the underlying charge." Tr. at 185.

Based on the evidence (and lack of evidence) the court rejected the contention that Mr. Munchel  arrived in Washington, DC to enter the Capitol building or to harm anyone: He "didn't

go to Washington, DC with an intention of storming the Capitol and causing harm to any individuals there." Tr. at 180. The Judge found that Mr. Munchel had a taser, he "picked up the zip ties once he – once he arrived in the Capitol," and while "the government also argues that they believe he had other weapons, perhaps more dangerous weapons than the stun gun, [] he didn't take those weapons into the Capitol. Presumably, that means he had a choice to take lethal weapons into the Capitol and he made a choice not to do that." Tr. at 179.

Regarding advance planning, the Magistrate Judge found that there is no evidence that Mr. Munchel "was engaged in any advance planning for these activities," and "when one looks at the videotapes and listens to the audio of those tapes, [it] seems pretty clear that there isn't much of a plan." Tr. 180, 184. "In fact, Mr. Munchel repeatedly asks his mother what her plan is, what's her goal, what's she going to do." Tr. at 180. The court credited the proffer that "the trip was planned just days before the event, that he went to that event and then fell into the mob." Tr. at 184.

The Magistrate Judge found that Mr. Munchel did not use the taser that he openly wore on his belt, did not use the zip ties he found at the Capitol, and that there was "no evidence that he even knew he was going to be in possession of zip ties unless and until he happened upon them during the course of being in the building." Tr. at 180.

  **ii.**   <u>**The Weight of the Evidence Against the Defendant**</u>

The evidence that Mr. Munchel was present on the grounds of the Capitol and inside the Capitol building is incontrovertible. Whether the government can succeed in proving the elements of each of the specific offenses charged, however, is debatable. For example, the most serious charge here is an alleged violation of 18 U.S.C. § 1752(a), entering and remaining in a restricted building. A restricted building is one that is "posted, cordoned off, or otherwise restricted." As Mr. Munchel's video demonstrates, he entered an open door that was neither posted nor cordoned off.

Neither the police officers standing at the door nor the officers Mr. Munchel later passed suggested that the building was restricted or that Mr. Munchel was required to leave. In any event, in determining whether conditions of release can ensure the safety of others, "[t]he weight of the evidence is the least important of the factors and the bail statute neither requires nor permits a pretrial determination of guilt." *United States v. Gebro*, 948 F.2d 1118, 1121-22 (9th Cir. 1991) (citing *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986)); *accord United States v. Jones*, 566 F. Supp. 2d 288, 292 (D.NY 2008).

### iii.   The History and Characteristics of the Defendant and Whether the Defendant Was on Court Supervision at the Time of the Alleged Offense

"[A] defendant's past conduct is important evidence—perhaps the most important—in predicting his probable future conduct." *Pope v. United States*, 739 A.2d 819, 827  (D.C.App. 1999) (quoting *Cruz-Foster v. Foster*, 597 A.2d 927, 930 (D.C.1991)). As the Magistrate Judge found, Mr.  Munchel's only criminal convictions were two misdemeanor possession of marijuana offenses that were seven and eight years old. Mr. Munchel is not under the supervision of any court. Tr. at 174-75.

The Magistrate Judge also found that Mr. Munchel is a high school graduate with some trade schooling, grew up in Georgia and moved to Nashville two years ago, has maintained employment until the date of his arrest, is in good health, enjoys the privileges of citizenship including having and expressing opinions, has a permit to carry firearms, and an interest in collecting firearms. Tr. at 174-75. The court found that Mr. Munchel legally possessed the weapons found in his home, and noted that after January 6th, Mr. Munchel did not try to hide or remove the weapons. Tr. 181-183. Any danger concerning the weapons, the Court found, could be and had been mitigated—"those weapons have been seized," and "[a] condition of release will be that Mr. Munchel not possess any firearms or other dangerous weapons." Tr. at 181-82.

iv.     **The Nature and Seriousness of the Danger that Would be Posed by the Defendant's Release**

The Magistrate Judge found that Mr. Munchel "has no prior history of violence," there was no evidence that he is a member of any organized collective action against the government, there was no evidence that he had ever previously taken action on his beliefs, and that he has respect for law enforcement. Tr. at 181, 184. In fact, the court found that

> [o]ne thread that seems to run through, notwithstanding Mr. Munchel's conduct here, is his apparent respect for law enforcement. And that's – it's a little bit counterintuitive because on the one hand his actions are an absolute disrespect of law enforcement, but on the other hand, the videos show him speaking with law enforcement in respectful ways, indicating his support of law enforcement. That's consistent with his prior actions and prior statements.
>
> And so the Court believes that when told to do something, that Mr. Munchel is capable of following those instructions and will comply with those orders.

Tr. at 182.

D.     **CONCLUSION: THE GOVERNMENT HAS PROVIDED NO EVIDENCE THAT THE MAGISRATE JUDGE'S FINDINGS WERE CLEARLY ERRONEOUS**

The Magistrate Judge thoughtfully and correctly applied the Bail Reform Act and concluded that "[b]ased upon the totality of the circumstances, giving due consideration to all the factors that the Court must consider in this case, . . . there are conditions that I can impose that will reasonably assure the safety of the community." Tr. at 175. The bail conditions set by the Magistrate Judge, in particular home confinement, electronic GPS monitoring, and third party custody, are sufficient to mitigate any risk to the community and to secure Mr. Munchel's appearance in court. For all of the reasons stated above, the government has not proved that the Magistrate Judge's factual findings were clearly erroneous. The Magistrate Judge's Order setting forth a combination of conditions of release should be allowed to take effect; the Court should reject the government's request to overturn it.

Respectfully submitted,


A. J. KRAMER
FEDERAL PUBLIC DEFENDER

           /s/
_____

SANDRA ROLAND
Assistant Federal Public Defender
625 Indiana Avenue, NW
Washington, DC 20004
(202) 208-7500
sandra_roland@fd.org