# Exhibit 1

1

1       UNITED STATES DISTRICT COURT
          MIDDLE DISTRICT OF TENNESSEE
2            NASHVILLE DIVISION

3

4   UNITED STATES OF AMERICA        )
                                    )
5   VS                             )   No. 3:21-mj-2668
                                    )
6   ERIC MUNCHEL                    )
    _____
7

8

9       BEFORE THE HONORABLE JEFFERY S. FRENSLEY,

10               MAGISTRATE JUDGE

11        **TRANSCRIPT OF ELECTRONIC RECORDING**

12             (via video conference)

13              January 22, 2021

14

15   _____

16

17

18

19

20   _____

21   PREPARED FROM **ELECTRONIC RECORDING** BY:

22   **Roxann Harkins, RPR, CRR**
     Official Court Reporter
23   801 Broadway, Suite A837
     Nashville, TN 37203
24   615.403.8314.
     roxann_harkins@tnmd.uscourts.gov
25

2

```
1    APPEARANCES:

2    For the Government:        JOHN BENJAMIN SCHRADER
                                JOSHUA KURTZMAN
3                               U.S. Attorney's Office
                                110 Ninth Ave S., Suite A961
4                               Nashville, TN 37203

5                               AHMED BASET
                                US Attorney's Office
6                               Washington, DC

7

8    For the Defendant:         CARYLL S. ALPERT
                                HENRY MARTIN
9                               Federal Public Defender's
                                   Office
10                              810 Broadway, Suite 200
                                Nashville, TN 37203
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

**I N D E X**

Government witness

**ANGELO DEFEO**

Direct Examination By Mr. Schrader ..................10
Cross-Examination By Ms. Alpert .....................28
Redirect Examination By Mr. Schrader ...............71
Recross-Examination By Ms. Alpert ..................77

Defense witnesses

**MS. MILLER**

Direct Examination By Ms. Alpert ...................85
Cross-Examination By Mr. Schrader ..................89
Redirect Examination By Ms. Alpert .................94

**WITNESS NO. 2**

Direct Examination By Ms. Alpert ...................97
Cross-Examination By Mr. Schrader .................110

**E X H I B I T S**

Government No. 1....Complaint and .................14
          Affidavit for 21-mj-2668

Defense No. 1....(SEALED)Ms. Miller's .............82
          Third-party custodian declaration
Defense No. 2....(SEALED)Employee .................82
          reference for defendant
Defense No. 3....(SEALED)Transcript ...............82
          of phone interview with ███████████
Defense No. 4....Picture of incident ..............82
Defense No. 5....(SEALED)Video of .................82
          incident
Defense No. 6....(SEALED)Video of .................82
          incident
Defense No. 7....(SEALED)Video of .................82
          incident
Defense No. 8....(SEALED)Video of .................82
          incident

4

1

2          The above-styled cause came to be heard

3    on January 22, 2021, before the Hon. Jeffery S.

4    Frensley, Magistrate Judge, when the following

5    proceedings were had to-wit:

6          **TRANSCRIPT OF ELECTRONIC RECORDING**

7                        **\*\*\***

8

9          THE COURT:  The number in this district

10   is 3:21-mj-2668.  We're conducting this proceeding by

11   video conference.  And there are a number of folks on

12   the conference.  Before we begin in earnest, I'm going

13   to open up the public access line.  I'll be calling my

14   conference line and we have a number of folks who will

15   be on that line.

16          I'm going to make an announcement to

17   them, reminding them to mute their phone and that

18   there is no recordings allowed of the proceedings.

19   And then we'll get started.  So if you-all can just

20   bear with me for a moment, we'll take it from there.

21          (Pause in proceedings.)

22          THE COURT:  Good afternoon, everyone.

23   This is Judge Frensley.  It is 2:09 in the afternoon

24   Central time here, and we are about to begin the

25   hearing in the matter of the *United States of America*

5

1    *versus Eric Munchel.*

2                A number of folks are participating on

3    this conference line, and before we begin the hearing,

4    I just want to remind you of a couple of things.

5    First of all, in order for us to efficiently conduct

6    this hearing and without interruption, I would ask

7    everyone on the conference line, please keep your

8    phone on mute.

9                And secondly, I want to remind you–all of

10   the Court's requirements that there are no recordings

11   allowed of any of the proceedings.  I'm going to place

12   the call on hold while I bring the parties on.  I will

13   announce the case, and we will begin from there.

14   Thank you all for being here today.

15                (Pause in proceedings.)

16                THE COURT:  All right, good afternoon.

17   We're here this in the afternoon in the *United States*

18   *of America versus Eric Munchel*, it's Case

19   No. 3:21–mj–2668.  This is a case that arises out of

20   the District of Columbia, that the case number in that

21   district is 1:21–mj–71.

22                We have we are here today, Mr. Munchel is

23   appearing by video conference and we have scheduled

24   this matter for a preliminary hearing and detention

25   hearing.  Ms. Alpert is here on behalf of Mr. Munchel.

6

1    And Ms. Alpert, if you could announce who else is

2    present for you and your client today.  Or with you

3    for your client.

4            MS. ALPERT:  Yes, Your Honor.  The

5    Federal Public Defender, Henry Martin is present.  And

6    I believe also my investigator, Brian Carter, has

7    telephoned in to this hearing as well.

8            THE COURT:  All right, very good.  Thank

9    you, Ms. Alpert.

10           And Mr. Schrader is here for the

11   United States.  Mr. Schrader, if you could announce as

12   well who else is present on the proceedings for the

13   government today.

14           MR. SCHRADER:  Yes, Your Honor.  Ben

15   Schrader from the United States.  We also have here

16   Ahmed Baset from the US Attorney's Office, and then a

17   colleague of mine here with the US Attorney's Office

18   in Nashville, Josh Kurtzman, who is handling

19   Ms. Eisenhart's matter, has always called in to

20   listen.

21           THE COURT:  Thank you, Mr. Schrader.  I

22   see on the screen we also have Ms. Putman here from

23   the US Probation Office.  Ms. Putman, if you could let

24   me know if anybody else from your office is

25   participating today as well for the record.

7

1          PROBATION:  Your Honor, this is Andrea

2     Testa from the probation office.  I'm here.

3          THE COURT:  Okay.  I think Ms. Putman's

4     screen might have frozen on her.  You might tell her

5     to refresh.  And anybody else from your office,

6     Ms. Testa?

7          PROBATION:  Officer Kim Haney.

8          THE COURT:  All right, very good.  Thank

9     you all very much.

10          Before we go any further, Ms. Alpert, did

11     you have a chance to speak with Mr. Munchel in advance

12     of today's proceedings?  And specifically, did you-all

13     discuss proceeding by video conference and does he

14     consent to do so?

15          MS. ALPERT:  Your Honor, we did have a

16     chance to speak.  He does consent to proceed by video

17     conference.  I also wanted to let the Court know just

18     on the screen is appearing one of our witnesses, which

19     will -- if the Court's okay, we will announce at the

20     time we call her rather than now.

21          Yes.  Mr. -- Mr. Munchel is prepared to

22     proceed by video.

23          And lastly, Your Honor, I wanted to

24     mention that we have advised the government and would

25     advise the Court now that we would waive an identity

8

1    hearing.

2                    THE COURT:  Okay, very good.  Thank you,

3    Ms. Alpert.  The Court is in receipt of the Pretrial

4    Services Report, which I've reviewed.  I assume that,

5    Ms. Albert, you and the government have also received

6    a copy of that document and you can keep that document

7    at the completion of today's proceedings.

8                    Pursuant to the Due Process Protections

9    Act, the Court reminds the government of its

10   obligations under *Brady vs Maryland* to disclose

11   evidence favorable to the defendant and material to

12   the defendant's guilt or punishment.

13                   The government's ordered to comply with

14   *Brady* and its progeny.  And failure to do so in a

15   timely manner may result in consequences, including

16   dismissal of the indictment or information, exclusion

17   of government witnesses or evidence, adverse jury

18   instructions, dismissal of evidence -- or dismissal of

19   charges, rather, contempt proceedings, sanctions by

20   the Court or any other remedy that's just under the

21   circumstances.

22                   Mr. Schrader, is the government prepared

23   to go forward at this time?

24                   MR. SCHRADER:  We are, Your Honor, yes.

25                   THE COURT:  All right.  Ms. Alpert, are

9

1    you ready?

2             MS. ALPERT:  Yes, Your Honor.

3             THE COURT:  Okay.  I don't know if you

4    all have discussed this.  My -- my intention, absent

5    any other recommendation, that we would simply combine

6    the proof for purposes of the preliminary and

7    detention hearing in order for efficiency purposes.

8    And I'll certainly allow you the opportunity to argue

9    individually on each of those issues if you wish to do

10    so.

11             Is that acceptable to the government?

12             MR. SCHRADER:  Yes, Your Honor.

13             THE COURT:  Ms. Alpert?

14             MS. ALPERT:  It is.

15             THE COURT:  All right, very good.

16             Mr. Schrader, do you have any proof you'd

17    like to put on?

18             MR. SCHRADER:  I do, Your Honor.  The

19    government calls FBI Special Agent Angelo Defeo.  He's

20    here with me, and I'm just going to trade places and

21    try to speak up so the Court can hear me.

22             THE COURT:  Okay.

23             Good afternoon, Special Agent Defeo.  If

24    you could raise your right hand so I can swear you.

25

**ANGELO DEFEO**

1

2   called as a witness, after having been first duly

3   sworn, testified as follows:

4            THE COURT:  All right, very good.  If you

5   could please state your name and spell your name for

6   the record, please.

7            THE WITNESS:  Angelo Defeo, D-e-f-e-o.

8            THE COURT:  All right, very good.

9   Mr. Schrader.

10            MR. SCHRADER:  Thank you, Your Honor.

11                    **DIRECT EXAMINATION**

12   BY MR. SCHRADER:

13       Q.    Agent Defeo, good afternoon.

14       A.    Good afternoon.

15       Q.    Agent Defeo, where do you work?

16       A.    Federal Bureau of Investigation.

17       Q.    What's your title with the Federal Bureau

18   of Investigation?

19       A.    Special agent.

20       Q.    How long have you been a special agent

21   with the FBI?

22       A.    Approximately five years.

23       Q.    Where do you currently work, in other

24   words, the location?

25       A.    The Nashville residence agency.

1          Q.     Did you work at an FBI office prior to

2     coming to Nashville?

3          A.     Yes.  Prior to coming to Nashville, I

4     worked at the Chicago field office.

5          Q.     What kind of cases did you investigate in

6     the Chicago field office?

7          A.     Primarily domestic terrorism, as well as

8     other violent crime.

9          Q.     (indiscernible) investigate here?

10         A.     Domestic terrorism and various violent

11    crime.

12         Q.     What are your duties as a special agent

13    with the FBI?

14         A.     Conducting investigations related to

15    domestic terrorism, other acts of firearm violations.

16         Q.     Does that include things like executing

17    federal search warrants?

18         A.     Yes.

19         Q.     Agent Defeo, prior to becoming an FBI

20    special agent, what was your job?

21         A.     It was a senior United States Probation

22    Officer for the Southern District of Iowa.

23         Q.     How long did you have that job for?

24         A.     Approximately four and a half years.

25         Q.     Agent Defeo, did you have an opportunity

1    to investigate the storming of the United States

2    Capitol on January 6, 2021?

3            A.    (indiscernible).

4            Q.    And are you familiar with the complaint

5    and an affidavit in support of a complaint prepared in

6    connection with the arrest of a person named Eric

7    Munchel?

8            A.    Yes.

9            Q.    As part of that investigation related to

10   that complaint, did you conduct surveillance at

11   Mr. Munchel's residence here in Nashville?

12           A.    (indiscernible).

13           Q.    Did you also participate in the execution

14   of a federal search warrant at Mr. Munchel's residence

15   on January 10, 2021?

16           A.    Yes.

17               THE COURT:   Hang on just a minute.

18   Special Agent Defeo, maybe if you could speak up a

19   little bit, we're having trouble hearing you.

20   Ms. Alpert, you had your hand up.  Did you have the

21   same issue?  Okay, yeah.  If you could try to get a

22   little closer to the microphone and speak up.  You're

23   break up a little bit and we're having trouble hearing

24   you.

25               Go ahead, Mr. Schrader.

13

1          MR. SCHRADER:  (indiscernible).

2          THE COURT:  No worries.  Go ahead,

3    Mr. Schrader.

4    BY MR. SCHRADER:

5          Q.    Agent Defeo, did you also have an

6    opportunity to participate in Mr. Munchel's arrest on

7    January 10, 2021?

8          A.    Yes, I did.

9          Q.    I mentioned just a moment ago a complaint

10   and an affidavit in support of a complaint prepared in

11   connection with Mr. Munchel's arrest.  I'm showing you

12   what has been marked as Government's Exhibit 1, which

13   has previously been provided to the Court and to

14   counsel.  Do you recognize Government's Exhibit 1?

15          What is Government's Exhibit 1?

16          A.    Criminal complaint and support affidavit

17   for the complaint.

18          Q.    Is that a joint complaint that identifies

19   both Eric Munchel and Lisa Eisenhart as defendants?

20          A.    Yes, it does.

21          Q.    Was it issued out of the District Court

22   for the District of Columbia?

23          A.    Yeah.

24          Q.    Now, Agent Defeo, if permitted by the

25   Court, would you like to adopt the representations

14

1   underlying that affidavit as part of your

2   (indiscernible) today?

3         A.    Yes.

4               MR. SCHRADER:  Your Honor, at this time

5   I'd ask to move into evidence Government's

6   Exhibit No. 1.

7               THE COURT:  It will be admitted.

8               (Government Exhibit No. 1 was admitted.)

9   BY MR. SCHRADER:

10        Q.    Agent Defeo, do you see Mr. Munchel here

11  at the hearing today?

12        A.    Yes, I do.

13        Q.    Please identify Mr. Munchel for the

14  record.

15        A.    On the video screen he's to my top left

16  wearing an orange or yellow shirt behind bars.

17              MR. SCHRADER:  May the record reflect an

18  in-hearing identification of Mr. Munchel.

19              THE COURT:  It will be reflected.

20  BY MR. SCHRADER:

21        Q.    Agent Defeo, let me ask you first some

22  follow-up questions about the search warrant that you

23  mentioned at a residence.  Again, did you have an

24  opportunity to participate in the execution of a

25  federal search warrant specifically at 731 Shadowood

1    Drive at approximately 6 o'clock in the morning on

2    January 10, 2021?

3        A.    Yes, I did.

4        Q.    Can you just provide a summary of the

5    execution of that search warrant?

6        A.    Yes.  At approximately 6 o'clock in the

7    morning, agents from the Federal Bureau of

8    Investigation knocked and announced their presence at

9    the residence of 371 Shadowood Drive.  An individual

10   later identified as Witness No. 1 came to the door.

11   He was temporarily detained while the residence was

12   made safe by the agents.  After the agents made the

13   residence safe, the execution of the warrant -- search

14   warrant had taken place.

15       Q.    Agent Defeo, what relationship, if any,

16   did Witness 1 have to Mr. Munchel, Eric Munchel?

17       A.    Witness 1 identified himself as Eric

18   Munchel's brother.

19       Q.    Agent Defeo, are you familiar, first of

20   all, with the memorandum in support of pretrial

21   detention that the government filed in this case?

22       A.    (indiscernible).

23       Q.    In particular, are you familiar with a

24   photograph of a person alleged to be Eric Munchel

25   leaping over a railing in the chamber of the

1    United States Senate on page 9 of that memorandum?

2          A.    I am.

3          Q.    Agent Defeo, did you recover any items of

4    evidence during the execution of the search warrant at

5    731 Shadowood Drive that appeared to be similar to the

6    items that the person jumping over that railing was

7    bearing?

8          A.    (indiscernible).

9          Q.    What items?

10         A.    We recovered a tactical vest, a black

11   tactical vest with a patch on the front, one patch

12   being a United States of America flag with a skull on

13   top of it, as well as a -- what appeared to be a state

14   of Tennessee patch with a thin blue line on it.

15               Additionally we recovered a cap, a shirt,

16   pants, boots and zip ties or flexicuffs at the

17   residence.

18         Q.    (indiscernible)?

19         A.    Flexicuffs are typically used by law

20   enforcement officers to detain individuals.

21         Q.    What color were they?

22         A.    White.

23         Q.    And how many pairs of those did you find

24   in the residence?

25         A.    Approximately four or five, maybe.

1          Q.    Did you ask Witness 1 if he knew anything

2    about where those zip ties or flex cuffs had came

3    from?

4          A.    Witness 1 admitted that the zip ties came

5    back from Washington, DC with Eric Munchel.

6          Q.    And you also mentioned some clothing, a

7    cap, tactical vest.  Did Witness 1 have anything to

8    say about who those items belonged to?

9          A.    Yes, he confirmed that they belonged to

10   Eric Munchel.

11         Q.    In addition to those items of evidence,

12   Agent Defeo, did agents recover any firearms or

13   ammunition evidence inside the residence?

14         A.    Yes.

15         Q.    And what did they recover?

16         A.    Approximately 15 firearms ranging from

17   AR-style weapons, a sniper rifle with a tripod,

18   multiple pistols, and I would say hundreds of rounds

19   of ammunition.

20         Q.    Agent Defeo, are you familiar with what's

21   known as a sniper rifle?

22         A.    Yes.

23         Q.    What's a sniper rifle?

24         A.    Long rifle that is meant primarily for

25   long distance targets or shooting.

18

1          Q.      (indiscernible) tripods at the end of a

2     barrel as well?

3          A.      They can.

4          Q.      Did you recover any items like that

5     inside the residence?

6          A.      Yes.

7          Q.      How many of those items?

8          A.      I believe one.

9          Q.      Did you recover -- did you say you

10    recovered multiple assault-style rifles?

11         A.      Correct.

12         Q.      Agent Defeo, are you familiar with what's

13    known as a drum magazine?

14         A.      Yes.

15         Q.      What's a drum magazine?

16         A.      It's a magazine that's intended to have a

17    high capacity, high number of rounds allowing the user

18    to fire more rounds than what is typically allowed for

19    the weapon.

20         Q.      Did you recover any drum-style magazines

21    inside the residence?

22         A.      Yes, we did.

23         Q.      How many?

24         A.      One.

25         Q.      Agent Defeo, did you recover any duffle

1    bags that contained ammunition?

2         A.    We took one duffle bag that had a large

3    number of filled magazines for a -- what appeared to

4    be an assault-style rifle.

5         Q.    In other words, a duffle bag containing

6    loaded magazines?

7         A.    (indiscernible).

8         Q.    Could you estimate the number of

9    magazines?

10        A.    A guess would be maybe 20 or 30.

11        Q.    Agent Defeo, as you sit here today, do

12   you have any evidence that any of these items,

13   firearms or ammunition evidence (indiscernible)?

14             THE COURT:  I'm sorry, you broke up.  The

15   answer to that question?

16             THE WITNESS:  No, Your Honor.

17             THE COURT:  Okay.

18   BY MR. SCHRADER:

19        Q.    Agent Defeo, when you-all were at the

20   residence, did you have an opportunity to interview

21   Witness 1 about the whereabouts of the defendant and

22   his mother, Ms. Eisenhart, on or about January 6,

23   2021?

24        A.    Yes.

25        Q.    And what is it that Witness 1 told you

1    about Mr. Munchel and Ms. Eisenhart's whereabouts?

2          A.    He indicated that Mr. Munchel and his

3    mother drove to Washington, DC for the Stop the Steal

4    rally that was to occur in Washington, DC on

5    January 6, 2021.

6          Q.    Did Witness 1 tell you anything about

7    Mr. Munchel and Ms. Eisenhart's state of mind,

8    specifically with respect to the outcome of the

9    presidential election in 2010?

10          A.    Witness 1 did indicate that Mr. Munchel

11    and his mother were upset about the outcome of the

12    election in 2020.

13          Q.    Did Witness 1 travel with them to DC or

14    remain in Nashville?

15          A.    Witness 1 remained in Nashville.

16          Q.    Did Witness 1 provide you any information

17    about when Mr. Munchel, meaning the defendant, and

18    Ms. Eisenhart returned from DC to Nashville?

19          A.    Witness 1 indicated that Mr. Munchel and

20    Ms. Eisenhart returned after the rally in

21    Washington, DC.

22          Q.    Did Witness 1 provide you any information

23    about where Ms. Eisenhart went at that time after

24    returning from DC to Nashville?

25          A.    Witness 1 indicated that Ms. Eisenhart

21

1   spent the night in Nashville and then returned to

2   Georgia the next day.

3        Q.   Agent Defeo, when you executed the search

4   warrant at the residence that morning, was the

5   defendant present?

6        A.   He was not.

7        Q.   Was Witness 1 able to provide you with

8   any information about where the defendant was at that

9   time?

10        A.   He was not.

11        Q.   When was the last time, according to

12   Witness 1, he had seen the defendant?

13        A.   Talking to Witness 1, he had seen the

14   defendant approximately one to two days prior when he

15   was reportedly going to work.

16        Q.   Did Witness 1 receive a call from anyone

17   at the defendant's place of work?

18        A.   Witness 1 indicated that Mr. Munchel's

19   employer had called Witness 1 to inquire as to where

20   he might be.

21        Q.   Was there any communication you're aware

22   of between the defendant and Witness 1 after the

23   defendant left that day to go to work but never showed

24   up?

25        A.   Witness 1 indicated there may have been

22

1    one text message in which the defendant stated that he

2    was okay but did not give any indication as to his

3    whereabouts or any other information.

4           Q.    Agent Defeo, was Witness 1 able to

5    provide you with any information about (indiscernible)

6    at that time?

7           A.    No, he was not.

8           Q.    Did he know where his brother was?

9           A.    (indiscernible).

10          Q.    Agent Defeo, did you also learn at some

11   point that the defendant had been staying for those

12   few days with a female I'll refer to as Witness 2?

13          A.    Yes.

14          Q.    Did you have an interview to interview

15   Witness 2?

16          A.    Yes, we did.

17          Q.    Do you know whether Witness 2 has

18   obtained any electronic devices from the defendant?

19          A.    She did obtain a cell phone from the

20   defendant.

21          Q.    Was that a red iPhone?

22          A.    Yes.

23          Q.    Did Witness 2 tell you -- well, did

24   Witness 2 have any communications or conversations

25   with the defendant while she was staying with him?

23

1      A.     Yes, she did.

2      Q.     Did the defendant say anything to

3   Witness 2 about why he was giving her the phone?

4      A.     Stated that there was a video from

5   January 6, 2021, and he wanted Witness 2 to have the

6   cell phone so as the video on the cell phone could not

7   be manipulated or (indiscernible) by law enforcement.

8      Q.     Agent Defeo, are you familiar with a --

9   you mentioned this already, but the photograph of the

10  person alleged to be Mr. Munchel jumping over a

11  railing in the Senate chamber.  Do you recall that

12  photograph?

13     A.     Yes.

14     Q.     Did the defendant say anything to

15  Witness 2 about who was depicted in that photograph?

16     A.     Witness 2 indicated that the defendant

17  confirmed that was him in the photograph.

18     Q.     Going back now to the memorandum in

19  support of pretrial detention that the government

20  filed in this case, are you familiar with a portion of

21  that memo, Agent Defeo, that includes a description of

22  the substance of a video purportedly captured by a

23  cell phone that the defendant had mounted to his chest

24  on January 6, 2021, at pages 17 through 20 of that

25  memo?

1          A.      I am.

2          Q.      Did you review that portion of the memo?

3          A.      I have.

4          Q.      And you've reviewed that video as well?

5          A.      Yes, I have.

6          Q.      And is the description that's captured

7     there on pages 17 through 20 of the government's

8     detention memo a fair and accurate description of the

9     substance of the video?

10         A.      Yes, it is.

11         Q.      Does that include the -- there were

12    certain statements that were quoted in there

13    (indiscernible) to the defendant and Ms. Eisenhart.

14    Were those accurate quotations?

15         A.      Yes.

16         Q.      Let me ask you about just one portion of

17    that video.  There's a portion of the video where the

18    defendant appears to come into contact with a couple

19    of people who are referred to as Oathkeepers.  Do you

20    recall that portion of the video?

21         A.      Yes, I do.

22         Q.      Could you just summarize that portion of

23    the video for the Court?

24         A.      The defendant comes in contact with

25    individuals who are dressed in what appears to be

1    tactical gear.  He says something about them being --

2    or identifies them as being Oathkeepers.  One of the

3    individuals states that at least 65 more of them are

4    coming.  And at the end of the interaction, the

5    defendant fist bumps the individual (indiscernible).

6         Q.    Are you familiar with the Oathkeeper

7    organization?

8         A.    Yes, I am.

9         Q.    How are you familiar with the

10   Oathkeepers?

11        A.    I work primarily domestic terrorism

12   violations.  The Oathkeepers are considered to be

13   antiauthority or antigovernment militia-style group.

14        Q.    Do they (indiscernible) with firearms?

15        A.    They do.

16        Q.    They appear to have military-style

17   training?

18        A.    Yes, they do.

19        Q.    Is it fair to describe them as a militia?

20        A.    (indiscernible).

21        Q.    And how would you describe Mr. Munchel's

22   interaction with the Oathkeepers?

23        A.    I would describe the interaction as

24   positive.  He identified them pretty quickly and

25   obviously was in support of them, giving them a fist

26

1    bump before moving on.

2          Q.    And Agent Defeo, one last set of

3    questions.  In the photograph of the person alleged to

4    be Mr. Munchel and the banister of the Senate chamber

5    and another photograph that depicts a person

6    (indiscernible) Mr. Munchel and his mother walking

7    outside the Capitol -- well, first of all, are you

8    familiar with those photographs?

9          A.    Yes, I am.

10         Q.    You understand they appear in the

11   government's detention memo as well?

12         A.    Yes.

13         Q.    Does Mr. Munchel in those photographs

14   appear to have a Taser -- well, an item on his hip and

15   a holster?

16         A.    Yes, it appears that there's something on

17   his right hip.

18         Q.    Is there evidence you're aware of that

19   that item is, in fact, a Taser?

20         A.    Yes.

21         Q.    And there is some reference to that in

22   the affidavit in the support of complaint, but can you

23   just summarize the evidence that that item is, in

24   fact, a Taser?

25         A.    Later on on the evening of the 6th

1    Mr. Munchel was approached by Metro police officers on

2    the street of Washington, DC because he had something

3    on his hip that might have been construed as a pistol

4    of some sort.  Metro police officers made contact with

5    Mr. Munchel, detained him temporarily to determine

6    that, indeed, it was a Taser that was on his hip.

7         Q.   Are you aware of interaction with the

8    Metropolitan police where they actually seized a Taser

9    from his person?

10        A.   Yes, they take the Taser from him.

11        Q.   Do you understand from another incident

12   outside of a Grand Hyatt hotel where police

13   (indiscernible) may be armed with a firearm but, in

14   fact, it was a Taser; is that right?

