# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 1:21-cr-118 (RCL)** |
| **ERIC MUNCHEL and** | : | |
| **LISA EISENHART,** | : | |
| | : | |
| **Defendants.** | : | |

---

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE INDICTMENTS

---

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits that this Court should deny Defendants Eric Munchel and Lisa Eisenhart's motions seeking dismissal of their indictments. *See* ECF Nos. 161, 176, 177, 178, 182. The government submits this omnibus response in opposition.

## PROCEDURAL BACKGROUND

This case arises from the January 6, 2021, attack on the United States Capitol. On October 7, 2022, a federal grand jury in the District of Columbia returned a 10-count indictment, the Second Superseding Indictment, jointly charging Munchel and Eisenhart with conspiracy to commit obstruction in violation of 18 U.S.C. § 1512(k) (Count 1); obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2), and 2 (Count 2); entering and remaining in the gallery of the House or Congress in violation of in violation of 40 U.S.C. § 5104(e)(2)(B) (Count 8); disorderly and disruptive conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 9); and parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. §

1

5104(e)(2)(G) (Count 10). In addition, Munchel is separately charged with disorderly conduct and violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1), (a)(2), and (b) (Counts 3 and 5), and unauthorized possession of a deadly or dangerous weapon on Capitol grounds or in a Capitol Building in violation of 40 U.S.C. § 5104(e)(1)(A) (Count 7). Eisenhart is separately charged with disorderly conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1) and (2) (Counts 4 and 6).

In their motions and motions to adopt, Defendants Munchel and Eisenhart assert: 1) Counts One, Two, Three, Four, Five, Eight, Nine, and Ten lack specificity; 2) Counts Two through Ten are multiplicitous; and 3) Counts One through Seven and Count Ten fail to state an offense. ECF Nos. 161, 176, 177, 178, 182. These motions rest on arguments that courts in this district have routinely rejected[1] and should likewise be denied for the reasons explained herein.

## LEGAL STANDARD

An indictment is sufficient under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished, as it is here, by "echo[ing] the operative statutory text while also specifying the time and place of the offense." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). And an indictment need not inform

---

[1] This Court rejected similar arguments of failure to state an offense and vagueness in *United States v. Bingert*, 21-cr-91, ---F.Supp.3d ---, 2022 WL 1659163, at *7-*11 (D.D.C. May 25, 2022).

a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the government "has made a *full* proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005) (emphasis added)—neither of which has occurred here.

Indeed, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.). Criminal cases have no mechanism equivalent to the civil rule for summary judgment. *United States v. Bailey*, 444 U.S. 394, 413, n.9 (1980) (motions for summary judgment are creatures of civil, not criminal trials); *Yakou*, 428 F.2d at 246-47 ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context"); *United States v. Oseguera Gonzalez*, No. 20-cr-40-BAH at *5, 2020 WL 6342940 (D.D.C. Oct. 29, 2020) (collecting cases explaining that there is no summary judgment procedure in criminal cases or one that permits pretrial determination of the sufficiency of the evidence). Accordingly, dismissal of a charge does not depend on forecasts of what the government can prove. Instead, a criminal defendant may move for dismissal based on a defect in the indictment, such as a failure to state an offense. *United States v. Knowles*, 197 F. Supp. 3d 143, 148 (D.D.C. 2016). Whether an indictment fails to state an offense because an essential element is absent calls for a legal determination.

Thus, when ruling on a motion to dismiss for failure to state an offense, a district court is

limited to reviewing the face of the indictment and more specifically, the language used to charge the crimes. *Bingert*, 2022 WL 1659163 at \*3 (a motion to dismiss challenges the adequacy of an indictment on its face and the relevant inquiry is whether its allegations permit a jury to find that the crimes charged were committed); *United States v. McHugh*, 2022 WL 1302880 at \*2 (D.D.C. May 2, 2022) (a motion to dismiss involves the Court's determination of the legal sufficiency of the indictment, not the sufficiency of the evidence); *United States v. Puma*, 2020 WL 823079 at \*4 (D.D.C. Mar. 19, 2022) (quoting *United States v. Sunia*, 643 F.Supp. 2d 51, 60 (D.D.C. 2009)).

## ARGUMENT

### I.   The Second Superseding Indictment Is Sufficient

The Court should deny defendants' motions to dismiss the Second Superseding Indictment on the basis that the indictment does not contain facts essential to the offenses charged. The indictments sufficiently put the defendants on notice of the date, place, and general conduct of the crimes alleged and, therefore, does not require allegations beyond the elements of the offenses.

#### A.  The Second Superseding Indictment Provides Sufficient Notice

The defendants contend the Second Superseding Indictment should be dismissed because it does not provide adequate specificity and information as to the charges against them. ECF No. 161 at 5 and ECF No. 176 at 1. The defendants premise this challenge on the Sixth Amendment's right "to be informed of the nature and the cause of the accusation" and Federal Rule of Criminal Procedure 7(c)'s requirement that an indictment must contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged."

The defendants misunderstand the purpose of an indictment and the low bar it must clear to satisfy the Federal Rules of Criminal Procedure and the Constitution. As the D.C. Circuit explained in *United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976), "[a]lthough an indictment

4

must in order to fulfill constitutional requirements apprise the defendants of the essential elements of the offense with which they are charged, neither the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the defendants on notice as to every means by which the prosecution hopes to prove that the crime was committed." *Id.* at 124. Indeed, "the validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). "While detailed allegations might well have been required under common-law pleading rules . . . they surely are not contemplated by Rule 7(c)(1), which provides that an indictment 'shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *Id.* at 110. As a mere notice pleading, an indictment is sufficient if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007); *Haldeman*, 559 F.2d at 123 ("The validity of alleging the elements of an offense in the language of the statute is, of course, well established."). Only in the rare case where "guilt depends so crucially upon . . . a specific identification of fact" not included in the statutory language will an indictment that restates the statute's language be insufficient. *Haldeman*, 559 F.2d at 125 (quoting *Russell v. United States*, 369 U.S. 749, 764 (1962)).

Applying these principles, judges in this district have upheld the sufficiency of indictments far less specific than the defendants'. For example, in *United States v. Apodaca*, 275 F. Supp. 3d 123 (D.D.C. 2017), the defendants were charged with offenses under 18 U.S.C. § 924(c). The indictments provided only "general detail as to the places where the offenses were committed: namely, Mexico and the United States." *Id.* at 154. As to the "when" of the offenses, the indictments alleged that the offenses had occurred over a two- and nine-year period. *Id.* Finally,

the indictments "d[id] not specify a particular weapon that was possessed," or "specify whether the firearms were 'used, carried or brandished'" under the statute. *Id.* Nonetheless, the indictments were sufficient.

Judges in this district have also rejected specificity challenges to indictments that arose out of the January 6, 2021, riot at the U.S. Capitol and are identical to the operative indictment in this case. For example, in *United States v. Sargent*, Judge Hogan rejected a similar specificity challenge to an indictment charging violations also faced by the defendants in this case. No. 21-CR-258, 2022 WL 1124817, at *3 (D.D.C. Apr. 14, 2022). In a careful and deliberate opinion, Judge Hogan concluded that every one of the charged counts was properly alleged because each stated the elements of the offense and, though the charging language closely mirrored the statute, no further factual allegations were required to provide notice or protect against double jeopardy concerns. *Id.* at *2–*10.

In *United States v. Williams*, Judge Berman Jackson similarly found that the language of an indictment charging a violation of 18 U.S.C. § 231(a)(3) that largely tracked the statute was sufficiently specific. No. 21-CR-618, 2022 WL 2237301, at *8 (D.D.C. June 22, 2022). She observed: "the first paragraph of the indictment comprising Count I sets forth all of the elements of section 231(a)(3) . . . It thereby enables Williams to prepare a defense and plead that an acquittal or conviction is a bar to future prosecutions." *Id.*

As in *Sargent* and *Williams*, the indictment here provides sufficient information to fairly inform the defendants of those offenses. The defendants know the day on which the alleged crimes occurred: January 6, 2021, which is alleged in all counts. *See* ECF 140. Both defendants know that all charged conduct occurred in this district, from the indictment's allegation. *Id.* Multiple counts specifically refer to conduct on U.S. Capitol grounds, further narrowing the "where" of the charged

crimes, and at a time when the Vice President was and would be temporarily visiting. The statutes charged are not so unusually vague that they require allegations beyond the elements of the offenses.

## II.   The Indictments State Viable Offenses

### A.   Count 1 and 2 (18 U.S.C. § 1512(k) and 18 U.S.C. § 1512(c)(2))

Counts One and Two of the Second Superseding Indictment charge the defendants with conspiracy to and corruptly obstructing, influencing, or impeding an "official proceeding," – *i.e.*, Congress's certification of the Electoral College vote on January 6, 2021 – in violation of 18 U.S.C. §§ 1512(k) and (c)(2) and 2. Count Two states:

> On or about January 6, 2021, within the District of Columbia and elsewhere, **ERIC MUNCHEL and LISA EISENHART,** attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18. ECF No. 140 at 2.

In 2002, Congress enacted Section 1512(c)'s prohibition on "[t]ampering with a record or otherwise impeding an official proceeding" as part of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745, 807. Section 1512(c)'s prohibition applies to:

> [w]hoever corruptly--
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) *otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so.*

18 U.S.C. § 1512(c) (emphasis added). Section 1515(a)(1), in turn, defines the phrase "official proceeding" to include "a proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B). By the statute's plain terms, then, a person violates Section 1512(c)(2) when, acting with the requisite

*mens rea*, he engages in conduct that obstructs a specific congressional proceeding, including, as here, Congress's certification of the Electoral College vote.

Notwithstanding the plain terms of the offense, the defendants advance three arguments for the notion that Section 1512(c)(2) does not reach the conduct alleged in the indictment: (1) that the conduct the defendants committed cannot qualify as conduct that "otherwise obstructs, influences, or impedes" the official proceeding; 2) that Congress's certification of the Electoral College vote is not an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2); and (3) that the statute is unconstitutionally vague itself and as applied to the defendants.

