# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-118-RCL** |
| **ERIC MUNCHEL and**<br>**LISA EISENHART,** | |
| **Defendants.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence:

- Eric Munchel to 57 months of incarceration, three years of supervised release, $2,000 in restitution, and the mandatory special assessment of $530. *See* Munchel PSR ¶¶ 177-78. The Sentencing Guideline range of imprisonment, as calculated by the government, is 46 to 57 months. A 57 months' sentence is thus the top end of the Sentencing Guidelines range, which Munchel deserves.

- Lisa Eisenhart to 46 months of incarceration, three years of supervised release, $2,000 in restitution, and the mandatory special assessment of $280. *See* Eisenhart PSR ¶¶ 176-78. The Sentencing Guideline range of imprisonment, as calculated by the government, is 41 to 51 months. A 46 months' sentence is thus the midpoint of the Sentencing Guidelines range.

1

## I.      INTRODUCTION

Defendant Eric Munchel, a 32 year-old then-bartender from the Nashville, Tennessee area, and his mother, defendant Lisa Eisenhart, a 59 year-old nurse from Woodstock, Georgia (a suburb of Atlanta), participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

After a bench trial with stipulated facts, the Court found Munchel guilty of five felonies and three misdemeanors and Eisenhart guilty of two felonies and five misdemeanors. Specifically, the Court found that:

- Both Munchel and Eisenhart violated 18 U.S.C. §§ 1512(k) (Conspiracy to Commit Obstruction); 1512(c)(2) (Obstruction of an Official Proceeding); 40 U.S.C. §§ 5104(e)(2)(B) (Entering and Remaining in the Gallery of Congress; 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building or Grounds); and §5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building);

- Munchel also violated 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A) (Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Weapon); 1752(a)(2) and (b)(1)(A) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon); and 40 U.S.C. §§ 5104(e)(1)(A) (Unlawful Possession of a Dangerous Weapon on Capitol Grounds or Building); and

- Eisenhart also violated 18 U.S.C. §§ 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds); and 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds).

As explained herein, a sentence of 57 months of incarceration, three years of supervised release, $2,000 in restitution, a fine, and the mandatory special assessment of $530 is appropriate for Munchel, and a sentence of 46 months of incarceration, three years of supervised release, $2,000 in restitution, a fine, and the mandatory special assessment of $280 is appropriate for Eisenhart because both defendants (1) prepared for violence on January 6 and projected their willingness to engage in it, wearing tactical vests (2) encouraged other rioters to fight police; (3) unlawfully entered the U.S. Capitol building despite blaring alarms and other signs that their presence was forced and illegal; (4) stole zip tie handcuffs from U.S. Capitol Police ("USCP") storage; (5) roamed the Capitol building for 12 minutes, penetrating all the way to the Senate Gallery; (6) carried the zip tie handcuffs into the Senate Chamber with them, implicitly threatening members of Congress and physically preventing them from using the Senate Chamber; and (7) openly declared to a reporter that their intent in storming and entering the Capitol was to intimidate Congress. Additionally, Munchel (8) wore paramilitary clothing; (9) armed himself with a Taser and other weapons; and (10) brought the Taser with him into the Capitol, including the Senate Gallery. The government's recommended sentences, which are within the Sentencing Guidelines

3

range, reflect the gravity of Munchel and Eisenhart's conduct while also acknowledging their admissions of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

To avoid redundant background exposition, the government refers the Court to the stipulated Joint Statement of Elements and Facts for Stipulated Trial filed in this case, ECF No. 202, and Trial Exhibits 201-221 for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.      Eric Munchel and Lisa Eisenhart's Role in the January 6, 2021 Attack on the Capitol

#### *Approach to the Capitol*

On January 4, 2021, Eric Munchel traveled with his mother, Lisa Eisenhart, from Nashville, Tennessee, to the Grand Hyatt Hotel in Washington, D.C. Eisenhart rented a hotel room from January 4, 2021, through January 7, 2021. Munchel and Eisenhart knew that the certification was slated for January 6, 2021, and traveled to D.C. to participate in advertised 2020 presidential election protest rallies scheduled for January 5-6, 2021.

On the afternoon of January 6, Munchel and Eisenhart left their hotel wearing tactical vests and made their way to the U.S. Capitol. *See* Image 1.



*Image 1: CCTV still photograph showing Munchel and Eisenhart at their hotel, both wearing tactical vests (Exhibit 102)*

In addition to his tactical vest, Munchel wore all-black paramilitary gear that made him look like a member of a SWAT team: black fatigues, a black neck gaiter, and a black baseball hat. *See* Image 2. He also carried a Taser holstered on his hip. *See id.* Meanwhile, Eisenhart wore a plaid flannel shirt, jeans, and a red knit hat emblazoned with "Keep America Great 2020." *See* Image 2.