15        A.   (indiscernible).

16        Q.   And then did you recover any items of

17   evidence from the execution of the search warrant at

18   731 Shadowood Drive lending further credence to the

19   evidence here that that item was a Taser?

20        A.   Yes, during the execution of the search

21   warrant, we recovered what appeared to be the

22   packaging for a Pulse Taser.

23        Q.   Agent Defeo, what is a Taser?

24        A.   It is a less-than-lethal use of force

25   method that emits an electrical force to temporarily

28

1   incapacitate a subject.

2             MR. SCHRADER:  One moment, Your Honor.

3             THE COURT:  Take your time.

4             MR. SCHRADER:  No further questions,

5   Your Honor.

6             THE COURT:  All right.  Very good.

7             Ms. Alpert, you may ask.

8             MS. ALPERT:  Thank you, Your Honor.

9                    **CROSS-EXAMINATION**

10  BY MS. ALPERT:

11        Q.   All right.  Agent Defeo, how many reports

12  did you prepare so far in connection with this case?

13        A.   (indiscernible) any reports in connection

14  with this case.

15        Q.   Okay.  Have you written up any reports or

16  memoranda connected to Mr. Munchel?

17        A.   No.

18             THE COURT:  Ms. Alpert, before you begin,

19  I need to pause for just a minute, if everybody could

20  just sort of hold tight for me for a minute, please.

21  Thank you.

22             (Pause in proceedings.)

23             MS. ALPERT:  Your Honor, I'm going to

24  step away for one second.  I'll be right back.

25             THE COURT:  Okay, we're back on.  Thank

1    you.  Appreciate your patience.  We were having some

2    issues with our conference line, and I think I've got

3    those resolved now.  So thank you all, and thank you

4    to everyone who's on the conference line.  Again, just

5    remind you-all on the conference line to please keep

6    your phones on mute and not to disrupt the

7    proceedings.  Thank you.

8                You can continue, Ms. Alpert.

9    BY MS. ALPERT:

10        Q.    Agent Defeo, I think I had just asked you

11   if you had written any reports at all related to

12   Mr. Munchel.

13        A.    Correct.  To my recollection I have not.

14   We do coauthor all of our interview reports, so I may

15   have coauthored (indiscernible).

16        Q.    You co- -- oh, I'm sorry, go ahead.

17        A.    (indiscernible).

18        Q.    Okay.  When you say you coauthored

19   something, do you review it before signing off on it?

20        A.    Yes.

21        Q.    And so you think you may have coauthored

22   some memos in connection with the interviews done in

23   connection with Mr. Munchel?

24        A.    Yes.

25        Q.    Are those the subsequent interviews that

1  you've referenced today in your court testimony?

2        A.    I do not remember off the top of my head

3  which ones I coauthored and I did not.

4        Q.    If you coauthored them -- if you

5  coauthored something in connection with Witness 1,

6  would you be -- is the statement that you made

7  something that you would have quoted exact statements

8  or summarized exact statements made by Witness 1?

9        A.    So ask the question again, I apologize.

10        Q.    Okay.  Explain what types of statements

11  you may have coauthored related to Witness 1 and

12  Witness 2.

13        A.    So typically when someone -- when another

14  agent writes a report, a coauthor simply reviews that

15  report, provides any feedback, the report is then

16  signed off by a supervisor.  We write reports all day,

17  so I cannot (indiscernible) which reports I coauthored

18  and which ones I did not.

19        Q.    Okay.  And is it fair to say that by

20  coauthoring it and reviewing it, you're adopting the

21  information that's in that report?

22        A.    That's fair.

23        MS. ALPERT:  Your Honor, I move for the

24  government to disclose any Jencks material related to

25  any reports prepared by agent -- or coauthored by

31

1    Agent Defeo in connection with Witness 1 and

2    Witness 2.

3              THE COURT:  Mr. Schrader, what do you

4    say?

5              MR. SCHRADER:  Your Honor, so if I can

6    address that.  So it was my understanding before the

7    hearing today that Agent Defeo had not, in fact,

8    authored either a report of the interview with

9    Witness 1 or Witness 2.

10             I have both of these items, and we

11   actually disclosed to the defense some of the

12   substance of those two interviews.  Specifically

13   substance that, in the government's view, mitigated

14   any detention arguments that we might have or

15   information that might arguably be exculpatory.

16             So we've already provided much of the

17   information that I think would be helpful to the

18   defense from those.  I don't have an issue with

19   providing them to the defense, but I can't do it as we

20   sit here right now.  And I also --

21             MS. ALPERT:  Your Honor --

22             MR. SCHRADER:  -- don't know exactly

23   whether it's -- Your Honor, I don't know whether

24   it's --

25             THE COURT:  Jencks or not?

1          MR. SCHRADER:  Exactly, right.

2          THE COURT:  Yeah, okay.  Ms. Alpert?

3          MS. ALPERT:  Well, Your Honor, I think

4    these are disclosable both for purposes of preliminary

5    hearing and detention hearing.  And I appreciate

6    Mr. -- Mr. Schrader did disclose some information,

7    which I understand he thinks is mitigating, but

8    certainly, as defense counsel, there may be other

9    materials in there that are not only *Brady*, but also

10   Jencks.  And regardless, at this stage I'm entitled to

11   both, if they are Jencks material, and I would submit

12   that they are, as pertains to Agent Defeo.

13          And, you know, the penalty for not

14   disclosing that information is it can be to strike the

15   witness's testimony (indiscernible).  If Mr. Schrader

16   could provide those to us now, we could at least have

17   time to review them in a short recess and come back

18   and ask any other questions.

19          I do want to proceed with the hearing

20   now.  If he could forward those to myself or

21   co-counsel, that would give us a chance to read them

22   and maybe take a short recess later and determine if

23   there's anything else we need to ask about.

24          MR. SCHRADER:  Your Honor, I don't have

25   an issue with providing it now.

33

1              THE COURT:  Okay.

2              MR. SCHRADER:  That's fine.

3              THE COURT:  Why don't you do that.  Go

4    ahead and if you'll forward an email to Ms. Alpert and

5    Mr. Martin.  And then let's go on with the

6    examination, and then we'll deal with that at the

7    completion of the examination.

8              Are you able to do that or have someone

9    do it, Mr. Schrader, while we're continuing?

10             MR. SCHRADER:  I'll need to -- because

11   this is my computer.  I need to pull it up here.  If

12   you give me just a moment, I can probably pull them up

13   and email them to counsel.

14             THE COURT:  That's fine, let's do that.

15   Just hang on for a minute, Ms. Alpert.  Mr. Schrader,

16   just let us know when you're ready.

17             MR. SCHRADER:  Thank you, Your Honor.

18   I've provided those reports to defense counsel.

19             THE COURT:  Thank you, Mr. Schrader.

20   Ms. Alpert, you can continue.

21             MS. ALPERT:  Thank you.

22   BY MS. ALPERT:

23       Q.    Agent Defeo, Mr. Munchel and

24   Ms. Eisenhart, his mother, drove to DC, just the two

25   of them; correct?

1      A.    Correct.

2      Q.    And the government's investigation in

3  this case reflected that Ms. Eisenhart made --

4  actually made her hotel reservation on January 4 at

5  the Grant Hyatt; correct?

6      A.    I'm unaware of that.

7      Q.    Now, so you -- what you've been doing so

8  far on this case, have you participated in the

9  investigation of Mr. Munchel and Ms. Eisenhart since

10  the beginning?

11      A.    Yes.

12      Q.    Okay.  And you've reviewed, I assume,

13  items that were on Mr. Munchel's phone?

14      A.    I have reviewed just one video, maybe two

15  videos on the phone.  I've not reviewed anything else

16  on the phone.

17      Q.    Okay.  You've also reviewed newspaper

18  articles and other information related to Mr. Munchel

19  from the Internet?

20      A.    I've seen news coverings of the arrests,

21  yes.

22      Q.    Are you the case agent for this case?

23      A.    I would consider myself a cocase agent.

24      Q.    Okay.  And who is the case agent?

25      A.    Special Agent Christopher Potts.

35

1          Q.     Sorry, cocase agent, okay.

2                 All right.  Do you have any reason to

3     believe that Ms. Eisenhart did not make her hotel

4     (indiscernible)?

5          A.     I'm so sorry.  Could you ask that one

6     more time?

7          Q.     Yes.  If other records reflect that

8     Ms. Eisenhart made her hotel reservation on January 4,

9     do you have any reason to dispute that at this point?

10         A.     No, I've not reviewed any hotel records

11     whatsoever.

12         Q.     There's no indication that Ms. Eisenhart

13     planned -- or Mr. Munchel planned in advance to go to

14     DC; correct?

15         A.     Correct, I have no information about

16     that.

17         Q.     And your investigation also showed that

18     they arrived in DC very early in the morning on

19     January 5, like after midnight on the 4th, early

20     morning January 4; correct?

21         A.     (indiscernible).

22         Q.     Mr. -- Mr. Schrader mentioned on direct

23     an incident on January 5, on the evening of January 5,

24     a video taken outside -- somewhere outside in

25     Washington, DC; correct?

36

1          A.    I don't recall if that was January 5 or

2     January 6.

3          Q.    Okay.  There's a video that -- where

4     Mr. Munchel interacts with local DC police officers;

5     correct?

6          A.    Correct.

7          Q.    And if -- it was an evening; correct?

8          A.    Correct, it was dark.

9          Q.    Do you have any reason to dispute that

10    that happened on January 5 as opposed to January 6?

11         A.    No.

12         Q.    Okay.  And that evening what the video --

13    is it fair to say that the video shows Mr. Munchel was

14    stopped by some DC police officers as he was walking

15    down the street?

16         A.    Correct.

17         Q.    And the officers (indiscernible) that

18    they thought he had a gun because he had a holster of

19    some sort that he was wearing visibly; correct?

20         A.    Correct.

21         Q.    And he explained to them that it was a

22    Taser, not a gun; correct?

23         A.    That's correct.

24         Q.    And in the video, you know, the -- it's

25    about a three or four-minute interaction with the

1    police or reflects at least three or four minutes of

2    the interaction?

3           A.    Possibly, yes.

4           Q.    Okay.  Just backing up for a minute, this

5    video came from Mr. Munchel's cell phone; correct?

6           A.    I believe so.

7           Q.    The video that -- it appears that it's a

8    video that he recorded on his cell phone --

9           A.    Yes.

10          Q.    -- as he was walking around?

11                Okay.  And so in the interaction Mr.

12   Munchel is polite with the police officers; correct?

13          A.    That is correct.

14          Q.    He doesn't try to flee; is that correct?

15          A.    No, ma'am.

16          Q.    And he truthfully answered the officer's

17   questions for him about his identity and what he was

18   doing and that type of thing; correct?

19          A.    Yes.

20          Q.    And there was some onlookers, some other

21   people in the area who started to approach the

22   interaction between Mr. Munchel and the police

23   officers; correct?

24          A.    That's correct.

25          Q.    And is it fair to say that some of the

1    people approaching expressed concerns about what was

2    going on?

3          A.    Yes, that's fair.

4          Q.    And some of the people appeared to be

5    hostile toward the police officers?

6          A.    It did appear that way.

7          Q.    And Mr. Munchel actually said, don't

8    worry about this -- he didn't know those people;

9    correct?  There's not any indication he knew those

10   people?

11         A.    There's no indication of that.

12         Q.    And in the video Mr. Munchel is telling

13   these people, who are kind of getting hostile to the

14   police, don't worry about this, the police are just

15   doing their jobs, no problem, something along those

16   lines; correct?

17         A.    Yes.

18         Q.    And then the police allowed him to leave

19   with his Taser?

20         A.    I believe so.

21         Q.    It's fair to say he still had the Taser

22   after that interaction with the police; correct?

23         A.    Yes, that's fair to say.

24         Q.    And it's actually legal to have a Taser

25   in DC, which is why the police let him leave; correct?

1          A.     I'm unaware of the laws in DC, but I

2     assume if the police let him leave with it, than it

3     wasn't in violation of any law.

4          Q.     Okay.  So I want to turn now to

5     January 6, the day of the rally.  You talked about

6     this a little bit on direct with Mr. Schrader.  Your

7     investigation revealed that Mr. Munchel and his mother

8     left their hotel, the Grant Hyatt, around midday that

9     day; correct?

10         A.     Yes.

11         Q.     And they're -- I think Mr. Schrader may

12    have referenced, they were carrying coffee, walking

13    down the street; correct?

14         A.     I'm sorry, your video feed broke up

15    again, I apologize.

16         Q.     Oh, okay, I'm sorry.

17              MS. ALPERT:  Your Honor, has my video

18    feed been breaking up frequently, because I will

19    refresh, if necessary.

20              THE COURT:  Not for me.

21              MS. ALPERT:  I'm not having any issues --

22              THE COURT:  I haven't had any problem

23    with you.  The only issues I've had with this hearing

24    is just the US Attorney's Office, their volume has cut

25    in and out a little bit, but I've been able to

1   understand the testimony.  And that's why I haven't

2   said anything other than the times I have, so.

3               MS. ALPERT:  Okay.

4   BY MS. ALPERT:

5        Q.    Agent, just let me know if you don't hear

6   a question again, thank you.

7        A.    Absolutely.

8        Q.    So he and his mother were walking down

9   the street in Washington, DC carrying coffee; correct?

10       A.    Correct.

11       Q.    And they were headed -- they were walking

12  toward the Capitol; correct?

13       A.    Yes, ma'am.

14       Q.    And they were -- is it fair to say there

15  were hundreds, if not thousands, of other people there

16  doing the same thing, walking in the streets toward

17  the Capitol that day?

18       A.    Yes.

19       Q.    Now, you indicated, I believe, that you

20  saw the video -- the video that Mr. Munchel took on

21  January 6 that day once he and his mother got to the

22  rally area of the Capitol; correct?

23       A.    Yes.

24       Q.    And that's a total of -- that's a total

25  of about 50 minutes on the video?

1          A.     Yeah, I believe it's approximately 50

2     minutes, yes.

3          Q.     Okay.  And --

4                 THE COURT:  I'm sorry, did you say -- I

5     apologize.  Is that 50, five zero or 15, one five?

6                 MS. ALPERT:  50, five zero.

7                 THE COURT:  Thank you.  Go ahead.

8     BY MS. ALPERT:

9          Q.     And from other footage that -- or

10    investigation that you've done, that -- it appears

11    that that footage is from a cell phone, again, that

12    Mr. Munchel has mounted on his chest, on his vest;

13    correct?

14         A.     Correct.

15         Q.     Now, you indicated on direct that -- that

16    the summary that Mr. Schrader put in his memorandum to

17    the Court on pages I think 17 to 20, accurately

18    summarized that video; correct?

19         A.     Yes.

20         Q.     Is it fair to say, though, that

21    Mr. Schrader did not include each and every fact from

22    that video?

23         A.     I believe it was intended to be a summary

24    from that video.

25         Q.     And is it fair to say it was intended to

1    be a summary in support of the government's desire to

2    detain Mr. Munchel?

3          A.    It was just in a detention memorandum.

4          Q.    And that memorandum was in support of the

5    government's desire to detain Mr. Munchel?

6          A.    Yes.

7          Q.    And this -- you obtained -- I'll come

8    back to that in a minute.

9              From your investigation, does it appear

10   that this video starts just maybe a few minutes before

11   2:00 p.m.?

12        A.    I'm not entirely sure what time the video

13   actually starts in the time stamp.

14        Q.    Okay.  And in -- throughout this video, I

15   want to talk about a few other things that aren't as

16   clear from the government's memorandum.  Or that might

17   not be as clear.

18             In the video, much of what Mr. Munchel is

19   doing is following his mother; correct?

20        A.    Yes.

21        Q.    And not only following her, but keeping a

22   firm grasp on a handle that's on the back of her vest;

23   correct?

24        A.    Yes.

25        Q.    Because he's trying -- it's pretty clear

43

1    from the video he's trying not to let her get lost in

2    the crowd or too far ahead of him or anything like

3    that; correct?

4         A.    Yes.

5         Q.    And in the video, while he and his mother

6    are outside -- outside the Capitol on the grounds, at

7    some point he says that he is not going to go into the

8    Capitol with weapons; correct?

9         A.    That's correct.

10        Q.    And at that point his mother says, well,

11   let's go put our stuff down in our backpacks; correct?

12        A.    That's correct.

13        Q.    And then they get to the backpacks and

14   Mr. Munchel says, take my stuff off, take my weapons

15   off before I go in there; correct?

16        A.    Something to that effect, yes.

17        Q.    Okay.  And they actually do leave a

18   backpack behind with some other people; correct?

19        A.    Yes.  It's unclear as to what was being

20   put in or taken out of the backpack in the video.

21        Q.    Okay.  On this video you can also hear

22   people talking and saying that Congress has been shut

23   down; correct?  While they're still outside, you can

24   hear people talking indicating that Congress has been

25   shut down?

44

1          A.     I don't recall that specific statement

2     being made on the video.

3          Q.     Okay.  When you -- Mr. Schrader mentioned

4     an encounter with Oathkeepers in the crowd outside.  I

5     know you already mentioned -- it was very crowded

6     outside on the grounds of the Capitol throughout this

7     video; correct?

8          A.     Yes.

9          Q.     People are kind of walking all over the

10    place, passing each other, helping each other get up

11    and down from walls and such like that; correct?

12         A.     Yes, there was lots of people, quite

13    chaotic.

14         Q.     Okay.  And the -- when you're referring

15    to (indiscernible), Mr. Munchel's mother actually came

16    upon this person that you're indicating was an

17    Oathkeeper first; correct?

18         A.     It's unclear who came upon them first

19    from just the statement that Mr. Munchel made

20    (indiscernible) Oathkeeper.

21         Q.     But she engages in conversation with the

22    person; correct?

23         A.     Yes.

24         Q.     And you indicated that Mr. Munchel was

25    friendly to this person, whoever the Oathkeeper person

1   was; correct?

2        A.    Yes.

3        Q.    He was also friendly to pretty much

4   everyone else he encountered outside in the crowd;

5   correct?

6        A.    I didn't see him engage in any type of

7   violence or anything of that sort, if that's what

8   you're asking.

9        Q.    And he wasn't rude to anybody?

10       A.    No.

11       Q.    He was assisting people.  For example, he

12  assisted some people who appeared to have been tear

13  gassed.  He was helping them climb over a step or

14  something; correct?

15       A.    Correct.

16       Q.    And he gave a hand to some people who

17  seemed to be maybe not super fit and needed a hand

18  getting up a step or something like that.  He did that

19  as well several times?

20       A.    It appeared that he was being overly

21  positive towards other people, yes.

22       Q.    Okay.  Just like -- and that's the same

23  type of thing he was saying to the Oathkeeper person,

24  whoever that was?

25       A.    Yes, he (indiscernible).

46

1          Q.    You have no indication or information

2    that Mr. Munchel is affiliated with the Oathkeepers;

3    correct?

4          A.    Correct.

5          Q.    All right.  So I want to turn now to when

6    they get in (indiscernible), when Mr. Munchel and his

7    mother approach the Capitol.  And the whole time

8    they're heading up toward the Capitol, again,

9    (indiscernible) following his mother; correct?

10         A.    Yes, correct.

11         Q.    And then they go into the Capitol and

12   they're inside the Capitol for probably about 11 or

13   maybe 12 minutes; correct?

14         A.    I do not recall the specific time, but it

15   was about I would say 10 or 15 minutes or so.

16         Q.    Okay.  And then when he goes into the

17   Capitol with his mother -- well, first of all, when

18   they walk into the Capitol, they walk in through an

19   open door; correct?  An unlocked door?

20         A.    Yes.

21         Q.    And as they walk in, there's law -- a

22   couple of law enforcement officers to their right that

23   are standing inside the doorway allow people to pass.

24   The officers are not, like, telling people to leave --

25   or they're standing there, they're not actively

47

1   telling people to leave or anything like that;

2   correct?

3        A.    That's what it appears in the video, yes.

4        Q.    And when they -- when Mr. Munchel goes

5   inside, he's attempting to limit his mother's actions

6   inside the Capitol?

7        A.    I wouldn't understand -- or I wouldn't

8   know what his intentions were with his mother.

9        Q.    Okay.

10        A.    (indiscernible).

11        Q.    Let me -- let me go through this a little

12   bit more.  Well, first of all, when they walk up, they

13   walk a set of stairs and he is still holding on to his

14   mother tightly by the strap on the back of her back;

15   correct?

16        A.    Yes.

17        Q.    And then about two minutes after they get

18   inside, Mr. Munchel asks his mother, what's your goal

19   here, Mom; correct?

20        A.    Yeah, something to that effect, yes.

21        Q.    Okay.  And then a couple minutes after

22   that, Mr. Munchel says to his mother, when she starts

23   going down some hallway, he says, we don't want to get

24   too split up.  We don't want to get stuck in here

25   because this is not a place for us, something like

48

1    that; correct?

2         A.    Correct.

3         Q.    While they're in there for that short 10

4    to 12, 15-minute period, Mr. Munchel is also telling

5    other people inside not to vandalize; correct?

6         A.    That's correct.

7         Q.    He said, so about four minutes after he's

8    been in the building he's telling people, don't

9    vandalize anything, we aren't Antifa; correct?

10        A.    With a little bit more colorful language,

11   but, yes, that is the effect.

12        Q.    Okay.  And then, you know, a few -- less

13   than a minute later he's saying "don't break shit" to

14   people?

15        A.    Correct.

16        Q.    And then he makes another comment about,

17   hey, easy, easy, easy, no vandalizing shit; correct?

18        A.    Yes.

19        Q.    And then after -- again, he repeats "no

20   vandalizing shit" again some time after that.  He says

21   it a number of times to people; correct?

22        A.    Yes, he says it multiple times.

23        Q.    And he also says something about "you

24   break shit, I break you;" correct?

25        A.    That's correct.

49

1          Q.     But, in fact, Mr. Munchel himself does

2     not engage in any vandalism inside the Capitol;

3     correct?

4          A.     Not that is recorded on the video.

5          Q.     Okay.  And not that you have determined

6     from any other investigation that's not on the video;

7     correct?  I didn't hear you, I'm sorry.

8          A.     That's correct.

9          Q.     Okay.  And he doesn't -- he doesn't

10    engage in destruction of property inside the Capitol?

11         A.     Not as indicated on the video or during

12    the course of our investigation, no.

13         Q.     And just to be clear, he hasn't engaged

14    in any vandalism or destruction of property outside of

15    the Capitol either, correct, to your knowledge?

16         A.     Again, just to my knowledge, no, I'm not

17    aware of that.

18         Q.     And he doesn't -- he didn't -- one

19    moment, please.

20         A.     Sure.

21         Q.     Just going back to what he was talking

22    about with his mother and -- as they walked by people,

23    he told people not to vandalize.  He then at some

24    point loses contact with his mother; correct?

25         A.     Yes, momentarily she goes off a different

50

1    hallway or something of that sort.

2         Q.    Okay.  And he's trying -- he's trying to

3    keep a reign on her.  At some point he says, about

4    five minutes in, Mom, where are you going, Mom, focus,

5    don't lose me; correct?

6         A.    That's correct.

7         Q.    A minute or two after that his mother is

8    walking onto the Senate balcony area, and he tells her

9    to be careful; correct?

10         A.    That's correct.

11         Q.    He asks her, Mom, where are you going,

12    what are you doing; correct?

13         A.    Yes, I believe so.

14         Q.    And says, Mom, be careful?

15         A.    Correct.

16         Q.    And this is -- this is while they're

17    all -- while the two of them are in that Senate

18    balcony area?

19         A.    Yes, the upper area of the Senate floor.

20    Correct.

21         Q.    Okay.  And while still -- and so -- at

22    this point he has lost his grasp on her vest.  He

23    doesn't have his grasp on her vest when he's asking

24    her, where are you going, what are you doing, be

25    careful; correct?

1        A.      That's correct.

2        Q.      And this is the same area where -- this

3    upstairs area of the Senate is the same area where the

4    photos that are on page 5 of the government's

5    complaint are; correct?  The two photos of -- that

6    you've identified as Mr. Munchel?

7        A.      Yes.

8        Q.      Okay.  And those photos are shrunk down

9    so it's focused just on the one individual; correct?

10       A.      I don't know how the -- if the

11   photographs were shrunken down or how they were

12   originally.

13       Q.      Okay.  Were you involved in preparing

14   these as exhibits to be included in the complaint?

15       A.      I did not have any (indiscernible).

16       Q.      Okay.

17       A.      (indiscernible).

18       Q.      So, first of all, let me ask you this.

19   Are you on page 5 of the complaint?

20       A.      I can be.

21       Q.      Okay.

22       A.      Yes, ma'am.

23       Q.      And I guess this is the affidavit in

24   support of the complaint, if we're being technical.

25   So the person behind the person that's -- behind the

52

1    person with the zip ties going over the railing, that

2    is not the -- the person behind that individual is not

3    Mr. Munchel's mother; correct?  It's someone else?

4         A.    Yes, we believe that's somebody else.

5         Q.    Okay.  And Mr. Munchel's mother, from

6    your investigation, appears to be ahead of him, not

7    behind him; correct?

8         A.    Yes, based on the video, the fact that

9    you can see her from his cell phone (indiscernible)

10   leads me to believe she was in front of him at that

11   point.

12        Q.    Okay.  In these two photos on page 5, you

13   see the individual going over the railing, has a hand

14   on -- has the right hand on the railing; correct?

15        A.    Correct.

16        Q.    I'm talking about the photo on the left.

17   And has the right foot resting on a chair; correct?

18        A.    Correct.

19        Q.    And then in the second photo, the person

20   is -- has their foot also -- has the left foot now on

21   a chair and is still holding onto the railing;

22   correct?

23        A.    Yes.  The left foot -- the right foot may

24   be in midair at that point, but it's pretty close.

25   It's hard to tell from this photograph, but...

1          Q.     And have you seen -- I know you don't

2     know if these photos were truncated, but have you seen

3     other photos of this railing area of the Senate

4     building?

5          A.     I'm sure at some point in our

6     investigation I've seen that.

7          Q.     And is it a fair statement to say that

8     the only way to get over that railing if you're in

9     that area is to climb over it or climb through it

10    somehow?

11         A.     I do not know.

12         Q.     So shortly -- a minute -- a couple

13    minutes after -- I'm going back to their time in the

14    Capitol.  A couple minutes after Mr. Munchel or the

15    person you guys have identified as Mr. Munchel is

16    stepping over the railing, Mr. Munchel says to his

17    mother, we need to find the exit; correct?