Accordingly, most judges in this district have rejected the challenges the defendants raise in their motions.[2] *See, e.g.*, *United States v. Fitzsimons*, 21-cr-158,---F.Supp.3d---, 2022 WL 1698063, at *6-*12 (D.D.C. May 26, 2022) (Contreras, J.); *United States v. Hale-Cusanelli*, No. 21-cr-37 (D.D.C. May 6, 2022) (McFadden, J.) (motion to dismiss hearing at pp. 4-8); *United States v. McHugh* (*McHugh II*), No. 21-cr-453, 2022 WL 1302880, at *2-*13 (D.D.C. May 2, 2022) (Bates, J.); *United States v. Puma*, 21-cr-454, ---F.Supp.3d---, 2022 WL 823079, at *12 n.4 (D.D.C. Mar. 19, 2022) (Friedman, J.); *United States v. Bozell*, 21-cr-216, 2022 WL 474144, at *5 (D.D.C. Feb. 16, 2022) (Bates, J.); *United States v. Grider*, 585 F.Supp.3d 21 (D.D.C. 2022) (Kollar-Kotelly, J.); *United States v. Nordean*, 579 F.Supp.3d 28 (D.D.C. 2021) (D.D.C. 2021) (Kelly, J.); *United States v. Montgomery*, 578 F.Supp.3d 54, (D.D.C. 2021) (Moss, J.); *United States v. Mostofsky*, 579 F.Supp.3d 9 (D.D.C. 2021) (Boasberg, J.); *United States v. Caldwell*, 581 F.Supp.3d 1 (D.D.C. 2021) (Mehta, J.); *United States v. Sandlin*, 575 F.Supp.3d 16 (D.D.C. 2021) (Friedrich, J.).

---

[2] Again, this Court dismissed a similar claim in *United States v. Bingert*, 21-cr-91, ---F.Supp.3d ---, 2022 WL 1659163, at *7-*11 (D.D.C. May 25, 2022) (Lamberth, J.).

### i.    Section 1512(c)(2) Applies to the Conduct Alleged in the Indictment.

The defendants' primary argument rests upon Judge Nichols' decision in *United States v. Miller,* 589 F.Supp.3d 60 (D.D.C. 2022) and contends that the defendant's conduct, like that of Miller, fails to fit within the scope of conduct prohibited by § 1512(c)(2). But *Miller* was wrongly decided,[3] and § 1512(c)(2) is "not limited by subsection (c)(1) – which refers to 'alter[ing], destroy[ing], mutilat[ing] or conceal[ing] a record, document, or other object' specifically." *United States v. Robertson*, --- F.Supp.3d ---, 2022 WL 2438546, *3 (D.D.C. July 5, 2022).

### a.  Section 1512(c)(2)'s Text, Structure, and History Confirm that its Prohibition Covers Obstructive Conduct Unrelated to Documentary Evidence.

In Section 1512(c)(2), Congress prohibited conduct that intentionally and wrongfully obstructs official proceedings. The ordinary meaning of "obstruct[], influence[], or impede[]" encompasses a range of conduct designed to frustrate an official proceeding. That conduct can include lying to a grand jury or in civil proceedings, exposing the identity of an undercover agent, or burning a building to conceal the bodies of murder victims. It also includes storming the Capitol to derail a congressional proceeding. A defendant who, acting with the necessary *mens rea*, obstructs Congress's certification of the Electoral College vote, commits a crime under Section 1512(c)(2).

### b.  Section 1512(c)'s Text and Structure Confirm that Section 1512(c)(2) Is Not Limited to Document-Related Obstructive Conduct

Section 1512(c)(2)'s plain text demonstrates that it prohibits any corrupt conduct that intentionally obstructs or impedes an official proceeding. When interpreting a statute, courts look

---

[3] The United States is pursuing an appeal from the ruling in *Miller*.  That appeal can be found at docket number 22-3041.

9

first to the statutory language, "giving the words used their ordinary meaning." *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) (internal quotation marks omitted). If the statutory language is plain and unambiguous, this Court's "inquiry begins with the statutory text, and ends there as well." *National Ass'n of Mfrs. v. Department of Defense*, 138 S. Ct. 617, 631 (2018) (internal quotation marks omitted). Here, the meaning of "obstruct[], influence[], or impede[]" is controlled by the ordinary meaning of those words.

The verbs Congress selected in Section 1512(c)(2) are "noncontroversial." *Montgomery*, 578 F.Supp.3d at 70. The words "obstruct" and "impede" naturally "refer to anything that 'blocks,' 'makes difficult,' or 'hinders.'" *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (brackets omitted) (citing dictionaries). Similarly, "influence" includes "affect[ing] the condition of" or "hav[ing] an effect on." *Influence*, Oxford English Dictionary, *available at* http://www.oed.com. These verbs plainly apply to obstructive conduct that otherwise might not fall within the definition of document or evidence destruction. *See United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013). When read with Section 1512(c)(2)'s subject ("whoever") and object ("any official proceeding"), those verbs prohibit a defendant "from coming in the way of, blocking, or holding up the business conducted by an official body, such as a court or the Congress, when that body has formally convened for the purpose of conducting that business." *Montgomery*, 578 F.Supp.3d at 70.

Comparing the language in Section 1512(c)(1) to that in Section 1512(c)(2) confirms that the latter, unlike the former, is not a document-focused provision. Section 1512(c) consists of two provisions requiring the defendant to act "corruptly." Both contain a string of verbs followed by one or more direct objects. Section 1512(c)(1) applies to whoever corruptly "alters, destroys, mutilates, or conceals a record, document, or other object . . . with the intent to impair the object's

integrity or availability for use in an official proceeding." The objects—"a record, document, or other object"—are static. In contrast, Section 1512(c)(2) applies to whoever corruptly "obstructs, influences, or impedes any official proceeding." The object—"proceeding"—is dynamic, and the verbs that precede it are all intended to change the movement or course of that "proceeding." They are verbs that do not apply to a fixed "record" or "document" or an inanimate "object." The two sections are related through their connection to an official proceeding: Section 1512(c)(1)'s verbs target forms of evidence tampering (*e.g.*, altering, destroying mutilating) directed at the documents, records, and objects that are used in official proceedings, while Section 1512(c)(2)'s verbs take the proceeding itself as the object—thus prohibiting whatever conduct blocks or interferes with that proceeding without regard to whether that conduct involved documentary or tangible evidence.

Importing into Section 1512(c)(2) a nexus-to-documents requirement would not only require inserting an extratextual gloss, *see Dean v. United States*, 556 U.S. 568, 572 (2009) (courts "ordinarily resist reading words or elements into a statute that do not appear on its face") (internal quotation marks omitted), it would also render the verbs in Section 1512(c)(2) inapt. The *actus reus* that the verbs in Section 1512(c)(2) encompass is obstructing, influencing, and impeding. But "[h]ow [could] anyone [] alter, destroy, mutilate or conceal an 'official proceeding' or how [could] anyone [] 'obstruct[], influence[], or impede[]' 'a record, document, or other object'?" *Montgomery*, 578 F.Supp.3d at 75; *accord Fitzsimons*, 2022 WL 1698063, at *12; *cf. Yates v. United States*, 574 U.S. 528, 551 (2015) (Alito, J., concurring) (rejecting interpretation of "tangible object" in Section 1519 that would include a fish in part because of a mismatch between that potential object and the statutory verbs: "How does one make a false entry in a fish?"); *id.* at 544 (plurality opinion) ("It would be unnatural, for example, to describe a killer's act of wiping his

11

fingerprints from a gun as 'falsifying' the murder weapon."). Such a mismatch is all the more unlikely given how readily Congress could have drafted language that supplies a nexus to documents in Section 1512(c)(2). *See Montgomery*, 578 F.Supp.3d at 73 (Congress could have enacted a prohibition that covers anyone who "'engages in conduct that otherwise impairs the integrity or availability of evidence or testimony for use in an official proceeding'").

The resemblance between the operative verbs in Section 1512(c)(2) and those Congress enacted in two other obstruction provisions, 18 U.S.C. §§ 1503(a) and 1505, demonstrates that Section 1512(c)(2) was designed to reach more than document-related obstructive conduct. Congress drafted the "omnibus clause" in Section 1503(a), which prohibits "corruptly . . . influenc[ing], obstruct[ing], or imped[ing] . . . the due administration of justice," to serve as a "catchall provision," *United States v. Aguilar*, 515 U.S. 593, 599 (1995), that criminalizes obstructive conduct that falls outside the narrower prohibitions within Section 1503(a) and neighboring provisions. *See, e.g.*, *United States v. Sussman*, 709 F.3d 155, 168-70 (3d Cir. 2013) (removing gold coins from safe-deposit box); *United States v. Frank*, 354 F.3d 910, 916-19 (8th Cir. 2004) (removing car to avoid seizure); *United States v. Lefkowitz*, 125 F.3d 608, 619-20 (8th Cir. 1997) (instructing employee to remove documents from a house); *United States v. Lester*, 749 F.2d 1288, 1295 (9th Cir. 1984) (hiding a witness); *United States v. Brown*, 688 F.2d 596, 597-98 (9th Cir. 1982) (warning suspect about impending search warrant to prevent discovery of heroin). Section 1505, which prohibits "corruptly . . . influenc[ing], obstruct[ing], or imped[ing] . . . the due and proper administration of the law under which any pending proceeding is being had," has been construed to have a similar scope. *See, e.g.*, *United States v. Vastardis*, 19 F. 4th 573, 587 (3d Cir. 2021) (manipulating an oil content meter to produce an inaccurate reading during a Coast Guard inspection and making a related false statement). Like Section 1512(c)(2), Sections 1503(a)

12

and 1505 do not include "any limitation on the nature of the obstructive act other than that it must be committed 'corruptly,'" which "gives rise to 'a fair inference' that 'Congress intended [Section 1512(c)(2)] to have a [broad scope].'" *McHugh*, 2022 WL 1302880, at *10 (quoting *Miller* at 114).

Consistent with the interpretation that obstructive behavior may violate Section 1512(c)(2) even where the defendant does not "take[] some action with respect to a document," *Miller* at 117, courts of appeals have upheld convictions under Section 1512(c)(2) for defendants who attempted to secure a false alibi witness while in jail for having stolen a vehicle, *United States v. Petruk*, 781 F.3d 438, 440, 447 (8th Cir. 2015); disclosed the identity of an undercover federal agent to thwart a grand jury investigation, *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009); lied in written responses to civil interrogatory questions about past misconduct while a police officer, *Burge*, 711 F.3d at 808-09; testified falsely before a grand jury, *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009); solicited information about a grand jury investigation from corrupt "local police officers," *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014); and burned an apartment to conceal the bodies of two murder victims, *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021) (unpublished); *see also United States v. Martinez*, 862 F.3d 223, 238 (2d Cir. 2017) (police officer tipped off suspects before issuance or execution of search warrants), *vacated on other grounds*, 139 S. Ct. 2772 (2019); *United States v. Ahrensfield*, 698 F.3d 1310, 1324-26 (10th Cir. 2012) (law enforcement officer disclosed existence of undercover investigation to target).

Interpreted correctly, Section 1512(c)(2) applies to the defendants' conduct, which involved trespassing into the restricted Capitol area with the purpose of interfering with the certification. In so doing, the defendants hindered and delayed an "official proceeding" before Congress. *See* 18 U.S.C. § 1515(a)(1)(B). Because construing Section 1512(c)(2) to reach such

conduct would neither "frustrate Congress's clear intention" nor "yield patent absurdity," this Court's "obligation is to apply the statute as Congress wrote it." *Hubbard v. United States*, 514 U.S. 695, 703 (1995) (internal quotation marks omitted).