*Image 2: photo showing Munchel and Eisenhart wearing tactical vests on the grounds of the U.S. Capitol, with Munchel's Taser circled in yellow (Exhibit 401)*

Once on the restricted U.S. Capitol grounds, Munchel affixed a cell phone to the chest of his vest so that the camera could record his and Eisenhart's movements throughout the Capitol grounds and building. *See* Exhibit 301. At first, Munchel and Eisenhart stood on the grass surrounding the U.S. Capitol building, watched while other rioters forcefully overwhelmed the police lines, and verbally encouraged those rioters' violent efforts. For example, Eisenhart yelled, "Fight 'em, don't let 'em in! Fight 'em, don't let them in! Don't let them in!" Eisenhart then yelled, "Push, push!" referring to rioters' efforts to break through the police lines. Eisenhart also yelled "We can't let them get a hold, because they're going to gas us out!" Exhibit 301 at 1:57, 3:45, and 4:00, respectively. While watching the battle, someone near the duo yelled out, "we broke the line up there." In response, the crowd cheered and Eisenhart bellowed, "Let's go, let's go!" *Id*. at 10:50-

11:20.

Immediately afterward, Munchel and Eisenhart systematically pushed their way through the crowd surrounding the Capitol, using a stack formation with Eisenhart in front shouting, "Let's go in, Let's go in!" *Id*. at 11:50; Image 3.



*Image 3: Still from Munchel's cell phone camera video (Exhibit 301 at 11:36) showing Munchel and Eisenhart walking, in stack formation, through the crowd on the west lawn towards the Capitol*

As they wormed their way through the crowd and towards the Capitol building, Munchel and Eisenhart encountered members of the Oath Keepers militia. *See* Image 4. An unidentified man stated, "There are 65 more of us coming." Munchel then bumped fists with one of the Oath Keepers. *See* Image 5.

 

*Images 4 and 5: Side-by-side stills from Munchel's cell phone camera video (Exhibit 301 at 12:00 and 12:02, respectively) capturing the Oath Keepers' interactions with Eisenhart and Munchel's fist bump with one of them*

Eisenhart then told Munchel, "We're going straight to federal prison if we go in there with weapons." Munchel responded, "Yeah, that's why I'm not going in there," and Eisenhart stated that they should put "em" in their backpacks. Exhibit 301 at 12:00-12:35. Munchel and Eisenhart then devised a plan to shed their weapons before entering the Capitol. At the same time, Eisenhart continued to urge fellow rioters to enter the building.

Munchel and Eisenhart moved back across the crowd to an area where a backpack was already stowed. Munchel remarked that he needed to "take my weapons off before I go in there." Munchel stashed a fanny pack inside the backpack, which Munchel admitted included at least a knife. He did not, however, take off his Taser. Meanwhile, as Munchel worked to store his weapons on Capitol grounds, he told other rioters that the cops "retreated." Eisenhart urged Munchel to

"Drop your shit and let's go." As the duo prepared to retrace their steps and resume advancing on the Capitol building, someone asked them if they were "Proud Boys." Munchel and Eisenhart replied that they were not Proud Boys, they were "Proud Americans." Exhibit 301 at 13:00-16:50.

As Munchel and Eisenhart walked closer to the Inaugural stage scaffolding, *see* Image 5, Eisenhart commented "They're putting that up for the stupid inauguration." In response, an unidentified person stated, "for Biden," and another unidentified person responded, "They won't be needing that." Eisenhart replied, "That's right." Exhibit 301 at 19:15-20 and 22:55-23:00.



*Image 5: Still from Munchel's cell phone camera video (Exhibit 301 at 21:45) showing the packed northwest lawn and stage*

During the time that Munchel and Eisenhart worked their way through the west lawn, Munchel's cell phone video camera captured numerous comments and conversations about how rioters, including Munchel and Eisenhart, were not deterred by the police officers' deployment of pepper spray and flashbangs. Munchel proudly proclaimed "We ain't playing fucking nice no goddamn more." Eisenhart replied, "That's right." Exhibit 301 at 25:15-25:20. After a man commented on Munchel and Eisenhart's attire, Munchel replied "We're fucking ready to fuck shit

9

up." *Id.* at 26:55-27:05. As Munchel and Eisenhart progressed closer to the Capitol, an unidentified man announced that Congress had been shut down and tear gassed, to which Eisenhart exclaimed "They got teargassed, motherfuckers! Oh my God. If that isn't my best day to know that they got tear gassed." *Id.* at 30:10-30:36.

Munchel and Eisenhart climbed up, under, and through the Inaugural stage scaffolding to access the northwest exterior steps of the Capitol, which lead directly to the Capitol's Upper West Terrace and multiple entry points. As she climbed the steps, Eisenhart exclaimed, "Stop the Steal." Exhibit 301 at 35:10-35:15. While directly in front of the Capitol building, Munchel stated, "Probably the last time I'll be able to enter the building with armor and fucking weapons," and "I guess they thought we were playing!" *Id.* at 36:36 and 36:55, respectively. As Munchel and Eisenhart approached the Upper West Terrace emergency exit doors, they discussed the presence of pepper spray in the air as members of the crowd around them can be heard, on Munchel's recording, coughing. Munchel then told Eisenhart to use her bandana to cover her face because "It's going to get spicy." *Id.* at 38:25-38:40.

### Breach of the Capitol Building and Munchel's Entry

At approximately 2:37 p.m., Munchel and Eisenhart entered the Capitol via the Upper West Terrace emergency exit door, ignoring the blaring door alarm. *See* Image 6.