18         A.     Yes, he does state that at some point

19    during the video.

20         Q.     And then about 30 seconds or so after

21    that, on their way out he sees an officer -- or a

22    couple officers again standing on the side, not -- not

23    directing people or anything, just standing on the

24    side.  And he tells the officers, sorry, guys, I still

25    love you, something like that?

1          A.      Correct.

2          Q.      And then about another 30 seconds or so

3     later, Mr. Munchel passes additional law enforcement

4     officers, again standing there and this is, again, as

5     he and his mother are trying to find their way out of

6     the building; correct?

7          A.      Correct.

8          Q.      And then they leave the building shortly

9     after that?

10         A.      I believe the video cuts out about that

11    time.

12         Q.      You've no reason to believe that he

13    stayed in the building much longer than that; correct?

14         A.      (indiscernible).

15         Q.      With all of the police officers that

16    Mr. Munchel encountered, he wasn't yelling at them or

17    screaming at them; correct?

18         A.      That's correct.

19         Q.      He was polite to the officers when he

20    spoke with them at all?

21         A.      Correct.

22         Q.      He didn't harass them?

23         A.      No.

24         Q.      Okay.  He did not use force or violence

25    in any way on that day; correct?

1     A.    I can't say as far as the entire day, but

2   as far as the video evidence that we've uncovered, he

3   did not commit any acts of violence against law

4   enforcement that we saw.

5     Q.    Okay.  I mean, you said video evidence,

6   but really, of all the evidence you have in this case,

7   there's no evidence indicating he engaged in any sort

8   of physical violence at all; correct?

9     A.    That's correct.

10     Q.    So just -- so going back through what

11   happened inside the Capitol, he also had told his

12   mother not to touch anything; correct?

13     A.    I don't recall that specific statement.

14     Q.    Let me ask, is it fair to say that when

15   his mother was interviewed, she advised that

16   Mr. Munchel had said, don't touch anything?

17     A.    That's fair.

18     Q.    Okay.  He doesn't -- he tries to

19   discourage other people from breaking or vandalizing

20   anything?

21     A.    Correct.

22     Q.    And he basically is trying to keep tabs

23   on his mom throughout their time there?

24     A.    Yes.

25     Q.    Now, you talk about these zip ties that

56

1  are shown in the photos in the complaint.  At least

2  one of your witnesses told you that Mr. Munchel

3  brought the zip ties back from DC; correct?

4       A.   Yes.

5       Q.   And the video in this case reflects that

6  Mr. Munchel and his mother picked up these zip ties

7  from an open cabinet with zip ties on top of it;

8  correct?

9       A.   Yes, it appears that the zip ties were

10  either inside or on top of a cabinet inside the

11  Capitol.

12       Q.   And somebody was, like, handing them out

13  or something it looked -- it appears to be the case;

14  correct?

15       A.   It appeared that they were at least near

16  that cabinet.  I don't know if someone was handing

17  them out or what was happening there, but yes, you can

18  see where they originated from the cabinet.

19       Q.   Okay.  So there's no evidence that

20  Mr. Munchel planned to do anything with those zip

21  ties; correct?

22       A.   From the evidence we've determined, we

23  can't say (indiscernible) with them.

24       Q.   You have no -- nothing to indicate that

25  Mr. Munchel -- I'm not talking about other people, but

1    Mr. Munchel in particular, you have no evidence

2    indicating he has some plan to use those zip ties for

3    any purpose?

4              A.    (indiscernible).

5              Q.    I couldn't hear you, I'm sorry.

6              A.    Not at this time.

7              Q.    And did you read the *Sunday Times* article

8    that Mr. Schrader had attached to his memorandum for

9    the Court?

10             A.    I did not.

11             Q.    Okay.  Are you aware that Ms. Eisenhart

12   explained to that reporter that she had -- she and her

13   son picked up the zip ties to prevent them from

14   falling in the hands of bad actors?

15             A.    I'm unaware of that.

16             Q.    Are you aware that Ms. Eisenhart advised

17   in an interview that she had -- she and her son had no

18   violent intentions when they entered the Capitol

19   building?

20             A.    I'm not aware of the interview that

21   Ms. Eisenhart (indiscernible).

22             Q.    You have no evidence that Mr. Munchel did

23   anything but a spontaneous visit to DC with his mother

24   to attend the rally; correct?

25             A.    No evidence at this time.

1          Q.    Okay.  And you've no evidence --

2    obviously at this time, you've no evidence that

3    Mr. Munchel is affiliated in any way with any militant

4    groups; correct?

5          A.    That's correct.

6          Q.    Or militias; correct?

7          A.    Correct.

8          Q.    Or hate groups or any organized groups

9    that have any plans to do anything in DC; correct?

10         A.    Not at this time we do not.

11         Q.    And how many federal agents are currently

12   investigating this -- the Capitol rally?

13         A.    I have no idea.

14         Q.    Okay.  But if you -- if there was

15   information related to Mr. Munchel, that information

16   is being shared among the entire agency and other law

17   enforcement; correct?

18         A.    Information related to Mr. Munchel would

19   be on a need-to-know basis, which would be the case

20   agent here and the agents in the Washington field

21   office.

22         Q.    Okay.  So if negative information or

23   information that you guys you thought was important to

24   your prosecution came up about Mr. Munchel, you would

25   be made aware of it?

1      A.     That's correct.

2      Q.     And you haven't been made aware of any of

3  that information --

4      A.     Not at this time.

5      Q.     -- or information of that nature?  Okay.

6             So you mentioned that you took part in

7  the execution of the warrant, the search warrant at

8  Mr. Munchel's home that he shared with his brother.

9  And this warrant was executed -- this was on Sunday

10  morning, January 10; correct?

11      A.     Correct.

12      Q.     And in your interview with Witness 1,

13  Witness 1 advised that his brother and mother did not

14  plan to cause trouble at the rally; correct?

15      A.     That's correct.

16      Q.     And he actually said that Ms. Eisenhart

17  was unhappy with the political climate (indiscernible)

18  the election; correct?

19      A.     I'm sorry, you broke up.  One more time.

20      Q.     He said -- you indicated that he said

21  they were both unhappy with -- with the current

22  political climate and the 2020 election.  That's what

23  you said on direct; correct?

24      A.     Correct.

25      Q.     But, in fact, he indicated that

60

1    Ms. Eisenhart was the person who was very upset;

2    correct?

3            A.    That may be true that Ms. Eisenhart was

4    more upset than Mr. Munchel.

5            Q.    Okay.  And he also -- Witness 1 also told

6    you that Mr. Munchel traveled with his mother to DC to

7    protect her; correct?

8            A.    That's correct.

9            Q.    So Mr. Munchel wasn't home Sunday morning

10   when the FBI searched his house, so am I correct that

11   Agent Potts left his -- Special Agent Potts left his

12   number with someone for Mr. Munchel to call when he

13   could?

14           A.    That's correct.

15           Q.    And Mr. Munchel did call Agent Potts

16   later that morning; correct?

17           A.    That's correct.

18           Q.    And he explained to Agent Potts that he

19   had stayed the previous night with friends because of

20   all of the news media and exposure and wide exposure

21   of his personal information; correct?

22           A.    That's correct.

23           Q.    And that included his -- among other

24   things, his phone number and his address that had been

25   exposed on national social media; correct?

61

1          A.    That is what he described was happening
2    (indiscernible).
3          Q.    And did he explain that he had turned off
4    his own cell phone because of that because it was
5    blowing up with all of this -- people trying to
6    contact him?
7          A.    Yes, he did.
8          Q.    And the contacts that he was receiving
9    was, in large part, harassment from people where his
10   personal information had been disclosed on social
11   media; correct?  Is that correct?
12         A.    Yes, correct.
13         Q.    Oh, sorry, couldn't hear you.  Did --
14   have you had a chance to examine the phone to see,
15   like, the numbers of -- the amounts of calls that were
16   coming in and that type of thing yet?
17              MR. SCHRADER:  Objection, discovery
18   (indiscernible).
19              THE COURT:  I'm sorry, Mr. Schrader, I
20   think you said something, I couldn't hear you, though.
21              MR. SCHRADER:  I said objection, seeks
22   discovery.  (indiscernible) towards the ongoing
23   government investigation (indiscernible).
24              THE COURT:  Sustained.  Why don't you
25   reask the question.  I think you can ask him if he has

62

1    been able to determine whether there's any validity or

2    veracity, either way, articulated.  But let's don't

3    get into the further investigative efforts.

4    BY MS. ALPERT:

5        Q.    Were you able to verify that there had

6    been an extreme number of phone calls and messaging to

7    Mr. Munchel's phone?

8        A.    I've not reviewed Mr. Munchel's phone in

9    any capacity outside the one video that was provided

10   to me -- or the two videos that were provided to me.

11       Q.    Okay.  So you don't know yes or no what

12   that was about yet, okay.

13       A.    No.

14       Q.    So did Mr. Munchel also explain that he

15   had seen some news media vehicles at his house and

16   that was another reason he did not want to stay at his

17   home?

18       A.    I did not speak with Mr. Munchel.

19   Special Agent Potts did, so there may be some details

20   he provided to Special Agent Potts that I'm not aware

21   of.

22       Q.    Okay.

23       A.    (indiscernible).

24       Q.    And when he spoke with Agent Potts, he

25   then made arrangements to come meet Agent Potts at the

1    FBI field office; correct?

2         A.    That's correct.

3         Q.    And he arrived -- he did actually go to

4    the FBI and arrived there around 1:30 p.m.; correct?

5         A.    Correct.

6         Q.    And as he testified about earlier, he

7    wanted to make sure his phone that he had turned off

8    was properly preserved.  And he had actually gotten a

9    different phone after that to use to keep in touch

10   with family members because he couldn't use the other

11   phone without all the media attention, social media

12   attention; correct?

13        A.    I don't know why he got the other phone,

14   but he did have a separate phone and admitted to

15   (indiscernible) when he arrived at the FBI office.

16        Q.    Okay.  And then he had left the other

17   phone for safekeeping with Witness 2?

18        A.    Correct.

19        Q.    And I'm talking about his iPhone.  That's

20   what he left with Witness 2?

21        A.    Yes.

22        Q.    Okay.  And then he made arrangements so

23   that Witness 2 and an attorney provided that phone to

24   you and Agent Potts at a later time?

25        A.    I'm unaware how the arrangements were

64

1   made.  Again, that was Special Agent Potts that made

2   the arrangements.  Yes, Witness 2 and a attorney

3   provided that cell phone to the FBI.

4        Q.    You're not aware of any -- any refusal or

5   interference from Mr. Munchel in getting that phone

6   turned over to you; correct?

7        A.    Correct.

8        Q.    Okay.  I'd like to talk about your

9   interview with Witness 2 for a few minutes.  She told

10  you and Agent Potts that she had talked some with

11  Mr. Munchel about the events that took place at the

12  Capitol; correct?

13       A.    That's correct.

14       Q.    And she said that he had told her that

15  they had not planned to go to the Capitol or inside

16  the Capitol when they went to DC; correct?

17       A.    That's correct.

18       Q.    And he said it was his mother's idea to

19  enter the Capitol?

20       A.    Correct.

21       Q.    And he went in the building with her to

22  keep an eye on her?

23       A.    That is what he reported to Witness

24  No. 2, yes.

25       Q.    Okay.  And that's really corroborated by

1   the videotape as well; correct?

2       A.   Yes, he does obviously make an attempt to

3   keep her close, so.

4       Q.   Okay.  So I want to talk about some of

5   the items found with the search warrant.  You talked

6   about some guns that he had.  To your knowledge, all

7   of those guns are legally owned firearms; correct?

8       A.   Correct.

9       Q.   And they're all -- all of those items

10  are -- Mr. Munchel properly possessed all of those

11  items?

12      A.   To our knowledge, that is correct.

13      Q.   Okay.  Your investigation showed that

14  Mr. Munchel has a Tennessee firearms permit; correct?

15      A.   Yes, I believe it's a conceal carry

16  permit.

17      Q.   Okay.  Are you aware that it's an

18  advanced carry permit?

19      A.   I was not aware of that.

20      Q.   Okay.  And the -- am I correct that

21  advanced carry permits allow people to carry both

22  concealed and unconcealed weapons?

23      A.   Yes.

24      Q.   And all of the firearms were seized from

25  Mr. Munchel's house, they are no longer there?

1          A.     Correct.

2          Q.     And the ammunition as well?

3          A.     That's correct.

4          Q.     And your investigation so far has not --

5     has not revealed anything to suggest that Mr. Munchel

6     had planned to go back to DC for Inauguration Day or

7     for any other rallies; correct?

8          A.     That's correct, we have no evidence of

9     any (indiscernible).

10              MS. ALPERT:  Could I have just a moment,

11    Your Honor?

12              THE COURT:  You may.  And while you're

13    waiting, Ms. Alpert, also, if you could have the

14    opportunity to check and see if you received the

15    documents from Mr. Schrader and let me know once

16    you've had a chance to review those as well.

17              MS. ALPERT:  Okay.  Could I ask the Court

18    if we could take maybe a five or 10-minute recess,

19    then, to look at those documents?

20              THE COURT:  Do you have them?

21              MS. ALPERT:  Oh, let me check.  Yes.

22    Looks like they've arrived.

23              THE COURT:  Very good.  Did you have any

24    other questions before you look at that that you

25    wanted to ask?

1          MS. ALPERT:  No, sir.  I might have some
2    questions after, but not before.
3          THE COURT:  Very good.  Let's take about
4    five minutes.  And I'll just -- I'll get back on here
5    in just a minute.  Thank you.
6          MS. ALPERT:  Thank you.
7          (Whereupon, a break was taken.)
8          THE COURT:  Ms. Alpert, I see that you're
9    back.  Have you had a chance to review what you needed
10   to?
11         MS. ALPERT:  I have, Your Honor.  And I
12   am ready to get started if the Court and everyone else
13   is ready.
14         THE COURT:  Mr. Schrader, are you back,
15   are you ready?  All right, very good.  Thank you.
16         Go ahead, Ms. Alpert.  You can continue.
17         MS. ALPERT:  Thank you.  Just a few
18   questions -- few more questions for Agent Defeo.
19   BY MS. ALPERT:
20        Q.   Agent Defeo, have you had a chance during
21   this break also to review the interviews, the FBI 302s
22   of Witnesses 1 and 2?
23        A.   Not during this break, no.
24        Q.   Okay.  But you're familiar with both of
25   those; correct?

1         A.      Correct.

2         Q.      So in the interview with Witness 1, he --

3     he did state that Ms. Eisenhart was not happy with the

4     current political climate or the results of the

5     election and wanted to voice her opinion.  He just

6     said Ms. Eisenhart; correct?

7         A.      Correct.

8         Q.      He also advised that he talked with his

9     brother and his brother had advised that he -- didn't

10    have any plans and the family is nonviolent and he

11    advised that Mr. Munchel has a nonviolent ideology.

12    Excuse me, let me ask that again.  That was very

13    confusing, sorry.

14            Witness 1 said that Mr. Munchel had told

15    him that he had no plans to do anything -- to do harm

16    to anyone as was being portrayed in the social media;

17    correct?

18        A.      That's correct.

19        Q.      And Mr. -- and Witness 1 also indicated

20    that Mr. Munchel is a nonviolent person; correct?

21        A.      Correct.

22        Q.      And that he doesn't have any

23    antigovernment ideology?

24        A.      That is what Witness 1 indicated, yes.

25        Q.      And that -- he also indicated that

1    Mr. Munchel is prolaw enforcement?

2            A.    Yes, he did.

3            Q.    And then in your interview with

4    Witness 2, she described Mr. Munchel as patriotic,

5    prolaw enforcement and respectful; correct?

6            A.    That's correct.

7            Q.    And she did tell you that Mr. Munchel had

8    asked to go over to her home because he had been doxed

9    and didn't feel safe being at his own residence;

10   correct?

11           A.    That's correct.

12           Q.    What does doxed mean?

13           A.    From what I understand, that is when

14   people's personal information is put out on the

15   Internet without their approval, you know, permission

16   to do so.

17           Q.    And through your interview -- in your

18   interview with Witness 2, she also indicated that

19   after Mr. Miller learned that the FBI was looking for

20   him, her family -- she and her family urged him to

21   turn himself in, which he did; correct?

22           A.    Yes.  I believe it was to obtain counsel

23   and turn himself in, yes.

24           Q.    Okay.  And lastly, Ms. Miller told you

25   and Agent Potts that Mr. Munchel might have been upset

1    at the presidential outcome and felt the election was

2    unfair but that he would never resort to violence or

3    other illegal activity because of politics; correct?

4         A.    Yes, she did indicate that.

5             MS. ALPERT:  Those are my questions.  Oh,

6    I'm sorry.  Couple other.

7             THE COURT:  Go ahead.

8    BY MS. ALPERT:

9         Q.    Were you present at the FBI when

10   Mr. Munchel turned himself in?

11        A.    Yes, I was in the building.

12        Q.    Okay.  Are you aware that he had been

13   talking with an attorney on his way to your office?

14        A.    I was told later that when he was -- got

15   out of the vehicle in front of our building that he

16   was on the phone with an attorney.  I was not aware of

17   that at the time.  We found that out later.

18        Q.    Okay.

19        A.    (indiscernible).

20        Q.    Okay.  And he proceeded anyway to turn

21   himself in?

22        A.    Yes.

23        Q.    Okay.

24             MS. ALPERT:  Those are my questions.

25             THE COURT:  Mr. Schrader, any redirect?

71

1          MR. SCHRADER:  Yes, Your Honor.

2                    **REDIRECT EXAMINATION**

3     BY MR. SCHRADER:

4          Q.    Agent Defeo, just for -- Ms. Alpert asked

5     some questions about statements that Witness 2 gave

6     you, including a statement that the defendant told her

7     that -- or she didn't believe that the defendant would

8     engage in any violent conduct in support of political

9     activity.  Do you recall that testimony?

10         A.    (No audible response.)

11         Q.    That was a statement that Witness 2 gave

12    to you after Mr. Munchel had traveled to

13    Washington, DC and then stormed the Capitol in

14    tactical gear with his mother, who was also dressed in

15    tactical gear, with a Taser on his hip; correct?

16         A.    (No audible response.)

17         Q.    You were asked some questions also about

18    the government's recounting of the substance of the

19    cell phone video captured on the cell phone that was

20    attached to Mr. Munchel's chest.  Do you recall that

21    testimony?

22         A.    Yes.

23         Q.    That video, I think as you testified, is

24    50 minutes long; correct?

25         A.    Yes, approximately.

72

1          Q.    The recounting of that video does not

2    include every single other (indiscernible) that anyone

3    made over that 50-minute period; correct?

4          A.    Correct.

5          Q.    It doesn't describe every action that

6    every person depicted on that video took; correct?

7          A.    (indiscernible).

8          Q.    In fact, it does include some things that

9    Mr. Munchel said that could be viewed favorably;

10   right?

11         A.    Yes.

12         Q.    And that includes things like

13   Mr. Munchel's (indiscernible) to other people not to

14   break items; right?  Not to commit vandalism; right?

15         A.    Yes.

16         Q.    It also -- well, at no point in that

17   video does the defendant say anything like, let's not

18   go into the Capitol.  Do you recall anything like that

19   happening?

20         A.    No.  He appeared to be a willful

21   participant.

22         Q.    Do you recall him saying anything to his

23   mother at any point, like, Mom, let's just go home,

24   let's -- you know, let's get out of here, anything

25   like that?

73

1          A.     No.

2          Q.     And in addition to some of the statements

3    that Ms. Alpert asked you about, Mr. Munchel did say

4    some things that were indicative of an intent to be

5    (indiscernible) inside the Capitol; is that fair to

6    say?

7          A.     Yeah.

8          Q.     And that includes statements like when he

9    was outside the Capitol, we ain't playing fucking nice

10   no Goddamn more.  Do you recall that?

11         A.     (indiscernible).

12         Q.     That also includes the defendant saying,

13   fucking ready to fuck shit up.  This is when he was

14   standing outside the Capitol.  Do you recall that?

15         A.     Yes.

16         Q.     Also includes the defendant saying, tell

17   me the last time I'll be able to enter the building

18   with armor and fucking weapons, something to that

19   effect.  Do you recall that?

20         A.     Yes.

21         Q.     Also includes the defendant saying when

22   he heard the sound of glass breaking, I guess they

23   fucking (indiscernible).  Do you recall that?

24         A.     Yes.

25         Q.     It includes the defendant, when he

1   observes people seizing zip ties saying, zip ties, I

2   need to get me some of them motherfuckers.  Do you

3   recall that?

4          A.    Yes.

5          Q.    And it includes the defendant in the

6   Senate gallery shouting, I want their fucking gavel.

7   Do you recall that?

8          A.    Yes.

9          Q.    All right.  You were also asked some

10  questions about this photograph of the defendant

11  jumping over the banister -- over a railing, rather,

12  in the Senate gallery.  That photo is not very large

13  in either the complaint or the defense memo.  Is that

14  fair to say?

15         A.    Yes.

16         Q.    You've seen other versions of that

17  photograph?

18         A.    I have.

19         Q.    And is it clear from the larger version

20  of the photograph that Mr. Munchel has an item with a

21  handle in a holster on his right hip?

22         A.    (indiscernible).

23         Q.    That's visible in that photograph?

24         A.    Yes.

25         Q.    You also testified that Mr. Munchel, I

75

1    think you said something about he appeared to be

2    limiting actions of his mother, or at least that's

3    what Ms. Alpert had asked you and you had confirmed

4    that.  Do you recall that testimony?

5         A.    Yes.

6         Q.    Would you describe the defendant and his

7    mother during this whole episode as a team?

8         A.    I would.

9         Q.    Why?

10        A.    Because they coordinate their actions

11   together.  He tries to hold onto her as much as

12   humanly possible when they're walking through, kind of

13   coordinating what they're going to do.  Mr. Munchel,

14   the defendant, grabs the zip ties, his mother also

15   grabs the zip ties.  A lot their actions are in

16   tandem -- appear to be in tandem.

17        Q.    At any point does the defendant really

18   disapprove of anything that his mother was doing?

19        A.    No.

20        Q.    Was it fair to say that the defendant was

21   an active participant in this episode?

22        A.    Yes.

23        Q.    You were also asking questions about

24   Mr. Munchel's intent in going into the Capitol.  Do

25   you recall that?

1          A.      (indiscernible).

2          Q.      This investigation has only been going on

3    since January the 6th; is that right?

4          A.      Right.

5          Q.      And, in fact, that's only -- it only

6    started January 6, but really the investigation into

7    investigation of Mr. Munchel started a couple of days

8    later than that when you were able to start

9    identifying him; is that fair?

10          A.      That's fair.

11          Q.      And I take it your investigation is not

12    over?  In fact, there are hundreds of people currently

13    under investigation by the FBI in connection with the

14    January 6 incident at the Capitol; is that fair to

15    say?

16          A.      Yes.

17          MS. ALPERT:  Your Honor, I'm going to

18    object to the relevance of this line of questioning.

19          THE COURT:  Mr. Schrader?

20          MR. SCHRADER:  Your Honor, Ms. Alpert

21    asked the question about the defendant's intent here.

22    My point is that this investigation is far from over,

23    and there are things like electronic devices, other

24    interviews, other videos that the government has not

25    yet exploited (sic), and I don't want the Court to be

1  left with the impression that the government does not

2  believe that Mr. Munchel's intent here was -- or

3  believes that Mr. Munchel's intent here was simply to

4  follow his mother around the Capitol.  My point is

5  just that this investigation is far from over.

6            THE COURT:  I think you've made the

7  point.  And Mr. Defeo -- Agent Defeo qualified his

8  answers I think in pretty much every single one of

9  Ms. Alpert's questions on that topic with "at this

10 time."  So I think your position's clear.  You can

11 move on.

12           MR. SCHRADER:  Very good.  That is

13 actually the end of my questions, Your Honor.

14           THE COURT:  All right.  Ms. Alpert,

15 anything else based on that?

16                   **RECROSS-EXAMINATION**

17 BY MS. ALPERT:

18      Q.   Regardless of words stated by

19 Mr. Munchel, he did not engage in any actual violence;

20 correct?

21      A.   (indiscernible).

22      Q.   I understand that everything you're

23 saying is based on the evidence you've uncovered so

24 far.

25           Based on the evidence you've uncovered so

1  far, he didn't attempt to use those zip ties in any

2  manner; correct?

3       A.    Correct, based on the evidence.

4       Q.    Based on the evidence you found so far,

5  he did not attempt to retrieve the gavel he yelled

6  about; correct?

7       A.    Correct.

8       Q.    Based on the evidence you've found so

9  far, he didn't attempt to vandalize anything; correct?

10       A.    That's correct.

11       Q.    And based on the evidence you've

12  uncovered so far, the main thing he was doing was

13  following his mother around; correct?

14       A.    Yes, among other things.

15       MS. ALPERT:  Those are my questions.

16       THE COURT:  All right.  Mr. Schrader,

17  anything else?

18       MR. SCHRADER:  No, Your Honor.

19       THE COURT:  All right.  Thank you,

20  Special Agent Defeo.  Appreciate your testimony.

21       THE WITNESS:  Thank you, Your Honor.

22       *****WITNESS EXCUSED*****

23       THE COURT:  Do you have any other proof,

24  Mr. Schrader?

25       MR. SCHRADER:  No, Your Honor.

79

1              THE COURT:  All right.  Very good.

2              Ms. Alpert, any proof you want to put on?

3              MS. ALPERT:  Yes, Your Honor.

4              THE COURT:  All right.

5              MS. ALPERT:  My proof relates to the

6     detention issue and not to probable cause.  We

7     would -- we would stand on the proof as it is

8     regarding probable cause.

9              THE COURT:  All right, very good.  Thank

10    you.  Do you want to call -- do you have any

11    witnesses?

12             MS. ALPERT:  Yes.  Your Honor, I also

13    have several exhibits that I want to introduce, if I

14    could introduce those first.

15             THE COURT:  Okay.  I think -- you

16    provided a copy to Mr. Schrader; is that correct?

17             MS. ALPERT:  I have.

18             THE COURT:  Okay, go ahead.

19             MS. ALPERT:  Your Honor, Defendant's

20    Exhibit No. 1 is a Declaration under Penalty of

21    Perjury from Ms. Miller who we intend to offer as a

22    third-party custodian.  And I am going to ask the

23    Court to place this and several other exhibits under

24    seal because I think both the government and defense

25    have concerns that the witnesses -- if the witnesses

1    in the case are identified, that they will be harassed

2    through social media and other media.

3              THE COURT:  Okay.  Why don't you go ahead

4    and identify the exhibits, and you can move their