### c. The Term "Otherwise" Reinforces that Section 1512(c)(2) Covers Obstructive Conduct "Other" than the Document Destruction Covered in Section 1512(c)(1).

The defendants' textual analysis overlooks Section 1512(c)(2)'s verbs and focuses almost entirely on the term "otherwise." ECF No. 176 at 18. But that term, properly interpreted, does not support such a narrowed interpretation of Section 1512(c)(2).

The term "otherwise" means "in another way" or "in any other way." *Otherwise*, Oxford English Dictionary, *available at* http://www.oed.com. Consistent with its ordinary meaning, the term "otherwise" conveys that Section 1512(c)(2) encompasses misconduct that threatens an official proceeding "beyond [the] simple document destruction" that Section 1512(c)(1) proscribes. *Burge*, 711 F.3d at 809; *Petruk*, 781 F.3d at 446-47 (noting that "otherwise" in Section 151 2(c)(2), understood to mean "in another manner" or "differently," implies that the obstruction prohibition applies "without regard to whether the action relates to documents or records") (internal quotation marks omitted); *United States v. Ring*, 628 F.Supp.2d 195, 224 n.17 (D.D.C. 2009) (noting that Section 1512(c)(2) is "plainly separate and independent of" Section 1512(c)(1), and declining to read "otherwise" in Section 1512(c)(2) "as limited by § 1512(c)(1)'s separate and independent prohibition on evidence-tampering"); *see also Gooch v. United States*, 297 U.S. 124, 126-28 (1936) (characterizing "otherwise" as a "broad term" and holding that a statutory prohibition on kidnapping "'for ransom or reward or otherwise'" is not limited by the words "ransom" and "reward" to kidnappings for pecuniary benefit); *Collazos v. United States*, 368 F.3d 190, 200 (2d Cir. 2004) (construing "otherwise" in 28 U.S.C. § 2466(a)(1)(C) to reach beyond the

14

"specific examples" listed in prior subsections, thereby covering the "myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of a court"). That reading follows inescapably from the text of Section 1512(c)'s two subsections read together: Section 1512(c)(1) "describes how a defendant can violate the statute by 'alter[ing], destroy[ing], mutilat[ing], or conceal[ing]' documents for use in an official proceeding," *Puma*, 2022 WL 823079, at *12, while "otherwise" in Section 1512(c)(2) "signals a shift in emphasis . . . from actions directed at evidence to actions directed at the official proceeding itself," *Montgomery*, 2021 WL 6134591, at *12 (internal quotation marks omitted).

In this way, Section 1512(c)(2) criminalizes the same *result* prohibited by Section 1512(c)(1)—obstruction of an official proceeding—when that result is accomplished by a different means*, i.e.*, by conduct *other* than destruction of a document, record, or other object. *Cf. United States v. Howard*, 569 F.2d 1331, 1333 (5th Cir. 1978) (explaining that 18 U.S.C. § 1503(a), which criminalizes the result of obstructing the due administration of justice, provides specific means of accomplishing that result and then a separate catchall clause designed to capture other means). Section 1512(c)(2), in other words, "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense involving documents or records under Section 1512(c)(1). *Petruk*, 781 F.3d at 447 (quoting *Volpendesto*, 746 F.3d at 286).

Contrary to the defendants' suggestions that Section 1512(c)(2) is untethered to Section 1512(c)(1), "otherwise" as used in Section 1512(c)(2) indicates that Section 1512(c)(2) targets obstructive conduct in a manner "other" than the evidence tampering or document destruction that is covered in Section 1512(c)(1). That understanding of "otherwise" is fully consistent with any reasonable definition of the term and does not render the term "surplusage."

This interpretation is not inconsistent with the canons of construction used in *Begay v.*

*United States*, 553 U.S. 137 (2008) and *Yates v. United States*, 574 U.S. 528 (2015).  In considering whether driving under the influence was a "violent felony" for purposes of the Armed Career Criminal Act (ACCA)'s residual clause, which defines a "violent felony" as a felony that "is burglary, arson, or extortion, involves use of explosives, or *otherwise involves conduct that presents a serious potential risk of physical injury*," 18 U.S.C. § 924(e)(2)(B)(ii) (emphasis added), the Supreme Court in *Begay* addressed a statutory provision that has an entirely different structure than Section 1512(c)(2). *See Sandlin*, 2021 WL 5865006, at *6 (distinguishing *Begay* on the ground that, unlike the ACCA residual clause, the "otherwise" in Section 1512(c)(2) is "set off by both a semicolon and a line break"). Unlike in the ACCA residual clause, the "otherwise" phrase in Section 1512(c)(2) "stands alone, unaccompanied by any limiting examples." *Ring*, 628 F.Supp.2d at 224 n.17. In other words, the "key feature" in Section 924(e)(2)(B)(ii) at issue in *Begay*, "namely, the four example crimes," 553 U.S. at 147, is "absent" in Section 1512(c)(2). *Caldwell*, 2021 WL 6062718, at *14. Although Judge Nichols recognized the structural difference between the ACCA residual clause and Section 1512(c)(2), *see Miller* at 107-08, he offered no reason to import *Begay*'s interpretation of "otherwise" to Section 1512(c)(2)'s differently structured provision.

     In fact, Section 1512(c)(2) is a poor fit for application of the *ejusdem generis* canon that *Begay* applied to the ACCA residual clause and that the Court functionally applied to Section 1512(c). "Where a general term follows a list of specific terms, the rule of *ejusdem generis* limits the general term as referring only to items of the same category." *United States v. Espy*, 145 F.3d 1369, 1370-71 (D.C. Cir. 1998). In *Yates*, for example, the plurality and concurring opinions applied the *ejusdem generis* canon to interpret the word "tangible object" in 18 U.S.C. § 1519, which makes it a crime to "knowingly alter[], destroy[], mutilate[], conceal[], cover[] up, falsif[y],

or make[] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence" an investigation. *See* 574 U.S. at 545-56 (plurality opinion); *id.* at 549-50 (Alito, J., concurring). But Section 1512(c)'s structure differs significantly: it includes one numbered provision that prohibits evidence-tampering, followed by a semi-colon, the disjunctive "or," and then a separately numbered provision containing the separate catchall obstruction prohibition. "The absence of a list of specific items undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008). Furthermore, in the same way that the *ejusdem generis* canon does not apply to the omnibus clause in Section 1503 that is "one of . . . several distinct and independent prohibitions" rather than "a general or collective term following a list of specific items to which a particular statutory command is applicable," *Aguilar*, 515 U.S. at 615 (Scalia, J., concurring in part and dissenting in part), it has no application to Section 1512(c)(2), which embodies the same structure. *Cf. Loughrin v. United States*, 573 U.S. 351, 359 (2014) (distinguishing the mail fraud statute (18 U.S.C. § 1341), which "contains two phrases strung together in a single, unbroken sentence," from the bank fraud statute (18 U.S.C. § 1344), which comprises "two clauses" with "separate numbers, line breaks before, between, and after them, and equivalent indentation—thus placing the clauses visually on an equal footing and indicating that they have separate meanings"); *see also McHugh*, 2022 WL 1302880, at *5 (explaining that the *ejusdem generis* canon on which *Miller* relied is "irrelevant" because rather than the "'A, B, C, or otherwise D'" structure found in the ACCA residual clause, Section 1512(c) "follows the form '(1) A, B, C, or D; or (2) otherwise E, F, or G'").

Moreover, *Begay* noted first that the "listed examples" in Section 924(e)(2)(B)(ii)—burglary, arson, extortion, or crimes involving explosives—indicated that the ACCA residual

clause covered only similar crimes. *Begay*, 553 U.S. at 142. Those examples, the majority reasoned, demonstrated that Section 924(e)(2)(B)(ii) was not designed "to be all encompassing," but instead to cover only "crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves." *Id.* at 142-43. The majority next drew support for its conclusion from Section 924(e)(2)(B)(ii)'s history, which showed that Congress both opted for the specific examples in lieu of a "broad proposal" that would have covered offenses involving the substantial use of physical force and described Section 924(e)(2)(B)(ii) as intending to encompass crimes "similar" to the examples. *Id.* at 143-44. In the final paragraph of that section of the opinion, the majority addressed "otherwise," noting that the majority "[could ]not agree" with the government's argument that "otherwise" is "*sufficient* to demonstrate that the examples do not limit the scope of the clause" because "the word 'otherwise' *can* (we do not say *must* . . .) refer to a crime that is similar to the listed examples in some respects but different in others." *Id.* at 144.

The majority's "remarkably agnostic" discussion of "otherwise" in *Begay*, which explicitly noted that the word may carry a different meaning where (as here) the statutory text and context indicates otherwise, *Montgomery*, at *11, suggests, if anything, that "*the government's* interpretation of 'otherwise' [in Section 1512(c)(2)] is the word's more natural reading," *McHugh*, 2022 WL 1302880, at *5 n.9; *see also Caldwell*, 2021 WL 6062718, at *14 (declining to depart from the "natural reading" of "otherwise" to mean "'in a different way or manner'" based on the discussion in *Begay*). In short, the majority in *Begay* "placed little or no weight on the word 'otherwise' in resolving the case." *Montgomery*, 578 F.Supp.3d at 71.

Whatever the significance of the majority's interpretation of "otherwise" in *Begay*, *Begay*'s holding and the subsequent interpretation of the ACCA residual clause demonstrate the central flaw with imposing an extratextual requirement within Section 1512(c)(2). The Supreme Court

18

held in *Begay* that Section 924(e)(2)(B)(ii) encompasses only crimes that, similar to the listed examples, involve "purposeful, 'violent,' and 'aggressive' conduct." 553 U.S. at 144-45. But "*Begay* did not succeed in bringing clarity to the meaning of the residual clause." *Johnson v. United States*, 576 U.S. 591, 600 (2015). Just as the *Begay* majority "engraft[ed]" the "purposeful, violent, and aggressive conduct" requirement onto the ACCA's residual clause, 553 U.S. at 150 (Scalia, J., concurring in judgment) (internal quotation marks omitted), so too would the defendant's proposed interpretation engraft onto Section 1512(c)(2) the requirement that a defendant "have taken some action with respect to a document, record, or other object" to obstruct an official proceeding. In the nearly 20 years since Congress enacted Section 1512(c)(2), no reported cases have adopted that interpretation, and for good reason. That interpretation would give rise to unnecessarily complex questions about what sort of conduct qualifies as "tak[ing] some action with respect to a document" in order to obstruct an official proceeding. *Cf. United States v. Singleton*, No. 06-cr-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (unpublished) (concluding that Section 1512(c)(2) "require[s] some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *see also United States v. Hutcherson*, No. 05-cr-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation of Section 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceeding[] through his conduct in relation to a tangible object").[4] In brief, the defendants' interpretation is likely to give rise to the very ambiguity it purports to avoid.