*Image 6: Still from CCTV (Exhibit 501.2) showing Munchel and Eisenhart (yellow square)
entering the Capitol at 2:37:38 p.m.*

Immediately after entering the building, Munchel and Eisenhart walked up some nearby steps,

gaining access to the Rotunda, where they roamed for several minutes. *See* Image 7.



*Image 7: Still from CCTV showing Munchel and Eisenhart (yellow square) in the Rotunda
(Exhibit 503.2)*

The duo then walked up steps off the Rotunda, gaining access to the third floor of the

Capitol building. As she climbed the stairs, Eisenhart chanted "Treason!" and yelled "Treasonous

bastards!" referring to members of Congress. Exhibit 301 at 41:39-41:44. Munchel acknowledged

the area was "not a place" for them. *Id.* at 42:09.

Instead of leaving the building, however, Munchel and Eisenhart followed signs indicating the direction of the Senate Gallery. On their way to the Senate Gallery, Munchel and Eisenhart spotted a collection of zip ties, fashioned into handcuffs, sitting on a shelf. Presumably the zip tie handcuffs belonged to the USCP. Munchel commented "Zip ties! I need to get me some of them motherfuckers." Munchel then stole a handful of the zip ties, one of which he handed to Eisenhart. *Id.* at 43:40-44:00. Munchel and Eisenhart then continued walking down the Capitol's third floor hallway, in the direction of the Senate Gallery. *See* Image 8.



*Image 8: Still from CCTV showing Munchel and Eisenhart walking the third-floor hallways with the zip ties in hand (Exhibit 506.2)*

As she walked past a staircase leading down to the second floor, Eisenhart yelled "Freedom! Traitors! We want a fair election!" Exhibit 301 at 44:00-44:20. Instead of walking down those stairs and exiting the Capitol building, Munchel and Eisenhart moved on to the Senate Gallery.

At approximately 2:45 p.m., Munchel and Eisenhart reached a door to the Senate Gallery. Munchel unlatched the door and they entered, both still holding the stolen zip tie handcuffs in their hands. With the Taser strapped to his hip, Munchel was also armed. Standing in the Senate Gallery, Eisenhart chanted "Treason!" Exhibit 301 at 45:00-45:30.



*Image 9: Still from CSPAN showing Munchel and Eisenhart in the Senate gallery at 2:45:55 p.m. (Exhibit 507.3)*

Munchel and Eisenhart stood in the Senate Gallery, contributing to the rioters' occupation of the hallowed chamber where approximately 30 minutes earlier, the country's elected representatives had been meeting to certify the results of the 2020 presidential election and thus carry out the peaceful transfer of power. With rioters like Munchel and Eisenhart storming the Capitol building and taking over the Senate Gallery, among other areas, the Senators had been forced to evacuate. As he walked around and took in the entire Senate floor, Munchel commented he "want[ed] that fucking gavel," referring to the ceremonial gavel on the Senate podium below. *Id.* at 47:33. Shortly thereafter, Munchel leaped over the banister dividing one section of the Senate

13

Gallery from another. A photojournalist captured the moment in what has become an iconic picture

from January 6, visually capturing the danger of the riot, to democracy in general and to our elected

representatives in particular. *See* Image 10. Due to this photograph, Munchel is widely known on

social media as "Zip Tie Guy."



*Image 10: Iconic photograph (Exhibit 402) of Munchel climbing over a banister in the Senate Gallery.*

The illegality and impact of their actions was not lost on Munchel or Eisenhart. As they

stood in the Senate Gallery, Munchel's cell phone camera video captured Eisenhart saying "I'm

gonna get arrest[ed] right this minute." Exhibit 301 at 48:05. Munchel also registered the gravity

of the situation and their criminal exposure, directing Eisenhart to dispose of the zip ties. *Id.* at

48:40.

Munchel and Eisenhart then left the Senate Gallery, walked to the Senate Carriage Doors,

and exited the Capitol at approximately 2:49 p.m., having spent approximately 12 minutes inside

the building. *See* Image 11. During that time, Munchel and Eisenhart penetrated and occupied one

of the most sensitive and sacred areas of the Capitol.



*Image 11: Still from CCTV capturing Munchel and Eisenhart's exit via the Senate Carriage doors (Exhibit 510.2)*

On January 7, 2021, Munchel and Eisenhart gave interviews to a reporter from the *London Times*. *See* Exhibit 601. Among other comments, Munchel told the reporter that "[w]e wanted to show that we're willing to rise up, band together and fight if necessary. Same as our forefathers, who established this country in 1776. . . It was a kind of flexing of muscles. The intentions of going in were not to fight the police. The point of getting inside the building is to show them that we can, and we will." *Id.* Meanwhile, Eisenhart tried to justify participating in a violent rebellion against the government by stating "This country was founded on revolution. If they're going to take every legitimate means from us, and we can't even express ourselves on the internet, we won't even be able to speak freely, what is America for? I'd rather die as a 57-year-old woman than live under oppression. I'd rather die and would rather fight." *Id.*

On January 10, 2021, FBI agents arrested Munchel, searched his home, and seized his

cell phone, which they subsequently searched as well. On Munchel's cell phone, agents

discovered the body camera-style video he had recorded of his and Eisenhart's activities while

on the restricted U.S. Capitol grounds, *see* Exhibit 301, discussion *supra*. They also discovered

multiple photographs Munchel had taken during the riot. Two of those photographs appear

below. *See* Images 13 and 14.