5    entry and we'll -- and then tell me what you want

6    under seal and I'll hear from Mr. Schrader.

7              MS. ALPERT:  Yes, sir.  Defendant's

8    Exhibit No. 2 is an email from my investigator, Brian

9    Carter, who is confirming that he had spoken with

10   Mr. Munchel's employer at his last place of

11   employment.  And they have advised that he was a

12   reliably good employee but would not be able to return

13   to work there.

14             THE COURT:  Okay.

15             MS. ALPERT:  Defendant's Exhibit No. 3 is

16   an interview with another individual who knows

17   Mr. Munchel, has known him for several years and

18   speaks well of him, she has worked with him.  She

19   talks about several other aspects of -- of his

20   mannerisms, including being protective of other

21   people, helping make sure people get home safely,

22   generally being a kind person, being a Trump

23   supporter, but not someone who behaves

24   inappropriately.  And that he always thanks police

25   officers for their service.  It also talks about

81

his -- this memo also talks about his interests when
he was younger in joining the Marines and how that had
been thwarted by a childhood back injury.  And so he
tried to serve in other ways.  And she also advises
that she's never seen him encourage or participate in
violence.

Defendant's Exhibit No. 4 is a larger
photo -- or I guess the rest of the photograph was in
the complaint on page 5.  And the purpose of
introducing this is just to show the Court that the
rail extends all the way down to the bottom of that
floor, and that both individuals are stepping over the
railing or attempting to step over the railing.

Your Honor, Defendant's Exhibit No. 5,
which we have provided both to the Court and the
government, is a video from Mr. Munchel's video -- or
from his -- the video on his camera from January 5 of
his interaction that's been discussed with the local
police officers in DC.

Exhibit No. 6 is a video of -- labeled as
January 6, 2021, footage consisting of about 12
minutes of video from the time that Mr. Munchel and
his mother enter the Capitol building.

Exhibit No. 7 and Exhibit No. 8 are both
excerpts from two security cameras that Mr. -- that

1    the government provided to defense counsel.  And those

2    would be all of our exhibits.

3              Regarding placing exhibits under seal, I

4    would ask that exhibits -- all for the same reasons,

5    that Exhibits 1 through 3 and 5 through 8 all be

6    placed under seal.

7              THE COURT:  Okay.  Mr. Schrader, what do

8    you have to say about that?

9              MR. SCHRADER:  No objection to admission

10   of these exhibits, Your Honor, or to placing those

11   specific exhibits under seal.

12             THE COURT:  Very good.  They'll be

13   admitted.  Exhibits 1 through 3 and 5 through 8 will

14   be placed under seal at this time subject to further

15   orders by the Court.

16             (Defense Exhibits Nos. 1 through 8 were

17   admitted; 1-3 and 5-8 under seal.)

18             THE COURT:  Ms. Alpert.

19             MS. ALPERT:  All right.  I wanted to make

20   two other proffers of evidence as well.  First,

21   regarding the Pretrial Services Report and -- if the

22   Court can bear with me for one minute.

23             In the report and in Mr. Schrader's

24   memoranda, there's mention of a failure to appear that

25   was not prosecuted.  And I think Mr. Schrader

83

1    acknowledged that that failure to appear was not

2    prosecuted.  I wanted to proffer to the Court that it

3    would not -- that Mr. Munchel never received the

4    notification that he was supposed to appear in court,

5    the type of thing where they would send him a date to

6    appear in court, never received that notification.

7    And then, of course, he did appear in court about a

8    month after that and answered to those charges.

9         So I just wanted to proffer that

10   information to the Court, as well as make a proffer

11   regarding another witness that my investigator, Brian

12   Carter, interviewed.  And I guess we can call this

13   person Witness No. 4.  This individual asked

14   specifically because of privacy concerns, like others

15   have had in this case, not to share his name at all

16   with the Court, but he -- I wanted to share some

17   information from him with the Court.

18        He is a childhood friend of

19   Mr. Munchel's.  He went to middle school and high

20   school with Mr. Munchel.  They played sports together.

21   They went camping and explored woods and did other

22   outdoor activities together.  Both of them active in

23   the Boy Scouts going into their high school years and

24   they developed a close friendship through that.  And

25   both of them had participated in national Boy Scout

1    leadership programs, including (indiscernible).

2              Mr. -- Mr. Munchel did stop -- stop his

3    work with the Boy Scouts a few, I guess, credits or

4    badges shy of becoming an Eagle Scout, but when he was

5    in high school he participated in other activities,

6    according to this witness, such as cross country and

7    theater.

8              And finally this witness described

9    Mr. Munchel as a competitive athlete, reliable student

10   and friend.  He advised that he had never seen a mean

11   side of Mr. Munchel, and that Mr. Munchel is someone

12   that would stick up for others and was a law-abiding

13   teenager when they were growing up together.

14             And that would be the proffer.

15             THE COURT:  All right, very good.

16             MS. ALPERT:  Your Honor, my first witness

17   is ████ Miller.  Excuse me, Your Honor.  My first

18   witness is Ms. Miller.

19             THE WITNESS:  Hi there.

20             THE COURT:  Hang on just a moment, ma'am.

21   I'll go ahead and swear you, please.  If you'd raise

22   your right hand.

23                        **MS. MILLER**

24   called as a witness, after having been first duly

25   sworn, testified as follows:

1          THE COURT:  All right, very good.  Thank

2   you.  Ms. Alpert, you can go forward.

3          MS. ALPERT:  Thank you, Your Honor.

4                  **DIRECT EXAMINATION**

5   BY MS. ALPERT:

6      Q.   Ms. Miller, you are -- you live in

7   Nashville, Tennessee?

8      A.   I do.

9      Q.   With your two daughters.  And your

10  brother is currently staying with you as well?

11     A.   Yes.

12     Q.   And your daughters are age 26 and 32,

13  approximately?

14     A.   Yes.

15     Q.   Okay.  I'm having a little bit of trouble

16  hearing you.

17     A.   Okay, sorry about that.  Can you hear me

18  better?

19     Q.   That's better where you are right now.

20          You've worked with a lot of -- over the

21  last ten years you've worked in the greeting card

22  business as a merchandiser; correct?

23     A.   Yes, that's correct.

24     Q.   And am I correct that you also have a --

25  you used to have a real estate license, but you no

86

1  longer do?

2         A.    That's correct.

3         Q.    And am I correct that you lived in

4  Florida previously?

5         A.    Yes.

6         Q.    And you knew Mr. Munchel from when he was

7  in Florida?

8         A.    Yes.

9         Q.    And that you moved to Nashville earlier

10  this year; correct?

11         A.    Correct.

12         Q.    And are you not -- are you currently

13  working?

14         A.    Because of CO-VID (indiscernible).

15         Q.    Okay.  How long have you known

16  Mr. Munchel?

17         A.    Approximately four years.

18         Q.    And how well do you know him?

19         A.    I knew him pretty well.  I would often

20  call him son and he would call me mom.

21         Q.    Okay.  Do you consider him to be family?

22         A.    Absolutely.

23         Q.    And does he spend time with you and your

24  family at your home?

25         A.    He does.  More in Florida.  Not so much

87

1    in Nashville because of CO-VID.

2         Q.    Okay.  Have you ever known Mr. Munchel to

3    engage in violence at all?

4         A.    Absolutely not.  Never.

5         Q.    If Mr. Munchel is released, are you

6    willing for him to come stay with you?

7         A.    Absolutely, yes, I am.

8         Q.    Okay.  And did you fill out some

9    paperwork that related to serving as what's called a

10   third-party custodian?

11        A.    Yes, I did.

12        Q.    Okay.  And what is -- first of all,

13   what's your understanding of what it means to be a

14   third-party custodian?

15        A.    My understanding is to make sure that

16   Mr. Munchel, Eric, follows all the protocol that has

17   been given to him and to make sure that he is

18   following everything and court dates and just to make

19   sure that he does everything that he's supposed to do.

20        Q.    Sorry.

21        A.    I'm sorry.  My understanding is also as

22   the custodian, I need to report at any time should I

23   feel that he is not or that I know that he's not

24   truthful or done anything (indiscernible) probation

25   officer or law enforcement, whoever I'm supposed to

88

1    report to first.

2         Q.    And if he's not following rules that are

3    established by the Court, are you willing to report

4    him even if you know that he's going to be locked up?

5         A.    Yes, absolutely I would.  Without a

6    shadow of a doubt, I would.

7         Q.    Do you feel like Mr. Munchel would follow

8    your advice in following the rules of the Court?

9         A.    Yes, I do.

10        Q.    And have you ever been asked to serve as

11   a third-party custodian before?

12        A.    No, I have not.

13        Q.    So in the third-party custodian document

14   that you filled out, I believe you checked at the time

15   you thought that Mr. Munchel might be staying at his

16   own home; correct?

17        A.    That's correct.  Yeah.

18        Q.    Have you since learned that he may not be

19   able to stay there due to the amount of attention that

20   was being -- that he might -- the attention that was

21   being called to the apartment complex?

22        A.    I have learned that he has been evicted.

23        Q.    Okay.  And was that in connection with

24   all of the people showing up at his apartment after

25   January 8?

89

1          A.     Yes, it was.

2          Q.     Okay.  And in -- I know he mentioned the

3    third-party custodian document or declaration, but now

4    that you know this for sure, are you willing for

5    Mr. Munchel to stay with you?

6          A.     Absolutely yes.

7          Q.     And would you have room for him to stay

8    at your house?

9          A.     Yes, I do.

10         Q.     And did Mr. Munchel actually stay at your

11   house the weekend prior to turning himself in?

12         A.     Yes, he did.

13         Q.     And if the Court wants Mr. Munchel to

14   participate in electronic monitoring, if the Court

15   requires him to have a homeland line, telephone line,

16   are you able to get one installed?

17         A.     Yes, I am.

18                MS. ALPERT:  Those are my questions for

19   Ms. Miller.

20                THE COURT:  Okay.  Mr. Schrader, do you

21   have any questions of this witness?

22                MR. SCHRADER:  Just a few, Your Honor.

23                       **CROSS-EXAMINATION**

24   BY MR. SCHRADER:

25         Q.     Ms. Miller, good afternoon.

1          A.     Hi, there.

2          Q.     Hi.  Ms. Miller, so the defendant stayed

3     with you the weekend before he was arrested; correct?

4          A.     About a day and a half, yes.

5          Q.     I'm sorry, you said for a day and a half;

6     is that right?

7          A.     Yes.  Yeah.

8          Q.     He -- so did he come to your house on

9     that Friday night or that Saturday?

10         A.     It was early Saturday morning after he

11    got off work.

12         Q.     Okay.  And he came over, I guess in part

13    to see one of your daughters; is that right?

14         A.     Correct.

15         Q.     Okay.  You understood that he was coming

16    off of work and he came to see you?

17         A.     Yes.

18         Q.     Did he tell you he was coming off of work

19    that morning?

20         A.     He told my daughter.

21         Q.     All right.  Do you know whether he

22    actually reported to work that day?

23         A.     I don't have -- he said he was at work,

24    yes.

25         Q.     And he came and he stayed with you, then,

91

1    for those -- I guess that day and a half until he

2    turned himself in; right?

3         A.    Right.

4         Q.    Did he mention to you at some point that

5    he thought he might be arrested?  He must have; right?

6         A.    He didn't, no.  He never said he was

7    being -- thought he would be arrested.  He --

8         Q.    (indiscernible)?

9         A.    People on his social media blowing up

10   everything (indiscernible) not true, some of the

11   people on social media.  And he was in fear of his --

12   of his life because his information had been released

13   to social media.

14        Q.    I see.  But you knew at some point that

15   weekend that he was being identified as a person who

16   had been involved in the incident at the Capitol; is

17   that right?

18        A.    On Sunday when we'd received a call from

19   his brother, said that the FBI was there, that is

20   exactly what we had -- you need to go and turn

21   yourself in.

22        Q.    And that point you told him to turn

23   himself in to the police; is that right?

24        A.    True, yes.

25        Q.    Okay.  You know that he gave your

1    daughter a cell phone; right?

2         A.    Yes.

3         Q.    All right.  Do you know why he gave that

4    to her?

5         A.    Yes.

6         Q.    Why?

7         A.    For safekeeping.  He had videos on there

8    and he wanted to make sure that it was seen properly.

9         Q.    Seen because he was worried those videos

10   might not come out?

11        A.    He -- he was worried that it may

12   disappear or something.  He wasn't sure.  He wanted it

13   to (indiscernible) attorney and for it to be handed

14   over properly.

15        Q.    I see.  But he didn't want it -- want to

16   provide it to the police because he was worried they

17   would do something with it?

18        A.    No.  No, he didn't say that to me.

19        Q.    Okay.  You said that he provided it to --

20   I guess you and your daughter for safekeeping; right?

21        A.    Correct.  Until -- he wanted my daughter

22   to turn it over to his attorney.

23        Q.    All right.  You said that you call him

24   your son?

25        A.    I've called him my son.  I call -- I've

1    called him my son, he calls me mom.

2         Q.    He calls you mom, okay.

3         A.    (indiscernible), you know, hey, mom, how

4    are you, yeah.

5         Q.    Do you have -- do you have a relationship

6    with his mother?

7         A.    No, I do not.

8         Q.    Does she know that he refers to you as

9    his mother?

10        A.    He doesn't refer to me as his mother.  He

11   just -- a lot of my children's friends, I'm just very,

12   very (inaudible) all their friends.  And I've always

13   introduced (indiscernible) mom.  You can call me mom.

14        Q.    Call you mom as just as sort of a

15   friendly nickname?

16        A.    Absolutely, yes.

17        Q.    All right.  You said you've known him for

18   four years and you treat him like a son; right?

19        A.    Absolutely, yes.  I love him like a son,

20   yes.

21        Q.    But you've never met his mother?

22        A.    I've never met his mother.

23        Q.    All right.

24        A.    I met his mom -- I'm sorry, I met his

25   mother one time because she did not live in the same

94

1   place as he lived when I (indiscernible).

2        Q.    I see.  I see.  And then, Ms. Miller, do

3   you have any guns in your house?

4        A.    No, I do not.

5        Q.    All right.

6        MR. SCHRADER:  All right.  No further

7   questions, Your Honor.

8        THE COURT:  Any redirect?

9                    **REDIRECT EXAMINATION**

10  BY MS. ALPERT:

11       Q.    Ms. Miller, was Mr. -- first of all, why

12  did Mr. Munchel turn -- did he turn his phone off at

13  some point while he was with the family?

14       A.    Yes, he did.

15       Q.    Why did he turn it off?

16       A.    He was getting so many horrible messages,

17  how people wanted him dead and how (indiscernible).

18       Q.    And did he believe the phone had

19  information that was helpful to show what he really

20  was involved in?

21       A.    Absolutely, yes.  Pretty much --

22       Q.    Go ahead.

23       A.    That he did not take the zip ties as they

24  were saying.  He wanted to make sure that it was known

25  that what was being said through -- over social media

1  and the news.

2      Q.   And he wanted to make sure that the phone

3  was preserved as potential evidence, is that -- is

4  that your understanding?

5      A.   Yes.  Yes.

6      Q.   And I think I heard you say the first

7  time he was aware of police were looking for him was

8  Sunday morning; is that right?

9      A.   Yes.  He received a phone call from his

10  brother.

11      Q.   And Mr. -- Mr. -- you indicated

12  Mr. Munchel stayed with you Saturday night as well?

13      A.   He stayed -- yes, it was late Saturday

14  after work that he got there.  I said, it's late, just

15  stay here.

16      Q.   Okay.  So -- wait, let's back up for a

17  second.  Initially you said he stayed for a day and a

18  half; correct?  About a day and a half?

19      A.   Uh-huh (affirmative).

20      Q.   So Friday was January 8; is that right?

21      A.   Yes, he stayed -- it was early Saturday

22  morning, late Friday night.  It was like 1 o'clock in

23  the morning when he came over.

24      Q.   Okay.  And then did he stay at your home

25  on January 9, Saturday January 9?

1           A.     Yes.  Yes, he did.

2           Q.     And was he supposed to work that night?

3    Do you know?

4           A.     He was supposed to work that day.

5           Q.     On Saturday, January 9?

6           A.     Yes.  And we -- I suggested that he not

7    go to work, that he let work know that this thing was

8    more prominent, you know, that he might need to get a

9    lawyer on this.

10          Q.     Okay.

11          A.     Because I --

12          Q.     Okay.  And was he actively looking for a

13   lawyer on Saturday, January 9?

14          A.     All day, yes.

15                 MS. ALPERT:  Those are my questions.

16                 THE COURT:  All right.  Thank you.

17                 Mr. Schrader, anything else?

18                 MR. SCHRADER:  No, Your Honor.

19                 THE COURT:  All right, very good.  Thank

20   you.  Thank you, ma'am.  Appreciate your testimony.

21   You can stay on the line if you'd like to.  You're

22   free to leave if you need to do that as well.

23                 *****WITNESS EXCUSED*****

24                 THE COURT:  Ms. Alpert, do you have any

25   other proof you want to put on?

 1              MS. ALPERT:  Your Honor, I do.  I'd like

 2    to call a witness identified as Witness No. 2.

 3              THE COURT:  Okay.  Is that person

 4    available by phone or video or what?

 5              MS. ALPERT:  They are available, yes, by

 6    video.

 7              THE COURT:  Okay.  All right, very good.

 8    If you could please raise your hand.

 9                          **WITNESS NO. 2**

10    called as a witness, after having been first duly

11    sworn, testified as follows:

12              THE COURT:  Very good, thank you, ma'am.

13              Go ahead, Ms. Alpert.

14              MS. ALPERT:  Okay.

15                     **DIRECT EXAMINATION**

16    BY MS. ALPERT:

17         Q.    I guess I'm going to call this Witness

18    No. 2.  Could you just get a little bit closer to the

19    screen, thank you.  And we'll let you know if we can't

20    hear you.

21              You are a personal friend of Mr. Munchel?

22         A.    Yes.

23         Q.    And you knew him from Florida?

24         A.    Yes.

25         Q.    And you've known him about four years?

1          A.     (indiscernible).

2          Q.     Okay.  You have to speak up a little bit

3     more.

4          A.     Yes.

5          Q.     Okay.

6          A.     I'm sorry.

7          Q.     And do you -- did you work with

8     Mr. Munchel in Florida as well?

9          A.     Yes.

10         Q.     Okay.  So at some point both you and

11    Mr. Munchel moved back to Nashville?

12         A.     Yes.

13         Q.     To Nashville?  How did that come about?

14         A.     My sister moved to Nashville, and me and

15    Eric had discussed when we worked together in Florida

16    that he wanted something different.  So I just

17    suggested he should try Nashville.  And he moved to

18    Nashville a week before I ended up moving to Nashville

19    as well.

20         Q.     Okay.  Did you work together with

21    Mr. Munchel in Nashville too?

22         A.     Yes.

23         Q.     And am I correct that you worked at one

24    of the bars downtown together?

25         A.     Yes, you are correct.

99

1          Q.    Okay.  And what type of work did you do

2    there and what type of work was he doing there?

3          A.    I was a server, and he was a server as

4    well.

5          Q.    Okay.  How long did the two of you work

6    there together?

7          A.    At Kid Rock's, three months because I

8    switched over to (indiscernible).

9          Q.    Okay.  And have you worked for other --

10   and how long did you work together in Florida?

11         A.    Oh, (indiscernible).

12         Q.    I'm having a little bit of trouble

13   hearing you.

14              THE COURT:  Yeah, I'm sorry.

15              THE WITNESS:  Over two years.

16              THE COURT:  Over two years, I think.

17              THE WITNESS:  We worked together at a

18   restaurant in Florida for two years together.

19   BY MS. ALPERT:

20         Q.    Okay.  How would you describe

21   Mr. Munchel, his work ethic as an employee?

22         A.    He was a very hard worker.  He always got

23   the job done, was never in trouble.  He always was --

24   I would say a team leader.  Like, if I ever had a

25   question, I would go to him and he would know what to

do, how to handle a situation.  As far as working at
both jobs with him, if anybody needed to walk to their
car, he would be the first one to drop what he was
doing and make sure we got to our car safely.

Q.   And just explain to the Court why people
might need someone to walk to their car with them.

A.   The restaurant we worked at together was
on Fort Myers Beach and it wasn't just -- we had to
park a mile and a half away from work, so the walk
itself wasn't safe.  So there's that.

And working downtown Nashville, we -- we
had to have clear bags on us, so -- anybody could see
what we had on us.  They would know that we had just
gotten off work (indiscernible), so it was kind of
like a safety thing for not getting mugged.  Where we
worked, they did away with security guards.  So
security guards could no longer walk us to our car
safely, so that's when Eric stepped in and helped us
out with that.

Q.   Are you currently living in the same
place with Ms. Miller?

A.   (indiscernible).

Q.   Okay.  And are you -- are you currently
employed?

A.   No, ma'am.

1          Q.    Okay.  Are you seeking employment

2    currently?

3          A.    Yes.

4          Q.    Okay.  And I'm guessing that the industry

5    that you're in has slowed down quite a bit, the

6    restaurant industry slowed down quite a bit because of

7    the CO-VID situation?

8          A.    (indiscernible).

9          Q.    Okay.  If Mr. Munchel is released, are

10   you willing to help keep an eye on him and make sure

11   he does what he's supposed to while he's on release?

12         A.    Yes.

13         Q.    Have you ever seen Mr. Munchel engage in

14   violence?

15         A.    No.

16         Q.    I wanted to ask you a few questions about

17   what happened after Mr. Munchel got back to Nashville

18   from DC.  Do you know when he got back into town?

19         A.    I do not.

20         Q.    Okay.  So you indicated -- let me back

21   up.  How did you find out that he had gone to DC?

22         A.    He had posted a live video on Facebook of

23   him talking with a bunch of people, like, with his

24   mom, just in a big crowd.  And I wrote on there, proud

25   of you for going to the -- going there.

1          And I found out on Friday because people

2    were messaging back onto my comment, saying things

3    like he's a terrorist (indiscernible).  And I know

4    Eric and I know that wasn't true, so I called him

5    immediately.  And he had told me that he was at work

6    and that he would come talk to me after he got off

7    work.

8          Q.    Okay.  So just to be clear

9    (indiscernible) on Facebook, is that what you're

10   saying?

11         A.    Yes.

12         Q.    And then you posted a comment.  Did you

13   post -- then post a comment on his Facebook page?

14         A.    Yes, on the video.

15         Q.    And then after you posted your comment,

16   were you then receiving all of the other comments that

17   people were making on that same video or on your

18   comment?

19         A.    It was replying back to my comment.  So I

20   got the notifications because it was -- they were

21   replying back to what I had said.

22         Q.    And were you able to reach Mr. Munchel --

23   so what time -- about what time was it when you called

24   Mr. Munchel?

25         A.    I believe 10 -- like 10 o'clock, 9:00,

1    10 o'clock.

2         Q.    And this is on Friday night?

3         A.    Yes.

4         Q.    Okay.  And so what did he -- were you

5    able to reach him or what happened?

6         A.    I called him and he -- he didn't pick up

7    and he called me back, and he had said that he was at

8    work and that he would come talk to me after he got

9    off work.

10        Q.    Okay.  And did he do that?

11        A.    Yes.

12        Q.    He came to your house after he left work?

13        A.    Yes.  It was like 1 o'clock in the

14   morning.

15        Q.    Were you (indiscernible) arrived at your

16   house?

17        A.    Yes.

18        Q.    Did he appear to be in work clothes?

19        A.    Yes.

20        Q.    Did it appear that he had, in fact,

21   worked Friday night?

22        A.    Yes.

23        Q.    Okay.  Were you able to see on his phone

24   that it was just overrun with calls and messages?

25        A.    Yes.

1    Q.    Could you see them coming in?

2    A.    Yup.

3    Q.    And did you guys all talk together about

4  what he should do at that point?

5    A.    Yes.  We had said you probably need to

6  turn your phone off because he couldn't even make a

7  phone call out or he couldn't do anything without

8  (indiscernible).  What I got from the voicemails, it

9  was news media people.  I don't know who they were,

10  but they constantly were calling and leaving him

11  voicemails.  He was just getting text messages after

12  text messages and all different kinds of numbers.

13    Q.    And at that point did you or -- do you

14  know if Eric knew at that point that his personal

15  identifying information had been released to the

16  public?

17    A.    Yes.

18    Q.    Okay.  And was that -- was that a concern

19  for him?

20    A.    Yes.  Yes.

21    Q.    And did you -- did you and your family

22  have a discussion about whether he should just stay

23  with your family that night?

24    A.    Yes.

25    Q.    And what -- how did that discussion end?

1          A.    We just said because of his address given

2     out, it probably wasn't safe for him to go back home,

3     so we offered him to stay here.

4          Q.    And is that what he did?

5          A.    Yes.

6          Q.    Okay.  And then -- so that was late

7     Friday night going into early Saturday morning

8     (indiscernible) Saturday morning.  What -- Saturday

9     day, what happened?

10         A.    Eric had left, went home, took a shower

11    and came back and said he was going to go to work.

12    And we had said, well, you should probably not go to

13    work and retain a lawyer because -- we didn't know how

14    the situation was going to go.  We didn't know

15    anything.  So the first thing you should do is

16    probably get a lawyer.

17               So he did text work saying that I'm not

18    going to come in and that we were helping -- we were

19    trying to get him a lawyer.

20         Q.    Okay.  And did he -- did you also invite

21    him to stay at your house that night?

22         A.    Yes.

23         Q.    And did he stay at your house that night?

24         A.    Yes.

25         Q.    And then what happened Sunday morning?

1      A.    He woke us up, said that he got a phone

2   call that the FBI was at his apartment looking for

3   him.  And then he said that he was going to turn

4   himself in.  And we all agreed that he needed to do

5   that and that is exactly what happened.

6      Q.    So what time did he wake you up?

7      A.    (indiscernible).

8      Q.    I couldn't hear you.

9      A.    It was around 11:00.

10     Q.    Okay, around 11:00.  And had he -- how

11  did he learn that the FBI was looking for him?

12     A.    From what I understand, a phone call.  He

13  had gotten a phone call.

14     Q.    Had he received a live call or do you

15  know if it was a message that was left or you don't

16  know?

17     A.    I do not know.

18     Q.    Okay.  Did it appear to you that he came

19  to tell you guys as soon as he heard anything?

20     A.    (indiscernible).

21     Q.    Okay.  I think you're speaking out loud.

22  It's kind of fading in and out, so just -- if you

23  could repeat your answer.

24     A.    Yes.

25     Q.    Okay.  Did you talk with -- hold on a

1   second.

2          Did you help him find an attorney on

3   Sunday?

4          A.    Yes.

5          Q.    And is that Mr. Bean?