---

[4] The defendants' interpretation of Section 1512(c)(2) is that given in *Singleton* and *Hutcherson*, both of which are unpublished. As noted in the main text, no other court, at least in a reported opinion, appears to have adopted the nexus-to-tangible-evidence-or-a-tangible-object standard articulated in *Singleton* and *Hutcherson*. *See United States v. De Bruhl-Daniels*, 491 F.Supp.3d 237, 250-51 (S.D. Tex. 2020) (identifying *Singleton* and *Hutcherson* as outliers from the "most popular—and increasingly prevalent—interpretation of § 1512(c)(2) [as] an unlimited

### d. Tools of Statutory Interpretation Do Not Support the *Miller* Court's Narrowed Interpretation.

Other tools of statutory construction reinforce the conclusion that Section 1512(c)(2) reaches conduct that obstructs or impedes an official proceeding in a manner other than through document destruction or evidence tampering.

Section 1512 is comprised of two parts: four subsections that define criminal offenses (Sections 1512(a)-(d)), followed by six subsections that provide generally applicable definitions and clarifications (Sections 1512(e)-(j)).[5] Within the first part, three subsections (Sections 1512(a)-(c)) define criminal offenses with statutory maxima of at least 20 years, *see* §§ 1512(a)(3), (b)(3), (c), while Section 1512(d) carries a three-year statutory maximum, § 1512(d). Within that structure, Congress sensibly placed Section 1512(c)(2) at the very end of the most serious—as measured by statutory maximum sentences—obstruction offenses, precisely where a "catchall" for obstructive conduct not covered by the more specific preceding provisions would be expected. In any event, the "mousehole" canon provides that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions," *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001), but it "has no relevance" where, as here, the statute in question was written in "broad terms," *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1753 (2020).

Any overlap between Section 1512(c)(2) and other provisions in Section 1512 has a

---

prohibition on obstructive behavior that extends beyond merely tampering with tangible items"); *Ring*, 628 F.Supp.2d at 225 n.18 (disagreeing with *Singleton* and *Hutcherson* but finding that the alleged conduct at issue in that case involved "some nexus to documents"). No court of appeals has cited either case.

[5] Section 1512 also includes one subsection, placed at the end, that adds a conspiracy offense applicable to any of the substantive offenses set out in Sections 1512(a)-(d). 18 U.S.C. § 1512(k).

"simple" explanation that does not warrant the Court's narrowing construction. *McHugh*, 2022 WL 1302880, at *8. When Congress enacted the "direct obstruction" provision in Section 1512(c)(2), that provision necessarily included the "indirect obstruction prohibited" in the rest of Section 1512. *Id.* Congress in Section 1512(c)(2) therefore did not "*duplicate* pre-existing provisions . . . but instead *expanded* the statute to include additional forms of obstructive conduct, necessarily creating overlap with the section's other, narrower prohibitions." *Id.* Congress was not required to repeal those pre-existing prohibitions and rewrite Section 1512 "to create a single, blanket obstruction offense" just to avoid overlap. *Id.* at *9. "Redundancies across statutes are not unusual events in drafting," *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992), and the "rule[] of thumb" that statutes should be interpreted to avoid superfluity necessarily yields to the "cardinal canon" that Congress "says in a statute what it means and means in a statute what it says there," *id.* at 253-54. In other words, Section 1512(c)(2) "creates only explicable and indeed inevitable overlap rather than outright redundancy," such that the "purported superfluity" in Section 1512 "simply does not justify displacing the provision's ordinary meaning." *McHugh*, 2022 WL 1302880, at *10. That is particularly so here because even a "broad interpretation of § 1512(c)(2) does not entirely subsume numerous provisions within the chapter," and any overlap with other provisions in Section 1512 is "hardly remarkable." *Sandlin*, 575 F.Supp.3d at 27 ; *accord Nordean*, 579 F.Supp.3d at 46.

Notably, the defendants' interpretation injects a more troubling type of superfluity. Construing Section 1512(c)(2) to require some action with respect to a document risks rendering Section 1512(c)(2) itself superfluous in light of the "broad ban on evidence-spoliation" in Section 1512(c)(1). *Yates*, 574 U.S. at 541 n.4 (plurality opinion) (internal quotation marks omitted); *cf. United States v. Poindexter*, 951 F.2d 369, 385 (D.C. Cir. 1991) (explaining that limiting the

21

catchall provision in Section 1503(a)'s omnibus clause to obstructive acts "directed against individuals" would render the omnibus clause superfluous because "earlier, specific[] prohibitions" in Section 1503(a) "pretty well exhaust such possibilities") (internal quotation marks omitted). The canon against surplusage is "strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013). It is even stronger here, when it would render superfluous "other provisions in the *same enactment*"—namely, the Sarbanes-Oxley Act. *Freytag v. Comm'r*, 501 U.S. 868, 877 (1991) (emphasis added; internal quotation marks omitted). At a minimum, the canon does not militate in favor of the defendant's reading. *See United States v. Ali*, 718 F.3d 929, 938 (D.C. Cir. 2013) (canon against surplusage "'merely favors that interpretation which avoids surplusage,' not the construction substituting one instance of superfluous language for another").

Finally, an interpretation of Section 1512(c)(2) that imposes criminal liability only when an individual takes direct action "with respect to a document, record, or other object" to obstruct a qualifying proceeding leads to absurd results. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994) (rejecting interpretation of a criminal statute that would "produce results that were not merely odd, but positively absurd"). That interpretation would appear, for example, not to encompass an individual who seeks to "obstruct[], influence[], or impede[]" a congressional proceeding by explicitly stating that he intends to stop the legislators from performing their constitutional and statutory duties to certify the Electoral College vote results by dragging lawmakers out of the Capitol and leading a mob to charge toward federal officers, pushing them aside to break into the Capitol, unless he also picked up a "document or record" related to the proceeding during that violent attack. The statutory text does not require such a counterintuitive result.

22

In short, if Congress in Section 1512(c)(2) endeavored to create the narrow document-focused provision that the Court envisioned, it "did a particularly poor job of drafting" because Congress would have "effectuated [its] intent in a way that is singularly susceptible to misinterpretation, as evidenced by the overwhelming majority of judges who have construed § 1512(c)(2) broadly." *McHugh*, 2022 WL 1302880, at *11. In accordance with those judges, the Court should reject the defendants' textual, narrowed interpretation.

The defendants' primary argument rests upon Judge Nichols' decision in *United States v. Miller,* 589 F.Supp.3d 60 (D.D.C. 2022) and contends that the defendants' conduct, like that of Miller, fails to fit within the scope of conduct prohibited by § 1512(c)(2). But *Miller* was wrongly decided and § 1512(c)(2) is "not limited by subsection (c)(1) – which refers to 'alter[ing], destroy[ing], mutilat[ing] or conceal[ing] a record, document, or other object' specifically." *United States v. Robertson*, --- F.Supp.3d ---, 2022 WL 2438546, *3 (D.D.C. July 5, 2022).

Furthermore, the defendants' conduct falls squarely within the confines of 1512(k) and (c)(2). This mother and son duo traveled to and stayed D.C. together. On the morning of January 6, 2021, both left their hotel together, wearing body amor. The defendants not only entered the Capitol building, when it was restricted to the public due to the electoral certification but, once inside, both made their way towards the Senate. Both defendants took zip ties from a closet and then entered the Senate gallery, where the session was already suspended due to the breach of the building.

### e. Legislative History Does Not Support a Narrowed Interpretation of 1512(c)(2).

Because "the statutory language provides a clear answer," the construction of Section 1512(c)(2) "ends there," and resort to legislative history is unnecessary. *Hughes Aircraft Co. v.*

*Jacobson*, 525 U.S. 432, 438 (1999). Regardless, the legislative history of Section 1512(c)(2)—particularly when considered alongside the history of Section 1512 more generally—does not support the defendants' interpretation of Section 1512(c)(2) for two reasons.

First, Section 1512(c) aimed at closing a "loophole" in Section 1512: the existing prohibitions did not adequately cover a defendant's *personal* obstructive conduct *not* aimed at another person. *See* 148 Cong. Rec. S6550 (statement of Sen. Hatch). To close that loophole, Section 1512(c)(1) criminalizes a defendant's firsthand destruction of evidence (without having to prove that the defendant induced another person to destroy evidence) in relation to an official proceeding, and Section 1512(c)(2) criminalizes a defendant's firsthand obstructive conduct that *otherwise* impedes or influences an official proceeding (though not necessarily through another person). *See Burge*, 711 F.3d at 809-10. The defendants' limiting construction undermines Congress's efforts at loophole closing.

Second, no substantive inference is reasonably drawn from the fact that the title of Section 1512 does not precisely match the "broad proscription" it in fact contains, given that the Sarbanes-Oxley Act unequivocally and broadly entitled the new provisions now codified in Section 1512(c), "Tampering with a record *or* otherwise impeding an official proceeding." Pub. L. No. 107-204, § 1102, 116 Stat. 807 (emphasis added; capitalization altered). Section 1512's title is more limited simply because Congress did not amend the pre-existing title when it added the two prohibitions in Section 1512(c) in 2002. *Cf. Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947) (describing "the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text").

And while the legislators who enacted Section 1512(c) in the Sarbanes-Oxley Act undoubtedly had document shredding foremost in mind, "it is unlikely that Congress was

concerned with only the type of document destruction at issue in the *Arthur Andersen* case." *Montgomery*, 578 F.Supp.3d at 77. In other words, "there is no reason to believe that Congress intended to fix that problem only with respect to 'the availability or integrity of evidence.'" *Id.* In addition, if the defendants' narrow interpretation were correct, then certain floor statements, such as Senator Hatch's description of Section 1512(c)'s purpose to strengthen an obstruction offense "often used to prosecute document shredding *and other forms of obstruction of justice*," 148 Cong. Rec. S6550 (emphasis added), "would be quite strange." *McHugh*, 2022 WL 1302880, at *12.

### f.  Even If Section 1512(c)(2) Required that the Obstructive Act Relate to Documentary Evidence, the Defendants' Conduct Would Be Covered.

Neither ordinary methods of statutory construction nor the rule of lenity supports limiting to Section 1512(c)(2) to document-based obstructive conduct. But even if Section 1512(c)(2) were so limited, it necessarily reaches beyond the direct evidence tampering already covered by Section 1512(c)(1) to include alternative ways of interfering with the consideration of documentary evidence—as happened here when the defendant impeded lawmakers' consideration of documents and records at the Electoral College vote certification proceeding.