*Image 12: Photo found on Munchel's cell phone capturing riot gear-clad USCP officers standing on the Lower West Terrace with what appears to be blood on the ground (Exhibit 302).*



*Image 13: Photo found on Munchel's cell phone showing a fake newspaper front page suggesting that the certification of Biden as the winner of the 2020 presidential election had been prevented (Exhibit 304)*

Inside Munchel's home, agents recovered zip ties matching those that Munchel stole from the Capitol and carried into the Senate Gallery. *See* Image 15.



*Image 14: Photograph of zip tie handcuffs found within Munchel's residence (Exhibit 701)*

## III.    THE CHARGES AND STIPULATED TRIAL

On, April 18, 2023, after a bench trial with stipulated facts, the Court convicted Munchel on all eight charges against him:

- *Count One*: Conspiracy to Commit Obstruction, 18 U.S.C. § 1512(k);
- *Count Two*: Obstruction of an Official Proceeding, Aiding and Abetting, 18 U.S.C. § 1512(c)(2);
- *Count Three*: Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A);
- *Count Five*: Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(2) and (b)(1)(A);
- *Count Seven*: Unlawful Possession of a Dangerous Weapon on Capitol Grounds or Building, 40 U.S.C. §5104(e)(1)(A);
- *Count Eight*: Entering and Remaining in the Gallery of Congress, §5104(e)(2)(B);
- *Count Nine*: Disorderly Conduct in a Capitol Building or Grounds, §5104(e)(2)(D); and
- *Count Ten*: Parading, Demonstrating, or Picketing in a Capitol Building, §5104(e)(2)(G).

At the same time, the Court convicted Eisenhart of all seven charges against her:

- *Count One*: Conspiracy to Commit Obstruction, 18 U.S.C. § 1512(k);
- *Count Two*: Obstruction of an Official Proceeding, Aiding and Abetting, 18 U.S.C. § 1512(c)(2);
- *Count Four*: Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1);
- *Count Six*: Disorderly and Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2);
- *Count Eight*: Entering and Remaining in the Gallery of Congress, §5104(e)(2)(B);
- *Count Nine*: Disorderly Conduct in a Capitol Building or Grounds, §5104(e)(2)(D); and
- *Count Ten*: Parading, Demonstrating, or Picketing in a Capitol Building, §5104(e)(2)(G).

## IV.    STATUTORY PENALTIES

Munchel and Eisenhart now face sentencing on all the counts listed above. As noted by the Presentence Report ("PSR") issued by the U.S. Probation Office ("Probation"), the maximum terms of incarceration for each count are detailed in the chart below.

| Count | Statute | Maximum Term of Imprisonment |
|---|---|---|
| 1 | 18 U.S.C. § 1512(k) | 20 years |

18

| 2 | 18 U.S.C. §§ 1512(c)(2) and 2 | 20 years |
| 3 | 18 U.S.C. § 1752(a)(1) and (b)(1)(A) | 10 years |
| 4 | 18 U.S.C. § 1752(a)(1) | 1 year |
| 5 | 18 U.S.C. § 1752(a)(2) and (b)(1)(A) | 10 years |
| 6 | 18 U.S.C. § 1752(a)(2) | 1 year |
| 7 | 40 U.S.C. § 5104(e)(1)(A) | 5 years |
| 8 | 40 U.S.C. § 5104(e)(2)(B) | 6 months |
| 9 | 40 U.S.C. § 5104(e)(2)(D) | 6 months |
| 10 | 40 U.S.C. § 5104(e)(2)(G) | 6 months |

For each of the felony counts—*i.e.* Counts 1-3, 5, and 7—the Court may also impose a term of supervised release of not more than three years and a fine of up to $250,000, and the Court must impose a mandatory special assessment of $100 per count.

As for each of the A misdemeanor counts—*i.e.* Counts 4 and 6—Eisenhart faces up to 1 year of imprisonment, a term of probation of not more than five years, a fine of up to $100,000, and a mandatory special assessment of $25 per count

With respect to the B misdemeanor counts—*i.e.* Counts 8-10—Munchel and Eisenhart face up to six months of imprisonment, a term of probation of not more than five years, a fine of up to $5,000, and a mandatory special assessment of $10 per count.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The draft PSR includes two errors. The first is that Probation did not apply the eight-level enhancement for threatening or causing physical injury to a person or property under U.S.S.G. § § 2J1.2(b)(1)(B) to Counts One and Two. The second is that Probation did not include a full Guidelines calculation for each offense, as required by U.S.S.G. § 1B1.1(a)(1-4).

**A. The Court Should Apply the Eight-Level Enhancement for "Threatening to Cause Physical Injury to a Person . . . in Order to Obstruct the Administration of Justice" under Section 2J1.2(b)(1)(B)**

After applying the enhancements it deemed appropriate, Probation calculated Munchel and Eisenhart's offense level as 17, which it then reduced by three points in recognition of their acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, bringing the final offense level to 14. *See* Munchel PSR ¶¶ 90-99; Eisenhart PSR ¶¶ 86-95. Given Munchel's criminal history category of II, Probation calculated Munchel's Guidelines range of imprisonment as 18-24 months. Eisenhart's criminal history category of I resulted in a Guidelines range of imprisonment of 15-21 months.