6          A.    Yes.

7          Q.    And so you guys -- he -- around 11:00 he

8   told you he had just learned that he had a -- that the

9   FBI was looking for him; is that right?

10         A.    Yes.

11         Q.    And then did you help make arrangements

12  for him to go to the FBI?

13         A.    Yes.

14         Q.    And did you, in fact, take him to the

15  FBI?

16         A.    Yes.

17         Q.    And while he was on his way to the FBI,

18  did he attempt to reach other -- an attorney?

19         A.    Yes.

20         Q.    Another attorney?

21         A.    Yes, yeah.

22         Q.    Is it your understanding that Mr. Bean

23  had referred him to the Federal Public Defender's

24  Office?

25         A.    Yes.

1        Q.    And then even while he was looking to

2  speak to another attorney, did Mr. Munchel indicate

3  that he was going to turn himself in?

4        A.    Can you repeat that, please?

5        Q.    Yeah.  So even though he hadn't had a

6  chance to talk to another attorney, did he -- did

7  Mr. Munchel still indicate he wanted to go ahead to

8  the FBI office to turn himself in?

9        A.    Yes.

10       Q.    At any time did it appear to you that

11  Mr. Munchel was trying to avoid the FBI?

12       A.    No, not at all.

13       Q.    Did it appear to you that Mr. Munchel was

14  trying to avoid letting the FBI have his phone?

15       A.    No.

16       Q.    Are you aware that Mr. Munchel had asked

17  Attorney Bean to (indiscernible).

18             Did Mr. Munchel ask you to give

19  (indiscernible) to an attorney?

20       A.    Yes.

21       Q.    To Mr. Bean?

22       A.    Yes.

23       Q.    Okay.  And then did Mr. Munchel indicate

24  whether it was okay for you and Mr. Bean to give that

25  phone to the FBI?

109

1      A.    Yes.

2      Q.    And did he indicate it was okay?

3      A.    He did, yes.

4      Q.    Do you know if Mr. Bean had told him to

5  leave his phone off and not do anything to it to

6  preserve it?

7      A.    I do not recall.

8      Q.    Okay.  I think you indicated Mr. Munchel

9  had talked a little bit with you about what happened

10  while they were in DC; correct?

11      A.    Correct.

12      Q.    Did he tell you whether he had a pocket

13  knife with him while he was in DC?

14      A.    He said yes.  He said he had a pocket

15  knife.

16      Q.    Did he tell you whether he left the

17  pocket knife in a backpack before he entered the

18  Capitol?

19      A.    Yes.

20      Q.    Did he indicate if he had any other types

21  of weapons with him that day?

22      A.    He just said he had a pocket knife.

23          MS. ALPERT:  One moment, please,

24  Your Honor.

25          THE COURT:  Okay.

1          MS. ALPERT:  Those are my questions.

2          THE COURT:  Mr. Schrader?

3          MR. SCHRADER:  Yes, Your Honor.  I may

4    have missed this.  Did we swear this witness in at the

5    beginning of her testimony?

6          THE COURT:  I did, yes.

7          MR. SCHRADER:  You did.  Okay.

8          THE COURT:  That's okay.  Thank you.

9                     **CROSS-EXAMINATION**

10   BY MR. SCHRADER:

11        Q.   Ma'am, I'll just refer to you as ma'am

12   because we don't want to say your name at this

13   hearing, all right.  As I understand it, the defendant

14   came to your house, was it early morning on Saturday;

15   is that right?  Is that yes?

16        A.   Yes.

17        Q.   Okay.  And at that point it was clear

18   that he knew -- all this was happening on social

19   media; right?

20        A.   Yes.

21        Q.   He was getting texts; right?

22        A.   Yes.

23        Q.   And people were identifying him as this

24   zip tie guy; right?

25        A.   From what I knew, I didn't know.

1          Q.    I'm sorry, you didn't know?

2          A.    No, I didn't (indiscernible).

3          Q.    I'm sorry, I'm having trouble hearing

4    you.

5          A.    I'm saying no to the question.

6                THE COURT:  Her response is no.

7                MR. SCHRADER:  I'm sorry, Your Honor?

8                THE COURT:  I just was repeating, her

9    response was no.

10                MR. SCHRADER:  Okay.

11   BY MR. SCHRADER:

12          Q.    He confirmed to you at some point that he

13   was the guy in this photograph that everyone was

14   talking about; right?

15          A.    Yes.

16          Q.    That was me.  And wearing the tactical

17   gear inside the Senate chamber; right?

18          A.    Yes.

19          Q.    And you said that he had posted a video

20   of him and his mom outside the rally; right?  Or

21   outside the Capitol, I guess?

22          A.    Yes.  It was not -- the video was not

23   outside the Capitol.  It was just somewhere around

24   the -- I don't know where it was, but I did not see

25   the Capitol at all in this video.

1        Q.    Okay.  And you supported that he had gone
2    to attend the rally; right?
3        A.    Yes.
4        Q.    I take it that means you align with those
5    views, you support the view that the rally was about;
6    right?
7        A.    Yes.
8        Q.    Do you recall when you posted that
9    supportive comment?
10       A.    I do not recall.
11       Q.    Okay.  And I take it you saw the events
12   of that day, correct, at the Capitol?
13       A.    To be honest, I was not aware.  I just
14   saw one video (indiscernible) oh, Eric went, I didn't
15   know.  And I didn't see anything else.  I wasn't
16   watching the news.  I was unaware of what actually --
17   what went down, (indiscernible) being portrayed on the
18   news.
19       Q.    You were not aware until Eric came to
20   your house in the early morning hours on Saturday that
21   the United States Capitol had been taken over by
22   people during the counting of the electoral college
23   vote; is that right?
24       A.    Yes, I was -- I had gotten aware of this
25   situation Eric was in on that Friday because people

1    were commenting back on my -- and I at that point had

2    no idea what was going on.  So it was that Friday when

3    I had found out everything -- everything had happened.

4         Q.    You didn't know that an incident had

5    happened at the Capitol until Friday; is that right?

6         A.    Yes, well, I had known that there was

7    stuff that had happened, but I wasn't -- again, I

8    didn't watch the news, I didn't -- I wasn't listening,

9    really, what had gone down.

10        Q.    Okay.  Have you seen videos since then

11   about what happened at the Capitol?

12        A.    Yes.

13        Q.    Okay.  I take it you don't support what

14   happened at the Capitol that day; is that fair to say?

15        A.    That's fair.

16        Q.    And I take it you saw the video that

17   Mr. Munchel captured on his camera of him going into

18   the Capitol; right?

19        A.    Yes.

20        Q.    I take it you don't support that either;

21   correct?

22        A.    I would say correct.

23        Q.    Correct you do support it or you don't

24   support it?

25        A.    I do -- I do not support it.

1   Q.   Okay.  And you hesitated a bit.  Is there

2   a reason why you hesitated?

3   A.   It's just something that I would not have

4   done.  I personally would have not have gone in there.

5   But if there was just a bunch of people being let in

6   and if -- from my understanding, he went in there to

7   make sure his mom was okay.  So if roles were

8   reversed, if my mom wanted to go into, I would have

9   her back fully 100 percent.  But I myself would not

10  have entered the Capitol building by myself.

11  Q.   Okay.  But you've seen the video --

12  you've seen the video on his -- that was mounted --

13  from a camera that was mounted on his chest; right?

14  A.   Yes.

15  Q.   And it's fair to say from that video that

16  he wasn't just -- just going to support his mom;

17  right?

18  A.   No, that -- no.

19  Q.   No, it's not fair to say?  It's fair to

20  say that Mr. Munchel (indiscernible); right?

21  A.   Can you repeat that?

22  Q.   It's not fair to say that he was going in

23  just to protect his mom?  In other words, he had his

24  own reasons for going in; right?

25  A.   No.

115

1          Q.    He had his own reasons for going in;
2     right?
3          A.    No.
4          Q.    You don't think he had any -- okay.  You
5     don't think he was interested in going in at all?
6          A.    No.
7          Q.    He just went because his mom went in?
8          A.    Yes.
9          Q.    Okay.  What's your relationship to
10    Mr. Munchel?
11         A.    He is a close friend of mine.
12         Q.    Do you have a romantic relationship with
13    Mr. Munchel?
14         A.    Never.  Nope.
15         Q.    And I believe he was with you for, sounds
16    like, about a day and a half before he finally turned
17    himself in to the police; right?
18         A.    Yes.
19         Q.    He could have gone to the police at any
20    point that Saturday; right?
21         A.    He was not -- he was -- we were -- none
22    of us were aware he was even wanted or -- there was no
23    contact of him wanting to be -- there was no phone
24    calls, there was nothing.  So we had no idea he was
25    even wanted until Sunday morning when they said that

116

1    the FBI was at his house looking for him.

2           Q.    Fair enough.  He could have called the

3    police and said it's me in that photograph; right?

4           A.    No, because the way the media is

5    saying -- what the media is saying about him is not

6    true.  The person --

7           Q.    Okay.  My question is different, though.

8    He could have called the police and said, that's me in

9    that photograph, the guy with the zip ties jumping the

10   banister.  He could have said that; right?

11          A.    No.

12          Q.    All right.  The next day he did turn

13   himself in; right?  The next afternoon?

14          A.    Yes.

15          Q.    That was Sunday afternoon; right?

16          A.    Yes.

17          Q.    And that was after the FBI had executed a

18   search warrant at his house that morning; right?

19          A.    Yes.

20          Q.    He learned that the FBI had searched his

21   house at some point and then turned himself in; right?

22          A.    Yes.

23          MR. SCHRADER:  No further questions,

24   Your Honor.

25          THE COURT:  Any redirect?

1          MS. ALPERT:  No, Your Honor.  Thank you.

2     And those are my witnesses.

3          THE COURT:  All right, very good.  Ma'am,

4     thank you very much.  I appreciate your testimony

5     today.  Thank you for being here by video.  You're

6     welcome to stay on if you'd like to, but you're free

7     to leave as well.  So thank you.

8          THE WITNESS:  Thank you.

9          *****WITNESS EXCUSED*****

10          THE COURT:  Does the government have any

11     rebuttal proof they want to put on?

12          MR. SCHRADER:  No, Your Honor.

13          THE COURT:  Okay, very good.  Ms. Alpert,

14     you introduced the videos as evidence.  Tell me what

15     you think I ought to do with that.  You introduced it,

16     but you didn't really refer to it about anything, so I

17     just want to know what -- what your -- what you want.

18          MS. ALPERT:  Yes, sir.  I did introduce

19     them.  I did in my cross-examination -- particularly I

20     think my cross-examination of the agent alluded to

21     much of the information in the videos.  And I do think

22     it would be helpful for the Court to view those

23     videos.  I think it's a total -- I think there's less

24     than a half hour of total viewing time on those

25     videos.

118

1          THE COURT:  Okay.

2          MS. ALPERT:  I -- I would have considered

3    playing it during the hearing, but there's some

4    logistical challenges right now.

5          THE COURT:  Sure, I understand.

6          Mr. Schrader, you've received a copy of

7    each of these videos; that's correct?

8          MR. SCHRADER:  I have.

9          THE COURT:  Okay.  And apart from the

10   questions you've already asked of the witnesses, you

11   don't intend, Ms. Alpert, to illuminate further other

12   than by argument, I assume; correct?  You don't

13   need -- you don't need to provide any other

14   information other than my viewing the videos; right?

15         MS. ALPERT:  Are you asking me or

16   Mr. Schrader?

17         THE COURT:  I was asking you, Ms. Alpert.

18         MS. ALPERT:  Oh, okay.  No.  Yeah, I only

19   have argument.

20         THE COURT:  Very good.  Here's what I --

21   well, let me ask you this.  Do you think I should --

22   would you like for me to view the videos before

23   argument or do you want to go ahead and argue and we

24   can take a recess and I'll look at them?  Do you have

25   any preference or thoughts one way or the other about

1   how I should look at them?

2           MS. ALPERT:  I think it might make sense

3   to argue first, Your Honor.

4           THE COURT:  Okay, all right.  Very good.

5   Okay.  Does anybody want to be heard on the probable

6   cause issue?

7           MS. ALPERT:  No, sir.

8           MR. SCHRADER:  And, Your Honor,

9   (indiscernible) if the Court needs sort of

10  illumination on certain aspects of it, but the

11  statutes -- it might take me a little bit to do that,

12  and it might save more time if I don't argue.  Thank

13  you.

14          THE COURT:  Let me ask you this.  I did

15  have a question I wanted to ask you-all about -- and I

16  apologize, maybe I should have asked it at the outset.

17  But I was just noting to myself that, you know, we've

18  delayed this hearing a little bit from Mr. Munchel's

19  initial appearance.  And in the interim it appears

20  that there's been a superseding complaint in this case

21  that's added two new charges, I believe.

22          First of all, I want to make sure that my

23  understanding is correct in that regard.  And

24  secondly, do you think it would be appropriate for me

25  to go ahead and advise Mr. Munchel with regard to the

1    new charges that have been added as far as the charges

2    and maximum penalties?

3              MR. SCHRADER:  That is correct.  And I

4    think it would make sense to advise him of those

5    maximum penalties.  It occurs to me I don't know that

6    I provided the Court with a criminal cover sheet, but

7    I think that we did for his mother.

8              THE COURT:  That's right.

9              MR. SCHRADER:  (indiscernible).

10             THE COURT:  That's right.  I -- I had --

11   I was able to get that.  First let me just ask,

12   Ms. Alpert, I gather from the tenor and course of the

13   examination here today that you're aware of the

14   superseding complaint.  You've received a copy it; is

15   that correct?  I'm not -- I can't hear you.

16             MS. ALPERT:  Yes, Your Honor.

17             THE COURT:  Okay.

18             MS. ALPERT:  I have received the

19   superseding complaint.  I believe a copy has gone out

20   in the mail to Mr. Munchel, but I do not believe he's

21   actually received a copy of that complaint yet.

22             THE COURT:  All right.  But I assume

23   you've had a chance to review the complaint with him

24   as well, however that --

25             MS. ALPERT:  Yeah.

1          THE COURT:  Okay, very good.

2          MS. ALPERT:  Yes, and discussed the new

3     charges.

4          THE COURT:  All right, very good.  Okay.

5          Mr. Munchel, just to sort of clean things

6     up a little bit, I know that you're aware, as

7     Ms. Alpert has indicated, that there's been a

8     superseding complaint from the District of Columbia.

9     Again, that case number, is 1:21-71.  And that -- that

10    superseding complaint adds two additional charges

11    against you.

12          I'd like to advise you of those charges

13    and the possible maximum penalties.  Count One of the

14    superseding complaint alleges a violation of

15    18 United States Code Section 371, conspiracy, that

16    carries a possible maximum term of imprisonment of up

17    to five years and a maximum fine of $250,000.

18          And Count Two charges you with an alleged

19    violation of 18 United States Code Section 231(a)(3),

20    civil disorder, which carries a maximum term of

21    imprisonment of up to five years and a maximum fine of

22    $250,000.

23          As I advised you at the initial

24    appearance, you have certain rights with regard to

25    these proceedings, including the right to a

122

1    preliminary hearing and detention hearing.  To the

2    extent that you -- your counsel is aware of the

3    complaint, I think that it's understood that everyone

4    was proceeding today with respect to all counts in the

5    superseding complaint, and so the Court's considered

6    the evidence as such.  Thank you.

7            I'll go ahead and address the probable

8    cause issue.  The Court's heard the arguments and the

9    evidence with regard to the probable cause issue in

10   this case, as well as reviewed the pleadings filed by

11   the government in support of their position in this

12   matter.

13           The Court's aware of the elements of the

14   charges alleged in the superseding complaint and has

15   considered that.  Given the relatively low threshold

16   for the government's burden in this case, the Court's

17   satisfied with respect to each of the counts in the

18   complaint that the government's met its burden with

19   respect to establishing probable cause and will find

20   as such.

21           I'll hear from you on detention at this

22   time, Mr. Schrader, if you want to go ahead with your

23   argument.

24           MR. SCHRADER:  I do, thank you,

25   Your Honor.  If you'll indulge me for a moment, I want

1    to make sure I kind of cover the territory here.

2             THE COURT:  No problem.

3             MR. SCHRADER:  So there are four factors

4    that you must consider here when determining whether

5    to detain Mr. Munchel pending trial.  The first part

6    of this goes to the nature and circumstances of the

7    offense and the evidence of the defendant's

8    dangerousness.  And I think that viewing the video or

9    at least the portion of the video that the defendant

10   submitted here will help inform the Court's decision.

11            The discussion today has been sort of

12   antiseptic about what happened here, but it's

13   important not to lose sight of the nature of the

14   conduct here.  This was not a momentary lapse in

15   judgment on the defendant's part.  He was not simply,

16   solely going in there to protect his mother.  This was

17   sort of the natural culmination of a plan to go and

18   rise up in Washington, DC as part of this rally.

19            We know a lot (indiscernible) through

20   evidence that we've gotten from witness testimony that

21   the Court has heard and also from the cell phone

22   video.  So you can basically see the crime happen on

23   that video.  But the defendant here and his mother

24   packed up their belongings, which included tactical

25   vests and a Taser and drove from Nashville all the way

124

1    to Washington, DC where they planned to stay for

2    several days when this rally was occurring.  They told

3    a *Sunday Times* reporter they wanted to show that they

4    were willing to rise up, band together and fight, if

5    necessary.  And they were dressed to fight, if

6    necessary.

7              After the rally itself, they and many,

8    many others gathered outside the Capitol in a crowd.

9    They wandered through that crowd, folks were chanting

10   all sorts of things as they wandered through.  They

11   encountered several Oathkeepers.  The Court heard a

12   little bit of mention of that today.  That is a

13   militia group that trains for events like this.

14             Mr. Munchel affirmed his support for that

15   group with a fist bump.  And then at that point the

16   defendant's mother says, we're going straight to

17   federal prison if we go in there with weapons.  The

18   defendant replies, yes, that's why I'm not going in

19   there.  And Ms. Eisenhart says, let's go, we can put

20   them in the backpacks.  And then they -- so she says,

21   drop your shit and let's go.

22             And they retreat back through the crowd

23   to a location where they have a backpack stored.  It

24   is not possible from the video to see exactly what it

25   is they (indiscernible).  But Mr. Munchel says he

1   needs to take my weapons off before I go in there.

2   And it is apparent from the photograph inside the

3   Senate chamber that he is equipped at that time with

4   what appears to be a Taser and a holster on his right

5   hip.

6                   Stands to reason that whatever he put

7   outside the Capitol was something more serious than a

8   Taser, something he thought he could not bring with

9   him inside the Capitol.

10                  Defendant and his mother then make their

11  way back to the Capitol.  They actually encounter a

12  couple fellow rioters who are sort of leaving the

13  scene, clearly been involved in some kind of scuffle

14  with the police or others.  And she says, while

15  everyone else is on their couch, you guys are training

16  and getting ready for it.  Again, approving of the

17  conduct at issue here.

18                  The defendant then makes a couple of

19  statements which reflect his intent in going in there.

20  He says, we ain't playing fucking nice no Goddamn

21  more.  Fucking ready to fuck shit up.  Clearly --

22  clearly ready for confrontation, sort of carry out

23  whatever plans they've made in coming to DC.

24                  His mother, as they get closer,

25  celebrates that members of Congress had been tear

1    gassed when she hears that people inside have been

2    tear gassed.  Then as they get closer to the Capitol,

3    just outside, the defendant says, probably the last

4    time I'll be able to enter the building with armor and

5    fucking weapons, an example, really, of one of many

6    moments when Mr. Munchel and his mother could have

7    turned around, could have walked away, could have not

8    gone inside the Capitol dressed in tactical gear, and

9    instead decided to -- they actually enter the

10   building.

11           The defendant heard the sound of broken

12   glass, he says, I guess they thought we're playing,

13   celebrating the disruption of the Capitol.  As they

14   made their way into the Capitol and go into a

15   corridor, they encounter some folks who have

16   discovered what appears to be a set of -- several sets

17   of plastic flexicuffs in a plastic bag.

18           The defendant is clearly excited by this

19   discovery.  He says, zip ties, I need to get me some

20   of them motherfuckers.  There is some suggestion that

21   he was going to give them back to the police or turn

22   them in at some point.  Mr. Munchel didn't do any of

23   those things.  He took a handful of them.  He carried

24   four, his mother carried one.  And he carried them

25   around as they continued marauding their way through

1    the US Capitol.

2                He never at any point, it appears, gave

3    them to any police officers in the Capitol or outside

4    or anywhere between DC and Nashville, for that matter,

5    because the police found them.  The FBI found them

6    when they executed the search warrant at his

7    residence.

8                After they had obtained those flexicuffs,

9    the defendant and his mother, then observed a

10   confrontation or sort of back and forth between a

11   couple of Capitol police officers and the crowd

12   inside.  Mr. Munchel -- I'm sorry, Ms. Eisenhart sort

13   of pursues after them, and it appears from the video,

14   as we have seen, shouts over a stair -- down to a

15   stairwell over a banister, traitors.  Traitors.  And

16   it appears at the Capitol police while accompanied by

17   the defendant.

18               And then while what I think is sort of

19   the haunting, frankly disturbing, part of this video

20   is when Mr. Munchel and Ms. Eisenhart enter the Senate

21   gallery.  This was -- this was the place where the

22   vice-president was moments earlier counting the votes,

23   counting the electoral college votes for the 2020 US

24   presidential election.  Lawmakers were evacuated from

25   that room because it was, boohoo, run, from people

1    like Mr. Munchel and his mother, carrying flexicuffs

2    and dressed in tactical gear.

3              As they entered they are surrounded by a

4    crowd of people chanting things like, anybody home?

5    They went into the tunnels, where do you go.  They're

6    cowards, are you afraid?  People with bullhorns

7    shouting these things and lawmakers who have fled,

8    fearing for their lives.

9              Ms. Eisenhart shouts treason.  God only

10   knows what would have happened in that room had

11   (indiscernible), in fact, been present.  Thankfully,

12   they were evacuated and made good their escape.  But

13   there is every reason to think that the defendant and

14   his mother would have actually put those flexicuffs to

15   use if they had found lawmakers in that room.

16             And as they leave that room, the

17   defendant says, I want that fucking gavel.  I want

18   that fucking gavel is what he says.  It is stunning to

19   see that conduct inside the Senate chamber of the

20   US Capitol.

21             The defendant here (indiscernible)

22   insurrection-type defense, but his actions and his

23   words are the actions and the words of insurrection.

24   The point of going in that Capitol that day was to

25   prevent Joe Biden from becoming the next president of

1    the United States, to overthrow a lawfully elected

2    president.  That's what happened, and I think it's

3    important not to lose sight of that.

4              The other factors the Court has to

5    consider here are the history and characteristics of

6    the defendant.  They include -- I'll say this,

7    Mr. Munchel does not have an extensive criminal

8    history.  We represented that in our papers.  He does

9    have a couple of marijuana charges from 2013 and 2014.

10             I don't have any additional information

11   to offer about the contempt of court charge, but I

12   accept Ms. Alpert's representations.  But -- but

13   that's something the Court, of course, has to weigh

14   against the conduct in this case.  Again, not conduct

15   the Court has to speculate about, but conduct that the

16   defendant captured on a recording from his phone, cell

17   phone camera.

18             The Court also has to assess the danger

19   to the community here.  Where this -- I think what

20   should be concerning to the Court, certainly most

21   concerning to the government is that there is

22   (indiscernible) of radicalization here.  This was a

23   person who rejects the results of a 2020 presidential

24   election.  Fair enough.  People are entitled to do

25   that.  And people can protest that as much as they

1    want.  That is, you know, a First Amendment right that

2    we all cherish.  But this is someone who's

3    demonstrated that he is willing to suit up in body

4    armor and carry a weapon into the halls of Congress in

5    order to prevent President Biden from taking office.

6              Remarkable to say that, but that's what

7    happened in this case.  And there's no getting around

8    it.  I recognize that Mr. Munchel has -- does not

9    appear, those weapons that were found in his house, it

10   doesn't appear that he possessed them illegally.

11             But he had some 15 firearms, including

12   some very serious firearms, assault rifles, a sniper

13   rifle with a tripod, hundreds of rounds of ammunition,

14   20 or 30 magazines full of ammunition.

15             But I think certainly from the

16   government's perspective, we feel Mr. Munchel has

17   essentially a lit fuse, who is willing to and capable

18   of attempting to engage in really serious conduct,

19   including the attempted overthrow of a lawfully

20   elected president.

21             And there's absolutely no reason,

22   Your Honor, to think that that's going to abate over

23   time.  It is something that appears to be a belief

24   that Mr. Munchel has held deeply based on his conduct

25   in this case.  So we think all those factors weigh in

131

1    favor of Mr. Munchel's detention.

2              Like I say, lastly, just a few words

3    about risk of flight.  We heard some evidence about

4    that today, but I do think it is fair to say that the

5    defendant did take some steps here to evade detection

6    by law enforcement.  He learned very quickly that he

7    was (indiscernible) my understanding he wants to get a

8    lawyer.  Who wouldn't.

9              But he didn't reach out to law

10   enforcement after learning that he was a suspect.  He

11   waited, really, until the FBI comes to his house and

12   seized all of his belongings and interviewed his

13   brother.  And at that point he decided it was

14   important that he finally needed to come forward after

15   giving his phone to an associate and buying -- and

16   buying a burner.

17             So I think there's also a concern here

18   about there's no real evidence in his background, I

19   don't think, about risk of flight, but I think there

20   is some concern from the government's perspective

21   about a potential failure to abide by Court orders and

22   also just a -- an effort, even if it was short-lived,

23   to evade law enforcement detection.  So for all those

24   reasons, Your Honor, we'd ask that this Court detain

25   Mr. Munchel pending trial.

132

1          THE COURT:  Mr. Schrader, you've

2    recounted some of the statements that Mr. Munchel made

3    that you think are significant in support of your

4    position for detention.  How do you reconcile those

5    statements with all of the statements that Ms. Alpert

6    has mentioned, and I suspect will highlight in her

7    argument, that seem inconsistent or counter to the