At a minimum, Section 1512(c)(2) covers conduct that prevents the examination of documents, records, and other nontestimonial evidence in connection with an official proceeding. Even assuming a focus on documentary evidence, the additional conduct that it would cover beyond Section 1512(c)(1) would include, for example, corruptly blocking the vehicle carrying the Electoral College vote certificates to the Capitol for congressional examination at the certification proceeding, which would not "alter[], destroy[], mutilate[], or conceal[]" that evidence under 1512(c)(1), but would plainly "obstruct[]" or "impede[]" the proceeding with respect to that evidence under Section 1512(c)(2). For similar reasons, Section 1512(c)(2) would

25

likewise cover blocking a bus carrying lawmakers to the Capitol to examine the certificates at the certification proceeding. And it just as readily covers displacing lawmakers from the House and Senate Chambers, where they would examine and discuss those certificates and other records.

The Electoral College vote certification is rooted in constitutional and federal statutory law that requires the creation and consideration of various documents, and that certification operates through a deliberate and legally prescribed assessment of ballots, lists, certificates, and, potentially, written objections. Had the defendant sought to alter or destroy any of those documents, he would have violated Section 1512(c)(1). Here, the defendants allegedly sought to stop Members of Congress from reviewing those constitutionally and statutorily mandated documents at a proceeding to certify the results of the 2020 presidential election. Thus, even if a violation of Section 1512(c)(2) covered only obstructive behavior that prevents the consideration of documents, records, or other objects at an official proceeding, the defendant's alleged conduct—corruptly obstructing and impeding the examination of physical or documentary evidence at a congressional proceeding—states an offense.

   ii.   **The Certification of the Electoral College Vote Is an Official Proceeding**

The defendants contend that the Electoral College certification before Congress does not constitute an "official proceeding" under 18 U.S.C. 1512(c)(2). ECF No. 176 at 8. This argument lacks merit and judges in this district have consistently rejected it, including in *Miller,* 589 F.Supp.3d at 66-67; *see also United States v. Rodriguez*, No. 21-cr-0246 (ABJ), 2022 WL 3910580 at *3-4 (D.D.C. Aug. 31, 2022); *Puma*, 2022 WL 823079, at *10; *Bingert*, 2022 WL 1659163 at *4; *United States v. Robertson*, 588 F.Supp.3d 114, 120-22 (D.D.C. 2022)  The same result is warranted here.

   a.  **The Plain Text of the Statute Establishes that the Joint Session Is An**

**Official Proceeding.**

## i.  Background

The Constitution and federal statutory law require that both Houses of Congress meet to certify the results of the Electoral College vote.  Two separate provisions in the Constitution mandate that the Vice President while acting as the President of Senate "shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted."  U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII.  Under the Electoral Act of 1887, a Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors."  3 U.S.C. § 15.  Section 15 details the steps to be followed: the President of the Senate opens the votes, hands them to two tellers from each House, ensures the votes are properly counted, and then opens the floor for written objections, which must be signed "by at least one Senator and one Member of the House of Representatives."  *Id.*  The President of the Senate is empowered to "preserve order" during the Joint Session.  3 U.S.C. § 18.  Upon a properly made objection, the Senate and House of Representatives withdraw to consider the objection; each Senator and Representative "may speak to such objection . . . five minutes, and not more than once."  3 U.S.C. § 17.  The Electoral Act, which specifies where within the chamber Members of Congress are to sit, requires that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared."  3 U.S.C. § 16.

The obstruction statute with which the Defendant is charged prohibits corruptly obstructing, influencing, or impeding any official proceeding.  18 U.S.C. § 1512(c)(2).  An official proceeding for purposes of § 1512(c)(2) is defined as:

(A) a proceeding before a judge or court of the United States, a United States

27

magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

(B) *a proceeding before the Congress*;

(C) a proceeding before a Federal Government agency which is authorized by law; or

(D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce[.]

18 U.S.C. § 1515(a)(1) (emphasis added).

> **b.  Certification of the Electoral College Vote Is a Proceeding Before the Congress.**

The certification of the Electoral College vote as set out in the Constitution and federal statute is a "proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B), and, therefore, an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2).  That conclusion flows principally from the obstruction statute's plain text.

Understanding what qualifies as an official proceeding "depends heavily on the meaning of the word 'proceeding'" because "official proceeding" is defined "somewhat circularly" as, among other things, a congressional "proceeding."  *See United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013).   The certification of the Electoral College vote constitutes a "proceeding" under any interpretation of that term.  In its broadest and most "general sense," a proceeding refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *Id.* (quoting *Proceeding,* Oxford English Dictionary, *available at* http://www.oed.com).   The defendants do not meaningfully contend that the certification of the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding—and indeed an official proceeding—

28

under that broad definition.  And there is good reason to construe "proceeding" as used in 18 U.S.C. § 1515 broadly.  Section 1515's text encompasses not only congressional proceedings, but judicial proceedings, grand jury proceedings, any legally authorized proceedings before federal government agencies, and proceedings "involving the business of insurance."   18 U.S.C. § 1515(a)(1); *see* S. Rep. No. 97-532, at 17 (1982) (noting that the "term 'official proceeding'" in the obstruction statute is "defined broadly").

But even if the "legal—rather than the lay—understanding" of proceeding governs Section 1515's interpretation, *see Ermoian*, 752 F.3d at 1170, the Electoral College vote certification qualifies.  This narrower definition includes the "business conducted by a court or other official body; a hearing."  Black's Law Dictionary, "proceeding" (11th ed. 2019).  Taken with its modifier "official," the term proceeding thus "connotes some type of formal hearing."  *Ermoian*, 752 F.3d at 1170; *see United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (the "more formal sense" of "official proceeding" is "correct in the context of § 1512").  For example, in cases assessing whether a law enforcement investigation amounts to an "official proceeding" as defined in Section 1515 courts analyze the degree of formality involved in an investigation.  *See, e.g.*, *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an "official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106 (2020); *Ermoian*, 752 F.3d at 1170-72 (same); *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (internal investigation conducted by a review panel within the Bureau of Prisons was an "official proceeding" because the review panel's "work [was] sufficiently formal"); *Ramos*, 537 F.3d at 463 (internal investigation conducted by Customs and Border Patrol not an "official proceeding" because that term *"contemplates a formal environment"*); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (investigation conducted by Bureau of Alcohol, Tobacco,

and Firearms not an "official proceeding" because that term encompasses "events that are best thought of as hearings (or something akin to hearings)"); *see also United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (holding that a "*formal* investigation" conducted by the Officer of the Inspector General at the Agency for International Development qualified as a "proceeding" for purposes of 18 U.S.C. § 1505) (emphasis added).

The formality involved in the certification of the Electoral College vote places it "comfortably within the category" of an official proceeding. *See Perez*, 575 F.3d at 169.   Few events are as solemn and formal as a Joint Session of the Congress.   That is particularly true for the certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute.   Required by law to begin at 1 pm on the January 6 following a presidential election, the certification of the Electoral College vote is both a "hearing" and "business conducted by . . . [an] official body."   *See* Black's Law Dictionary, *supra*.   The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election.   3 U.S.C. § 15.

As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection.   *Id.*   And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall."   *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left;" the Senators "in the body of the Hall" to the right of the "presiding officer;" the Representatives "in the body of the Hall not provided for the Senators;" various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform").   The Electoral College vote certification, moreover, must terminate with a decision: no recess is permitted until the "the count of electoral

30

votes" is "completed," and the "result declared." *Id.* In short, the certification of the Electoral College vote is a "proceeding before the Congress." *See* 18 U.S.C. § 1515(a)(1)(B).

### iii.    Section 1512(c)(2) Is Not Unconstitutionally Vague.

Next, the defendants contend that Section 1512(c)(2) is unconstitutionally vague. ECF No. 176 at 11. As pointed out by defendants, every judge in this district has denied this argument.

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV. An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)). To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'" *Bronstein*, 849 F.3d at 1107

31

(quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (*per curiam*)). A provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

The defendants have not overcome the "strong presumpti[on]" that Section 1512(c)(2) is constitutional. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963). Section 1512(c)(2) does not tie criminal culpability to "wholly subjective" terms such as "annoying" or "indecent" that are bereft of "narrowing context" or "settled legal meanings," *Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized ordinary case of the crime," *Johnson*, 576 U.S. at 604. Section 1512(c)(2)'s prohibition on "corruptly … obstruct[ing], influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy." *Williams*, 553 U.S. at 306. The statute requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily defined official proceeding. While "it may be difficult in some cases to determine whether these clear requirements have been met," "'courts and juries everyday pass upon knowledge, belief and intent – the state of men's minds – having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).

The defendants' claim that the word "corruptly" in Section 1512(c)(2) is unconstitutionally vague is incorrect. As Judge Friedman recently observed, "[j]udges in this district have construed 'corruptly' to require 'a showing of "dishonesty" or an 'improper purpose'[;], 'consciousness of

wrongdoing'[;] or conduct that is 'independently criminal,' 'inherently malign, and committed with the intent to obstruct an official proceeding.'" *Puma*, 2022 WL 823079, at *10 (quoting *Montgomery*, 578 F.Supp.3d at 81); *Bozell*, 2022 WL 474144, at *6; *Caldwell*, 581 F.Supp.3d at *19; and *Sandlin*, 575 F.Supp.3d at 33 (alterations omitted). Under any of these common-sense constructions, the term "corruptly" "not only clearly identifies the conduct it punishes; it also 'acts to shield those who engage in lawful, innocent conduct – even when done with the intent to obstruct, impede, or influence the official proceeding.'" *Id.* (quoting *Sandlin*, 575 F.Supp.3d at 33). It presents no vagueness concern.

Nor does *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), support the defendants' attacks on the word "corruptly" for at least two reasons. First, the D.C. Circuit narrowly confined *Poindexter*'s analysis to Section 1505's use of "corruptly," and expressly declined to hold "that term unconstitutionally vague as applied to all conduct." 951 F.2d at 385. Five years later, in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction of a defendant for "corruptly" influencing the testimony of a potential witness at trial. *Id.* at 629-30. Other courts have similarly recognized "the narrow reasoning used in *Poindexter*" and "cabined that vagueness holding to its unusual circumstances." *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017); *see also, e.g.*, *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (rejecting vagueness challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (same for 18 U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) (same for 18 U.S.C. § 1503). The defendants' invocation of *Poindexter* accordingly fails to establish that Section 1512(c) suffers the same constitutional indeterminacy.

Second, *Poindexter* predated the Supreme Court's decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). There, the Court explained the terms "'[c]orrupt" and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil." *Id.* at 705 (citation omitted). In doing so, the Court "did not imply that the term was too vague." *Edwards*, 869 F.3d at 502. Third, and as noted above, courts have encountered little difficulty when addressing "corruptly" in Section 1512(c)(2) following *Arthur Andersen*. *See Puma*, 2022 WL 823079, at *10 (quoting *Montgomery*, at 81); *Bozell*, 2022 WL 474144, at *6; *Caldwell*, 581 F.Supp.3d at 19; and *Sandlin*, 575 F.Supp.3d at 32-33 (alterations omitted). Such efforts demonstrate that the statute's "corruptly" element does not invite arbitrary or wholly subjective application by either courts or juries.