These are wrong. Given the facts of this case—including Munchel and Eisenhart's own words—Probation should have included the eight-level Section 2J1.2(b)(1)(B) enhancement to Counts One and Two because those offenses by Munchel and Eisenhart involved "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice."[2] Applying the enhancement raises Munchel's offense level to 22 and his Guidelines range of imprisonment to 46-57 months, and it raises Eisenhart's offense level to 22 and her Guidelines range of imprisonment to 41-51 months. There are at least four reasons why the enhancement should be applied.

First, Munchel and Eisenhart made statements and engaged in conduct that both explicitly and implicitly threatened Members of Congress. On January 6, Munchel and Eisenhart were

---

[2] For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress, 18 U.S.C. § 1515(a)(1)(B). *See United States v. Matthew Wood*, 21-cr-223 (J. Mehta, Sentencing Hearing Nov. 28, 2022), at 35-38.

prepared for battle. They both wore tactical vests. Munchel also dressed in paramilitary gear and carried a Taser, which he acknowledged was a deadly or dangerous weapon. ECF No. 202 ("Joint Statement of Elements and Facts for Stipulated Trial") at 9. Both Munchel and Eisenhart repeatedly expressed an eagerness for violence and a willingness to inflict it. *See, e.g.* Exhibit 301 at 11:50 (Eisenhart: "Let's go in, Let's go in!"); *id.* at 22:55-23:00 (Eisenhart stating "That's right" in answer to another rioter commenting that the mob would render the staging for Biden's inauguration unnecessary); *id.* at 25:15-25:20 (Munchel: "We ain't playing fucking nice no goddamn more"); *id.* at 26:55-27:05 (Munchel: "We're fucking ready to fuck shit up"). Then, once inside and occupying the U.S. Capitol building, Eisenhart repeatedly yelled encouragement to other rioters and attempted to keep the mob riled up with shouts of "Treason!", "Treasonous bastards!", and "Cowards!" as she roamed, referencing members of Congress who would vote to certify the election. *Id.* at 41:39-41:44. Most egregiously, Munchel stole a cache of zip tie handcuffs, exclaiming "Zip ties! I need to get me some of them motherfuckers," *id.* at 43:40-44:00, and Eisenhart took one as well.

The logical inference is that Munchel and Eisenhart wanted to use the zip tie handcuffs to capture their enemies: the members of Congress voting to certify the election. Supporting that inference, Munchel explicitly stated that his intent in storming and occupying the Capitol was as a show of force to threaten violence against those same members of Congress and thus intimidate them into doing what he wanted them to do. In Munchel's own words to the *London Times*, "It was a kind of flexing of muscles. The intentions of going in were not to fight the police. The point of getting inside the building is to show them (Congress) that we can, and we will." Additionally, as Munchel and Eisenhart stood in the Senate Gallery, with Munchel holding a large handful of

zip tie handcuffs and Eisenhart holding the one Munchel had given her, Eisenhart shouted "Treason!" and "Cowards!" in reference to those same members of Congress, some of whom heard these or similar shouts/chants from their hiding places and felt scared.

Second, Munchel and Eisenhart made statements and engaged in conduct that both explicitly and implicitly threatened another group of people: the police officers defending the Capitol and resisting the rioters, both outside and inside the building. As she crossed the U.S. Capitol grounds and approached the building, Eisenhart—wearing a tactical vest—repeatedly yelled support to rioters battling the police in hand-to-hand combat. She shouted, "Fight 'em, don't let 'em in! Fight 'em, don't let them in! Don't let them in!"; "Push, push!"; and "We can't let them get a hold because they're going to gas us out!" In doing so, Eisenhart threatened the police.

As for Munchel, in addition to his paramilitary clothing, his tactical vest, and the Taser he carried on his hip—all of which intentionally communicated to anyone looking at Munchel that he was prepared for violence—Munchel's aforementioned statements welcoming violence (e.g. "We ain't playing fucking nice no goddamn more" and "We're fucking ready to fuck shit up") occurred when he and Eisenhart were *outside* the Capitol building and readying themselves to fight if necessary to get through the police lines and into the building.

Third, as discussed above, Munchel and Eisenhart encouraged *others* to engage in conduct that threatened injury, and so the §2J1.2(b)(1)(B) enhancement applies under §1B1.3(a)(1)(A) based upon Munchel and Eisenhart's aiding, abetting, counseling, commanding, and inducing other rioters. Besides his verbal support to rioters fighting police outside the Capitol building, Munchel also encouraged others—including Eisenhart—to take and carry the zip ties. Following Munchel's lead and suggestion that zip ties would be useful, if not necessary, other rioters stole

zip ties from the same stash.

Finally, the §2J1.2(b)(1)(B) enhancement applies to Munchel and Eisenhart, pursuant to §1B1.3(a)(1)(B), based on their jointly undertaken criminal activity with each other. Because Munchel and Eisenhart conspired to obstruct the official proceeding and acted jointly to do so, they are each responsible for all acts and omissions of the other that were within the scope of their jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity. Consequently, Munchel is also responsible for all of *Eisenhart's* statements and conduct that either explicitly or implicitly threatened Congress or the police, and vice versa. All the criminal conduct and statements described above was within the scope of Munchel and Eisenhart's joint goal, in furtherance of it, and reasonably foreseeable to both Munchel and Eisenhart. They are thus both responsible for all of it, making the §2J1.2(b)(1)(B) enhancement applicable on this ground as well.