8    statements that you've identified for the Court?

9          MR. SCHRADER:  Well, I think actions

10   speak louder than words, in a sense.  I mean, this is

11   a defendant who -- not just someone that has said

12   things that might -- most of the statements that

13   Ms. Alpert, I think, has highlighted are ones that

14   suggest that he's not violent or inclined to engage in

15   violent behavior.

16          But that -- I don't think you can

17   reconcile that with what he did, which was travel to

18   Washington dressed for combat.  I mean, this is not

19   somebody who was there just to stand at a rally and

20   protest.  This is someone who came with tactical

21   vests, a Taser, potentially additional weapons.  His

22   mother had a tactical vest as well.  And then when --

23   they could have just left after the rally, they could

24   have left after the Stop the Steal rally and that was

25   it.  Or they could have stood outside the US Capitol.

1    But they -- they encouraged folks who were heading

2    inside.  They assisted some folks that were heading

3    inside, as we laid out in our memo.  They celebrated

4    things like the Capitol being destroyed.  They entered

5    the Capitol.

6             When they found these zip

7    ties (indiscernible) try to prevent anyone else from

8    getting them.  They kept them for themselves.  And in

9    a middle of the crowd of people chanting things like

10   "treason" and "where are you, cowards."

11            So it's -- I understand that Mr. Munchel

12   may have an interest now in telling folks that he

13   didn't have any plans up there to engage in any harm

14   or hurt anybody or do anything violent.  This was a

15   violent act.  It was a violent act what Mr. Munchel

16   did, and I think it's -- I don't think it's difficult

17   to recognize it as such, at least from the

18   government's perspective.

19            THE COURT:  Some of the statements that

20   you mentioned, you specifically referred to that

21   Mr. Munchel replies -- and these are recounted in your

22   memorandum at page 18 -- "fucking ready to fuck shit

23   up."  Any evidence that he fucked any shit up?

24            MR. SCHRADER:  There's no evidence on

25   these videos that we have that he caused any physical

134

1    damage inside the US Capitol.  I will say there was --

2    part of the video when he is viewing the Senate

3    chamber he is attempting to open one of the doors to

4    the Senate chamber that appears to be stuck.  And so

5    he is trying to do that.  I don't know if it's in an

6    aggressive manner or what, but he's trying to get the

7    door open.  But other than that, there's no evidence

8    that he destroyed property, no.

9              THE COURT:  You alluded to statements he

10   made to the -- to the extent or similar to statements

11   such as that he was ready to fight.  Any evidence of

12   him fighting anyone?

13             MR. SCHRADER:  There's no evidence that

14   he engaged in any physical -- acts of physical

15   aggression I guess I would say.  There's no evidence

16   that he fought anybody in the Capitol, no.

17             THE COURT:  Okay.  And there's been some

18   discussion about some of the videotape evidence, which

19   I'll be looking at.  But some conversations about --

20   or discussion about him passing law enforcement

21   officers in the Capitol.

22             Did you take any issue with Ms. Alpert's

23   characterization about those interactions or have any

24   evidence that he made any physical gestures or

25   statements toward any law enforcement agents themself?

135

1           MR. SCHRADER:  You mean aggressive acts?

2           THE COURT:  Yeah.

3           MR. SCHRADER:  No, other than, really,

4  than there's a bit of video where, as I mentioned, his

5  mother appears to be yelling at a police officer and

6  Mr. Munchel is with her there.  They're together the

7  whole time.  They're both holding these flexicuffs.

8  But I don't recall any specific evidence of

9  Mr. Munchel shouting at police officers or anything

10  like that himself.

11           THE COURT:  And the inference that you

12  draw from the -- the statements and actions about

13  putting some -- some items or item into the bag before

14  entering the Capitol is that that must have been

15  something more dangerous or more serious than the stun

16  gun, based upon his statement that he didn't intend to

17  take any weapons into the Capitol.  Is that my

18  understanding of your inference?

19           MR. SCHRADER:  Correct.

20           THE COURT:  Okay.  And just to be clear,

21  there was a little bit of testimony about

22  Mr. Munchel's interaction with Metropolitan Police

23  Department officers the evening before on the 5th and

24  then after the events at the Capitol regarding the

25  stun gun.

1            Do I understand correctly that there was

2      a contact with law enforcement on the night of the 5th

3      where they approached Mr. Munchel about the -- about

4      the stun gun, allowed him to keep the stun gun, and

5      then there was an interaction between law enforcement

6      after the Capitol event at the hotel where they

7      again -- law enforcement again approached him about

8      the stun gun and took the gun from him at that time?

9      Is that right?

10            MR. SCHRADER:  So I'm aware of sort of

11      two different episodes.  One, there is some videotape

12      from the night before, so the night of the 5th, where

13      officers encounter him.  They actually run down the

14      street because they think he's got a gun on his hip.

15      They detain him.  I don't know if they seized the stun

16      gun from him at that time or not.  I don't know

17      whether they did or didn't.

18            But I do know that the next day, staying

19      at the Grant Hyatt hotel there is a Metropolitan

20      Police Department report that details an encounter

21      where police at that time interacted with him and did

22      seize a Taser from him at that time.  I believe that

23      that incident occurred subsequent to the storming of

24      the Capitol.

25            THE COURT:  Okay.  Thank you.

137

1              Now, with respect to the firearms and

2    ammunition recovered at his home incident to the

3    search warrant, you say that he was aware that he was

4    a potential suspect in this episode at least by

5    Saturday, the day before the execution of the search

6    warrant.  Is that government's position?

7              MR. SCHRADER:  I think that's a fair

8    inference (indiscernible).

9              THE COURT:  And that's based upon the

10   efforts of various media and private citizens engaged

11   in activities on social media, rather than any actions

12   taken by law enforcement; is that correct?

13             MR. SCHRADER:  Correct.

14             THE COURT:  Okay.  And if Mr. Munchel

15   had, say, on Saturday gone to the police department

16   and said, I'm the guy in the video, there was no

17   active arrest warrant for him at that time, was there?

18             MR. SCHRADER:  I don't believe we got it

19   until that evening or possibly the following morning.

20             THE COURT:  Okay.  In the absence of an

21   arrest warrant, if he had gone to a police station to

22   turn himself in, he would have been turned away;

23   right?  There would be no basis to detain him; right?

24             MR. SCHRADER:  That's correct.

25             THE COURT:  Okay.  And --

1          MR. SCHRADER:  I think there may have

2     been an effort -- I mean, if he had shown up and said,

3     I'd like to turn myself in, then there may have been

4     action we could have taken at that point to effectuate

5     that.

6               THE COURT:  All right.  But --

7               MR. SCHRADER:  I take the Court's point.

8               THE COURT:  But in any event, no one from

9     law enforcement had either -- well, first, let me ask

10    it this way.  Nobody from law enforcement had reached

11    out to Mr. Munchel prior to the execution of the

12    warrant on the 9th; right?

13              MR. SCHRADER:  Correct.

14              THE COURT:  And had anybody from law

15    enforcement made any general statement to the public

16    asking for Mr. Munchel to be identified that you're

17    aware of?

18              MR. SCHRADER:  I'm sorry, I don't think I

19    follow the Court's question.

20              THE COURT:  Yeah, it's not a very good

21    one.  I'll just leave it alone.  I don't think there's

22    any need to go there.

23              Now, with respect to the detention

24    determination, my decision has to be whether or not

25    there are any conditions or combination of conditions

1   that I could impose that would reasonably assure

2   Mr. Munchel's presence at court appearances and

3   protect the safety of the community.  Tell me what the

4   government perceives the danger to the community to be

5   by Mr. Munchel specifically between now and the time

6   these charges are resolved.

7            MR. SCHRADER:  So I don't -- I think I

8   mentioned at the end of my argument, but I don't see

9   any reason why Mr. Munchel's views here would abate.

10  Part of the reason he went to Washington, DC, right,

11  was to join this Stop the Steal rally.  He followed

12  the crowd into the United States Capitol dressed as he

13  was and, as I mentioned, to disrupt the recounting of

14  the electoral college vote.

15           I don't see any reason why that view

16  would not -- in other words, his aggrievement at the

17  2020 presidential election, the way that turned out,

18  would abate.  He clearly possesses views that are

19  extreme, in a sense, if he's willing to engage in that

20  sort of conduct.

21           So there's no reason to think that those

22  views are going to diminish over time.  In fact, they

23  may just get worse if he becomes further aggrieved by

24  the fact that we now actually do have a different

25  president.

140

1          THE COURT:  Well, I think you alluded to

2    it earlier, but you're not suggesting that we detain

3    him just because he has views; correct?

4          MR. SCHRADER:  Of course not.  Of course

5    not, of course not.  It's because he has proven

6    himself willing, able and interested in acting in

7    those views in one of the most extraordinary ways I

8    could conceive, entering the US Capitol in the middle

9    of this ceremony dressed for combat.

10         THE COURT:  Yeah.

11         MR. SCHRADER:  And carrying around his

12   flexicuffs, chanting, you know -- standing in a crowd

13   of people chanting for lawmakers who are running for

14   their safety.  He's willing to do that.  He's shown

15   he's willing to do that.  That's the danger,

16   Your Honor.

17         THE COURT:  Fair enough.  So what -- what

18   is the government's argument in terms of what the

19   future danger -- are you saying that you think he's

20   going to go back to DC, get in a mob, attack the

21   Capitol again and try to overthrow the government?  Is

22   that the danger, based on those views?

23         MR. SCHRADER:  I think there's a risk of

24   that.

25         THE COURT:  Okay.

141

1          MR. SCHRADER:  There's a risk of that

2    happening, there's a risk of that happening here, at

3    events here.  He has attended rallies here in the past

4    in Franklin, Tennessee.  So there's no reason to think

5    that he wouldn't engage in this conduct in the future.

6    I have no idea what form that would take, but he has

7    shown the Court what he's willing to do.  And

8    (indiscernible).

9          THE COURT:  Okay.  And you don't believe

10   there are any conditions that I could impose that

11   would reasonably assure that he would not carry out

12   those types of actions in the future?

13         MR. SCHRADER:  I do not.

14         THE COURT:  Okay.  Thank you,

15   Mr. Schrader.

16         Ms. Alpert, I'll hear from you.

17         MS. ALPERT:  First I wanted to add my --

18   the information we have regarding the Tasers.  Sorry,

19   the two incidents with Metro police.  My

20   understanding, and the Court will have the video, I

21   believe it's Defendant's Exhibit 5.  That incident

22   happened on January -- evening of January 5, and that

23   Mr. Munchel, you know, that incident ended amicably

24   with Mr. Munchel leaving in possession of the Taser.

25   And, you know, the government certainly has not

142

1    presented any evidence indicating that Tasers are

2    illegal to possess in DC.

3            The second encounter, my understanding,

4    is that Mr. Munchel went back to his hotel,

5    encountered Metro police -- or police officers eating

6    dinner, I believe, at the hotel.  Mr. Munchel greeted

7    them.

8            The officers finished their dinner, they

9    then came over to Mr. Munchel and asked him about the

10   Taser and what it was.  And then said that they wanted

11   to keep it because -- because of the incidents that

12   had happened at the Capitol that day.  And so that's

13   what happened.

14           THE COURT:  Okay.

15           MS. ALPERT:  Your Honor, I -- you know, I

16   certainly believe Mr. Munchel should be released, and

17   there are certainly conditions on which he can be

18   released to alleviate any of the concerns that

19   Mr. Schrader has.

20           Mr. Schrader, I think in a lot of ways,

21   is imputing the facts and feelings and sentiments of

22   the entire group of people who went to DC and also

23   Mr. Munchel's mother onto Mr. Munchel.  Of course, he

24   does not -- not everyone has the same views, not

25   everyone was in DC for the very same purpose.  There

1    were lots of people there for different reasons, and a

2    lot of people with different beliefs.

3                THE COURT:  Isn't that the risk that you

4    take when you make yourself a part of that mob?

5                MS. ALPERT:  Well, no.  I mean, I guess

6    what I'm saying here, Your Honor, is Mr. Schrader is

7    saying a crowd was yelling treason.  Well, that

8    doesn't mean that Mr. Munchel was yelling treason.  He

9    says Mr. Munchel's mother yelled things at the police

10   officer.  That wasn't Mr. Munchel.

11               And I think when the Court looks at the

12   video, the Court will see that there are many

13   different people at the videos, there are many

14   different people there behaving differently and acting

15   in different ways.  All of them obviously went for

16   some reason.

17               There's no -- we are aware that

18   Mr. Munchel was a supporter of Mr. Trump and felt

19   badly about the election, but there's also plenty of

20   evidence that he would not act in a violent manner.

21   That doesn't mean that you can't go and march and

22   exercise your right to protest.  I understand also

23   that entering the Capitol was a further act of

24   civil -- or can be viewed, certainly, as an act of

25   civil disobedience.

144

1          But, again, we need to bring the focus

2    back to whether Mr. Munchel poses a flight risk or

3    danger to the community as an individual and not

4    certainly -- certainly not the entire amount of people

5    who were there.  He can't be held in custody because

6    of their views.  And certainly not all the people in

7    the Capitol have been held in custody.  And I'll come

8    back to that in just a moment.

9          First of all, there's a presumption of

10   release under the Bail Reform Act, and the government

11   bears the burden of proof here, which we've

12   acknowledged.  And for Mr. Munchel to be detained, the

13   government has to prove that there are no conditions

14   or combinations of conditions that could reasonably

15   assure his appearance in Court or reasonably ensure

16   the safety of the community.

17          I think, you know, the government really

18   had very little to say about any indication that

19   Mr. Munchel failed to appear in court.  I will address

20   their arguments regarding dangerousness, but I do want

21   to say numerous courts across the country, numerous

22   federal courts have released people under similar or

23   even more egregious circumstances than what's before

24   the Court today.  It is unfortunate for Mr. Munchel

25   that he has become -- this photograph of him that the

1    government included in its complaint has made him this

2    poster child in this moment.  But it's in the -- that

3    is one snapshot in time.  And it doesn't represent who

4    Mr. Munchel is or whether he's a flight risk or

5    danger.

6              First of all, one of the reasons I wanted

7    to introduce into evidence the -- so just as an

8    example.  The government has indicated that

9    Mr. Munchel was leaping over this rail and apparently

10   in an effort to go do something when, in fact, if the

11   Court looks closely at the exhibit, he is stepping

12   over the railing and it appears, as the agent

13   indicated also, that Mr. Munchel was stepping over the

14   railing in pursuit of his mother.

15             Let me bring this back a little bit more

16   focused to the factors that the Court has to consider

17   under 3142(g).  Regarding the nature and the

18   circumstances of the offense, I would submit to the

19   Court that things that Mr. Munchel is charged with are

20   trespassing and civil disobedience related charges.

21             He is not charged -- I would submit to

22   the Court he is not charged with a crime of violence,

23   a terrorism crime.  There's no minor victims involved,

24   there was no drugs involved.  There are no firearms,

25   explosives or destructive devices involved in this

1   case.

2          I would submit to the Court that the

3   weight of any evidence of danger is limited.  He was

4   not engaged in any physical violence.  The Court has

5   heard no indication that he's indicated -- that he's

6   engaged in physical violence during his life or in

7   this incident.

8          There's no indication at all that he did

9   anything or had any plans to do anything with the zip

10  ties or the Taser.  And the government's suggestion

11  that he might have had more severe weapons is just --

12  it's really a stretch.

13         The Court heard evidence that, in fact,

14  Mr. Munchel had a pocket knife.  When the Court views

15  the videos and hears -- actually, I guess that's not

16  in that portion.  But there is no indication and it's

17  unreasonable to think that Mr. Munchel would have

18  brought some sort of long gun or any gun and stowed it

19  in a backpack and left it in a crowd of a thousand

20  people.  That was a completely 100 percent out of

21  character of Mr. Munchel.

22         He is a legal licensed firearm owner.

23  There's no indication that he has ever used a firearm

24  or handled a firearm improperly.  And there's no

25  indication that he brought firearms with him to this

147

1    rally.  So I strongly dispute the government's

2    allegation.

3                Turning to his history and

4    characteristics, by accounts of everyone who knows

5    him, he is not a violent person.  He is a kind person

6    who is looking out to help other people.  He has solid

7    ties here in Nashville.  He himself has lived here for

8    two years.

9                He has, you know, the unofficial family

10   in the Millers, and he has moved up here when they

11   moved up here.  And he has a solid third-party

12   custodian to stay with.  The whole family has

13   indicated that they are willing to help make sure he

14   complies with the Court's orders if he's released.

15               We have other evidence that when he was

16   younger he was -- his character now is similar to his

17   character when he was younger, growing up in the Boy

18   Scouts, someone who sticks up for other people.  He

19   was a high school graduate, participated in team

20   sports.  He was a competitive athlete.

21               He has maintained employment, and that's

22   not -- that's not the easiest thing to do in his line

23   of work during this time of -- during the pandemic.

24   So he has maintained steady employment.

25               Another factor the Court has to consider

148

1   under this statute is that he's not on probation,

2   parole or supervision at the time this happened.  And

3   the facts, as Mr. Schrader noted, it's a very

4   relatively small record that's primarily

5   (indiscernible) simple possession of marijuana.  And

6   all of his criminal history is in his early 20s.

7              The government repeatedly today said,

8   well, this is all we know so far.  And I understand

9   that.  I know there's a massive investigation going

10  on, but at the same time there's a massive

11  investigation going on.  And as Agent Defeo said, if

12  Mr. Munchel or anything related to Mr. Munchel came

13  up, he would be told about it.

14             So there is a lot of investigating going

15  on and there is nothing to indicate that Mr. Munchel

16  had nefarious intentions when he went to DC.  And

17  there's nothing to indicate that he's radical or has

18  been radicalized.

19             Your Honor, he doesn't pose a flight

20  risk.  I talked about some of the details already, but

21  he has strong ties here.  He doesn't have a passport.

22  He doesn't have the financial means to flee.  He

23  appeared in the past in court as he was directed to do

24  so.  I know there was that one failure to appear, but

25  as we indicated before, he just didn't even know he

1    was supposed to appear, and then he went to court

2    within the month and resolved that case anyway.

3            But most importantly -- and I agree with

4    Mr. Schrader when he says that actions can speak

5    louder than words.  Mr. Munchel's actions here do show

6    that he's not a flight risk.  He didn't -- when his

7    name started popping up all over the place, he

8    hunkered down with family here.  He didn't try to run

9    away from this situation.

10           And I -- he did not know or have reason

11   to believe that law enforcement was looking for him

12   until Sunday morning, January 10, which is when the

13   search was conducted at his house.  Before that, what

14   he knew was that people, private citizens and other

15   people on social media, were attempting to identify

16   people who were present at the Capitol, and that while

17   doing that, there were other people who were doxing or

18   releasing personal information.

19           So he knew that someone had released his

20   personal information and that was out there in the

21   world, and he could no longer use his phone.  So

22   turning off the phone is not an effort to avoid law

23   enforcement.  Staying with his family and friends was

24   not an effort to avoid law enforcement.  It was an

25   effort to try to figure out what the heck to do.  And

1    he did, in fact, try to find a lawyer and then the

2    next morning, Sunday morning when he found out that,

3    in fact, the FBI was looking for him and that there

4    was a search warrant, he called and turned himself in

5    right then.

6            He learned -- from the proof today, he

7    learned around 11 o'clock, late morning, that the FBI

8    was looking for him.  By 1:30 that day he was in FBI

9    custody.  The Court -- he had turned himself in.

10           The Court -- as the complaint reflects in

11   this case -- or, sorry, the arrest warrant, the arrest

12   warrant for Mr. Munchel was issued at 1:15.  So he was

13   in custody 15 minutes after the arrest warrant was

14   actually issued.

15           In that short time period between when he

16   learned that he was -- that the FBI had searched his

17   house and the FBI wanted to talk to him, he talked

18   with the agent more than once, apparently.  He tried

19   calling an attorney, but even while he's calling an

20   attorney, including Mr. Martin, he's on his way over

21   to the FBI to turn himself in.  And he did not wait

22   until an attorney appeared there with him.  He went

23   ahead and turned himself in.  That (indiscernible) is

24   not someone who will not appear in court.  That is

25   someone who will appear in court when they're directed

151

1    to do so.

2              He also made arrangements to preserve his

3    phone so that there would be -- to have his phone held

4    and retained until he knew what was going on, but he

5    made it clear that it was okay to turn the phone over

6    to FBI, which is exactly what happened.  He made that

7    clear to the attorney, Mr. Bean, who was the first

8    attorney he had spoken with and also to Witness 2.

9    All of that, Your Honor (indiscernible) prepared to

10   face the music and consequences of their actions and

11   would appear in court.

12             It's -- I would also submit, Your Honor,

13   that there's a lot to indicate that he doesn't pose a

14   danger.  And things we heard about today are that he

15   has no ties -- there's no indication he was tied to

16   any extremist group, militia groups, antigovernment

17   groups.  The witnesses that were interviewed indicated

18   that he doesn't have antigovernment sentiments and, in

19   fact, he is very much prolaw enforcement, which is

20   also shown by his actions on the videos that the Court

21   will see.

22             He's very respectful to the law

23   enforcement.  There's no indication he coordinated or

24   preplanned going to this event or coordinated with

25   anyone or had plans to do anything when he was there.

1   Again, he has no history of violence, history of

2   illegally using guns.  He did remove a knife and

3   possibly other items before he went into the Capitol.

4   He still had the Taser on him, but he had been allowed

5   to keep the Taser in DC the night before by the Metro

6   police there.

7          Inside the Capitol, he tried to prevent

8   other people from engaging in dangerous acts or

9   violent acts or destruction.  I think also in terms of

10  danger, I think that interactions that the Court will

11  see in Exhibit 5 that Mr. Munchel had on January 5 is

12  significant because it shows that he's truthful.

13         He's not trying -- he's not resisting the

14  police in any way, shape or form.  He's not trying to

15  rile up anyone.  He's trying to do the opposite.  He's

16  respectful with the police.  He truthfully answers

17  their questions.  He tells other people in so many

18  words, I'm fine, don't -- leave the police alone,

19  don't worry about this, they're just doing their job.

20  I think those also speak to the fact that he doesn't

21  pose a danger.

22         Regarding his entry into the Capitol

23  building -- and as the Court will see, they're really

24  only in there for about 11 minutes.  And he is --

25  there could be other reasons, but certainly a big

1    reason he's in there is because his mother wants to go

2    in and he is following her in there.  He never once

3    touches his Taser, he never does anything with the zip

4    ties.

5              I think it's very important for the Court

6    to look at Exhibits 7 and 8.  In the government's

7    brief the government, I think, insinuates that -- and

8    in argument the government is insinuating, I think,

9    that Mr. Munchel and his mother are, you know, right

10   on the tail of a crowd observing police officers being

11   attacked and then the mother goes and yells things

12   over the side at those police officers, like they're

13   in hot pursuit of them.

14             I would submit to the Court that is not

15   what the videos show.  What the videos show is that

16   there is a crowd of people that had an interaction

17   with police.  The videos show that Mr. Munchel

18   appeared -- doesn't appear on the screen when the

19   officers are there at all.  And there's a number of

20   people between Mr. Munchel and his mother and the

21   officers.  And there's a 15 -- at least a 15-second

22   gap, and it's not at all clear whether his mother

23   actually saw what happened to the officers.  It's just

24   not clear from the video at all.  So I would

25   respectfully disagree with the government that they

1    were in hot pursuit of the officers.  It appears that

2    they were behind a crowd that was behind the group

3    that was in the interaction with the officers and then

4    they were walking in the same direction.

5              His mother does apparently lean over and

6    yell something at the crowd below, but we don't know

7    who's down there or what they're doing at that point.

8    And Mr. Munchel and his mother were not part of the

9    crowd that was engaging with those police officers.

10             And what he is doing when he's in the

11   Capitol is keeping a firm grip on his mother's vest

12   except when she gets past him.  He's asking her what

13   her purpose is in being there, telling her

14   (indiscernible).  He's trying to keep up with her

15   while she's going around.  He's trying to find their

16   way out of the building.  He's telling other people

17   not to engage in violence.  So all of these things I

18   think show that he's not a flight risk or danger.

19             As I mentioned earlier, there are

20   numerous people charged in these Capitol cases in

21   other jurisdictions, other federal jurisdictions who

22   have been released.  I just want to talk about a few.

23   This information is available on the DOJ website.

24   They have a list called Investigations Regarding

25   Violence at the Capitol, and on that website it

155

1     includes the case names, fairly up-to-date information

2     about what cases are about and the affidavit and

3     complaints in those cases.  I'm sorry, fairly

4     up-to-date information about the procedural posture.

5              But just as some examples of what's going

6     on in other courts, Christopher Alberts was released.

7     He was arrested on the Capitol grounds after he did

8     not respond promptly to the police who were ordering

9     people to leave the Capitol grounds premises.  He was

10    wearing a bulletproof vest and he had a firearm -- a