### a. The Rule of Lenity Does Not Apply.

Text, structure, history, and other tools of statutory interpretation unambiguously demonstrate that Section 1512(c)(2) prohibits any conduct that obstructs or impedes an official proceeding, and the *mens rea* and nexus requirements ensure that the provision does not ensnare conduct that is "not inherently malign." *Arthur Andersen*, 544 U.S. at 704. Accordingly, the rule of lenity has no role to play. Text, structure, history, and other tools of statutory interpretation unambiguously demonstrate that Section 1512(c)(2) prohibits any conduct that obstructs or impedes an official proceeding, and the *mens rea* and nexus requirements ensure that the provision does not ensnare conduct that is "not inherently malign." *Arthur Andersen*, 544 U.S. at 704. Accordingly, the rule of lenity has no role to play.

"When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity." *Bell v. United States*, 349 U.S. 81, 83 (1955). That principle underlies the "venerable rule of lenity," *United States v. R.L.C.*, 503 U.S.

291, 305 (1992) (opinion of Souter, J.), which ensures that "legislatures and not courts" define criminal activity given the "seriousness of criminal penalties" and the fact that "criminal punishment usually represents the moral condemnation of the community." *United States v. Bass*, 404 U.S. 336, 348 (1971); *see Liparota v. United States*, 471 U.S. 419, 427 (1985) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability.").

The rule of lenity does not come into play when a law merely contains some degree of ambiguity or is difficult to decipher. The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998); *Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019). In short, some ambiguity is insufficient to trigger the rule of lenity; instead, a court must find "grievous ambiguity" that would otherwise compel guesswork. *See Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (internal quotation marks omitted). "Properly applied, the rule of lenity therefore rarely if ever plays a role because, as in other contexts, 'hard interpretive conundrums, even relating to complex rules, can often be solved.'" *Wooden v. United States*, 142 S. Ct. 1063, 1075 (2022) (Kavanaugh, J., concurring) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)).

Simply put, the rule of lenity is "inapplicable" here. *Puma*, 2022 WL 823079, at \*26. Congress made clear in Section 1512(c)(2) that it sought to protect the integrity of official proceedings—regardless of whether a defendant threatens such a proceeding by trying to interfere with the evidence before that tribunal or threatens the tribunal itself. Any such distinction between

these forms of obstruction produces the absurd result that a defendant who attempts to destroy a document being used or considered by a tribunal violates Section 1512(c) but a defendant who threatens those conducting that proceeding escapes criminal liability under the statute. Not only does the rule of lenity not require such an outcome, but such an application loses sight of a core value that animates the lenity rule: that defendants should be put on notice that their conduct is criminal and not be surprised when prosecuted. *See Wooden*, 142 S. Ct. at 1082 (Gorsuch, J., concurring) ("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous laws."). It would strain credulity for any defendant who was focused on stopping an official proceeding through unlawful means to profess surprise that his conduct could fall within a statute that makes it a crime to "obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so." 18 U.S.C. § 1512(c)(2).

## B.  Counts Three through Six (18 U.S.C. § 1752)

The defendants move to miss Counts Three through Six, which charge violations 18 U.S.C. § 1752, on the following grounds: (1) only the Secret Service, not the Capitol Police, can designate "restrictive areas" and the Secret Service did not establish the "restricted area" on January 6, 2021, and (2) one of the Secret Service's protectees that day, former Vice President Mike Pence, was not "temporarily visiting" the Capitol. ECF No. 176 at 23-27.

These are now well-trodden arguments in this district, having been raised and rejected consistently in similar cases arising from the January 6th Capitol attack. The area was restricted due to a visiting protectee and therefore the Secret Service did not have to expressly establish the restricted area. For the following detailed reasons, the Court should deny the defendants' motions here as well.

36

### i.   Section 1752 Does Not Require the Government to Prove that the Restricted Area Was Restricted at the Secret Service's Direction.

First, the defendants assert that Counts Three through Six, charging 18 U.S.C. §§ 1752(a)(1)–(2) and (b)(1)(A), should be dismissed for failure to state an offense because the U.S. Capitol Police, and not the Secret Service, designated the "restricted area" around the U.S. Capitol on Jan. 6, 2021. ECF 176 at 23. Nothing in the express language of Section 1752 requires this, and the defendants' attempts to read such a requirement as implied in the statutory language flies against the common sense reading of the text and its legislative history.

Section 1752 provides in relevant part:

(a) Whoever—

> (1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so; [or]

> (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

(c) In this section—

> (1) [T]he term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

>> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting;

18 U.S.C. § 1752. Section 1752 also defines "restricted building or grounds" to include any posted,

cordoned off, or otherwise restricted area "of the White House or its grounds, or the Vice President's official residence or its grounds" or "of a building or grounds so restricted in conjunction with an event designated as a special event of national significance." 18 U.S.C. §§ 1752(c)(1)(A), (C).

The language of Section 1752 contains no express requirement that the "restricted buildings or grounds" must be restricted by USSS for there to be a violation of Section 1752. Nonetheless, the defendants argue the requirement is the "exclusive" role of the Secret Service. ECF 176 at 23. However, because the plain language of the statute is clear and unambiguous, reading the implied requirement provided by the defendants is unwarranted. Even if one were to look beyond this plain language, the legislative history of Section 1752 also weighs against the defendants' interpretation.

First, there is no ambiguity in the text of Section 1752 as to the meaning of "restricted building or grounds." Namely, Section 1752 proscribes certain conduct in and around "any restricted building or grounds," *see* 18 U.S.C. § 1752(a), and it provides three definitions for the term "restricted buildings and grounds," *see* § 1752(c)(1), including "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting," § 1752(c)(1)(B). Through a cross-reference, Section 1752 makes clear—and the defendants do not appear to dispute—that "person[s] protected by the Secret Service" include the Vice President. § 1752(c)(2); *see* § 3056(a)(1). The proscribed conduct within a "restricted building or grounds" includes, as relevant here, knowingly and unlawfully entering or remaining, § 1752(a)(1), and knowingly and with intent to impede or disrupt government business, engaging in "disorderly or disruptive conduct" that "in fact, impedes or disrupts" "government business," § 1752(a)(2).

38

In short, Section 1752 "prohibits persons from knowingly entering without lawful authority to do so in any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd*, 831 F. App'x 513 (D.C. Cir. 2020). Where, as here, the words of the statute are unambiguous, "the judicial inquiry is complete." *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation marks omitted). However, under the defendants' interpretation of Section 1752, there is an additional, implied requirement unstated in the statutory language above that any restricted area must be designated by USSS. There is no such requirement, nor is there any credible rationale why one should be inferred.

And while looking beyond the plain language is unwarranted here, *See United States v. American Trucking Associations*, 310 U.S. 534, 543 (1940) (stating that looking beyond clear statutory text is appropriate where the results would be absurd or demonstrably at odds with clearly expressed Congressional intent), the legislative history of Section 1752 in fact affirms the plain reading of the text that the defendants resist. As the defendants acknowledge, when Section 1752 was first enacted in 1970, the Secret Service was part of the Treasury Department, and this original version of the statute explicitly incorporated regulations promulgated by the Treasury Department governing restricted areas. *See United States v. Bursey*, 416 F.3d 301, 306-07 (4th Cir. 2005) (noting that definition of restricted area required interpreting Treasury regulations). Specifically, subsection (d) of Section 1752 gave authority to Treasury, which oversaw the Secret Service, to "prescribe regulations governing ingress or egress to such buildings and grounds and to posted, cordoned off, or otherwise restricted areas where the President is or will be temporarily visiting." Pub. L. 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan. 2, 1971).

However, when Congress revised Section 1752 in 2006, it struck subsection (d) from the

statute, eliminating the requirement that "restricted building or grounds" be necessarily defined or designated by the Secret Service or any other particular law enforcement agency. Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9, 2006). In 2012, Congress further reinforced this interpretation by adding the definitional subsection (c) cited above, which provides the current definition of "restricted building or grounds." Pub. L 112-98, Title I, Sec. 2, 126 Stat 263 (March 8, 2012). Contrary to the defendants' reading, the legislative history shows that Congress deliberately excised any requirement that a restricted area depend on any definition or determination by the Secret Service.

Both the plain language and legislative history of Section 1752 show that there is no requirement, express or implied, that an area be restricted by a particular law enforcement agency, as courts in this district have unanimously held. *United States v. Grider*, --- F.Supp.3d ---, 2022 WL 3016775, at *7 (D.D.C. July 29, 2022) (collecting cases) (internal quotations omitted) ("[N]othing in the statutory text requires the Secret Service to be the entity to restrict or cordon off a particular area, nor does Grider point to any provision in the statute in support of such a proposition."); *United States v. Bingert*, --- F.Supp.3d ---, 2022 WL 1659163, at *14 (D.D.C. May 25, 2022) ("[D]efendants fashion a bizarre requirement, seemingly out of thin air: that only the Secret Service can designate an area as restricted [for the purposes of 18 U.S.C. § 1752]."). The defendants' contention that Counts Three through Six are defective for this reason should be likewise rejected.

### ii. Several Secret Service Protectees Were Temporarily Visiting the Capitol Grounds on Jan. 6, 2021

Section 1752 prohibits the unlawful entry into a restricted or otherwise cordoned off "building or grounds where the President or other person protected by the Secret Service is or will

be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B). As the government intends to prove at trial, at the time of the defendants' relevant conduct on Capitol grounds on January 6, 2021, three Secret Service protectees—Vice President Pence and two immediate family members—were present. The defendants' conduct accordingly falls within the Section 1752's plain sweep when they entered the restricted area of the Capitol and assaulted law enforcement officers with a metal barricade while the Vice President and his family were "temporarily visiting."

The defendants contend that the Section 1752 charges against them must be dismissed because the U.S. Capitol grounds on Jan. 6, 2021, were not a building or grounds "where the President or other person protected by the Secret Service is or will be temporarily visiting." ECF No. 176 at 25-26. In particular, the defendants argue that because former Vice President Mike Pence lived and worked in the District of Columbia, and because he had an office inside the Capitol building, he could therefore not be "temporarily visiting" the building or grounds for the purposes of Section 1752.

The defendants make no mention of Vice President Pence's two immediate family members—both Secret Service protectees—who were also with him that day. This makes any argument as to whether Vice President Pence was "temporarily visiting" a moot point. Regardless, the Court should reject the defendants' argument as meritless, as all others have,[6] as it defies

---

[6] *E.g. United States v. Puma*, 2022 WL 823079, at *17 (D.D.C. Mar. 19, 2022) (rejecting same argument as "not supported by the statutory text and … out of step with the statutory context); *United States v. McHugh*, 583 F. Supp. 3d 1, 35 (D.D.C. 2022) ("None of McHugh's arguments about the meaning of 'temporarily visiting' sway the Court from the commonsense conclusion, founded on ordinary usage, dictionary definitions, and judicial interpretations, that Vice President Pence was 'temporarily visiting' the Capitol on January 6, 2021."); *United States v. Rodriguez*, No. CR 2 (ABJ), 2022 WL 3910580, at *16 (D.D.C. Aug. 31, 2022) ("This strained interpretation is inconsistent with both the text and the structure of the statute.").