Accordingly, the eight-level enhancement under § 2J1.2(b)(1)(B) for "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice" should be applied to Counts One and Two. The government's calculations for Counts One and Two are thus:

Count One and Two: 18 U.S.C. § 1512(k) and (c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Cause Physical Injury to Person or Property | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[3] | +3 |

---

[3] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Munchel and Eisenhart admitted that they engaged in threatening language and behavior and worked jointly with each other to corruptly obstruct and impede an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.9 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan

|  |  | 25 |
|---|---|---|
| Acceptance of Responsibility | | <u>-3</u> |
| **Total** | | **22** |

## B. The PSR Should Include a Guidelines Calculation for Each Count of Conviction, Regardless of Whether a Count's Calculation Impacts the Final Guidelines

The second error in the draft PSR is that it does not include a full Guidelines analysis for the defendants' counts of conviction other than Counts One and Two. *See* Munchel PSR ¶¶ 84-89; Eisenhart PSR ¶¶ 84-95. Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The draft PSR does not fully follow these steps. It (correctly) concludes that all the counts group but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4). Although the government readily acknowledges that including separate Guidelines analyses for Counts Three, Five, and Seven would not alter the grouping and unit analysis and thus would not alter the ultimate total offense level or Guidelines sentencing range, Probation still should not have skipped this required step.

The Guidelines analysis for Counts Three through Seven follow:

---

area responded to assist in protecting the Capitol from the rioters.

## Count Three: 18 U.S.C. § 1752(a)(1) and (b)(1)(A))

| Base Offense Level: | 4 | U.S.S.G. §2B2.3 |
|---|---|---|
| Special offense characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." |
| Special offense characteristic | +2 | U.S.S.G. § 2B2.3(b)(2): a dangerous weapon was possessed. |
| Cross Reference | | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |
| Base Offense Level (adjusted) | 25 (from Count Two) | U.S.S.G. §2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." |
| **Total** | **25** | |

## Count Four: 18 U.S.C. § 1752(a)(1)

| Base Offense Level: | 4 | U.S.S.G. §2B2.3 |
|---|---|---|
| Special offense characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." |
| Cross Reference | | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |
| Base Offense Level (adjusted) | 25 (from Count Two) | U.S.S.G. §2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." |
| Total | 25 | |

## Count Five: 18 U.S.C. § 1752(a)(2) and (b)(1)(A)

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Special offense | +3 | U.S.S.G. § 2A2.4(b)(1)—Dangerous Weapon |

| characteristic | | U.S.S.G. § 2A2.4(b)(1)(B) applies a +3-level enhancement if the offense involved "a dangerous weapon" that "was possessed and its use was threatened[.]" |
|---|---|---|
| **Total** | **13** | |

## Count Six: 18 U.S.C. § 1752(a)(2)

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Total | 10 | |

## Count Seven: 40 U.S.C. §5104(e)(1)(A)

| Base Offense Level: | 6 | U.S.S.G. §2K2.5(a) |
|---|---|---|
| Cross Reference | | U.S.S.G. §2K2.5(c)(1)(A): "If the defendant used or possessed any firearm or dangerous weapon in connection with the commission or attempted commission of another offense… apply – (A) §2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense if the resulting offense level is greater than that determined above." |
| Base Offense Level (adjusted) | 25 (from Count Two) | U.S.S.G. §2X1.1(a): Same Analysis as in Count Three |
| **Total** | **25** | |

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As discussed in Section II(B), Eric Munchel and Lisa Eisenhart's felonious conduct on January 6, 2021, was part of a massive riot that substantially delayed the certification vote from being carried out, stopping the peaceful transition of presidential power that is the foundation of our democracy and nearly throwing the United States into a constitutional crisis. As explained in

the above factual narrative of their crimes, other than those rioters who engaged in actual violence against police officers, Munchel's actions on January 6 were among the most serious. He, stole zip tie handcuffs, egged on others, Although Eisenhart engaged in most of the same conduct, she did not carry a deadly or dangerous weapon into the Capitol or initiate the theft of the zip tie handcuffs, which her lower Guidelines range reflects. Together, they conspired and acted to stop democracy in its tracks.

It is terrifying to contemplate what Munchel and Eisenhart would have done if members of Congress had still been present in the Senate Chamber when they entered it. With Munchel's tactical vest on his chest, his Taser on his hip, stolen zip tie handcuffs in his hand, and his entire body covered in black except his eyes, Munchel was ready to take hostages, and Eisenhart— wearing a tactical vest of her own and carrying a set of stolen zip tie handcuffs too—was prepared to help him and to show Congress who was really in charge. The fact that they did not—and indeed, that they did not actually attack any members of Congress or police officers—is not a mitigating factor. Had Munchel and/or Eisenhart done so, they would have faced additional criminal charges and a much higher Sentencing Guidelines range. Their conduct fully supports a sentence at the top of the Guidelines range for Munchel and in the middle of the Guidelines range for Eisenhart.