11    firearm on his right hip.  He tried to flee when the

12    officers went to detain him.  He was released on

13    pretrial release.

14              Larry Brock was released on pretrial

15    release.  Mr. Brock is the person, the other person

16    who had been identified as Zip Tie Guy.  He's an

17    older -- retired military person who was dressed in

18    full military gear, and he was also carrying zip ties

19    that he also said he had found in the Capitol.  He was

20    released on pretrial release custody.

21              Jenny Cudd was released.  She was inside

22    the Capitol.  She was quoted in newspapers and in the

23    government's affidavit and complaint saying, we just

24    pushed and pushed and we got in.  She also talked

25    about how they broke down Nancy Pelosi's door.

1          Hunter Ehmke, E-h-m-k-e, was released.

2   He tried to break the windows -- or window to get into

3   the Capitol building.  He physically struck the

4   windowpane with his fist.  He was released.

5          Adam Johnson, the individual who stole or

6   at least moved the House Speaker's lectern, he was

7   released.

8          Mark Leffingwell.  Mr. Leffingwell tried

9   to push his way past US Capitol police officers who

10  had formed a barrier to prevent people from entering

11  the Capitol.  Mr. Leffingwell struck an officer

12  repeatedly with a closed fist.  Mr. Leffingwell has

13  been released on conditions.

14         Aaron Mostofsky.  (indiscernible) inside

15  the Capitol Rotunda and was wearing a US Capitol

16  Police bulletproof vest that he had found and carrying

17  a US Capitol Police riot shield in the Rotunda.  He

18  was released on pretrial release.

19         Robert Packer, who was inside the Capitol

20  wearing a (indiscernible) Camp Auschwitz shirt and who

21  had stolen a piece of Nancy Pelosi's name plate, he

22  was released.

23         Christine Priola, who was inside the

24  Senate chamber and sat in Vice-president Pence's seat,

25  she was released.

157

1          And then Joshua Pruitt, who earlier

2   entered the Capitol and then later (indiscernible)

3   failed to disperse while he was outside the Capitol,

4   he refused an order from Metro Police to disperse, he

5   was released.

6          So these folks, I would submit to the

7   Court, have more egregious situations.  Of course, we

8   don't have all the facts, but these are people who are

9   largely in the Capitol, many of people directly

10   disobeyed orders.  Some of them engaged in physical

11   violence.  Some of them stole things, vandalized.

12   These people, who I would submit are similarly

13   situated to Mr. Munchel, were released on conditions.

14          The government has suggested some

15   conditions of release in its memorandum, and we're not

16   opposed to those conditions.  And we're agreeable to

17   consideration of any other conditions of release that

18   the Court may think is appropriate, but we do think

19   that Mr. Munchel should be released pending trial.

20          THE COURT:  Ms. Alpert, did -- did -- it

21   maybe should be assumed, but I would assume you would

22   suggest that Ms. Miller serve as the third-party

23   custodian.  You proffered her as such, and are you

24   suggesting that would be an appropriate --

25          MS. ALPERT:  Yes.

158

1              THE COURT:  -- condition?

2              MS. ALPERT:  And I think -- I think we're

3    happy for that, if that provides some added assurance.

4    I think she and the family are a good influence and

5    will remain a good influence.  And they're very fond

6    of Mr. Munchel.

7              THE COURT:  Well, I gather, based on her

8    testimony, he really doesn't have any other place to

9    go if he were to be released; right?

10             MS. ALPERT:  Correct.

11             THE COURT:  Okay.

12             MS. ALPERT:  We could -- we could

13   certainly look into other options, but I believe that

14   would be the best and most appropriate option.

15             THE COURT:  Where's your client being

16   detained currently?

17             MS. ALPERT:  David -- Davidson County

18   Detention Center.

19             THE COURT:  All right, thank you.

20             Mr. Schrader, I'll give you the last word

21   if you want it, since it's the government's burden.

22             MR. SCHRADER:  Just briefly due to it's

23   almost 5:30 this afternoon.  Ms. Alpert --

24             THE COURT:  I didn't notice,

25   Mr. Schrader.

1          MR. SCHRADER:  Ms. Alpert mentioned that

2    (indiscernible) had been released on conditions.  I

3    don't know whether the government sought detention in

4    those cases, and I think we charged over a hundred

5    people at this point.  I could probably give you just

6    as many examples of people who have been detained in

7    these cases, everything -- it's a case-by-case

8    determination here.

9          You know, the defendant here brought

10   weapons of various types to the US Capitol, and the

11   rest of his conduct is, I think, pretty well laid out

12   on the video.  I've made my argument, I won't make it

13   again.

14          I guess what I'd say is if I can't

15   convince you after watching that video that he ought

16   to be detained, there's not anything (indiscernible).

17   I think the conduct on that video is egregious and it

18   warrants detention.  I'm standing (indiscernible)

19   serious concern about releasing Mr. Munchel back into

20   the community.

21          THE COURT:  I mean, Mr. Schrader, you --

22   the conduct on that video is eventually what the

23   government wants to sentence him for; right?  Why

24   should I make a decision about detention based on the

25   conduct of the video when that's not really even a

160

1    decision I've got to make?  I've got to make a

2    decision about whether or not between today and the

3    time he eventually resolves this matter, that I can

4    reasonably assure the safety of the community and that

5    he will appear for court.  Why is it -- why should it

6    be enough what happened on that video?

7              MR. SCHRADER:  Because of the seriousness

8    of the conduct that's before the Court.  It is

9    videotaped evidence of dangerousness, somebody who is

10   willing to suit up in body armor and take weapons to

11   the United States Capitol on January 6 when the

12   electoral vote is counted.

13             We all watched what happened that day,

14   right.  We watched lawmakers get evacuated from that

15   building.  People were -- I mean, people died.  Five

16   people died in the course of this event.  And Mr. --

17   as the Court alluded, I mean, you can't separate

18   yourself once you go into that hallway, really.

19             You can't say, well, I'm just kind of

20   there to walk around, particularly when you're dressed

21   like Mr. Munchel is.  I mean, you know, the conduct on

22   that video just speaks volumes about what it is that

23   Mr. Munchel is willing to do to carry out his belief.

24   He's got every right to protest, (indiscernible)

25   wherever he wants.  But he cannot, he cannot carry

161

1    weapons and pick up flexicuffs and wander around the

2    Capitol with crowds who are looking for lawmakers

3    chanting treason.

4              It's shocking conduct.  And that is

5    obviously the Government's concerns here, Your Honor.

6    That is one of the issues the government

7    (indiscernible) that we suggest that you detain

8    (indiscernible).

9              THE COURT:  I won't disagree that it's

10   shocking conduct, but, again, you're saying that

11   because he engaged in shocking conduct, there's no

12   condition that I can impose that will assure that he

13   won't engage in the same conduct in the future.

14   That's what you're really saying; right?

15             MR. SCHRADER:  In part because of the

16   nature of the conduct (indiscernible) willing to do

17   because of (indiscernible).

18             THE COURT:  Do you think if there --

19             MR. SCHRADER:  (indiscernible) engaging

20   in conduct, engaging in this sort of conduct.

21             THE COURT:  Do you think if there hadn't

22   been a rally that day that Mr. Munchel would have

23   engaged in that conduct?

24             MR. SCHRADER:  I don't know.

25             THE COURT:  Well, are you aware of any

1    rallies in the future that he's planning to go to

2    where that conduct will happen?

3              MR. SCHRADER:  I -- I mean, he's been

4    detained since, you know --

5              THE COURT:  Right.

6              MR. SCHRADER:  -- it happening.  I have

7    no -- I have no evidence that he is actively making

8    plans to attend any in the future.  I know he's

9    attended rallies in the past.  They weren't violent

10   rallies.

11             THE COURT:  Right.

12             MR. SCHRADER:  But it's clear what he is

13   willing to do.  I do think my colleague from DC was

14   trying to say something, if the Court would entertain

15   that as well.  I don't know that he's entered an

16   appearance in this case, but he was motioning to say

17   something.

18             THE COURT:  I'll let him talk in a

19   minute.  I want to ask you one more question, and that

20   is:  Do you think that if that rally had ended before

21   folks went to the Capitol, that Mr. Munchel was going

22   to go to the Capitol and do anything to interfere with

23   that vote?

24             MR. SCHRADER:  I don't know.

25             THE COURT:  Okay.

163

1          MR. SCHRADER:  He -- he dressed -- he was

2     there for that event.

3          THE COURT:  Okay.

4          MR. SCHRADER:  He was part of a crowd of

5     people who (indiscernible) to overturn the results of

6     the election by storming the Capitol and potentially,

7     who knows, killing lawmakers, holding them hostage.

8     (indiscernible) wanted to do those things.  The only

9     thing he didn't have was lawmakers.

10          THE COURT:  Right.  Okay.

11          Yes, sir.  You wanted to say something?

12          MR. BASET:  Yes, Your Honor, if I may.

13     I'm Ahmed Baset from the US Attorney's Office in

14     Washington, DC.

15          THE COURT:  Yes, sir.

16          MR. BASET:  And my co-counsel here has

17     said pretty much everything he could, except one

18     thing, if I could just emphasize.  Your Honor asked a

19     question of it seems as if the harm -- or the danger

20     to the community existed at the time of this rally in

21     DC, and that perhaps that rally not existing anymore

22     would abate any concern for the community.

23          From -- I think a real acute concern that

24     we have is that a lot of people disagreed with the

25     outcome of the election and the -- and President Biden

164

1    becoming president.

2                And only a very small percentage of those

3    people ended up going to this rally in DC on the 6th.

4    And an even smaller percentage of those people

5    actually had the audacity to enter and storm into the

6    Capitol.  And even far more smaller percentage of

7    people than that did so with possessing a dangerous

8    weapon, that being the Taser.

9                We're not even talking about the

10   flexicuffs that he found, that he didn't give to

11   police, that he actually took with him back to

12   Tennessee.  And so the concern at that point is you're

13   talking about someone who not just -- who doesn't only

14   just believe that the election was stolen, that

15   President Biden is not the rightful president, but

16   someone who has an extreme belief in that regard.

17               Insofar as it needs him to take -- go

18   into the Capitol and -- with possession of these

19   items, ostensibly going into the Senate floor looking

20   for legislators at the rest of the crowd --

21               THE COURT:  Hang on.  I'm sorry to

22   interrupt you, but can you hang on just a second.  I'm

23   hearing some background noise.  It sounds like

24   somebody else may be talking.  If you're not talking,

25   would you please mute your microphone.  We don't need

165

1   to hear your conversation.

2              I apologize, I didn't mean to interrupt

3   you.  I just wanted to make sure I could hear you.

4              MR. BASET:  No, no.  I appreciate that,

5   thank you.  And so the point being that this --

6   someone, at least from the government's point of

7   view -- and we're making decisions very carefully on

8   who we are asking to be held.  He represents among the

9   extreme of the extreme that decided to go into the

10  Capitol building that day with weapons.

11             And moreover, to make the impact for what

12  that means for the community in Nashville and in the

13  country abroad is that if he encounters people who

14  don't share in his position, in his extreme position,

15  if people have the audacity to actually be proud of

16  who the president is and to talk about those beliefs

17  in open air and have different opinions than him, the

18  concern is that he might not be able to control

19  himself in those situations.

20             And we saw that he's somebody who

21  couldn't control himself on the day of this incident.

22  That is etched into the memory and history of this

23  country.  That is unprecedented in nature.  Counsel

24  raises the issue of, well, he didn't know he couldn't

25  bring the Taser into the Capitol building, he was

1    allowed to keep it the day before, but that just is --

2    is -- it's strange credulity and it also is not a

3    defense because ignorance of the law is not a defense.

4           That's why we have guards outside of the

5    Capitol building, inside the Capitol building.  It's

6    one of the most fortified buildings in this country.

7    So to think for a moment that they would allow

8    somebody like Mr. Munchel inside with a Taser dressed

9    like that is absurd.

10          And he knew very well that he wouldn't be

11   able to go in that manner.  And, in fact, he relied on

12   the people in front of him to breach the doors, to get

13   in with the flexicuffs so that he could achieve what

14   he ultimately came up to do, which was to stop the

15   Senate from carrying out its duties, its Democratic

16   duties and obligations.  That was the purpose.

17          He was there with his mother.  They share

18   the same views, and afterwards they didn't -- they had

19   no remorse for that.  They continued to tell people in

20   the press that, we are revolutionaries prepared to die

21   because we think that what happened in this election

22   was wrong.

23          And that opinion doesn't change.  If

24   anything, it intensifies because the president has

25   been installed.  And so from the government's point of

1    view, the injury and the harm and the risk to the

2    community is not just in the District of Columbia, but

3    it exists in any place in this country where he may

4    encounter someone of a different opinion because his

5    views are extremist.

6           And that's all I have to say.  I

7    appreciate that.  Thank you, Your Honor.

8           THE COURT:  You wouldn't want me to

9    believe that he's never encountered people with

10   different views before in his life, would you?

11          MR. BASET:  No, certainly that's not my

12   argument.  My argument --

13          THE COURT:  You think now because of

14   this, anybody he encounters with a different view is

15   going to be in danger from him.

16          MR. BASET:  No.  I would proffer, though,

17   if I may -- and I don't know if this came out at

18   trial, or at the hearing, but there was an encounter

19   that he did have at the hotel at the night the Taser

20   was confiscated from him, the night of the 6th.  He

21   had an encounter with (indiscernible) news reporter

22   who was videotaping things.  He then called him Antifa

23   and threatened to hurt him and actually put hands on

24   him.  His mother at that point said, I'm going to

25   spray you with mace.  And so to think that --

168

1          MS. ALPERT:  Your Honor, I object.  I

2    object to this being brought in at this point.

3          MR. BASET:  Your Honor, can give it zero

4    weight if you'd like.  I merely make the point, I

5    would be remiss if I didn't, given the severity and

6    importance of this hearing.  If you'd like, give it

7    zero weight, but what I can say -- and this is

8    something that the government can support with an

9    incident report, and it's something that is available

10   on Open Source --

11         THE COURT:  Well, we're done with the

12   proof in this matter.  I don't want to hear about any

13   other instance than what's in the record already.  If

14   you want to refer to something in the record, I'll

15   hear from you, but I think -- I think I -- I think

16   everybody's made their point and I've heard the

17   arguments of counsel in this case.

18         MR. BASET:  Thank you.

19         THE COURT:  All right.  I tell you what

20   we're going to do.  I need to review these videotapes.

21   I want to look a little more closely at the exhibits.

22   I had hearings right up until the time of this one, so

23   I appreciate you getting those things to me in

24   advance, but I hadn't really had a chance to look at

25   them that closely.  I don't think that piece will take

1   very long, but I do need to review these videos.

2   What I think we should do is -- y'all are

3   free to just sort of -- I think what I want you to do

4   is stay online and -- but you can go about your

5   business, mute your screens.  You know, if

6   Mr. Schrader, if you and Ms. Alpert have anything to

7   talk about, y'all can talk by telephone or otherwise

8   while we're on a little recess.

9   And I'll just -- I'll just come back and

10  let you know when I'm -- when I'm ready to -- to

11  render my decision.  Okay?  Thank you all.  We'll in

12  recess for now.

13  MR. SCHRADER:  Thank you, Your Honor.

14  THE COURT:  And we still have some

15  folks -- you're all muted.  And when I -- when I'm

16  ready to render my decision, I'll come back on and

17  announce that and we'll -- we'll take it from there.

18  So thank you, everyone.  We'll be in recess.

19  (Whereupon, a break was taken.)

20  THE COURT:  Okay.  We're ready to go back

21  on the record now.  Thank you all for your patience

22  and waiting.  Ms. Alpert, are you there?  Very good.

23  Looks like everyone's back on the screen.  I apologize

24  that it took me a while to get through that, but I

25  thought it was important, I wanted to review all of

1   the exhibits that were filed in the case.

2           I've reviewed all of the -- the videos

3   that Ms. Alpert provided as well, so I have -- I have

4   done that.  I guess before I begin, any of the parties

5   have any announcements or anything else you want to

6   say before I tender my ruling?

7           MR. SCHRADER:  I don't believe so,

8   Your Honor.  I mean, I think it depends on what the

9   Court's ruling is.  I've included in my detention

10  memo, if the Court's inclined to release the

11  defendant, we'd ask for a stay until (indiscernible)

12  Monday to file an appeal with the District Court in

13  Columbia.  We'd also ask (indiscernible) be imposed.

14  So I just reiterate that request at this time.

15          THE COURT:  All right, very good.  Thank

16  you.

17          First of all, I want to commend the

18  lawyers for their work on this case.  I think that

19  your performance and conduct is a true testament to

20  the character of our constitution and of the values

21  and principles that we as Americans hold dear and that

22  are important, as signified through the Bill of

23  Rights.  Certainly the lawyers have given this time --

24  this case the time and attention that it deserves.

25  That's evidenced by your submissions to the Court and

1    by the arguments that you have made.

2              I also want to take a moment to say thank

3    you to the witnesses in the case who have testified on

4    behalf of Mr. Munchel, those individuals who have been

5    willing to put themselves on the line, who have been

6    there to support Mr. Munchel in this case.

7              It's not lost on this Court that there

8    are many individuals who come before the Court charged

9    with criminal offenses who have no one who cares about

10   them or is willing to stand behind them or stand up

11   for them.  And so I really appreciate the witnesses'

12   willingness to testify in this case and their

13   agreement to serve the Court, should I see fit to

14   include that as a condition of release.

15             I'm sure that my appreciation to those

16   witnesses pales in comparison, though, to

17   Mr. Munchel's appreciation, knowing that those folks

18   are willing to stand up for him and behind him and

19   with him as he goes through these proceedings.

20             The Bail Reform Act ordinarily requires

21   that a defendant be released pending trial unless

22   there are no conditions that will reasonably assure

23   the appearance of the person at future court

24   proceedings and the safety of the community.

25             In determining whether or not release is

172

1  appropriate in the case, the Court is directed to

2  consider several factors.  Those include the nature

3  and circumstances of the offense charged, the weight

4  of the evidence against the defendant, the history and

5  characteristics of the defendant and the nature and

6  seriousness of the danger posed by the defendant's

7  release.

8           The Court, in hearing the proof in this

9  case, takes into account all of those factors.

10  Additionally, as we conduct this proceeding by video

11  conference, we're all very well aware of the ongoing

12  COVID-19 pandemic and its impact on the operations of

13  the courts and on our daily lives as citizens in this

14  country.

15           The Court likewise takes into account the

16  pandemic and its impact, particularly in custodial

17  situations and the case -- cases of CO-VID that are

18  prevalent in jail communities among incarcerated

19  individuals, and gives appropriate consideration to

20  that.

21           In our society liberty is the norm and

22  detention prior to trial, without trial is the

23  carefully limited exception.  As the Supreme Court has

24  stated, unless this right to bail before trial is

25  preserved, the presumption of innocence secured only

1    after centuries of struggle would lose its meaning.

2    The traditional right to freedom before conviction

3    permits a defendant to prepare his defense and

4    prevents the infliction of punishment prior to

5    conviction.

6            The Court is also mindful of the tension

7    that exists between the Bail Reform Act and the

8    presumption of innocence which applies to Mr. Munchel,

9    as it does to all individuals charged with criminal

10   offenses under our constitutional system.

11           As an initial matter, having reviewed the

12   video submissions from the defendant in this case, I

13   have to say that from an emotional standpoint,

14   Mr. Schrader's arguments have a lot of appeal.  Seeing

15   the conduct of fellow citizens on January the 6th and

16   what happened at the Capitol is -- is difficult to

17   watch.  It's something that I'm not sure that there

18   are many of us who ever thought we would see in this

19   country.

20           And there's an obvious visceral reaction

21   to it that I think is natural and reasonable for

22   individuals to have, and the Court has to give that

23   the appropriate consideration but also has to be

24   guided by the law in this case and has to consider the

25   factors that the law requires be considered in this

1   case.

2          With respect to Mr. Munchel's history and

3   characteristics, the Court's reviewed the bond report

4   in this case, heard the testimony and reviewed the

5   submissions of the parties.  Mr. Munchel's a high

6   school graduate with some trade schooling.  He grew up

7   in Georgia, it appears, for the most part; lived in

8   Nashville for a couple of years.

9          Court's heard about his employment and

10  about his character and the type of person he's

11  perceived to be by his friends.  And it appears that

12  he's maintained employment up until the time of his

13  arrest.  He's in good health.

14         As evidenced from the search of his home,

15  Mr. Munchel -- and also of his social media and other

16  aspects, Mr. Munchel enjoys the privileges of

17  citizenship, of having opinions and expressing those

18  opinions.

19         Mr. Munchel also appears to be interested

20  in firearms.  The search of his residence discovered a

21  number of firearms.  The Court also notes that

22  Mr. Munchel has a permit, conceal carry permit.  There

23  was argument from counsel suggesting that he has a

24  permit that not only allows him to carry in a

25  concealed fashion, but also in an unconcealed fashion.

175

1          The Court's reviewed and considered

2     Mr. Munchel's criminal history, as it is.  He has two

3     prior convictions, appear to be for simple possession

4     of marijuana in Georgia.  Those convictions are both

5     over five years old.  He has no felony convictions.

6     No convictions for any crime of violence.  There's not

7     been any proof of any probation violations alleged.

8     And at the time of this offense, he is not and was not

9     on probation.

10          In looking at the dual considerations

11    that the Court must consider regarding risk of flight

12    and dangerousness, I'll take the flight issue first.

13    The government argues that, in part, Mr. Munchel

14    should be detained because he poses a risk of flight.

15    In support of this position, the government argues

16    that Mr. Munchel deactivated his social media

17    accounts.  He gave his cell phone to an associate.  He

18    left his house.  He didn't show up for work and did

19    not disclose to his brother where he was.

20          The Court does not accept the

21    government's assumption that this indicates a risk of

22    flight.  The Court heard evidence, and I think can

23    generally take judicial notice that there was a large

24    contingent of individuals after this event on the 6th

25    who were engaged in detective activity for lack of a

1    better term, on social media platforms, attempting to

2    identify individuals, attempting to locate them.

3            The Court heard proof that there was --

4    that Mr. Munchel was receiving threatening

5    communications, harassing communications, that there

6    was a lot of media interest in him.  And the Court

7    believes that those are legitimate and reasonable

8    considerations for why an individual might take the

9    actions of deactivating social media and passing off

10   their cell phone to another individual.

11           With respect to the giving of the cell

12   phone to the individual in this case, the Court's

13   heard proof, and there's no counterevidence, that the

14   purpose of that was to preserve the information that

15   was contained on it, to assure that it could be

16   utilized and that it was subsequently provided to the

17   authorities in this particular case.

18           Likewise, and most importantly, I would

19   say, it became clear that when -- when it became

20   clear, rather, that the FBI was searching for

21   Mr. Munchel by way of the search warrant executed at

22   his house and him receiving notice of that, he

23   voluntarily turned himself in.  He communicated,

24   reached out to the FBI, made arrangements to surrender

25   and did, in fact, surrender.

1        As my conversation and discussion with

2   Mr. Schrader evidences, it wasn't until there was the

3   existence of a warrant, there really wasn't anything

4   for Mr. Munchel to turn himself in on.  Once he knew

5   for certain that there was law enforcement interest in

6   him by way of the search and indication that there

7   would be a warrant forthcoming, he turned himself in.

8        Certainly in the time period between that

9   Friday evening and the Sunday when he surrendered, if

10  Mr. Munchel were inclined to flee, he had ample

11  opportunity to do so, and he didn't.  He stayed in the

12  area.  The Court heard testimony from the individuals

13  he stayed with.

14        The Court accepts and credits that

15  testimony and believe that in light of that testimony

16  and in light of all those circumstances, there is no

17  risk of flight by Mr. Munchel, and that does not form

18  a basis upon which to detain him.

19        In any event, the Court believes that

20  Mr. Munchel's prior experience with the criminal

21  justice system suggests that he'll stand up and answer

22  to his charges, and there's no reason to believe that

23  imposing conditions of release would not also

24  reasonably assure his appearance at future court

25  proceedings.  And the Court believes that through

1    those conditions that appearance can be reasonably

2    assured and, therefore, declines to detain Mr. Munchel

3    on the basis of a risk of flight.

4            So that leaves the second consideration,

5    and that's the issue of dangerousness.  As I said in

6    questioning during argument, mobs are dangerous.

7    They're inherently dangerous.  Whether it's a mob at a

8    sporting event or mob at a concert or a mob at a

9    political protest or a mob intendant upon doing

10   damage, anytime you choose to be a part of a mob,

11   there is a mob mentality and you automatically connect

12   yourself to that dangerousness.

13           In this case it appears, as the

14   government's indicated, that Mr. Munchel chose to be a

15   part of that mob.  He chose to be a part of this group

16   that engaged in the conduct that's outlined in the

17   criminal complaint and that is captured by numerous

18   videos and photographs and the like.  It's conduct

19   that is dangerous as an inherent nature.  It's conduct

20   that bore out itself to be dangerous in this incident.