Section 1752's plain terms, purpose, and structure.

As noted above, to determine the meaning of a statute, a court "look[s] first to its language, giving the words used their ordinary meaning." *Levin*, 568 U.S. at 513 (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). The verb "visit" means, *inter alia,* "to go to see or stay at (a place) for a particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee."[7] Either definition describes the Secret Service protectees' activities on January 6. Vice President Pence was physically present at the U.S. Capitol for a particular purpose: he presided over Congress's certification of the 2020 Presidential Election, first in the joint session, and then in the Senate chamber. Similarly, the Vice President's family members came to the U.S. Capitol for a particular purpose: to observe these proceedings. Finally, as President of the Senate, Vice President Pence oversaw the vote certification. Given the presence of the Vice President and his family members, the U.S. Capitol qualified as a building where "[a] person protected by the Secret Service [was] . . . temporarily visiting." 18 U.S.C. § 1752(c)(1)(B).

The defendants emphasize Section 1752's use of the term "temporarily," citing cases where the President or Vice President were "traveling outside of D.C., where they live and work, 'visiting' that area for a 'temporary' purpose." ECF 176 at 27. First, Section 1752 does not impose a requirement that the location being temporarily visited be outside of the District of Columbia. Second, Section 1752 does not require that the purpose of the visit be temporary, but that the nature of the visit itself be temporary. Vice President Pence and his family had traveled to the U.S. Capitol to oversee and attend the Joint Session of Congress—a proceeding of limited duration. At the close of the proceeding, they left—confirming the "temporary" nature of their visit.

---

[7] https://www.merriam-webster.com/dictionary/visit.

### C.  Count Ten (40 U.S.C. § 5104(e)(2)(G)) Is Neither Vague Nor Overbroad.

The defendants' motion to dismiss the Section 5104(e)(2)(G) count is without merit and should be denied.  The defendants advance two arguments: (1) Section 5104(e)(2)(G) is "substantially overbroad," ECF 176 at 28; and (2) Section 5104(e)(2)(G) is "unconstitutionally vague on its face." *Id*. at 27.  However, courts have routinely held that the language of 5104(e)(2)(G) is clear as it plainly prohibits only conduct that would disrupt the orderly business of Congress.

### i.  Section 5104(e)(2)(G) Is Not Unconstitutionally Vague.

The defendants are also incorrect when they assert that Section 5104 is "unconstitutionally vague on its face." ECF No. 176 at 27. [8]  Their flawed argument should be rejected, as it was when raised by other January 6 rioters in *Nassif*, 2022 WL 4130841, at *7, and *Seitz*, No. 21-cr-279 (DLF), ECF No. at 51 at 7-8.

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV.  An outgrowth of the Due Process Clause, the "void for vagueness"

---

[8] As a general matter, one making such a facial vagueness challenge must demonstrate that the law is "impermissibly vague in all its applications;" one whose conduct is "clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Vill. of Hoffman Ests.*, 455 U.S. 489, 494-95 (1982).  The defendants cannot surmount that demanding standard.  Where the facial challenge relies on a First Amendment theory, a facial challenge may be available where the challenger shows that the law in question "reaches a substantial amount of constitutionally protected conduct." *See Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 940 (9th Cir. 1997) (citing *Kolender v. Lawson*, 461 U.S. 352, 359 n.8 (1983)).  Even assuming that is viable theory under governing law, *see Quigley v. Giblin*, 569 F.3d 449, 457-58 (D.C. Cir. 2009) (questioning the breadth of "First Amendment vagueness doctrine"), The defendants' facial vagueness claim fails for the same reasons that their overbreadth challenge falls short.

doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).  To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)).  To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *Williams*, 553 U.S. at 306, or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010).  "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'" *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)).  Rather, a provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application.  *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

A statutory provision is therefore "not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *Bronstein*, 849 F.3d

44

at 1107 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)).  A statute is instead vague

where it fails to specify any "standard of conduct . . . at all." *Coates v. Cincinnati*, 402 U.S. 611,

614 (1971). "As a general matter," however, a law is not constitutionally vague where it "call[s]

for the application of a qualitative standard . . . to real-world conduct; 'the law is full of instances

where a man's fate depends on his estimating rightly . . . some matter of degree.'" *Johnson*, 576

U.S. at 603-04 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).

    The defendants fail to overcome the strong presumption that Section 5104(e)(2)(G)

passes constitutional muster. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32

(1963) ("The strong presumptive validity that attaches to an Act of Congress has led this Court

to hold many times that statutes are not automatically invalidated as vague simply because

difficulty is found in determining whether certain marginal offenses fall within their language.").

    Section 5104(e)(2)(G) does not tie criminal culpability to "wholly subjective" terms such

as "annoying" or "indecent" that are bereft of "narrowing context" or "settled legal meanings,"

*Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized

ordinary case of the crime," *Johnson*, 576 U.S. at 604.  That the statute makes it unlawful to

"willfully and knowingly … parade, demonstrate, or picket in any of the Capitol Buildings,"

gives rise to "no such indeterminacy." *Williams*, 553 U.S. at 306; *see also Nassif*, 2022 WL

4130841, at *7.  That is, the plain language clearly prohibits an individual from engaging

in disruptive conduct inside the Capitol building. *See Bynum*, 93 F. Supp. 2d at 57-58

(explaining that Capitol Police regulation at issue in that case was unnecessary because Congress

had provided "more than sufficient guidance" in Section 5104(e)(2)(G)'s statutory text).  While

"it may be difficult in some cases to determine whether these clear requirements have been met,"

"'courts and juries every day pass upon knowledge, belief and intent—the state of men's

minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).[9]

As Judge Bates explained as he rejected an identical argument that Section 5104(e)(2)(G) "does not define the offense so as to put ordinary people on notice of what is prohibited," ECF No. 51 at 7; *Nassif*, 2022 WL 4130841, at *6,

> The definition of demonstrate—"to make a public demonstration; esp. to protest against or agitate for something," Oxford English Dictionary (3d ed. 2005), or "to make a public display of sentiment for or against a person or cause," as by "students demonstrating for the ouster of the dictator," Webster's New International Dictionary (3d ed. 1993)—is not so vague as [defendant] contends. When read "in light of its neighbors," *McHugh I*, 2022 WL 296304, at *12, "parade" and "picket," it is clear that § 5104(e)(2)(G) prohibits taking part in an organized demonstration or parade that advocates a particular viewpoint—such as, for example, the view that the 2020 U.S. Presidential Election was in some way flawed.

Accordingly, Judge Bates held, as this Court should, that "§ 5104(e)(2)(G) is not unconstitutionally vague on its face." *Id.* at *7.

### ii. Section 5104 Is Not Unconstitutionally Overbroad

The statute is not overbroad either. *See Seitz*, 21-cr-279 (DLF), ECF No. 51 at 12-14. In the First Amendment context, as in others, "[f]acial challenges are disfavored." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008). Facial overbreadth challenges— in which a defendant asserts that a statute, constitutionally applied to her, is nevertheless invalid because it would be unconstitutional in a "substantial number" of

---

[9] For the reasons given above, Defendants' reliance on scattered comments during the floor debate in the House does not require a different outcome.

*other* cases, *id.* at 449 n.6 (internal quotation marks omitted)—are even more exceptional. "'Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment,'" overbreadth is "'strong medicine' to be employed 'only as a last resort.'" *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999) (quoting *New York v. Ferber*, 458 U.S. 747, 769 (1982)); *cf. Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (noting the "substantial social costs created by the overbreadth doctrine when it blocks application of a law to . . . constitutionally unprotected conduct") (emphasis omitted).

The Supreme Court has therefore "vigorously enforced the requirement that a statute's overbreadth be *substantial* . . . relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292. "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). Rather, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties   not before the Court." *Id.* at 801. And laws that are "not specifically addressed to speech" are far less likely to present such a danger. *Hicks*, 539 U.S. at 124; *see id.* (observing that "an overbreadth challenge" to such a law will "[r]arely, if ever, . . . succeed").

The defendants' challenge fails that demanding standard. Because "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers," the "first step in overbreadth analysis is to construe the challenged statute." *Williams*, 553 U.S. at 293. The prohibition in Section 5104(e)(2)(G) presents "no ambiguity"; it "tells the citizen that it is unlawful" for her to parade, demonstrate, or picket inside the Capitol Building. *Jeanette Rankin Brigade*, 342 F. Supp. at 583. The operative verbs—parade, demonstrate, and picket—

47

principally target conduct rather than speech, and those verbs are paired with the "willfully and knowingly" scienter requirements, *see Williams*, 553 U.S. at 294 (focusing on scienter requirement in determining that statute was not overbroad). And the subsequent six words, "in any of the Capitol Buildings," makes clear that the statute prohibits conduct within a nonpublic forum, which cabins the overbreadth of which the defendants complain. *Nassif*, 2022 WL 4130841, at *4. At the very least, the defendants cannot show that Section 1512(c)(2) is "substantial[ly]" overbroad relative to its "plainly legitimate sweep." *Washington State Grange*, 552 U.S. at 449 n.6 (internal quotation marks omitted).

The defendants' own prosecution—which involves physically trespassing into the restricted Capitol where an official proceeding had been taking place before it was disrupted— is illustrative of the numerous constitutionally legitimate applications of the statute to conduct and unprotected speech. And far from showing a "realistic danger" of constitutionally problematic applications in other cases, *Taxpayers for Vincent*, 466 U.S. at 801, the defendants fail to identify a single actual example of a prosecution based on protected speech. The limitations inherent in the crime of conviction, moreover, render the possibility of any such prosecutions marginal at best, and any such case could be the subject of an as-applied challenge. Nothing at all calls for the "strong medicine," *Los Angeles Police Dep't*, 528 U.S. at 39 (internal quotation marks omitted) of overbreadth invalidation.

The defendants' citations to case law show the weaknesses of their overbreadth claim. The defendants rely on *Bynum v. U.S. Capitol Police Bd.*, (ECF No. 176 at 29) where Judge Friedman ruled that a Capitol Police regulation interpreting Section 5104(e)(2)(G)[10] that defined

---

[10] At the time, the provision was Section 193(f)(b)(7).

"demonstration activity" to include "holding vigils" and "sit-ins" swept too broadly because it "invited the Capitol Police to restrict behavior that is no way disruptive." 93 F. Supp. 2d at 53, 57. As an initial matter, *Bynum*'s invalidation of a Capitol Police regulation—which was applied to an individual who was denied permission to pray inside the Capitol building—does not inform the statutory challenge that Carpenter presses here.