### B. The History and Characteristics of the Defendants

#### i.   *Eric Munchel*

Munchel, who lives near Nashville, Tennessee, has been gainfully employed since graduating high school. At the time of his participation in the riot at the U.S. Capitol, Munchel was 30 years-old and working as a bartender. PSR ¶¶ 117, 132. He has since moved on to jobs as a lawn care technician, *id.* ¶ 131, and a field service manager working on "erosion control for new

building construction," *id.* ¶ 130.

This is not Munchel's first contact with the criminal justice system.   Munchel's criminal history includes the following prior arrests and convictions, in chronological order:

- In 2011, Munchel was arrested for Possession of Marijuana and Speeding. The charges were withdrawn after he completed a diversionary program. *Id.* ¶ 101

- In March 2013, Munchel was convicted of Possession of Marijuana and sentenced to 12 months' probation. *Id.* ¶ 102.

- In May 2013, Munchel was arrested and charged with two counts of Battery. The charges were *nolle prossed* in August 2015. *Id.* ¶ 106

- In March 2014, Munchel again was arrested and charged with Possession of Marijuana for the third time. He was again sentenced to 12 months' probation. *Id.* ¶ 103.

- In March 2014, Munchel was charged with Failure to Appear but was not prosecuted. *Id.* ¶ 107.

Munchel's crimes on January 6 thus were not isolated events in an otherwise law-abiding life. And his criminal history demonstrates a pattern of reoffending. Moreover, although Munchel appears to have a supportive family, that should give the Court concern, not comfort. Munchel committed his crimes on January 6 alongside his mother, co-defendant Eisenhart. Additionally, the narrative appeal on Munchel's GiveSendGo fundraising page, which appears to have been authored by his wife, minimizes and excuses his conduct ("He simply wanted to ask questions and get the answers that America has been asking.") while referring to the D.C. Central Detention Facility as the "DC Gulag," the nickname adopted by January 6 apologists. PSR ¶ 120. Munchel's mother and wife appear more likely to reinforce the beliefs and behaviors that led Munchel to commit his crimes than to help rehabilitate him. Munchel's personal history and characteristics support the government's sentencing recommendation.

### ii.   Lisa Eisenhart

Eisenhart, who lives in Woodstock, Georgia, near Atlanta, has worked as a nurse for almost 30 years. PSR ¶¶ 129-131. Although her criminal record reflects no prior convictions, she has three prior contacts with the criminal justice system, all for driving offenses. *See id.* ¶¶ 100-101. The disposition of one of those cases is unknown, *see id.* ¶ 100, while the other two were dismissed after she paid restitution and court costs, *id.* ¶ 101. Despite a relatively clean record and steady employment in a valued profession, Eisenhart decided to throw it all away on January 6, 2021 in spectacular fashion, attacking her own government to interfere with the peaceful transfer of power. Eisenhart's behavior on January 6 weighs in favor of incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration. Munchel and Eisenhart's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to these particular defendants also weighs heavily in favor of a lengthy term of incarceration.

First, as discussed above, Munchel's criminal history category of II, in conjunction with his history of prior arrests and convictions, reveals a clear pattern of disrespect for the law. *See* Section IX(B) *supra.* Even after receiving the benefit of a diversion program for his first marijuana conviction, *see* PSR ¶ 101, and being arrested on another marijuana offense, *see id.* ¶ 102, he continued using marijuana and racked up a third marijuana arrest just three days later, *see id.* ¶ 103. Ultimately, the state court resolved those latter two marijuana cases by sentencing Munchel to a fine and 12 months of probation, *see id.*, but those experiences with the criminal justice system did not deter Munchel from committing much more serious crimes on January 6.

Second, although Munchel and Eisenhart accepted responsibility by stipulating to all of the facts underlying their guilt and resolving their cases via a bench trial, their post-January 6—and even post-plea—conduct and statements are devoid of any regret, remorse, or apology. Neither Munchel nor Eisenhart has taken any steps to denounce their words and actions on January 6, 2021, including to the Probation officer who conducted his PSR interview. The Court should view any remorse Munchel and/or Eisenhart expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for

his actions.") (statement of Judge Chutkan).

Munchel and Eisenhart did not accept the results of the 2020 presidential election, so on January 6 they dressed for violence, Munchel armed himself, and together they encouraged violence against police, invaded the Capitol, occupied the Senate, and boasted about their intent to show force and intimidate members of Congress. With the 2024 presidential election approaching, a rematch on the horizon, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Munchel and Eisenhart in a manner sufficient to deter them specifically, and others generally, from going down that road again.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.       Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every

sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases, including three from this Court, provide suitable comparisons to the relevant sentencing considerations in this case.

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

*United States v. Ronald Sandlin*, No. 21-cr-88 (DLF), shares much in common with this case. Sandlin, like Munchel, breached the Capitol building and penetrated to the Senate, which he entered via the Senate Gallery. Additionally, both Sandlin (online) and Munchel (on Capitol grounds and to the *London Times*) made statements embracing violence as a means to achieve their political goals, specifically stopping the election certification, and egged on other rioters. The main differences between the cases balance each other out. While Sandlin actually engaged in direct violence against police officers, pushing against officers who were guarding the Rotunda doors, allowing other rioters to stream into the building, Sandlin did not carry a dangerous or deadly weapon into the Capitol or dress in paramilitary gear. Judge Friedrich sentenced Sandlin to 63 months of incarceration.