21           The Court also should look to the issues

22   of motive, intent and actions in addressing this issue

23   of dangerousness.  Was there an intent to do harm?

24   That's not clear in this case as it relates to this

25   particular defendant.  As I noted throughout the

179

1    hearing, there is evidence of -- sort of on both sides

2    of that coin.  Mr. Munchel made some statements that

3    are captured on the audio that are very troubling and

4    concerning.  And he also made statements that are

5    exactly the opposite of those statements.

6                So it's not clear what his motive was.

7    It's not clear what his intent was.  The proof on

8    these issues are inconsistent.  What we do know is

9    what his actions were.  And his actions were to follow

10   the mob, to go into the Capitol, to interfere with

11   governmental functions, all of the things that I

12   relied upon to find probable cause for the charges

13   that have been brought in this case.

14               We know that he took a Taser gun into the

15   Capitol, based upon the evidence that's been

16   presented.  We know that he picked up the zip ties

17   once he -- once he arrived in the Capitol.  What the

18   government also argues that they believe he had other

19   weapons, perhaps more dangerous weapons than the stun

20   gun, and he didn't take those weapons into the

21   Capitol.  Presumably that means he had a choice to

22   take lethal weapons into the Capitol and made a choice

23   not to do that.

24               Likewise, there's the issue of advance

25   planning.  What advanced planning was there in this

1    situation?  There's been no evidence presented to me

2    that Mr. Munchel was engaged in any advance planning

3    for these activities.  And when one looks at the

4    videotapes and listens to the audio of those tapes,

5    seems pretty clear that there isn't much of a plan.

6              In fact, Mr. Munchel repeatedly asks his

7    mother what her plan is, what's her goal, what's she

8    going to do.  That all suggests to me that Mr. Munchel

9    didn't go to Washington, DC with an intention of

10   storming the Capitol and causing harm to any

11   individuals in there.

12             And the items that he had on them -- had

13   on himself, while they may classify under the statutes

14   as dangerous weapons, there's no evidence that he

15   utilized those weapons, no evidence that he used those

16   zip ties, no evidence that he even knew he was going

17   to be in possession of zip ties unless and until he

18   happened upon them during the course of being in the

19   building.

20             The Court's considered all of these

21   factors in the decision as to whether or not

22   Mr. Munchel poses a danger to the community.  And

23   that's really the crux of the matter.  The Court has

24   to decide in this case whether or not there are

25   conditions that will reasonably assure the safety of

1    the community between today and the time that

2    Mr. Munchel addresses the charges in this case in

3    their final form.

4            I asked the government pointblank what

5    that danger was, and they referred to Mr. Munchel's

6    radicalization, his views that he holds with regard to

7    the legitimacy of the president, the presidential

8    election and of the government and his prior actions

9    in this situation of going to Washington, DC, going

10   into the Capitol, carrying a Taser gun and having the

11   zip ties.

12           The Court believes that in light of this,

13   Mr. Munchel does not pose an obvious and clear danger

14   to the safety of this community.  Mr. Munchel has no

15   prior history of violence.  He's an individual who's

16   had beliefs in the past.  He's been to other rally

17   situations that clearly didn't rise to the level or

18   get out of control in the manner that this one did.

19   And there's no evidence that he's ever taken any

20   action on that.

21           Mr. Munchel has -- is an individual who's

22   kept a lot of weapons.  Those weapons appear to be

23   lawful.  He appears to legally possess those weapons.

24   But what strikes me as significant as it relates to

25   the dangerousness around those weapons, while just

1    describing the weapons can feel and seem dangerous,

2    that's a danger that this Court believes it can

3    control.  Those weapons have been seized.  A condition

4    of release will be that Mr. Munchel not possess any

5    firearms or other dangerous weapons.  The Court

6    believes that Mr. Munchel will comply with those

7    conditions.

8            One thread that seems to run through,

9    notwithstanding Mr. Munchel's conduct here, is his

10   apparent respect for law enforcement.  And that's --

11   it's a little bit counterintuitive because on the one

12   hand his actions are an absolute disrespect of law

13   enforcement, but on the other hand, the videos show

14   him speaking with law enforcement in respectful ways,

15   indicating his support of law enforcement.  That's

16   consistent with his prior actions and prior

17   statements.

18           And so the Court believes that when told

19   to do something, that Mr. Munchel is capable of

20   following those instructions and will comply with

21   those orders.

22           It's also not lost on this Court, a

23   factor that wasn't really discussed much, and that is

24   that the government indicates that Mr. Munchel was

25   aware that law enforcement was on his tail, that

183

1   people were looking for him.  He had all those

2   weapons, and it doesn't appear that he did anything to

3   try to hide the weapons or secret away weapons and

4   there's no indication that there are any other weapons

5   that he's storing somewhere else.  It appears that he

6   just left these weapons where they were.

7          And that would suggest that he did not

8   have a nefarious intent in possessing those weapons or

9   was holding those weapons for some improper purpose in

10  the future.  In any event, the Court believes that by

11  imposing a condition that he not possess any firearms

12  or dangerous weapons, that that concern can be

13  alleviated.

14         As the government notes, Mr. Munchel is

15  entitled to his opinions.  It's protected under the

16  constitution.  He has a right to hold those beliefs.

17  He has a right to state those beliefs.  He doesn't

18  have the right to do what he did on January the 6th.

19         Now, that's for another day, but

20  certainly the Court's heard evidence in this case that

21  would suggest that he engaged in conduct that is, at

22  its core, dangerous.  Again, the issue, though, is

23  whether or not there are conditions that I can impose

24  that can reasonably assure the safety of the

25  community.

184

1    I believe that the government's (sic)
2    requested conditions in this case are conditions that
3    will reasonably assure the safety of the community.  I
4    have no reason to believe that Mr. Munchel won't
5    comply with those conditions.  I have no reason to
6    believe that Mr. Munchel is a member of any organized
7    collective action against the government.
8    There was reference to a group, the
9    Oathkeepers.  There's also testimony Mr. Munchel has
10   no apparent connection to them.  While he may have
11   some affinity to them or gave them a fist bump, gave
12   somebody associated with them a fist bump, it's a very
13   different thing than saying that he's a part of any
14   sort of organized group like that.
15   Likewise, as I said, no evidence that he
16   made planning in advance in terms of what he was going
17   to do in DC.  It appears that that trip was planned
18   just days before the event, that he went to that event
19   and then fell into the mob.
20   I believe that, again, there are
21   conditions that I can impose that will reasonably
22   assure the safety of the community in this case and,
23   therefore, find that release is appropriate.
24   Now, I want to be clear that this
25   decision in no way is intended to condone the actions

1    on January the 6th.  I found that those actions are

2    dangerous.  I believe those actions are dangerous.

3    They're dangerous in many ways.  They're dangerous

4    to -- in terms of the conduct that occurred, the

5    evidence supports that.  There were numerous injuries,

6    including death.

7              It's also dangerous to our system of

8    government and our democracy and our constitution.

9    But, again, the consequence of those actions is for

10   another day.  What's for today is whether or not there

11   are conditions that can reasonably assure the safety

12   of the community between now and the time those

13   consequences happen with regard to the underlying

14   charges.

15             Based upon the totality of the

16   circumstances, giving due consider to all the factors

17   that the Court must consider in this case, the Court

18   finds that there are conditions that I can impose that

19   will reasonably assure the safety of the community.

20             Therefore, it will be the order of the

21   Court that Mr. Munchel will be released subject to the

22   following conditions:  He must not violate federal,

23   state or local law while on release.  He must advise

24   the Court or the pretrial services office or

25   supervising officer in writing before making any

186

1    change of residence or telephone number.  He must

2    appear in court as required and, if convicted, must

3    surrender to serve any sentence that may be imposed as

4    directed.

5              I'm also going to order that he be placed

6    in the custody of Ms. Miller who will serve as the

7    third-party custodian.  He will reside with Ms. Miller

8    at her address.  Ms. Alpert, I'd ask that you, upon

9    completion of the matters and at an appropriate time,

10   have Ms. Miller indicate her signature on the order.

11             I'd ask that you provide the address and

12   other identifying information directly to probation,

13   rather than include it in the order to protect the

14   issues that we've already talked about.  Ms. Miller's

15   agreed to supervise Mr. Munchel, to use every effort

16   to assure his appearance at court proceedings and

17   notify the Court immediately if he violates any

18   condition of release or is no longer in the

19   custodian's custody.

20             Additionally, I'm going to impose the

21   following additional conditions:  That Mr. Munchel

22   must submit to supervision by and report for

23   supervision to the pretrial services office as

24   directed.  I will require that, at a minimum, he must

25   call pretrial services once per week.  However, I'll

1    leave the frequency and method of that communication

2    to pretrial services for anything greater than once

3    per week.  The once per week will be a minimum.

4            He is to continue or actively seek

5    employment.  He is to abide by the following

6    restrictions on personal association, residence and

7    travel.  That travel will be limited only within the

8    Middle District of Tennessee unless preapproved by

9    pretrial services.

10           The defendant may not travel outside the

11   continental United States without court approval.

12   Defendant must participate in all future court

13   proceedings as directed.  And he may not go to

14   Washington, DC unless he is appearing for court,

15   meeting with pretrial services or consulting with his

16   attorney.  So effectively his travel will be limited

17   to the Middle District of Tennessee and the District

18   of Columbia as specified herein.

19           He is to avoid all contact, directly or

20   indirectly, with any person who is or maybe a victim

21   or witness in the investigation or prosecution.  That

22   includes any codefendants in the case.  He's not to

23   possess a firearm, destructive device or other

24   dangerous weapon.  He's not to use alcohol

25   excessively.  He's not to use or unlawfully possess a

1    narcotic drug or other controlled substance defined in
2    21 United States Code Section 802 unless prescribed by
3    a licensed medical practitioner.

4            He's to submit to testing for prohibited
5    substance if required by pretrial services.  That
6    testing may be used with random frequency and may
7    include urine testing, the wearing of a sweat patch,
8    remote alcohol testing system and/or any form of
9    prohibited substance screening or testing.

10           Defendant must not obstruct, attempt to
11   obstruct or tamper with the efficiency and accuracy of
12   prohibited substance screening or testing.

13           He's to participate in a program of
14   inpatient or outpatient substance abuse therapy and
15   counseling if directed by pretrial services.

16           He'll participate in the following
17   restriction and comply with its requirements as
18   directed:  That will be home detention.  You are
19   restricted to your residence, in this case the
20   residence of Ms. Miller, at all times except for
21   employment, education, religious services, medical,
22   substance abuse or mental health treatment, attorney
23   visits, court appearance, Court-ordered obligations or
24   other activities approved in advance by the pretrial
25   services office.

1          You're to submit to location monitoring

2    as directed by the pretrial service office or

3    supervising officer and comply with all of the program

4    requirements and instructions.  You must pay all or

5    part of the cost of the program based on your ability

6    to pay as directed or determined by the pretrial

7    services office or supervising officer.

8          You're to report as soon as possible or

9    within 48 hours to the pretrial services office or

10   supervising officer every contact with law enforcement

11   personnel, including arrests, questioning or traffic

12   stops.  You're to permit pretrial services to visit

13   you at home or elsewhere at any time and allow the

14   pretrial services officer to confiscate any contraband

15   in plain view.

16         And you are to quarantine for 14 days

17   upon release prior to reporting to pretrial services

18   to be placed on electronic monitoring in light of the

19   ongoing pandemic and concern for the probation office

20   and pretrial services, in light of that fact.

21         I need to also advise you of the

22   following penalties and sanctions of violating any of

23   the foregoing conditions of release may result in the

24   immediate issuance of a warrant for your arrest, a

25   revocation of your release, an order of detention,

1    forfeiture of any bond and a prosecution for contempt

2    of court and could result in imprisonment, a fine or

3    both.

4           While on release if you commit a federal

5    felony offense, the punishment is an additional prison

6    term of not more than ten years.  For a federal

7    misdemeanor offense, the punishment is an additional

8    prison term of not more than one year.  This sentence

9    will be consecutive, meaning in addition, to any other

10   sentence that you receive.

11          It's a crime punishable by up to ten

12   years in prison and a $250,000 fine or both, to

13   obstruct a criminal investigation, tamper with a

14   witness, victim or informant, retaliate or attempt to

15   retaliate against a witness, victim or informant or

16   intimidate or attempt to intimidate a witness, victim,

17   juror, informant or officer of the Court.

18          The penalties for tampering, retaliation

19   or intimidation are significantly more serious if they

20   involve a killing or attempted killing.  If after

21   release you knowingly fail to appear as the conditions

22   of release require or to surrender to serve a

23   sentence, you may be prosecuted for failing to appear

24   or surrender and additional punishment may be imposed.

25   If you're convicted of an offense punishable by a term

1   of imprisonment of five years or more but less than 15

2   years, you'll be fined not more than $250,000 or

3   imprisoned for not more than five years or both.

4          For any other felony, you'd be fined not

5   more than $250,000 and imprisoned for not more than

6   two years or both; and for a misdemeanor you'd be

7   fined not more than $100,000 and imprisoned for not

8   more than one year or both.  A term of imprisonment

9   imposed for failure to appear or surrender will be

10  consecutive to any other sentence that you may

11  receive.

12         And normally, Mr. Munchel, I would pass

13  you a copy of this order, have you review it with your

14  attorney and sign in open court.  However, since we're

15  conducting this proceeding by video conference, I need

16  to ask you a series of questions.  Do you acknowledge

17  that you're the defendant in this case and that you're

18  aware of the conditions of release that I've

19  previously reviewed with you, sir?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  Do you promise to obey all

22  the conditions of release, to appear as directed and

23  surrender to serve any sentence that might be imposed

24  in the case?

25         THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  And are you aware of the

2   penalties and sanctions set forth in the document that

3   I just reviewed?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  All right.  This will be the

6   order of the Court.  You'll be released subject to

7   these conditions.

8          Mr. Schrader, I'll hear from you about

9   the stay.

10         MR. SCHRADER:  Yes, Your Honor.  We do

11  intend to (indiscernible) District of Columbia and

12  would ask (indiscernible) the end of the day on Monday

13  for us to file that with the court in DC.

14         THE COURT:  Mr. Schrader, in some of the

15  other cases before this Court, I've received

16  information from the district indicating -- from the

17  District of Columbia with regard to setting cases and

18  have been advised that in the event the government

19  wished to seek detention upon appearance in DC before

20  a magistrate judge if the defendant was released here,

21  that that was to be set in person, no earlier than

22  three business days following the hearings in the

23  jurisdiction of arrest.

24         I gather what you're suggesting is

25  something otherwise, that you wish to directly appeal

1    this and you'd like time by way of a stay to seek that

2    appeal.  Do you have any knowledge about this -- this

3    email that I've received from your office about

4    setting things?

5              MR. SCHRADER:  I don't.  This is a

6    request from the (indiscernible) the government in at

7    least up four other cases (indiscernible).

8              THE COURT:  Yeah, I'm sorry, I'm having

9    trouble hearing you.  Maybe you want to refresh your

10   screen so I can hear you.  You might try that.

11             MR. SCHRADER:  Sure, just a moment.

12             THE COURT:  Thank you.

13             MR. SCHRADER:  Maybe that works better.

14             THE COURT:  Yeah, I think that might be a

15   little bit better.

16             MR. SCHRADER:  I know there's a

17   (indiscernible) at least one other case, there was a

18   gentleman who was photographed in I think in Pelosi's

19   chair, I believe an Arkansas defendant, that he was

20   released on conditions there.  The government filed an

21   emergency motion with Judge Beryl Howell, a judge in

22   DC.  She issued the transfer order as a result of the

23   government's request.  So we'd like to proceed under

24   the same, basically give the judge there a day to rule

25   on this (indiscernible).

194

1          THE COURT:  Yeah, I'm familiar with that

2     case.  I think the request for stay in the -- in the

3     district where the magistrate judge ruled was denied,

4     if I'm correct; isn't that right?

5          MR. SCHRADER:  I don't know.

6          THE COURT:  Okay.

7          MR. SCHRADER:  I don't know whether

8     Mr. (indiscernible) I don't know.

9          THE COURT:  I'm sorry --

10          MR. SCHRADER:  Do you have --

11          THE COURT:  You broke up a little bit on

12     me, there.  Go ahead, sir.

13          MR. BASET:  Yes.  My understanding is

14     that we had made an oral request to stay in Arkansas.

15     The judge denied that oral request.  We then filed an

16     emergency motion here in DC for -- to revoke --

17     reconsider that decision.  Chief Judge Howell, my

18     understanding, she granted the government's motion to

19     stay the order releasing the defendant in that case

20     and for transfer of that matter to DC.

21          I believe it's still pending, as far as

22     whether -- as to the ultimate decision to release.

23     And so the only thing in that case so far is

24     Judge Howell has granted the government's motion to

25     reconsider and that matter is pending.

1          THE COURT:  Okay, thank you.  I
2    appreciate your input on that.
3          Ms. Alpert, you want to be heard on this?
4          MS. ALPERT:  Yes, Your Honor.  We would
5    object to a stay.  In general there are four
6    considerations on whether a stay is appropriate, and
7    the Sixth Circuit has found that the two most
8    important factors are whether the movant has made a
9    strong showing that he is likely to succeed on the
10   merits of the appeal that they're seeking.  Here, I
11   don't believe the government has made any showing
12   of -- that it's likely to succeed on the merits of
13   seeking detention.
14          And, in fact, based on the list of cases
15   where other similarly or more egregiously situated
16   defendants have been released, I don't think that the
17   government has a likelihood of success on the merits.
18          Secondly, the Court should consider
19   whether the movant -- whether the government will be
20   irreparably injured absent the stay.  I think the
21   answer is also no.  The government has not
22   demonstrated any irreparable injury, and particularly
23   not with the conditions that the Court has imposed.
24   We're asking the Court to allow Mr. Munchel to remain
25   at home on home detention on very strict conditions

196

1    until the government proceeds with an appeal.

2                    It also appears, I am familiar -- I think

3    the email that the Court mentioned was forwarded -- I

4    think Mr. Schrader may have forwarded that email to

5    the Court and myself at some point -- earlier point in

6    this case.  And it looks like they may even do video

7    hearings.

8                    The government's asking the Court to keep

9    Mr. Munchel in custody because it doesn't like the

10   ruling, but it really doesn't meet -- that doesn't

11   meet the standard for getting a stay at this point.

12   I'd respectfully ask the Court to release Mr. Munchel.

13   If the government chooses to proceed with an appeal,

14   it can do that.

15                   THE COURT:  Very good.

16                   It's your motion, Mr. Schrader.  I'll

17   give you the last word on it if you want it.

18                   MR. SCHRADER:  Your Honor, we just

19   (indiscernible).  I understand (indiscernible) until

20   Monday, we can appeal that issue in DC.

21                   THE COURT:  Hang okay, Mr. Schrader.  I'm

22   sorry, Mr. Schrader, I'm just -- I'm not catching

23   enough to follow what you're saying.  I'm not sure

24   what we can do here, but if --

25                   MR. SCHRADER:  (indiscernible) speak up.

1          THE COURT:  How about -- what about this.

2     Do you think you could telephone in?  I think maybe

3     we'll have a little better -- I mean, I don't mind

4     trying to work with you to do it by video, but I think

5     if we can -- it's more important to hear what you say

6     than me to see what you look like.  Because you're not

7     getting any better.  You just -- I'm just not getting

8     enough of what you're saying, I'm sorry.

9          All right, very good.  Yes, sir.  Thank

10    you.

11          (Pause in proceedings.)

12          THE COURT:  Okay, if you mute your video,

13    I think I'll hear you okay on the phone.

14          MR. SCHRADER:  Done.  Can you hear me all

15    right now?

16          THE COURT:  Excellent, thank you.  Go

17    ahead.

18          MR. SCHRADER:  Okay.  Thank you,

19    Your Honor.  So I think what Ms. Alpert was saying was

20    that the government's not happy with the Court's

21    ruling and wants to keep Mr. Munchel detained.  That's

22    true, except that we're only requesting that he be

23    detained through Monday so that we can give the court

24    in DC an opportunity to rule on the motion here.  And

25    I don't want to argue too much the facts of the other

1    case, the case involving the gentleman in Ms. Pelosi's

2    chair, but the Court there clearly believed the Court

3    satisfied the requirements that it needed to satisfy

4    to issue a stay of the magistrate judge's ruling in

5    that case.

6              And here, I mean, I -- from what I --

7    from my understanding of the conduct in this case

8    versus the conduct in that case, I think -- I don't

9    think it's hard for us to argue that it is a much

10   closer case for detention here.  And so I think we

11   have a much higher likelihood of success on the merits

12   in Washington.

13             THE COURT:  All right, give me just a

14   second.  Y'all bear with me.

15             MR. SCHRADER:  Sure.

16             (Pause in proceedings.)

17             THE COURT:  Okay, thank you all for your

18   patience.  I've heard the positions of the parties and

19   given some consideration to this matter.  We're here

20   now just after 7:15 p.m. on Friday evening.  The

21   Court's heard the proof in this matter.  I've made my

22   decision.  I feel comfortable in my decision.  But I

23   likewise understand the government's intentions in

24   this case.  And I think that considering all the

25   factors and sort of weighing those against each other,

1    the prudent approach in this case will be to grant a

2    temporary stay of my ruling.  I'm not going to give

3    you to the end of business on Monday.  I'll give you

4    until 10:00 a.m. on Monday Central time.  And we'll --

5                    MR. SCHRADER:  Thank you, Your Honor.

6                    THE COURT:  We'll see what happens from

7    there.

8                    MR. BASET:  Thank you, Your Honor.

9                    THE COURT:  Mr. Munchel, the Court's made

10   its ruling in this case.  What happens from here on is

11   not up to me.  I certainly hope that this experience

12   is one that you'll learn from, that if my order stands

13   and you're released subject to these conditions, that

14   you'll understand the importance of complying with

15   those conditions.

16                    Ms. Alpert, Mr. Martin will tell you that

17   the most important thing you can do between now and

18   the time you resolve this case is to sleep at the foot

19   of the cross and not have any issues come up with

20   regard to these conditions, assuming that they hold.

21   I'm comfortable and confident that the rulings that

22   I've made in this case are correct, that you can

23   comply with my conditions, and I hope that you'll do

24   so.

25                    And with that, Mr. Schrader, anything

200

1   further from the government's standpoint we need to do

2   today in this case?

3               MR. SCHRADER:  No, Your Honor, I don't

4   believe so.

5               THE COURT:  Ms. Alpert, anything else for

6   your client?

7               MS. ALPERT:  No, thank you.

8               THE COURT:  Mr. Schrader, let me ask one

9   thing.  We've referred to this email about setting

10  matters.  Is this something -- I don't really

11  understand this.  Typically it's not -- I don't set

12  matters in other districts.  They run their calendars.

13  Do I need to include something in the order about --

14  about his appearance in the district or not?

15              MR. SCHRADER:  I don't know that I have a

16  great answer for you.  We've been getting some

17  guidance from those courts up there in trying to deal

18  with these cases around the country.  I've just been

19  passing that along to the Court as I've gotten it.

20              So I can -- I'm happy to follow up and

21  see if I can get some additional guidance if you have

22  a specific question that you want me to ask them.  I'm

23  maybe just as well-positioned as anyone to do that.

24              THE COURT:  Okay.  Well, we'll run some

25  traps on that.  And we'll -- if it's something that we

1    need to do, we'll -- we'll enter an order on Monday

2    setting an appearance in the district.  And if you --

3    if you have any additional information, if you'd share

4    it with myself and Ms. Alpert, I'd appreciate that,

5    Mr. Schrader.

6                    MR. SCHRADER:  I will.

7                    THE COURT:  Ms. Alpert, anything else for

8    your client tonight?

9                    MS. ALPERT:  No, thank you.

10                    THE COURT:  Thank you all.  We'll be in

11    recess.  Good luck to you, Mr. Munchel.

12                    **\*END OF ELECTRONIC RECORDING\***

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE**

2

3              I, Roxann Harkins, Official Court Reporter

4     for the United States District Court for the Middle

5     District of Tennessee, in Nashville, do hereby

6     certify:

7                    That I transcribed from **electronic**

8     **recording** the proceedings held via video conference on

9     January 22, 2021, in the matter of UNITED STATES OF

10    AMERICA v. ERIC MUNCHEL, Case No. 3:21-mj-2668;

11             that said proceedings in connection with the

12    hearing were reduced to typewritten form by me; and

13    that the foregoing transcript is a true and accurate

14    transcript of said proceedings.

15

16             This is the 27th day of January, 2021.

17

18                      s/ Roxann Harkins_____
                        ROXANN HARKINS, RPR, CRR
19                      Official Court Reporter

20

21

22

23

24

25