Moreover, Judge Friedman in *Bynum* (and Judge Bates in *Nassif*) concluded that the inside of the Capitol building is a nonpublic forum, where the government may restrict First Amendment activity if "the restrictions are 'viewpoint neutral' and 'reasonable in light of the purpose served by the forum.'" *Id.* at 56 (citing *Cornelius v. NAACP Legal Defense and Educational Fund*, 473 U.S. 788, 806 (1985)); *see also Nassif*, 2022 WL 4130841, at *4. He reasoned that, although the regulation went too far, Section 5104(e)(2)(G) itself set forth "legitimate purposes," *Bynum*, 93 F. Supp. 2d at 57, that were "aimed at controlling only such conduct that would disrupt the orderly business of Congress—not activities such as quiet praying, accompanied by bowed heads and folded hands," *id.* at 58.[11] In short, Judge Friedman concluded that, unlike the regulation at issue in *Bynum*, the statute itself was not "substantial[ly]" overbroad relative to its "plainly legitimate sweep." *Washington State Grange*, 552 U.S. at 449 n.6 (internal quotation marks omitted); *see also Nassif*, 2022 WL 4130841, at *4.

Additionally, the defendants' reliance on *Lederman v. United States*, 89 F. Supp. 2d 29

---

[11] The defendants argue that the legislative debate over what became Section 5104(e)(2)(G) undercuts Judge Friedman's interpretation that the statute was designed to prevent conduct that disrupted congressional business. *See* ECF No. 176 at 30. Even putting aside the irrelevance of legislative history when interpreting unambiguous statutes, the defendants confuse congressional debate about whether to add an additional intent requirement to the existing "willfully and knowingly" scienter in the statute with the actus-reus question—what type of conduct does "demonstrate" in Section 5104(e)(2)(G) encompass—at issue in *Bynum*.

(D.D.C. 2000), is likewise unavailing.  Like *Bynum*, *Lederman* involved a challenge to a Capitol Police regulation, and is of marginal, if any, relevance for that reason.  Furthermore, the regulation at issue there limited the areas within the Capitol *grounds* in which individuals could engage in "demonstration activity," which in *Lederman* involved the distribution of leaflets in support of the arts.  *Id.* at 32. Relying in part on *Jeanette Rankin Brigade*, *supra*, Judge Roberts in *Lederman* concluded that the entire Capitol Grounds constitute a traditional public forum. *Id.* at 37, and that although the regulation left open alternative channels for expression, its imposition of a total ban burdened more speech than necessary. *Id.* at 38-39.  The hypothetical "group of congressional staffers" whose conduct would violate the regulation "stood outside the Capitol," and thus "within a traditional public forum." *Id.* at 41.  But Section 5104(e)(2)(G)'s prohibition applies only within the nonpublic forum inside the Capitol buildings, rendering the hypothetical inapt.  As Judge Friedrich held, the statute does not cover a substantial amount of protected expressive activity.  *Seitz*, 21-cr-279 (DLF), ECF No. 51 at 14.

The defendants digress at various points—where precedent and the language of the statute do not support their argument—to statements during the House debate on the statute.  But legislative history "is an uneven tool that cannot be used to contravene plain text." *Bingert*, 2022 WL 1659163, at *11 (citing *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011)); *see also Nassif*, 2022 WL 4130841, at *7 (defendant's "reliance on legislative history is misplaced where the plain text of the statute leaves no need to resort to alternative methods of interpretation.").  The floor statements on which the defendant rely are "particularly 'unreliable.'" *United States v. Powell*, No. 21-cr-179, ECF No. 73, at 6 (D.D.C. July 8, 2022) (citing *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 474 (1921)).  For example, in at least one instance, the defendants' citation to the legislative history is misleading.  T h e   defendants accurately quote

Representative O'Neal's statement that O'Neal is "a little bit disturbed" about the language of the predecessor to Section 5104(e)(2)(G), *see* ECF No. 176 at 28, but omit the later discussion in which O'Neal makes clear that the basis for his concern was that the prohibition does not also include the Capitol grounds.  *See* 113 Con. Rec. H29,390 (daily ed. Oct. 19, 1967) (statement of Rep. O'Neal) (asking if "anyone would have an objection to adding the word 'grounds' to the new language").[12]

### D.  A Taser Could Be Considered a Dangerous Weapon and Thus Count Seven (40 U.S.C. § 5104(e)(1)(A)) Is Not Insufficient.

Defendant Munchel's contention that Count Seven (40 U.S.C. § 5104(e)(1)(A)) must be dismissed because a Taser is not a deadly or dangerous weapon, is wrong. Under 40 U.S.C. § 5104(e)(1)(A)(i), "dangerous weapon" is defined to include "a device designed to expel or hurl a projectile capable of causing injury to individuals or property…" Munchel argues a Taser is not deadly or dangerous simply because it is a "less lethal" option. ECF No. 161 at 10-11. That statement, alone, highlights that Tasers are used to incapacitate and therefore can be dangerous. The District of Columbia Court of Appeals already rejected this argument when it was raised during his appeal of his detention. *United States v. Munchel*, 991 F.3d 1273, 1281 (D.C. Cir.), *judgment entered*, 844 F. App'x 373 (D.C. Cir. 2021). The Court of Appeals noted:

> "Eisenhart's argument that a taser is not a dangerous weapon—which Eisenhart raises for the first time in reply, and which Munchel seeks to adopt in his reply—is without merit. The relevant statute, 40 U.S.C. § 5104(a)(2)(B), defines the term "dangerous weapon" to include "a device designed to expel or hurl a projectile capable of causing injury to individuals or property. ..." While the record contains no evidence or proffer as to how Munchel's taser operates, a taser is commonly understood as a device designed to expel a projectile capable of causing injury to

---

[12] Other representatives clarified that the law enacted in 1946 already included a similar prohibition that applied to the Capitol Grounds.  *See* 113 Con. Rec. H29,390 (daily ed. Oct. 19, 1967) (statement of Rep. Colmer) (noting that such an addition "would be surplusage").

individuals. *See Cantu v. City of Dothan*, 974 F.3d 1217, 1224–25 (11th Cir. 2020); *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) ("[A] taser uses compressed nitrogen to propel a pair of 'probes'—aluminum darts tipped with stainless steel barbs connected to the taser by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person, the taser delivers a 1200 volt, low ampere electrical charge. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless." (internal alterations and quotation marks omitted)). Thus, at this stage, the evidence sufficiently demonstrates that Munchel's taser is a dangerous weapon under the statute." *Id.* at footnote 5.

### III.   The Indictment's Counts Are Not Multiplicitous

A defendant may be convicted of and sentenced under different statutory provisions for multiple offenses arising out of the same single act or course of conduct so long as Congress authorized the imposition of such multiple punishments.  *See United States v. McLaughlin*, 164 F.3d 1, 8 (D.C. Cir. 1998) ("If the legislature intends to impose multiple punishment, imposition of such sentences does not violate Double Jeopardy.").  "To determine multiplicity vel non, courts generally apply the *Blockburger* test: '[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not,' i.e., whether either is a lesser included offense of the other." *United States v. Mahdi*, 598 F.3d 883, 888 (D.C. Cir. 2010) (quoting *United States v. Weathers*, 186 F.3d 948, 951 (D.C. Cir. 1999), and *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).  If the two offenses each require proof of a fact the other does not, then the charges are not multiplicitous.  *Id.* at 890.[13]  The

___

[13] On the other hand, if two offenses fail the *Blockburger* test—because one is a lesser-included offense of the other—that is not the end of the inquiry.  In that scenario, the "*Blockburger* test . . . provides only a canon of construction, not a 'conclusive presumption of law,' *id.* at 888 (quoting *Garrett v. United States*, 471 U.S. 773, 779 (1985)), because there "'is nothing in the Constitution which prevents Congress from punishing separately each step leading to the

52

*Blockburger* "test focuses on the statutory elements of the offense, not on the proof offered in a given case." *United States v. McLaughlin*, 164 F.3d 1, 8 (D.C. Cir. 1998). Thus, it is irrelevant whether there is significant overlap in the factual proof of each count at trial, or even whether two counts "are based upon the exact same set of facts and circumstances," as long as each count's elements require proof of a fact that the others do not. *United States v. Manafort*, 313 F. Supp. 3d 311, 314 (D.D.C. 2018); *see id.* ("[T]he test for multiplicity is not whether two counts are based on the same set of facts; rather, it is whether the statutory elements of the two offenses are the same.").

Here, the defendants' multiplicity arguments fail because each of the offenses charged in the indictment "requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304. Indeed, these are not close questions—which is likely why the defendants spend but a page on the argument, does not even attempt to evaluate or analyze the statutes' elements, and cites nothing to support the claim. Many of the Counts require proof of multiple facts not required by the other Counts, and all require proof of at least one. Thus, the indictment satisfies *Blockburger*.

The defendants complain that the charges all "seemingly refer to Defendant[s]alleged presence at the Capitol Grounds on January 6." ECF No. 161 at 13. But that simply assumes what evidence the government will use at trial to prove each Count. Moreover, each Count plainly requires proof of more than mere "alleged presence" on Capitol grounds. In any event, the defendants misunderstand that the *Blockburger* multiplicity analysis refers to the elements of the offenses, not whether a single act could violate multiple statutes. The very premise of *Blockburger*

---

consummation of a transaction which it has power to prohibit and *punishing also the completed transaction.*" *Id.* (quoting *Garrett*, 471 U.S. at 779) (emphasis in original). Here, the offenses clearly each require proof of a fact the others do not, so it is not necessary to conduct this further analysis.

and its progeny is that the "same act or transaction"—here, the defendants' presence and conduct at the Capitol grounds—can form the basis of multiple criminal charges so long as each Count requires proof of a fact that the others do not. *Mahdi*, 598 F.3d at 888; *Manafort*, 313 F. Supp. 3d at 314 (counts can be "based upon the exact same set of facts and circumstances," if *Blockburger* is satisfied). That the defendants' conduct on January 6, 2021, has led to multiple related charges is unsurprising and utterly ordinary in a criminal case.

## **CONCLUSION**

For the foregoing reasons, the defendants' motions to dismiss, *see* ECF Nos. 161, 176, 177, should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:

/s/ Rebekah E. Lederer
REBEKAH E. LEDERER
Assistant United States Attorney
Pennsylvania Bar No. 320922
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-7012
Rebekah.Lederer@usdoj.gov

/s/ Michael M. Gordon
MICHAEL M. GORDON
Assistant United States Attorney
Florida Bar No. 1026025
400 N. Tampa St., Suite 3200
Tampa, FL 33606
(813) 274-6370
michael.gordon3@usdoj.gov

54