In *United States v. Jacob Chansley*, No. 21-cr-3 (RCL), the defendant—shirtless, heavily tattooed, and wearing face paint and an outlandish hat that earned him the nickname, "the QAnon Shaman"—first invaded the Senate Chamber via the Senate Gallery, like Munchel. After standing there for a brief time, Chansley walked downstairs and entered the Senate floor, where he scaled the Senate dais, sat in the very chair that Vice President Mike Pence had been in less than an hour earlier, took pictures of himself, left a menacing note, led rioters in a self-congratulatory "prayer," and occupied the room for 8 minutes, disregarding an officer's instructions that he leave, all while carrying a flagpole as a spear. This Court sentenced Chansley to 41 months of incarceration, the bottom of his Sentencing Guidelines range. Though Munchel and Eisenhart never accessed the Senate floor, other aspects of their conduct were significantly worse and more threatening than Chansley's. Moreover, Munchel's Guidelines range is higher than Chansley's, in part due to Munchel's worse criminal history. While Munchel and Chansley both occupied the Senate,

physically preventing Congress from resuming its Joint Session by their presence, both encouraged other rioters, and both carried weapons, Chansley's flagpole was not as dangerous a weapon as Munchel's Taser and Chansley did not wear a tactical vest or steal property, let alone zip tie handcuffs. This Court should sentence Munchel to a substantially higher sentence than Chansley.

Finally, while the two defendants penetrated different highly sensitive areas of the Capitol, Munchel's case contains substantial similarities to *United States v. Richard Barnett*, No. 21-cr-38 (CRC). In the lead up to January 6, Barnett, like Munchel, prepared for and expected violence. Both men made statements welcoming it, and when both men invaded the Capitol building, they did so armed with electric stun devices. Barnett's path roaming the Capitol building led him to the highly sensitive area of Speaker of the House Nancy Pelosi's personal office, where Barnett stole an envelope, left a menacing note, and put his feet up on the desk, posing for what became another iconic January 6 photograph that, like Munchel's, symbolized the degree to which rioters had captured and occupied Congress. Once he exited the Capitol building, Barnett, like Munchel, bragged about how he had shown members of Congress that they should fear him and other "patriots" like him. After Barnett was convicted on all counts at trial, Judge Cooper sentenced him to 54 months in prison. Although Munchel deserves credit for accepting responsibility, his criminal history is worse than Barnett's and his conduct and statements were more threatening, both implicitly and explicitly.

With respect to Eisenhart only, the Court should also consider *United States v. Joshua Johnson*, No. 22-cr-80 (CRC). Like Eisenhart, Johnson prepared for violence and to resist police (he brought a gas mask), breached the Capitol building, and penetrated to the Senate, where he first entered the Senate Gallery and then proceeded to the Senate floor. Similar to Eisenhart,

Johnson later explicitly stated, in essence, that his goal was to interfere with the certification. Johnson stayed on the Senate floor for 17 minutes, during which he rifled through a Senator's desk, filmed video and took photographs of its contents, and drank from a Senator's water bottle. Afterward, Johnson—like Eisenhart—celebrated his conduct. Judge Cooper sentenced Johnson to 24 months of incarceration. Eisenhart's conduct was far worse than Johnson's. While Johnson physically occupied the Senate for longer than Eisenhart and invaded the privacy of Senators' desks and papers, Eisenhart's conduct was more threatening to both the police and members of Congress. Johnson, unlike Eisenhart, is not captured on video repeatedly encouraging violence against the police. He did not steal anything. He did not carry zip tie handcuffs that logically could be used to capture members of Congress. And Johnson did not contribute as much as Eisenhart did to the fear experienced by nearby hiding Senators and their staff members, who heard rioters in the Senate yell things similar to the shouts of "Treason!" and "Cowards!" unleashed by Eisenhart. Eisenhart deserves a longer sentence than Johnson.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).

Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Munchel was convicted of at least one offense under Title 18, the VWPA applies.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C.

2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[7]

Because the defendants in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Munchel and Eisenhart to pay $2,000 in

---

[7] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

restitution for their convictions on Counts One and Two, and for Munchel's solo convictions on Three and Five. This amount fairly reflects Munchel and Eisenhart's roles in the offenses and the damages resulting from their conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose on Munchel a sentence of 57 months of incarceration, three years of supervised release, $2,000 in restitution, and the mandatory special assessment of $530. The government recommends that the Court impose on Eisenhart a sentence of 46 months of incarceration, three years of supervised release, $2,000 in restitution, and the mandatory special assessment of $280.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:     */s/ Michael M. Gordon*
MICHAEL M. GORDON
Assistant United States Attorney, Detailee
Florida Bar No. 1026025
400 N. Tampa St., Suite 3200
Tampa, Florida 33602
michael.gordon3@usdoj.gov
813-274-6370

39

/s/ Rebekah Lederer
REBEKAH LEDERER
Assistant United States Attorney, Detailee
Pennsylvania Bar No. 320922
601 D St., NW
Washington, D.C. 20001
rebekah.lederer@usdoj.gov
202-252-7012