```
 1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2   - - - - - - - - - - - - - - - x
     THE UNITED STATES OF AMERICA,
 3                                       Criminal Action No.
                     Plaintiff,          1:21-cr-00118-RCL
 4                                       Friday, September 8, 2023
     vs.                                 1:01 p.m.
 5
     ERIC GAVELEK MUNCHEL and
 6   LISA MARIE EISENHART,
                     Defendant(s).
 7   - - - - - - - - - - - - - - - x
     _____
 8
                     TRANSCRIPT OF SENTENCING
 9        HELD BEFORE THE HONORABLE ROYCE C. LAMBERT
                  UNITED STATES DISTRICT JUDGE
10   _____
     APPEARANCES:
11   For the United States:      MICHAEL MATTHEW GORDON, ESQ.
                                 DOJ-USAO
12                               400 North Tampa Street,
                                 Suite 3200
13                               Tampa, FL 33602
                                 (813) 274-6370
14                               michael.gordon3@usdoj.gov

15   For Defendant Munchel:      JOSEPH WILLIAM ALLEN, ESQ.
                                 1015 State Highway 248, Suite I
16                               Branson, MO 65616
                                 (417) 334-6818
17                               josh@mybransonattorney.com

18   For Defendant Eisenhart:    GREGORY STUART SMITH, ESQ.
                                 LAW OFFICES OF GREGORY S. SMITH
19                               913 East Capitol Street, SE
                                 Washington, DC 20003
20                               (202) 460-3381
                                 gregsmithlaw@verizon.net
21

22   Court Reporter:             Lisa A. Moreira, RDR, CRR
                                 Official Court Reporter
23                               U.S. Courthouse, Room 6718
                                 333 Constitution Avenue, NW
24                               Washington, DC  20001
                                 (202) 354-3187
25
```

```
 1                      P R O C E E D I N G S
 2             THE COURTROOM DEPUTY:  Your Honor, we're on the
 3    record for Criminal Case 21-118, *United States of America*
 4    *vs. Eric Munchel and Lisa Eisenhart.*
 5             Counsel, please approach the lectern and identify
 6    yourselves for the record.
 7             MR. GORDON:  Good afternoon, Your Honor; Mike
 8    Gordon with the United States.
 9             MR. ALLEN:  My name is Joe Allen for Eric Munchel.
10             MR. SMITH:  Good afternoon, Your Honor; Greg
11    Smith, appointed counsel for Lisa Eisenhart.
12             THE COURT:  I'll check with the government's
13    opposition to the presentence report first because I have to
14    make a determination of the guidelines before I hear the
15    allocution, so let me have the government's arguments on the
16    proper determination of the guidelines first then.
17             MR. GORDON:  Thank you, Your Honor.
18             So, first, let me dispense with the sort of two
19    easy issues, which is that the PSR states that the
20    government has objected to a lack of an enhancement under
21    3C1.1 for obstruction of the prosecution.  That's not the
22    case.  We don't have an objection to that, and so you can --
23    we can either sort of withdraw the objection that doesn't
24    exist or just determine it's resolved, however you want to
25    deal with that.
```

1          THE COURT:  Yes.

2          MR. GORDON:  The second is the issue with

3   probation not calculating a separate guideline calculation

4   for each count.  It's a really technical objection.  It's

5   one that we raise in every one of these cases.  I understand

6   probation, as a matter of course, doesn't do that.  I'm sure

7   you've now seen the same objection in every case.  We

8   maintain it's the right thing to do, but it doesn't change

9   the bottom line anywhere.

10          So the only objection from the government that

11   really requires a lot of discussion is the government's

12   objection to the probation's choice not to apply the

13   eight-level enhancement that comes for engaging in conduct

14   that threatened anyone essentially in this course of

15   conduct; and it's a big difference, because that objection

16   carries, you know, eight levels of an enhancement, and it

17   substantially changes the guidelines for both defendants.

18          In its discussion at the end of the final PSR

19   probation essentially says:  Look, we agree with the

20   conduct.  We can't really dispute any of that.

21          And they say that the conduct of the defendants

22   appears to be sort of part and parcel with what the mob was

23   doing, and they don't separate sort of the defendants from

24   that.  And then probation says, as for the stolen zip tie

25   handcuffs:  Well, they stole them, but they didn't destroy

1        them.  But then they throw it to the Court:  Well, this came

2        in a stipulated trial so we're not going to change the PSR;

3        it's up to the Court.

4              So probation doesn't really address the substance

5        of the government's arguments.  Defense counsel does in

6        their response.

7              But let's talk about this particular enhancement.

8        It's applicable to both defendants if you find that it

9        applies to either defendant, because they're charged with a

10       conspiracy.  Not just charged, they've been convicted of a

11       conspiracy.  And so any actions that were reasonably

12       foreseeable to either member of the conspiracy and that were

13       undertaken to advance the conspiracy they're both

14       responsible for.  They're both responsible for it as co-

15       conspirators.

16             So if the plus-eight applies to one, it applies to

17       the other, which somewhat simplifies the analysis here.

18             There are three different reasons this applies,

19       then, once you sort of accept that you have to apply -- to

20       cross each other.  First, if they threatened Congress in

21       some manner.  Second, if they threatened the police in some

22       manner.  And then third, if they encouraged anyone else to

23       do that.  By the rules of the guidelines, any one of those

24       three is sufficient.  You don't have to find all three, just

25       one of the three.

1            Now, in terms of what is a threat, this is what

2    defense counsel really takes issue with.  To them, a threat

3    is only a threat if it's expressed directly to the object of

4    that threat verbally and explicitly.  That's not true.

5    There are all kinds of threats that are communicated

6    nonverbally in our lives.  We all know that.  We all know

7    that there are ways that people seek to intimidate others,

8    scare or threaten others without speaking.  Nonverbal

9    threats are parts of everyday life for pretty much everybody

10   who lives in society.

11           Secondly, threats do not have to be explicitly

12   directed at a particular person.  Think about what we have

13   seen in some places in America where on election days people

14   have gathered outside of the restricted zone but sort of

15   with guns or heavily -- wearing camouflage or holding signs.

16   Those things are all intended to convince or intimidate, in

17   some manners, other people.  That happens.

18           It happens in other situations, too.

19           So you don't have to take my word for what Eric

20   Munchel and Lisa Eisenhart were trying to do on January 6th.

21   They said so themselves.  After they left the Capitol, they

22   gave an interview to *The London Times*, and they were

23   explicit about what they were trying to do.

24           Eric Munchel said, "We wanted to show that we're

25   willing to rise up, band together and fight if necessary.

1       Same as our forefathers who established this country in

2       1776."  Here's the key part.  It was a kind of flexing of

3       muscles.  The intentions of going in were not to fight the

4       police.  The point of getting inside the building is to show

5       them that we can and we will.

6              So who's the "them"?  It's Congress, right?

7              The point of getting inside the building is to

8       show them that we can and we will.  He's explicitly stating

9       that his intent is to intimidate and threaten Congress, to

10      show them you are not safe here.  Me and people like me, we

11      can get in here if we want to.  We can take over this

12      building, if we want to.  And we will.  That's what Eric

13      Munchel said his purpose was.

14             That is an intent to threaten Congress.

15             Lisa Eisenhart wasn't as explicit, but close.  She

16      said, "This country was founded on revolution.  If they're

17      going to take every legitimate means from us, and we can't

18      even express ourselves on the Internet, we won't even be

19      able to speak freely.  What is America for?  I'd rather die

20      as a 57-year-old woman than live under oppression.  I'd

21      rather die and would rather fight."

22             So where did she go to fight?  She went inside of

23      Congress in a conspiracy with her son who explained that the

24      point of it was to intimidate Congress.  So they made their

25      intent clear.

1          Well, what about their actions?  Did their actions

2     support their intent?

3          Think of how Eric Munchel chose to dress on

4     January 6th.  Right?  He's wearing an all-black shirt, a

5     tactical vest, tactical pants that are black camouflage, a

6     black neck gator pulled up just under -- below his eye, and

7     then a black hat carrying a taser strapped to his waist.

8     This is not just what he chose to wear because he forgot to

9     do laundry that week and it's the only thing that was clean.

10    It's not what just happened to be in his closet between the

11    sweatshirt or his favorite sports shirt and a concert shirt.

12    This is a deliberate attempt to dress like a paramilitary

13    soldier, like a commando.

14          Why?  Why choose to dress that way?  Because of

15    how it looks to other people.  Because of the message it

16    sends.  It says:  "I'm here for combat.  I am prepared to do

17    what is necessary."

18          And that's what he said with his own words

19    throughout the day on January 6th as he encouraged others to

20    attack police, as he shouted similar intimidating statements

21    towards police, as he went inside Congress itself; as his

22    mother, also wearing a tactical vest, was right beside him

23    shouting "treason, cowards," and other such things directed

24    at -- mostly at Congress, but somewhat the police, too.

25          Then, while inside the Capitol building, the two

1    of them came across a cache of zip tie handcuffs left there

2    by police officers.  And the reason why police officers use

3    zip tie handcuffs when they anticipate having to arrest a

4    lot of people at a time is they can't use -- they don't have

5    enough of the metal ones.  The metal ones are heavy.  Right?

6    And they need to have their own key.  So if you want to do

7    sort of mass arresting, the zip tie handcuffs are very

8    convenient.  That's why the officers had them.  That's why

9    they were there in the Capitol.

10              When Eric Munchel and Lisa Eisenhart stumble

11   across those zip tie handcuffs, Eric Munchel's response is:

12   "Zip ties, I gotta get me some of them motherfuckers."

13   That's what he says, and then he takes up one -- a bunch of

14   them.

15              His mother takes one, too.

16              And together they bring those inside -- inside --

17   the Senate.

18              Now, luckily for all of us, the senators had

19   already evacuated, and so had their staffs, to the

20   disappointment of the mob, including Lisa Eisenhart and Eric

21   Munchel.  Because the mob was shouting, "Where did they go?

22   Where did they go?  Treason.  Cowards."

23              Lisa Eisenhart chimes in, "Cowards."

24              Why pick up zip tie handcuffs?  Why say, "I've got

25   to get me some?"  What is the purpose of them?

1          The only purpose of those things is to restrain

2    someone.  He's not trying to restrain the other rioters.

3    He's not trying to handcuff them.

4          Every statement they made was about how they

5    believed that Congress was complicit in stealing the

6    election, that they were traitors, and they needed to be

7    dealt with by people like them.

8          All of that behavior doesn't become nonthreatening

9    just because Congress had evacuated.  You don't have to have

10   a senator or their staff member sitting in the room for

11   everything that Eric Munchel and Lisa Eisenhart did to

12   threaten Congress.  Their acts were threatening.  That's why

13   the evacuation happened.

14         Not solely because of them.  Obviously the

15   evacuation happened because them and hundreds of others

16   invaded the Capitol, but that was the threat.

17         And it's not the case that under that argument

18   any -- that this plus-eight would apply to every rioter in

19   the Capitol.  It wouldn't.  Because not everybody dressed

20   like a commando and carried a taser and stole handcuffs with

21   the clear, obvious, implied intent to use them, if he could.

22         That purpose was frustrated because the Capitol

23   Police and others were able to evacuate.

24         The plus-eight clearly should apply based on their

25   conduct.  I recognize that it is a large jump in the

1    guidelines.  It is a huge difference.  I get that.  But at

2    this stage, that's not where we talk about that.  That comes

3    later when we're talking about the appropriate sentence.

4            Right now it's just the mechanical application.

5    Does this conduct fit with the guideline; and if it does,

6    what is the proper guidelines analysis?  We'll talk later

7    about what the appropriate sentence is.

8            Based on this conduct, you know, it fits.

9            Now, I know the Court has read all the documents

10   submitted in this case.  The facts mostly come from the fact

11   that Eric Munchel created his own body camera.  He took his

12   own cell phone, turned it on video and strapped it to his

13   chest and recorded himself, you know, and his mother as they

14   went through the events of the day and all the key events

15   that I've just described.

16           We cited to time stamps in our sentencing memo.  I

17   don't know if the Court has had the opportunity to watch the

18   full video, so I'm prepared to play it, if the Court would

19   like to watch it.  It is 50 minutes long, so it's long.

20           If the Court would like to see for itself from

21   Eric Munchel's perspective everything he did, I'm happy to

22   press "play."

23           I would like the Court to have seen it.  That

24   being said, if you've already watched it or are only

25   interested in certain parts of it, I don't want to waste

1   anyone's time, including Your Honor's.

2           THE COURT:  You can play a short extract, but --

3   when we get to the sentencing.  I want to go through the

4   guidelines first.

5           MR. GORDON:  Yes.  Understood, Your Honor.

6           So the focus of the plus-eight really should be on

7   the threat to Congress.  The threats to the police officers

8   have to do much more -- it's the verbal statements

9   primarily, but it's also the fact that they are both wearing

10  tactical vests, making them resistant to the officers' crowd

11  control efforts.  And Eric Munchel was armed as well in a

12  way that -- you know, openly, on his hip, in a way that is

13  sort of openly intimidating to officers.

14          Officers know what a taser is.  They know how it

15  works.  It's used against them in their training.  And they

16  know that if they see somebody with that, that that's a

17  dangerous weapon that can be used against them.

18          It would be different if Eric Munchel had chosen

19  to wear that in a hidden manner, then it wouldn't be openly

20  as intimidating or threatening to officers.

21          But he did.  He wore it openly on his hip, which

22  his mother knew about.  All right?  So it's foreseeable to

23  her, and it's all in furtherance of the same conspiracy.

24          So there are verbal statements to the officer, and

25  Mr. Munchel's sort of brazen carrying of the taser also make

1    their conduct applicable there.

2           And then finally, Your Honor, they shouted

3    encouragement to other rioters who were in the midst of

4    having confrontations with police, and that also can

5    substantiate the plus-eight.

6           So any one of those things found for either

7    defendant is the plus-eight for both.  Thank you.

8           THE COURT:  Who wants to go first?

9           MR. SMITH:  The prosecutor is talented and

10   persuasive, but on this point I really think he's just

11   wrong.

12          First of all, the notion that this is a conspiracy

13   case, while true, my client is not charged in a conspiracy

14   related to the weapon.  She is not.

15          It used to be.  It was dropped.  Never pled.

16          The only conspiracy she's involved in is only the

17   obstruction, not the weapons case.  So the fact that it may

18   apply to Mr. Munchel does not mean that it necessarily

19   applies to Ms. Eisenhart.

20          But more importantly, let me turn to the guideline

21   itself.  The government is presenting to you not the

22   language of the guideline, but what it wants the guideline

23   to say.  It says "threats."  The government's up here

24   talking about "intimidation."  That word is nowhere in this

25   guideline.  It could have been.  It could have been

1     "threatened or intimidated," but it's only "threatened."

2          It doesn't say "acts that are threatening."  It

3     says "threatening."

4          And Your Honor must know from all the cases it's

5     tried over the years that a threats case involves threats.

6     They mentioned people standing outside of polls or outside

7     of an abortion clinic who may hold signs that are

8     intimidating, or even guns that are intimidating.  That is

9     not a threats case.  Those people would not be charged with

10    threats under the criminal law because that is not a threat.

11         "Intimidation" is not the language of the statute.

12    Maybe they want it to be, but that's not what we have here.

13         We have threats.  Threats to a person.

14         It was interesting during the government's

15    presentation -- I don't know if you picked up on this

16    language, but after talking about the flexing of muscles and

17    some of the other things that were said, the government said

18    that showed a clear intent to threaten.  That's the

19    distinction.

20         It never got to the point of threatening.  It did

21    not get to the point of any threats ever being made.  And we

22    have seen in other January 6th cases clear threats.  And I'm

23    going to be talking about some of those examples in other

24    cases where threats were actually given.

25         There were no threats here, and what they're

1    claiming simply does not meet the standard or the language

2    of this guideline.

3             Plus, as I said, it has to be threatening a

4    person.

5             What are the comments that they talk about that

6    meet -- they claim meet the standards?  Threatening

7    Congress.  Threatening the police.  Who is the person that

8    was supposedly threatened?  We don't have a person that

9    they've named or can name that was specifically threatened

10   here.  It just doesn't meet.

11            Now, let me just quickly go through -- we've

12   briefed this at some length, and I don't want to take too

13   much of the Court's time, but let's start with the basics.

14   This is the government's burden of proof.  We argue that

15   because it's such a huge bump, actually a clear and

16   convincing standard of proof applies.  But there was no

17   physical violence here.  They're relying entirely on this

18   concept of threat, and it is not a threat to a person

19   because none is ever satisfied.

20            What physical injury was ever threatened?  They

21   don't specify what physical injury was ever threatened.  Nor

22   is any threatening language specified such as "I will do

23   this to you," or "If you do X, I will do Y."  In fact, they

24   seem to concede up here there is no language.  They claim

25   language isn't necessary, but in any criminal threats

 1    case -- I've never experienced a threats case under criminal

 2    law that didn't involve language of threats.

 3             At bottom they're relying on this notion of

 4    implicit threats such as making others uncomfortable, and

 5    it's just not clear that that's what this massive eight-

 6    level guideline enhancement was meant to reach.  After all,

 7    this bump equates -- not only is it double Ms. Eisenhart's

 8    guideline range, but it equates -- it gives the same

 9    eight-point increase as if there is actual physical

10    violence.

11             I submit it's got to be a real threat -- not some

12    implicit threat, not some veiled threat -- for it to meet

13    the standard to where it's the equivalent of actual physical

14    violence.

15             He mentions a couple of things.  The tactical

16    vest.  Well, the tactical vest was worn the day before when

17    they were just out on the town.  You know, I have a friend

18    of mine whose kid moved to D.C., and he asked me -- you

19    know, he's scared he's moving to D.C.  There's a sense out

20    there in the hinterlands, which I find hard to follow

21    sometimes, but they were really worried about him moving to

22    D.C. and asked me if it was safe down by the waterfront; and

23    I told them it was.

24             But people come to the big city here -- you know,

25    I'm not sure it used to be down near the waterfront, but,

1    you know, there's a fear of the city.  And people do stuff

2    like -- I mean, she wore -- it wasn't just for this day.  It

3    was the day before.  They were just out on the town, and she

4    was wearing the same vest.

5         So, you know, the notion that somehow this was

6    black -- you know, Mr. Munchel wore a black suit or a black

7    set of clothing, my client was wearing a plaid, bright red

8    plaid shirt.  So there was not any, you know, trying to be

9    devious and hide there.  And of course she was pretty easy

10   to pick out.

11        In terms of the stun gun, that, too, was taken out

12   the night before.  Actually, there was an interaction

13   between, as the Court may recall, Mr. Munchel and the police

14   the night before where they returned the stun gun to him

15   because it's legal to possess in D.C.

16        In any event, the stun gun, as I mentioned, my

17   client is not charged for being in a conspiracy in relation

18   to.  It was only Mr. Munchel.  And he never removed it from

19   his holster at any time.

20        Finally, the zip ties.  My understanding, and I

21   think that the evidence said this, is that Mr. Munchel

22   grabbed them and handed one to my client.  One.  And more

23   importantly, in the *Brock* case, it simply was deemed not

24   enough to be a threat, and its implicit -- this notion that,

25   you know, intimidation is the same thing as a threat.  It's

1    not.  It was not a threat in *Brock,* Judge Bates found.  And

2    nor was the action of Mr. Brock -- I mean, he was not -- he

3    not only had multiple zip ties, but he was on the Senate

4    floor, not just in the gallery, and he also was in clear

5    combat attire.  He's former military.  He had a full helmet

6    on as well as combat gear.  None of that was found

7    sufficient for the plus-eight increase in *Brock*.  And if it

8    didn't apply there, it shouldn't apply here.

9         We urge you to adopt the probation officer's

10   position on this.  This probation office, just like the

11   prosecutors, have seen and evaluated hundreds of these

12   January 6th cases.  They say this one doesn't fit.

13        And as a personal matter, I would also

14   specifically note with respect to Ms. Eisenhart, a finding

15   that she threatened physical violence to another person

16   would have huge and very serious collateral consequences.

17   It would likely be, if you find that she threatened physical

18   injury, that her nursing career may well be over forever.

19   So I would ask that the Court take particular care before it

20   issues a ruling to that effect, because the collateral

21   consequences would be pretty devastating for my client.

22        And we -- I appreciate the Court hearing me out on

23   this.  I just don't think it applies, Judge.  It didn't

24   apply in *Brock* on facts that I submit are even worse, and it

25   shouldn't apply here.

1          THE COURT:  Mr. Allen.

2          MR. ALLEN:  It may not surprise you, Your Honor,

3    that I'm also standing here to say that the enhancement does

4    not apply in this case, so I'm not going to regurgitate what

5    Mr. Smith said.

6          I just want to say that I echo his arguments and

7    maybe would just add that not only is the government trying

8    to make a leap here in an if/then argument, but I would

9    argue that the government is trying to make a double leap.

10          So, for example, Congress had already been

11    evacuated when both of these defendants went into the

12    building.  So not only did they not make any threats of

13    violence, but there was nobody in the room to threaten.

14          Holding on to zip ties or carrying a taser or

15    wearing combat attire is not threatening anyone especially,

16    and this is where the double leap comes in, when there's no

17    one there to threaten.

18          I can wear -- I can wear a bullet-proof vest under

19    my suit.  I can wear combat boots.  I can wear them in here.

20    I can wear them to the grocery store.  That's not a threat

21    to anyone at all.

22          And if someone perceives that as a threat, that's

23    not because of something that I'm doing or I'm intending;

24    that's a perception.  And that's not what the language of

25    the statute says.

1          The language says, as Mr. Smith said, a threat.

2    There was no threat here, Your Honor.  And the government is

3    trying to make a very large leap.  And the drafter of the

4    PSR who, again, as Mr. Smith said, has reviewed hundreds, if

5    not more, of these cases, very clearly stated that this

6    enhancement does not apply in this case.

7          Thank you.

8          THE COURT:  All right.  I'm going to take a short

9    recess before we proceed then.

10          (Recess taken)

11          THE COURTROOM DEPUTY:  Your Honor, we're back on

12    the record for Criminal Case 21-118, *United States of*

13    *America v. Eric Munchel and Lisa Eisenhart.*

14          THE COURT:  Okay.  I find that -- I'm sorry for

15    the delay in taking the other matter.

16          I find that an eight-level enhancement for causing

17    or threatening to cause physical injury to a person or

18    property damage in order to obstruct the administration of

19    justice should apply to both Mr. Munchel and Ms. Eisenhart.

20          After a stipulated bench trial, the Court

21    convicted Mr. Munchel and Ms. Eisenhart of conspiring

22    together to commit obstruction in violation of 18 USC

23    Section 1512(k) and of obstruction of an official proceeding

24    and aiding and abetting in violation of 18 USC 1512(c)(2)

25    and 2; therefore, under the Sentencing Guidelines, Section

1    1B1.3(a)(1)(B), when determining the applicable guideline

2    ranges for Mr. Munchel and Ms. Eisenhart, the Court must

3    take into account all acts and omissions of the other

4    co-defendant that were within the scope of the jointly

5    undertaken criminal activity in furtherance of it and

6    reasonably foreseeable in connection with that criminal

7    activity.  All the facts that the Court will discuss satisfy

8    these criteria.

9         Additionally under Sentencing Guidelines Section

10   1.1 -- 1B1.3(a)(1)(A), the Court must take into account any

11   conduct that was aided and abetted by the defendants.

12        The parties stipulated to facts which this Court

13   found that establish that Mr. Munchel and Ms. Eisenhart

14   threatened physical injury to members of Congress and law

15   enforcement.  Indeed, the Court agrees with the government

16   that both defendants repeatedly expressed eagerness and

17   willingness to engage in acts of violence.  Both Mr. Munchel

18   and Ms. Eisenhart wore tactical vests, and Mr. Munchel wore

19   dark camouflage fatigues.  Both defendants picked up and

20   carried zip ties.  Mr. Munchel carried a bag containing a

21   knife, which he eventually stowed, and Mr. Munchel visibly

22   holstered a stun gun.

23        This conduct, in conjunction with statements made

24   by Mr. Munchel and Ms. Eisenhart, constitute seriously

25   threatening behavior.  For example, Mr. Munchel stated,

1   quote, We're fucking ready to fuck shit up, unquote, and

2   quote, We ain't fucking playing nice no god damned more,

3   unquote.

4           Ms. Eisenhart shouted, "treason," "treasonous

5   bastards," and "cowards."

6           Both defendants stipulated that they made these

7   statements and engaged in this conduct, quote, for the

8   purpose of obstructing, influencing, impeding or

9   disrupting government business, unquote.  And after January

10  6th, Mr. Munchel made a statement to the press in which he

11  stated that his goal was to show them, quote, that we can

12  and we will -- as the Court understands it -- physically

13  fight members of government and law enforcement to achieve

14  his objective goals.

15          It's clear, in light of these and other undisputed

16  facts stipulated to by the defendants, that they threatened

17  to cause physical injury to members of Congress and law

18  enforcement to obstruct the administration of justice.

19  That's what this was all about.

20          The Court also notes that Mr. Munchel and

21  Ms. Eisenhart repeatedly gave words of support or otherwise

22  supported the mob of rioters as is evident in the facts

23  stipulated to by the parties.  That mob, which the

24  defendants aided and abetted in obstructing the Electoral

25  College certification, engaged in and threatened acts of

1    violence against law enforcement and members of Congress.

2           The Court also notes that it has considered Judge

3    Bates's rulings in *U.S. v. Brock*, 21-cr-140, regarding this

4    sentencing enhancement and declines to follow it.  Unlike in

5    *Brock*, the facts here are sufficient to justify the eight-

6    level enhancement.

7           Mr. Munchel carried a dangerous weapon in

8    addition to wearing tactical gear and carrying zip ties,

9    which renders his conduct seriously threatening.  And both

10   Mr. Munchel and Ms. Eisenhart made threatening statements on

11   January 6th as opposed to the lead-up to January 6th.

12          Based on the stipulated facts, the Court concludes

13   that the defendants engaged in seriously threatening conduct

14   that threatened members of Congress and law enforcement with

15   physical injury.  The conduct of these defendants warrants

16   the application of the eight-level enhancement.

17          So with the eight-level enhancement, then the

18   total offense level would be 22.

19          For Mr. Munchel, the criminal history category

20   would be 2.

21          For Ms. Eisenhart, the criminal history category

22   would be 1.

23          And let me ask the probation officer if he would

24   come forward and give me the proper calculations under the

25   guidelines with those changed offense levels.

```
 1              THE PROBATION OFFICER:  Your Honor, for

 2   Mr. Munchel, at Offense Level 22, Criminal History Category

 3   2, I have 46 to 57 months.

 4              And then for Ms. Eisenhart, total offense level of

 5   22, criminal history category of 1, 41 months to 51 months.

 6              THE COURT:  41 to...?

 7              THE PROBATION OFFICER:  51.

 8              THE COURT:  50.  Okay.

 9              THE PROBATION OFFICER:  51.

10              THE COURT:  And then for supervised release it

11   was --

12              THE PROBATION OFFICER:  I'm sorry, Your Honor, it

13   was 51 months.

14              THE COURT:  51, okay.

15              THE PROBATION OFFICER:  Yes, sir.

16              Supervised release would stay the same.

17              THE COURT:  Supervised release remains the same?

18              THE PROBATION OFFICER:  Yes, sir.  And I can look

19   up the fine.

20              THE COURT:  Yes, look up the fine because I have

21   to make a guideline calculation before they start arguing

22   the appropriate sentence.

23              THE PROBATION OFFICER:  As to the fines, at

24   criminal -- I'm sorry, at Total Offense Level 22, they will

25   both be at $15,000 to $150,000.
```

```
 1                THE COURT:  For Mr. Munchel?

 2                THE PROBATION OFFICER:  And for Ms. Eisenhart.

 3    They'll be the same for each.

 4                THE COURT:  The same?  Okay.

 5                THE PROBATION OFFICER:  Yes, sir.

 6                THE COURT:  And then restitution will be the same?

 7                THE PROBATION OFFICER:  Yes, sir.

 8                THE COURT:  And special assessment would be the

 9    same --

10                THE PROBATION OFFICER:  Yes, sir.

11                THE COURT:  -- as on the report?

12                THE PROBATION OFFICER:  Yes, sir.

13                THE COURT:  All right.  Then with those

14    calculations and pursuant to the Sentencing Guidelines being

15    advisory, I'll hear allocution from the government so that I

16    consider the 18 USC 3553 factors before determining the

17    sentence in the case.

18                The government may allocute first.

19                MR. GORDON:  Thank you, Your Honor.

20                THE COURT:  And I have read your -- both sides'

21    sentencing memos and the helpful attachments from the

22    defendants as well, but I have not -- I have not viewed

23    videos.  So if there's some parts of those videos you want

24    me to look at, I'll be happy to look at them.

25                MR. GORDON:  There are, Your Honor.
```

 1          So that's where I'm going to begin.  I'll start

 2     with showing essentially the conduct and then talking about

 3     what it means and what sentence should go with it.

 4          What I'm going to do is play a total of five

 5     clips.  The first three are relatively short, very brief;

 6     the next one lasts a couple of minutes; and the final one

 7     lasts seven minutes.

 8               THE COURT:  Okay.

 9               MR. GORDON:  A total of about ten minutes of video

10     all told.

11          So, Your Honor, the first one I'm going to show is

12     very brief, but it's a statement by Ms. Eisenhart where

13     you're going to hear her urge other rioters to fight the

14     police.

15          And so just for the appellate record, I am using

16     Government's Exhibit 301 for all of these, and for the first

17     one I'm beginning at the time stamp at 1:42, but the

18     relevant statement occurs about 15 seconds in at 1:57.

19               (Video played)

20               MR. GORDON:  I'm sorry, have you published this

21     for everybody?

22               THE COURTROOM DEPUTY:  It's published.

23               MR. GORDON:  It is.  Thank you.

24               (Video played)

25               MR. GORDON:  So, Your Honor, that voice that

said "Fight them, don't let them in, fight them," that's Ms. Eisenhart.

What's going on at this moment is Mr. Munchel and Ms. Eisenhart are standing on the West Plaza, that sort of column -- white-shrouded column you see is inaugural scaffolding.  It's been covered with white sheeting.

And what's happening at this minute is law enforcement officers are trying to push the crowd back. They're using bike rack barricades and other methods.  So the "them" that she is urging to be fought against and to not let them in is telling other rioters fight those police officers and do not let them push us rioters back off these grounds.

Next I'm playing, starting at the 12-minute mark, a statement about Ms. Eisenhart demonstrating the defendants' -- and Mr. Munchel demonstrating the defendants' knowledge of exactly what they were doing.  I know that defendant after defendant after defendant has come before this Court and other judges in this courthouse and said, "Oh, January 6th, I just got caught up in the moment." Right?  "I didn't mean to.  I didn't intend to do any of that.  Things got out of control, and I followed other people."

That is not these defendants.  All right?  They knew -- they prepared in advance.  They knew what they were

1    doing, and they were conscious of it all throughout.  There

2    was never a sense that this was allowed and this is okay and

3    the police are welcoming us in or any of that nonsense that

4    some other January 6th defendants have claimed.

5           Here it is.  You're going to hear the defendants

6    say they already know -- they didn't go into the Capitol

7    yet, but they already know that what they're doing is

8    illegal.

9           (Video played)

10          MR. GORDON:  So it's Ms. Eisenhart who says,

11    "We're going straight to federal" -- first of all, she says,

12    "Go in.  Let's go in."  And then she says to Mr. Munchel,

13    "We're going straight to federal prison if we go in there

14    with weapons."

15          She's urging the rest of the crowd to enter the

16    Capitol, then an acknowledgement that entering was illegal,

17    particularly with weapons.  With Ms. Eisenhart in the

18    lead -- they alternate back and forth on who's the

19    instigator.  This is not one of them is to blame and the

20    other is the follower.  They're working hand in hand.

21          At this moment Ms. Eisenhart's the leader.  She

22    takes Mr. Munchel and herself to an area where they can then

23    stash whatever is in the bags that Mr. Munchel's carried.

24          Now, we know from admissions that a knife was in

25    there.  We don't know if there were other weapons.  We

1    don't.  Certainly the statements suggest that there may have

2    been, but we can't prove that one way or the other.  But

3    it's important that they go find a place on Capitol grounds

4    to stash what's in their bags.

5            But even knowing all of that, even with that

6    statement, Mr. Munchel keeps the taser.

7            And it's not an oversight, because here at the 35-

8    minute mark -- this is just as he's about to enter the

9    Capitol -- you're going to hear that Mr. Munchel says, "Last

10   time I go in with armor and fucking weapons" referring to

11   the Capitol.

12           I'm beginning to play at 34:40.

13           (Video played)

14           MR. GORDON:  So Ms. Eisenhart, "The story of how

15   we got in is going to be great."

16           I think she's already celebrating this violent

17   entry.

18           And "Last time I get to go in with body armor and

19   fucking weapons."

20           From here I'm going to play the long clip which

21   goes from approximately 41:30 through almost to the end,

22   48:45.  This period covers once Ms. Eisenhart and Mr.

23   Munchel are inside the building.  They progress up the

24   stairs, come upon the flex cuffs.  We've been calling them

25   zip ties, but Your Honor, that's actually not really

1   accurate.  Zip ties are those things you can buy at a

2   hardware store that you can use for all kinds of things.

3   You can tie up the cords behind your TV or whatever you want

4   to do.

5          Flex cuffs are the technical name for what these

6   items are.

7          So they come across the flex cuffs, steal those,

8   carry them into the Senate, and then we're going to see

9   their behavior once they're inside the Senate.

10          So this one is from 41:30 through about 48:45.

11          (Video played)

12          MR. GORDON:  Soon after that moment, the

13   defendants exited the Capitol.

14          Whether the video ends because Defendant Munchel

15   turned it off or because the battery died, I can't say, but

16   there's not much more that happens once they're outside.

17          So, Your Honor, the government is requesting a

18   sentence at the high end of the guidelines for Mr. Munchel,

19   which is 57 months, and a sentence at the midpoint of the

20   guideline range at 46 months for Ms. Eisenhart.

21          I'm going to have to sort of address them both

22   together and separately as I go through this, but I want

23   to start with this photograph of Mr. Munchel.  Government's

24   Exhibit 402.  And to be clear, the person behind him

25   in the purple sweatshirt and orange hood, that is not

 1     Ms. Eisenhart.  She has been falsely -- that person's been

 2     falsely identified as Ms. Eisenhart by some people in the

 3     video.  That's not her.  All right?

 4          But this is Mr. Munchel.  And this image is one of

 5     the most iconic photographs of January 6th for a lot of

 6     reasons.

 7          So, first, this photograph was published the

 8     afternoon of January 6th as events were still going on and

 9     as journalists were starting to publish records of what was

10     happening in real time.

11          And as people around the country --

12          THE COURT:  This is at the time that the shaman

13     was downstairs, or do you know?

14          MR. GORDON:  I don't believe so, Your Honor.  I

15     believe he had already left at that point.

16          THE COURT:  He was already gone?  Okay.

17          MR. GORDON:  When we looked at the video clip that

18     I just showed, it appears that the Senate floor is mostly

19     empty at that point.

20          THE COURT:  All right.

21          MR. GORDON:  So but this image, as people saw it

22     around the country in the afternoon, when people didn't

23     really know what was going on, made many, many people --

24          THE COURT:  Because this was live when it was

25     shown?

1            MR. GORDON:  Essentially.  This was a live-taken

2     photograph that was -- but it's a photograph, and so it was

3     published not seconds after it was taken, but that same

4     afternoon.

5            THE COURT:  All right.

6            MR. GORDON:  People around the country saw this

7     and were -- not the country, I guess the world, and feared

8     that an organized group -- some of the rioters were just

9     regular people, sure, but some were organized sort of

10    commandos undertaking an almost sort of stealth mission to

11    seize the government.

12           Now, obviously that's not who Mr. Munchel was.

13    Right?  And obviously those conclusions were incorrect.  I'm

14    not seeking to have Mr. Munchel sentenced more harshly

15    because of a false assumption people made.  But it's

16    important to realize that what this image conveys is that

17    that seemed plausible given the events of the day; that a

18    group of armed commandos had stormed into the United States

19    Capitol and seized it with the intention of taking lawmakers

20    and others hostage.

21           You know, here we are two and a half years after

22    January 6th.  It's easy to forget -- well, maybe not

23    "forget," but at least have it faded from how terrifying

24    that afternoon was, how much on the precipice we seemed.

25           Now, while Mr. Munchel wasn't a part of any kind

1    of armed commando group, he certainly wanted to look that

2    way to others because he's the one who went through his

3    belongings and chose to dress like this.  Obviously there

4    are other options.

5         His mother chose to dress in a flannel shirt.  She

6    still put a tactical vest on.  She's wearing jeans and a

7    flannel shirt, boots and a regular hat.  She's dressed in

8    normal clothes but for the tactical vest.

9         Mr. Munchel, he wants to look like a commando.

10   And so that image crystallizes how serious his conduct was.

11        And I don't buy for one second the suggestion that

12   he grabbed those flex cuffs for any purpose other than to

13   take hostages, specifically congressional hostages, if the

14   opportunity presented itself.  It fits his words.  It fits

15   his conduct.  Those are not zip ties you can use to tie back

16   the cords on your TV.  He's not thinking about "Later I've

17   got a home improvement project I need to grab these for.

18   That's what these will be useful for."

19        No.  He sees -- in his mission overtaking the

20   Capitol, he sees the flex cuffs, and says, "Great, zip ties,

21   I've got to take these motherfuckers.  They will be useful

22   to take hostages with."  That's the thought process.

23        And it's not mitigating that he wasn't able to do

24   that because the senators had already been evacuated.  That

25   doesn't make it better.  That doesn't make his conduct

1    somehow less culpable.

2           In fact, had he taken Congress members hostage, he

3    would have other charges and be punished for those.  This

4    shows his -- the seriousness of his intent, and it's what

5    makes him different from many, many other rioters.

6           He may not have planned ten minutes before, an

7    hour before, a week before, to do this at this moment.  That

8    doesn't matter.  That's not mitigating either; that when he

9    had stormed the Capitol, he thought that it would be a good

10   idea to take members of Congress hostage.  Imagine how

11   everyone in this courthouse would feel if the same thing

12   happened here.

13          And why did he do this?  Why did Ms. Eisenhart do

14   this, too?  Because their preferred candidate lost, and they

15   believed -- despite all the evidence to the contrary,

16   despite 60-plus court cases finding otherwise -- they

17   believed the election had been stolen.  So they decided that

18   that was parallel to 1776, and it justified an armed, if

19   necessary, revolution against the government.  It justified

20   them and hundreds, no, thousands of others storming the

21   Capitol, overtaking it; and as Mr. Munchel himself said, "To

22   show Congress we can and we will come in here and do this."

23          Let's say the bank makes an error or I believe

24   they've made an error, and I'm convinced they have, and I go

25   into the bank, and I -- you know, I ask the teller and the

1    teller says, "Nope, nope, this is your account.  Nope, this
2    is what you have in it."
3              And I say, "No, no, no, you've got it all wrong.
4    I'm missing thousands of dollars."
5              I go talk to the manager.  I go talk to corporate,
6    whatever.  I pursue every avenue I possibly can.
7              If at the end of the day I exhaust all those
8    options, I'm stuck.  I can report it to the police.  I can
9    try a civil lawsuit.  I have lots of options.
10             But what I can't do is decide that the system has
11   failed.  The bank is wrong.  They have my money, and I'm
12   going to get it back by force.  And if that means taking
13   hostages, so be it.
14             That situation sounds absurd.  Nobody would think
15   they could do that.  And yet these defendants did.
16             But it wasn't the bank.  It was our democracy.
17   That's what they thought they had the right to go overtake
18   by force because they didn't believe that the election had
19   happened legitimately.
20             They're vigilantes.  That's what they are.  And we
21   cannot -- cannot -- give vigilantes like this any kind of
22   slap on the wrist.  We have to make them understand they can
23   never do anything like this again; and we need to make the
24   country understand that no one can do anything like this.
25             You heard Ms. Eisenhart and others in the mob

1    shout "treason" while they were inside the Capitol.  They

2    are the ones who took up arms and gave comfort to the

3    enemies of our government.  They are.

4           When people use the word "terrorism," we think of

5    mass casualty events.  We think of 9/11.  We think of

6    suicide bombers in Jerusalem.  When people use the word

7    "terrorism," that's what we think of.

8           But in the political science sense, that's not

9    what terrorism is.  Terrorism is an act calculated to induce

10   fear to achieve a political end.  That's terrorism.  The

11   fact that many terrorists choose things that have killed

12   people as their means of fear doesn't make that the only

13   kind of terrorism.

14           What Mr. Munchel and Ms. Eisenhart did is sort of

15   small-T terrorism.  They sought to induce fear in Congress

16   to achieve their political end.  And they knew it.

17           That's part of what's so aggravating about this

18   case.  As we cited in our sentencing memo, as you saw on the

19   video, they repeatedly, both of them, made statements

20   acknowledging that what they were doing was illegal.  "I'm

21   going to get arrested.  We're going to get arrested.  We're

22   going straight to federal prison."  Right?

23           At the end, as they were getting ready to leave

24   the Capitol, Ms. Eisenhart said, "We've got to get rid of

25   the flex cuffs, got to get rid of the zip ties."  They

1    didn't want to get caught with those either.

2           So they were absolutely conscious that that's what

3    happens to -- what they saw themselves as, the

4    revolutionaries.  But they know that the revolutionaries --

5    they knew that those are the ones branded as traitors.

6    Right?  So they knew that if they didn't succeed in

7    violently taking over the government, they were going to be

8    on the wrong end of the law, and they knew it the whole

9    time.

10          And the obliviousness of Mr. Munchel as he's

11   walking out of the Capitol to say to one of the Capitol

12   Police officers, "Sorry, guys, still love you."  Just

13   jaw dropping in its complete lack of self-awareness by

14   Mr. Munchel.  The police who are trying to enforce the law.

15   He thinks that -- I don't know if he did -- because he put a

16   "Back the Blue" bumper sticker or something similar that he

17   actually backs the blue.  No.

18          When the situation came down to it, when the

19   police tried to enforce the law, Mr. Munchel either ignored

20   them or pushed through them and thought a verbal pat on the

21   back as he walked out the door somehow meant that's how he

22   shows how he loves the police.  It's outrageous.

23          What he shows is that had -- and Ms. Eisenhart

24   did, too, that when they believe the law is between them and

25   their goals, their desires, it's not their goals or the

1   desires that have to change, it's the law that gets to be

2   ignored.

3           The difference in the sentencing recommendations

4   between asking for the high end for Mr. Munchel and the mid-

5   range for Ms. Eisenhart has to do with a few things.

6           First, their guidelines ranges are different

7   because this isn't Mr. Munchel's first run-in with the law.

8   He's in a Category 2.  They're marijuana offenses.  I

9   understand there are people that think that marijuana should

10  be legalized federally.  That's a question for another place

11  at another time.

12          The issue is that the law said it was illegal and

13  Mr. Munchel chose to ignore it repeatedly despite -- maybe

14  one time he got caught and he sort of learns his lessons.

15  No, even after getting caught, arrested, charged, convicted,

16  he kept on.

17          It's just a small thing, maybe, but it's a

18  pattern that shows the same thing that we have here, that

19  when the law was between Mr. Munchel and what he wanted to

20  do, Mr. Munchel chose his desires, ignored the law.  So he

21  had -- so that is a significant aggravating factor.

22          Also, the fact of his choice of attire, his more

23  intimidating behavior, and the fact that he's the one who

24  grabbed the zip ties or grabbed the flex cuffs and grabbed

25  the big bunch of them.

1          You know, I anticipate that, you know, Mr. Smith

2     will get up here -- and I'll agree with him -- and say that

3     yeah, it's Mr. Munchel who grabbed them.  He handed one,

4     just one, to Ms. Eisenhart, and she carried it.  So yeah, I

5     think that's less culpable.  I don't think it means she

6     should not be held accountable for the flex cuff.  She just

7     as easily could have said, "What do I need this for?" and

8     put it back.

9          That being said, Mr. Munchel's behavior is worse.

10         Their statements are roughly equivalent, so I

11    don't think that cuts either way.

12         And I don't think their post-January 6th conduct

13    is different, so I don't think that's a differentiator

14    either.

15         The only other differentiator that I think matters

16    is that Mr. Munchel, by his cell phone, you know, was

17    consistently documenting everything that he was seeing.  And

18    in addition to, you know, the sort of famous photograph --

19    Ms. Jenkins, can I have that back -- there's also this one

20    that he took with his own cell phone of riot-gear-clad

21    Capitol Police officers engaged in a defensive posture on

22    the West Plaza with what is pretty clearly fresh blood on

23    the ground at their feet.  This is before he ever entered.

24    The awareness that not only was he not supposed to be there,

25    but that conflict had already resulted in bloodshed was not

1    at all dissuading to Mr. Munchel.

2              Do I think Ms. Eisenhart probably saw the same

3    thing?  Yeah, I think she probably did, but I can't say for

4    certain.

5              I know Mr. Munchel saw it because he made a point

6    of taking a photograph with his camera, so I know he noticed

7    it; and that, I think, is aggravating, too.

8              So when you look at all the various factors of

9    sentencing, punishment, deterrence, I think all those argue

10   for a high-end sentence for him and certainly at least a

11   middle range sentence for her.

12             I anticipate that Mr. Smith will talk about

13   Ms. Eisenhart's career as a nurse.  I think that is to her

14   credit, absolutely.  She has spent her professional life

15   trying to help people.

16             It doesn't change or erase much about what she did

17   on January 6th.  She chose to throw all that away.  She had

18   a great career that she dedicated her life to and she loved.

19   It was less important to her than that, and she said

20   herself -- right? -- "I'd rather die as a 57-year-old

21   fighting."  To her, this was the moment of truth.  So I

22   don't think if it was less important to her what she'd done

23   her whole life and what she was doing on January 6th, I

24   don't think that the Court should flip that.

25             I anticipate that Mr. Allen will talk about, among

1    other things, that, you know, Mr. Munchel has a child on the

2    way.  I think that's, you know, lovely.  I hope that he and

3    his family are happy and healthy forever after.  But having

4    children can't -- doesn't absolve us of our own conduct, and

5    it doesn't sort of serve as any kind of get-out-of-jail-free

6    card.  And defendants every day in front of this Court and

7    every judge have children.  We have to weigh Mr. Munchel's

8    conduct on what he did.

9            And then finally, Your Honor, there's the fact

10   that I don't see any indication from either of them -- maybe

11   today they'll get up and make compelling arguments for --

12   compelling statements about their remorse that the Court

13   finds convincing.  I would ask the Court to take them with a

14   gigantic grain of salt.  They haven't expressed remorse

15   before, but today, when it serves them, I expect they will.

16           And I'm reminded of just last week in Judge

17   Kelly's courtroom where a Proud Boy defendant named Dominic

18   Pezzola got up, gave a heartfelt, tear-filled expression of

19   remorse and sorrow and swore off politics.

20           Judge Kelly gave him a 50 percent downward

21   variance, and then after Judge Kelly left the courtroom,

22   Dominic Pezzola turned around to the crowd and held up his

23   fist as the marshals tried to escort him out and yelled,

24   "Trump won," obviously indicating that everything he had

25   said before was a sham intending to manipulate the Court.

 1          Now, I don't -- obviously neither of these

 2   defendants is Dominic Pezzola.  I'm not asking the Court to

 3   punish either of them for something somebody else said.

 4   That's not the point I'm making.

 5          What I am asking the Court to do is to have some

 6   healthy skepticism about any expressions of remorse that

 7   come only today and never before.

 8          Your Honor, in the end, it's long-since apparent

 9   that January 6th was one of the worst days in the history of

10   this country, and I fear that we may be headed for another

11   such event in the future.  The political climate is not

12   particularly different than it was then.  Many figures are

13   still proclaiming the election to have been stolen and

14   trying to amp people up or asking people to revolt against

15   their government.

16          My fear is that Mr. Munchel or Ms. Eisenhart, if

17   given the opportunity, would do so again.  And I think the

18   Court should sentence them to make sure that they don't.

19   And I think the Court's sentence needs to make the

20   incremental dent in making sure that no one else in the

21   public adopts January 6th as a dry run or a rehearsal rather

22   than something never to be repeated.

23          Thank you, Your Honor.

24          THE COURT:  Mr. Allen.

25          MR. ALLEN:  Thank you, Your Honor.

1          I find it a little offensive and inappropriate

2    that the government would try to appeal to the Court by

3    comparing Eric to Dominic Pezzola and what he did.  Eric is

4    an individual.  He gets to come up here, and he gets to tell

5    you if he is remorseful or not; and what Dominic Pezzola or

6    any other Proud Boy or Oath Keeper or any other defendant

7    from January 6th did has nothing to do with what is in my

8    client's heart and mind.

9          There's an important reason for the rule of

10   foundation when it comes to evidence, and that's because the

11   Court gets to know and determine who took a photo, who

12   created a document.  Has that document been changed?  Who

13   has possessed that document or that photo?

14         The photo of the blood on the ground that the

15   government showed lacks foundation.  And the important part

16   of that is that Eric, despite what the government told you,

17   never took that photo.  That photo was texted to him by an

18   unknown individual after January 6th.  Eric did not take

19   that photo.  The only reason it was found on his phone is

20   because someone texted it to him.

21         I think that in any criminal case, whether we

22   speed or commit some other serious offense, there are two

23   things that are very important after the fact, and that's

24   recognizing and admitting that you're wrong and learning

25   from that mistake and not doing it again.  And that's where

1    remorse comes in.

2           I suspect and understand that the Court has read

3    my sentencing memo, so I don't want to regurgitate that.

4           What I do want to do is point out some things that

5    I think are very important about Eric.

6           After January 6th, he voluntarily surrendered

7    himself to law enforcement after learning that the FBI was

8    looking for him.  He never had to be found by anyone, hunted

9    down, searched.  He voluntarily surrendered himself.  I

10   think that is the first step that shows that he realized he

11   did something wrong.

12          He's been on pretrial release since March 29th of

13   2021 and has had no problems or violations.

14          The government alluded to Mr. Munchel being a

15   rioter.  You can say anything.  Anybody can say anything

16   they want about what happened on January 6th and Eric's or

17   anybody else's actions on January 6th, but I think it's very

18   important for this Court to consider a much larger picture.

19          I realize he has a couple of charges for -- or

20   convictions for possession of marijuana.  Okay?  He does not

21   have a long history.  He's not a career criminal.  In fact,

22   since he's been on pretrial release, he's worked full time.

23   He met Taylor at church.  They got married, and now they

24   have a baby due in December of this year.

25          Not only has he worked full time and supported his

1   new family, but he's also become management or gained a

2   management position.  He's moved up in his work.

3           He's been drug tested consistently while on

4   pretrial release and never had a positive drug test.

5           As opposed to demanding a jury trial or a

6   traditional bench trial and requiring the government to come

7   in and put on a full case, he agreed to a stipulated bench

8   trial, and he agreed to a set of stipulated facts that the

9   government provided to him, and he signed that.  He took a

10  whole lot of work off of the government's and the Court's

11  plate by doing that.

12          He participated in the events of January 6th as an

13  individual with his mother.  He was not a part of any group,

14  not a part of any preplanned conspiracy.  He went to the

15  Capitol, went to Washington, D.C., on January 6th as an

16  individual with his mother.

17          Eric no longer has any social media presence.  I

18  think this is important for a couple of different reasons.

19          In my personal opinion, social media of all kinds

20  is disgusting, and it's a breeding ground for disgusting

21  acts.  Unfortunately, even if we delete all of our social

22  media, we still have TV.  We still have the actual media.

23  And ever since COVID, there's been a nasty, nasty rhetoric

24  spewed by not only our president, our former president, but

25  by political actors on both sides.  And the media from both

1    sides grabs ahold of that, and they broadcast it.

2            I think that while Eric is generally an

3    intelligent person and a good person, I think that there was

4    a certain weak point in his mind along with many other

5    people who came to D.C. on January 6th.  He believed in his

6    president.  He listened to his president.  And Donald Trump

7    has since been indicted for his actions on January 6th.

8    That's what personally really makes me angry looking back at

9    all of the people who were attending that rally and listened

10   to their president.

11           Eric is ultimately responsible for his actions,

12   and he will tell you that today.  I promise you.  But it's

13   really unfortunate that there are people in higher power

14   continuing to do it today that are preying on people who

15   just believe in their leaders.

16           I wonder what would have happened if that rally

17   didn't occur or if that -- or at that rally Donald Trump

18   would not have said, "Go down the street."

19           One of the things that I noticed in the PSR was

20   that during the last five years there have been seven

21   defendants whose primary guideline was 2J1.2 with a final

22   offense level of 14 and a criminal history category of 2.  I

23   realize today that we've added an enhancement to that

24   guideline range.  But I still want to point out that six of

25   those seven defendants received a sentence of imprisonment,

1    and the average length of the prison imposed was eight

2    months, and the median sentence was five months.

3            Your Honor, I respect the Court's decision, and

4    can understand after hearing the Court's reasoning how the

5    Court arrived at that decision to apply the eight-level

6    enhancement, but I'm still going to ask the Court today to

7    consider what I've argued, to consider Eric's life as a

8    whole, what happened before that one day of his life and

9    what has happened after that one day of his life.  And I'm

10   going to ask the Court to go below the guidelines.

11           I don't think that an extensive length of

12   imprisonment is going to serve either Eric or society.  I

13   think that he has shown to this Court that he can function,

14   and he can be a good member of society because of his time

15   on pretrial release.

16           So, Your Honor, I'm going to ask the Court to

17   please consider going below the guidelines in sentencing

18   Eric.

19           He has a child on the way, due in December.  So

20   I'm going to also ask the Court, whatever sentence it

21   decides, to stay that sentence until after his child is born

22   and to allow him to self-report.

23           He has had no problems, no problems on pretrial

24   release.  He's made all of his court appearances.  He's not

25   going to hide from this.  I would ask that the Court allow

 1    him to self-report soon after his child is born.

 2              And, Your Honor, if it pleases the Court, I would

 3    like to ask -- or Eric would like to ask if he could make a

 4    statement.

 5              THE COURT:  Sure.

 6              Let me hear the other counsel first, and then I'll

 7    hear from the defendants last.

 8              Mr. Smith.

 9              MR. SMITH:  Thank you, Your Honor.

10              This Court is obviously very familiar with this

11    case already.  The facts of this case are also largely not

12    in dispute.

13              THE COURT:  And they're all sad cases.  I mean,

14    they're like Mr. Munchel.  They're basically good kids, good

15    people who got caught up in something that day that is not

16    their life.

17              MR. SMITH:  That's right.

18              THE COURT:  And they ended up here before me.

19    It's not the kind of case I see in criminal cases that I

20    see.

21              MR. SMITH:  Yes.

22              THE COURT:  And they're not defendants I see --

23              MR. SMITH:  Right.

24              THE COURT:  -- and the kind of criminal cases that

25    I see every day.  So it is unusual and sad cases that I'm

1    dealing with when I see these January 6th cases.  I agree

2    with you.

3              MR. SMITH:  Yes, Your Honor.

4              THE COURT:  And, you know, I've had you several

5    times.

6              MR. SMITH:  Yes, Your Honor.

7              THE COURT:  So you know what I'm talking about.

8              MR. SMITH:  Yes, Your Honor.

9              It's 59 and a half years for my client.  Pretty

10   much every day leading up to January 6th and every day since

11   it's been a good life, a very good life.  So, you know, I

12   guess the saying everybody is more than the worst thing

13   they've ever done, it's not -- it's more than a truism, as I

14   mentioned in my brief.  I don't think you can ignore the

15   vast 99.9 percent of her life, and you have got to keep this

16   piece in context.

17             Yes, it is a piece.  Yes, we're here.  Yes, she

18   has a felony conviction.  But it's 0.01 percent of her

19   entire lifetime.  I'll get back to that.

20             But the government is, as you said, seeking 46

21   months for her actions that include 12 minutes spent inside

22   of Capitol.  You found the eight-level enhancement, so the

23   guideline range for her is 41 to 51 months.  The government

24   said she should be given the middle of the range with no

25   variance.

1           But regardless of the range, we continue to submit

2     that an appropriate sentence is 12 to 15 months.  And in any

3     event, no matter what, I feel to my core that she should not

4     be given more than the 24 months given to Larry Brock.  It

5     would be an incredible disservice and injustice for her to

6     get more time than Larry Brock for all the reasons we put in

7     our sentencing memorandum.

8           I want to spend most of my time talking about

9     Ms. Eisenhart as a person.  She had a very hard life,

10    growing up, as the Court saw, and she overcame it.  After

11    domestic violence, she became a nurse, has served in that

12    profession honorably and without incident for over 30 years

13    or about 30 years.

14          She is not a member of any militia group, any

15    organized group, nor is she a racist.  And I want to put

16    this out there.  As the Court saw, perhaps, her best friend

17    in the world, a fellow nurse, has grandkids that she has

18    helped raise.  That nurse and her kids are African-American.

19          You've seen all the letters of support from those

20    who have known her in the community.

21          She has never been in trouble with the law except

22    for a few ancient traffic matters resolved by paying a mere

23    fine.

24          Other than traffic stuff, nothing in the 59 and a

25    half years of good conduct both before that January 6th day

1    and since that day.  How much does she deserve for one day,

2    or, more specifically, the 12 minutes she was inside the

3    Capitol that day?

4         Now, to be sure, I'm going to be pretty -- this is

5    my last January 6th case.  I have several I've been

6    appointed to.  I'm going to put it all out there.

7         Ms. Eisenhart is not perfect.  I've been with her

8    now for over three years after being appointed.  She can

9    sometimes be quite opinionated, sometimes even stubborn, and

10   maybe that fed into January 6th.  But to quote something I

11   learned growing up in the South, not every dog that barks

12   even loudly bites.

13        Not even when Ms. Eisenhart was abused by a

14   domestic partner and her kids were abused as well did she

15   ever engage in violence.  No violent acts ever in her

16   lifetime.  And she was much more angry at that guy than she

17   was on January 6th.

18        He eventually went to jail for abusing the kids.

19        But Ms. Eisenhart is not necessarily an easy

20   person, as I can attest as her appointed lawyer.  But, Your

21   Honor, we've all known people like this, people with a hard

22   exterior, who then surprise us, who are kind, who deep down

23   are good people.

24        Ms. Eisenhart lives to help kids.  I don't think

25   you can read the letters without coming to that conclusion,

1      from her character letters.  And I ask that you think on all

2      those surprising things that they said about what she has

3      done, what her actions show.

4           The government says she shows no remorse and

5      criticizes her letter as not really apologizing.  But many

6      Courts and this one have seen insincere apologies.  The

7      government even referenced one.  We've all seen that, where

8      people go on to Fox News or elsewhere and say the opposite.

9           Ms. Eisenhart is not that.  Trust me.  She will

10     never say anything she doesn't mean.  You know what you get

11     with her.  She speaks her mind and her feelings with

12     honesty, and yes, with passion.  She may not say the words

13     that they might say you should want to hear, but what she

14     told you you can count on.

15           Looking at her actions, one sees this.  She owned

16     up to every one of the stipulated facts and agreed to a

17     stipulated trial saving both this Court and a jury the

18     burdens of putting the government to its burden of proof.

19     There's no question she earned and deserved acceptance of

20     responsibility.  In addition, she was in custody, no shots,

21     no disciplinary issues at all in custody, and then served

22     two and a half years on pretrial supervision without

23     incident, even under unusually strict conditions of release

24     that very few, if any, January 6th people have faced,

25     including no Internet.  She complied fully without

1    complaining or even seeking modification of the terms that

2    she'd agreed to.  She showed respect for the system;

3    compliance with societal and judicial expectations imposed.

4         And even on January 6th, we see it there, too.

5    Yes, you saw the video.  Yes, there are things that she

6    shouldn't have done.  But she's the one who insists that

7    they turn around and drop the weapons.  They actually walk

8    back against the crowd in the opposite direction so that she

9    can do that.

10        Once inside we also see it.  You heard that

11   despite their chance and the hyperbole and all the

12   craziness, they say, "This is not a place for us."  They

13   leave voluntarily and without prompting only 12 minutes

14   after their entry.  They also warn others repeatedly not to

15   vandalize.

16        What does that tell you?  She has a conscience.

17        Their conscience is calling to them when they

18   said, "This is not a place for us," and she listened to that

19   conscience.  Not soon enough.  That's why we're here.  But

20   she still listened.  And she left only after 12 minutes in

21   the Capitol.  One of the shortest of all the January 6ers

22   that I know of who entered.

23        She's not like many of the January 6ers who

24   refused orders, refused to leave.  This gives you a window

25   into her as a person beyond the --

1          THE COURT:  And who insisted on a trial.

2          MR. SMITH:  Yes, and who have insisted on a trial

3    and gone on social media and raised money and trying to

4    profit off this.  None of that.

5          Since then, you've seen the rest.  She voluntarily

6    kept in touch with the FBI.  She turned herself in.  Full

7    pretrial compliance.  Passed up opportunities to get

8    involved in politics.

9          She's told you frankly and, unlike many, honestly

10   what her intentions are.  She wants to move to Nashville,

11   stay with her other son, and hopefully focus on her

12   grandkids.

13         She's not going to sit here and tell you

14   everything you may want to hear about her views on who won

15   the election.  The government criticizes her for -- what do

16   they want?  She won't lie and say she no longer has any

17   lingering questions.  She's given you the truth.  It's a

18   true and genuine promise.  She will never do this again.

19         So what's a fair sentence here?  As I said, the

20   one thing I feel most strongly about is she should get less

21   than Larry Brock, especially given how many similarities

22   exist between that one and this.  It is clearly the

23   single-most analogous case.

24         The government has thrown some other comparables

25   out, and I want to quickly go through them, but -- and

1    it's not even clear they're raising them as comparable for

2    Ms. Eisenhart.

3           They compare her to Joshua Johnson, who got 24

4    months.  But let's look at these other people they say are

5    comparable when they're asking for all this time on these

6    two.

7           Sandlin.  Sandlin wasn't just charged and

8    convicted of destruction.  He was charged with assaulting

9    officers.  He brought a case full of weapons to D.C. in

10   anticipation of violence, a "Civil War boogaloo."  He

11   brought a Glock pistol, pocket pistol, two magazines of

12   ammunition, two cans of bear mace, a gas mask, taser,

13   slingshot, body armor, two helmets, baton, walkie-talkies,

14   and several knives.  He recruited others to come with him to

15   D.C. and raised money to caravan people, part of a broader

16   conspiracy.

17          He -- before joining the Capitol riot, he warned

18   on social media there would be violence.  This is before

19   coming to the Capitol riot.  And he would occupy the Capitol

20   if needed.  He said that.  He walked to the Capitol talking

21   on walkie-talkies.

22          On January 6th he four times rallied others with

23   cries of "Freedom is paid for with blood."  That's a lot

24   stronger than anything these guys ever said.  And according

25   to the government's brief, he also directly assaulted two

1    U.S. Capitol Police officers, including trying to rip their

2    helmet off of one officer, and aiding and abetting in the

3    assault of four others, actual assaults.

4           In fact, he led the mob's charge at two different

5    choke points; one in the Rotunda Doors, and in a shoving

6    much there -- I'm sorry, and the other one was blocking

7    officers to lock the Senate gallery doors before they were

8    closed.  And he forced them open and, in a shoving match,

9    also struck an officer on the head.

10          He then entered the Senate gallery and jumped down

11   onto the Senate floor.  Literally sat in the vice

12   president's seat, and later smoked marijuana in the Rotunda

13   and celebrated that "We made history."

14          On his way out, he stole a book from a Senate

15   office desk as a souvenir, and he even picked up an oil

16   painting, put it over his shoulder, until other January 6ers

17   stopped it.

18          He was a QAnon follower.  Fancying himself as a

19   modern Patrick Henry.  Later sought to profit by selling

20   video footage.  Said, "I'll do my time proudly."  And he

21   also obstructed by deleting videos and group chats; and

22   raised $21,000, supposedly for attorneys' fees, even though

23   he had a CJA-appointed lawyer and then he used it for his

24   personal expenses.

25          Does that guy sound like our guys?  No way.  Not

1    even close.

2         Next let's look at Mr. Chansley.  You know

3    Mr. Chansley, I'm sure, very well.  He's been in front of

4    this Court, and you even issued a recent opinion where you

5    literally said that Chansley was the face of the riot on

6    January 6th.  Shirtless; horned, fur-lined hat; red, white,

7    and blue face paint.  The very vision of chaos taking over.

8    Far more iconic, I would submit, than the Munchel photo.

9    Certainly more than my client, who it is now being conceded

10   isn't even in that photo.

11        But more importantly, he was way out in front of

12   these defendants.  He literally, as the Court noted in its

13   opinion, was one of the very first people to enter the U.S.

14   Capitol.  One of the first 30 people inside.  He entered

15   only one minute after the first breach through a broken

16   door.  Our clients came through an open door.

17        Unlike these two, he was also a leader of the mob.

18   He used a bullhorn to demand that lawmakers come out to face

19   the mob.  In fact, that bullhorn may have been what

20   literally led to the evacuation and suspension of the

21   certification because it occurred so early on.  He was

22   carrying a six-foot-long pole with a spearhead attached.  He

23   was confronted by law enforcement not just once or twice

24   but, as the Court noted in its opinion, a half a dozen

25   times.

1          Unlike these defendants, and unlike most of the

2     other people around him that day, he refused those orders.

3     He entered not just the Senate gallery, but the Senate

4     Chamber.  He climbed onto the Senate dais, even sat in the

5     vice president's chair and took photos of himself,

6     specifically referenced the vice president in vulgar

7     language, wrote a threatening note to the vice president.

8     Way more than the sort --

9          THE COURT:  Mr. Carlson should have talked to you,

10    I guess.

11         MR. SMITH:  He then used a bullhorn in leading

12    other rioters in a demonstration called a prayer.  He stayed

13    in the Senate Chamber a whopping 38 minutes, refusing the

14    officers' orders to leave until he feared they got enough

15    officers in there to arrest him.

16         He later said, "I consider this a win."

17         He later feigned great remorse before Your Honor

18    only to then turn and recant.

19         That is, again, a person of a different magnitude

20    than these defendants.

21         THE COURT:  No doubt about it.

22         MR. SMITH:  Next is Barnett, who is even worse.

23    Bigo is the guy who worked his way all the way up to the

24    Speaker's office and put his feet on her desk.  Before

25    January 6th, he recruited others using the "We Are The

1    Storm" hashtag.  He purchased a stun gun device that was

2    hidden in a walking stick, something called a Hike 'N

3    Strike, and pepper spray.  The Hike N' Strike, get this,

4    950,000 volts.  950,000 volts.  And on social media he

5    bragged he might use that against someone that day.

6            On January 6th he came armed with this stun gun

7    plus a ten-pound steel pole with a flag that was flex-tied

8    to it.  He breached a police line, entered the Capitol,

9    although he later tried to claim, "Oh, I got pushed in."  He

10   invaded the Speaker's office suite, stole a signed envelope,

11   which he later claimed "it wasn't stolen because I left a

12   quarter on the desk."  He invaded Nancy Pelosi's personal

13   office space, put his feet on the desk, as I mentioned, and

14   he left a note:  "Nancy, Bigo was here you biotch."

15           Ten full minutes he spent inside the Speaker's

16   office, and he left only after the MPD forced him out.

17           Then he went into the Rotunda.  He realized he'd

18   left his flag in Pelosi's office, so he tried to get it

19   back.  He threatened officers there that if he couldn't go

20   back and get it himself, or they wouldn't get it for him,

21   then he would beckon other people to come and charge them.

22   He flashed his stun gun at the officers.  And, as I say, the

23   photos showed him beckoning on the other rioters.  And he

24   told the officer, "You'd better get my flag or I'm going to

25   bring them in."

1          Officer Craig specifically testified that these

2    threats caused him to fear for his life.

3          Eventually he left the Capitol, but he'd been

4    inside for quite a while.  And even outside he used a

5    bullhorn to earn further fighting.

6          Absolutely unrepentant guy.  Arrogant.

7    Braggadocios.  He saw this as a big joke.  He said he was

8    going to win it "because I'm Bigo."  Felt he was above the

9    law and untouchable.

10          On social media he mocked U.S. Capitol Police and

11    the judicial process.  He got rid of his phone and stun gun,

12    which were never found, and he tried to profit.  He

13    literally tried to trademark, "Nancy, Bigo was here you

14    biotch."  And he also raised $25,000 via autographed photos

15    of himself inside the Speaker's office.

16          Then he insisted on a jury trial, ten-day jury

17    trial, where he testified, the government said, falsely; and

18    also, it said, he suborned perjury because he got his

19    girlfriend to say that, yes, his phone had just fallen off

20    his truck; it hadn't been tossed by him.

21          Also, he was not a first offender.  He had three

22    prior DUI convictions.

23          Is that a comparable case?  Nothing like it.

24          Finally, my client as compared to Josh Johnson,

25    and at least the facts of the January 6th activities there

1    are more similar.  He got a 24-month prison sentence.  He

2    entered with a gas mask; eventually got into the Senate

3    Chamber, not just the gallery.  And once in the Capitol,

4    he'd gone straight to the Senate, put on a gas mask to enter

5    the gallery expecting trouble.

6          He spent 17 minutes on the Senate floor,

7    photographed and filmed himself -- I'm sorry, photographed

8    and filmed documents he found on Senator Feinstein's desk,

9    invading her privacy.

10          He took off his overcoat and other clothing items

11   right on the floor of the Senate to get comfortable, and

12   apparently thought he'd stay a while.

13          He, too, went up to the Senate dais.  He didn't

14   sit in the vice president's chair, but he walked right

15   behind it.  And then he drank from Rick Scott's water

16   bottle.  And he left only when officers outnumbered the

17   rioters and he feared arrest.  He left the Capitol, raised

18   his arms triumphantly and texted, "It was awesome."

19          Beyond those events, the bigger issue was he was

20   not a first offender.  In fact, far from it.  His criminal

21   history category was 3, with significant priors including

22   armed robbery, two counts of armed robbery where he had a

23   ski mask and hoodie, entry into a store with two separate

24   victims.

25          He also had domestic violence cases.  He'd broken

1   into his parents' home for a gun, and twice he caused bodily

2   injury to his wife, plus he owed $37,000 in child support.

3          The government said criminal history was the main

4   reason it sought 24 months there.  Ms. Eisenhart has zero

5   points.

6          Giving her a more modest sentence than this repeat

7   violent felon isn't out of line at all and, as I noted,

8   giving her less -- giving her more than the 24 months given

9   to this guy with his Criminal History Category 3 armed-

10  robbery-and-domestic-violence background, than Larry Brock,

11  would simply be an injustice.

12         Comparing those folks to Lisa, let's look at what

13  she did and didn't do.

14         Did she ever seek publicity?  No.

15         The only statement she's given to the press was

16  when the press came to her shortly after January 6th.  And

17  even if the citation -- the article they cite in *The London*

18  *Times* or whatever it was, if you look at what it says in the

19  article, Judge -- I can show it to you, if you want -- it

20  says that she made those comments teary-eyed.

21         THE COURT:  Made those comments what?

22         MR. SMITH:  While she was teary-eyed.

23         She's not defiant.  She's sad at what she thinks

24  is happening, she's fear -- what she fears America has lost.

25         So she didn't seek publicity.  No press conference

1    was held when she was released on bond, nor despite the

2    multiple requests for interviews.  She's turned them all

3    down.

4           She's not defiant, nor has she ever reached out to

5    anyone in Congress.  She hasn't joined in any protest.  She

6    hasn't gotten involved in any politics; in fact, she

7    scrupulously avoided it.  She's seeking to return to a

8    normal life.

9           Did she ever try to profit off this?  Not at all.

10   The only fundraising that was done was by her mom, and that

11   was limited to simply trying to raise money for a future

12   nursing attorney.

13          On that ground, I would also note the fine clearly

14   should be waived here, especially since given the Court's

15   ruling I think she is at great risk of losing her nursing

16   license forever.  We have no objection to the restitution of

17   $2,000, but I think a fine is overkill.

18          But did she demand a jury and try to turn that

19   process into a joke like Mr. Barnett did?  No.  She did the

20   opposite.  She's been nothing but respectful of the judicial

21   process here and has fully conformed with bond, no matter

22   how strict the conditions, without complaint.

23          Now, to be clear, none of this diminishes my

24   client's actions on January 6th or the seriousness of the

25   events that day.  I have some pretty strong feelings about

1     that day myself, Judge.  And Ms. Eisenhart and I have talked

2     a lot about that.  I won't get into attorney-client

3     privilege, but I can say we've had frank and respectful

4     conversations, even if they sometimes have been heated.

5            She is not a Q person.  She's not even a Trumper

6     frankly.  But she is a person with passionate and strong

7     views, which is okay.

8            Now, the government says, well, what she did is

9     just like, you know, this banking example he gave where

10    people charge into a bank because they can't resolve their

11    dispute.

12           No, that would be doing it for personal benefit.

13    There's no suggestion, no evidence, that Ms. Eisenhart ever

14    did any of this for personal benefit.  The commander-in-

15    chief had encouraged it and called them.  It was

16    unprecedented.

17           You know, if we're going to look at a banking

18    example, it would be like Jerome Powell of the Fed

19    declaring, "The banks are cheating you, they're holding your

20    money improperly," you know, and then people go into the

21    bank and start demanding their money back.

22           The government said that these guys had no self-

23    awareness, but look around.  We have Republican candidates;

24    they'll support a convicted felon if he wins the primary.

25    Right and wrong is feeling blurred.  There's a leadership

1    void.

2          As I said, this is my last January 6th case; so

3    I'm going to speak my mind.

4          What I've concluded, to the extent I can discern

5    it, is the events of January 6th may frankly be bigger than

6    me and Ms. Eisenhart or perhaps any of us.  We see in our

7    society outlandish stories that get pushed to the top of the

8    news cycle, and then they get mainstreamed by media outlets

9    and its representatives who historically were considered

10   reliable.

11         This Court's *Chansley* opinion in fact references

12   the Tucker Carlson Reports show on Fox.  Is everyone who

13   believed or trusted Tucker Carlson before he was fired from

14   Fox culpable?  Is this their fault alone, or is it a broader

15   societal issue?

16         Today -- I worked in the House and Senate.  Today

17   people with long service as U.S. senators, the traditional

18   statesmen that we have in this world, in our country,

19   including our sitting president, are viciously attacked.

20   Fox and other media sources have regularly referred to a

21   "Biden crime family" nonstop for the last three years.  It

22   feels relentless.

23         And while I don't often agree with Mitch

24   McConnell, I respect him.  We all used to respect these

25   people that were our statesmen in the United States Senate.

1    Yet Mitch McConnell, too, gets pilloried, called a RINO, or

2    worse, including by many in his own party.

3         "Compromise" is a dirty word.  Merely dining with

4    a colleague on the other side of the aisle is viewed as

5    disloyal.  Virtually every institution today is questioned,

6    including the judicial system; and I find it just as

7    disturbing as you, I would suggest.

8         Our media and social media lately seems less

9    interested in reporting truths than an agenda, even

10   propaganda.  You fairly criticized Tucker Carlson in your

11   opinion.  But did your truth-telling pierce the bubble of

12   many?

13        Too often today each side conveys and hears only

14   one side, one-sided versions, with the viewers drawn to

15   rage.  Even when a Fox News calls Arizona, a News Max or an

16   OANN is created to replace them.

17        No easy solution to these broader societal issues

18   are apparent to me.  We seem to more and more live in

19   separate silos.

20        Outlets say that distrusting -- other Americans

21   with different views should be treated as the enemy, and

22   they urge tuning out any contrary views just out of hand.

23   And it's affected us all.

24        My own relationship with my own mostly Republican

25   family is often strained.  And social media algorithms cause

1    whatever views that we may have to only then be reinforced.

2          Every day all of us on all sides are barraged with

3    something disturbing, something that is designed to make us

4    angry.  The world is changing fast, and it's unnerving to

5    many.

6          Is it surprising that my client believed the

7    election was stolen when everywhere she turned and tuned in

8    to told her that?

9          Is it surprising that maybe she still hasn't

10   shaken all doubts when a poll -- when the polls show that a

11   majority of Republicans feel the same way?

12         During COVID, like many, Ms. Eisenhart looked a

13   lot on social media.  She saw liberal excesses that

14   disturbed her, and then it was reinforced more and more.

15   This may help all of us, including me, to understand how

16   someone like Ms. Eisenhart got to where she was on January

17   6th.

18         And certainly Ms. Eisenhart now understands she

19   doesn't want to go back there again, but is it surprising

20   she was angry when much of media and its ratings seemed to

21   focus on fomenting anger?

22         It doesn't excuse January 6th, and I won't insult

23   your intelligence.  I'm not seeking probation or home

24   confinement like some January 6th attorneys do.  I'm aware

25   of and respectful of your view of the seriousness of January

1   6th as a dark day for democracy.  Frankly, I personally

2   share in many of those views.

3           But I do believe that a sentence of 12 to 15

4   months of prison here does seem fair and proportionate to

5   me.  One month in prison for every single minute that she

6   was inside the Capitol.  One month in prison for each minute

7   inside the Capitol is not an insignificant sentence.  That

8   proportionality, frankly, should send a pretty clear

9   deterrent message to anyone, in my view.  It's certainly

10  proportional to what Larry Brock and other comparable

11  defendants have received, and it's particularly warranted

12  here given Ms. Eisenhart's 59 years of good conduct and the

13  harsh confinement conditions she endured literally, which

14  you may remember included solitary confinement, basically 23

15  hours a day in her cell, plus the two and a half years of

16  unusually restrictive pretrial conditions for which she will

17  get no credit.

18          This has been and will be a significant constraint

19  on her liberty.  She's been hit hard already.  She will be

20  hit again today.  She is deterred.

21          She is also facing, clearly, serious collateral

22  consequences, the loss of her nursing license and her

23  livelihood.

24          I ask you to consider all 59 and a half years of

25  her life, including her 30 years of unblemished nursing

 1    experience.  I believe a 12- to 15-month sentence is

 2    sufficient but not greater than necessary, and that no more

 3    is needed here.

 4            Thank you for listening.

 5            THE COURT:  Thank you, Mr. Smith.

 6            We're going to have to take a short recess for our

 7    court reporter before she strangles me.  We'll take a short

 8    recess, and then I'll come back and hear from the defendant.

 9            (Recess taken)

10            THE COURTROOM DEPUTY:  This Court is again in

11    session.  Please be seated and come to order.

12            THE COURT:  Okay.  Mr. Munchel, we'll start with

13    you.  I know you'll be nervous at a time like this, but

14    anything you want to say I'm certainly interested in

15    hearing.

16            DEFENDANT MUNCHEL:  Thank you, Your Honor.  Before

17    I get started, I just want to say thank you to everyone

18    here.  I appreciate all the hard work, diligence, and aside

19    from a few Zoom calls, we've never had a good face-to-face

20    to be able to look each other in the eye.  So thank you,

21    Your Honor, for everything that you've done for us so far.

22            Your Honor, I am standing in front of you today to

23    help bring more clarity to you about myself.  Since my

24    actions on January 6, 2021, I have made it a priority to

25    better myself.  I'm aware that my decisions to participate

1    in the protest that ultimately led to me walking into the

2    Capitol building was made in poor judgment.

3           Immediately after leaving and returning home, I

4    felt remorse for my decision to participate in that action.

5    I made the last-minute decision to travel to Washington,

6    D.C., with my mother.  It was imperative to me to make sure

7    that she was -- that I was there to protect her in case of

8    any opposition protesters showed up.

9           Prior to our attending this protest, we had seen

10   several rallies across the nation that ended up with -- that

11   ended up poorly, with protesters injured, attacked, and even

12   in some cases killed.

13          I say this not to excuse anything, but to explain

14   my decision to wear body armor, carry nonlethal protection,

15   and brought medical equipment along with me.

16          Before our departure from Tennessee, I was aware

17   of the gun laws in Washington, D.C., and made an intentional

18   decision to leave behind any firearms which are strictly

19   forbidden here.  I'm a licensed -- was a licensed gun owner

20   with concealed weapons carry permits and always practiced

21   safe law.

22          Upon learning that the FBI was looking for me, I

23   contacted the agent in charge and immediately self-

24   surrendered in Nashville, Tennessee.  Once in custody, I had

25   plenty of time to reflect on my decision and how I ended up

1    in this current state.

2          I know now that my actions are inexcusable and

3    wrong.  Your Honor, I wanted to make it known.  I take full

4    responsibility for what happened and my actions, and the

5    responsibility is mine alone.

6          Since my release from 11 weeks in solitary

7    confinement, which was 23 and 1, I have been fully employed,

8    even moving up to the leadership positions in both jobs that

9    I obtained.

10          I joined a church and started serving on the set-

11   up and tear-down team.  It just so happens that's the same

12   church where I met my wife.

13          Since I wasn't allowed to go out and do community

14   service projects, I found another calling, serving the

15   church inside.

16          We spent the time before and after services for

17   three weeks before I divulged everything about my legal

18   situation.  At first she was very skeptical, and we used the

19   next few weeks of her asking a lot of questions directly and

20   indirectly to ensure that I would not be getting into

21   trouble like this ever again before committing to move

22   forward with our relationship.

23          She constantly encourages me and inspires me to be

24   a better man.

25          When she told me that we were expecting our child,

1   it became an utmost priority of mine to be the best man,

2   father, and example for my daughter.  I hope to teach her

3   that even when we make mistakes and do something wrong, we

4   take responsibility for our actions and learn from it and to

5   be better because of it.

6         This is what I feel I have done throughout the

7   last two and a half years.  I have taken responsibility for

8   my actions and learned an immeasurable amount, to never stop

9   trying to be better, to be a better citizen, husband,

10   father, son, brother, and more.

11         I'm asking that you consider all of these things

12   in addition to what my attorney has stated when making your

13   decision on what you find to be a reasonable and appropriate

14   sentence in my case.

15         Thank you for this time of hearing me.

16         THE COURT:  Okay.  Thank you, Mr. Munchel.

17         Ms. Eisenhart.

18         MR. SMITH:  Your Honor, Ms. Eisenhart has given a

19   written statement.

20         THE COURT:  Okay.

21         MR. SMITH:  So I don't think we're going to -- she

22   wants to say anything further, but she has directed me to

23   add this.

24         You just heard Eric Munchel say it was a last-

25   minute decision and the decision was his --

1          THE COURT:  I'm sorry, I can't quite hear you.

2          MR. SMITH:  You just heard Mr. Munchel say it was

3    a last-minute decision on his part.  And my client did want

4    to say -- has directed me to say that the only reason Eric

5    came was because she asked him.  He came --

6          THE COURT:  Yes, I understood that.

7          MR. SMITH:  He came to protect her.  But she did

8    not want -- you know, I think she feels a good deal of

9    remorse for him being here, and she wanted me to make sure

10   that you understood that.

11         THE COURT:  A good mother would say that.

12         MR. SMITH:  Beyond that, Judge, the only other, I

13   guess, thing we will at some point ask the Court to consider

14   allowing my client to move to Tennessee.  I think we may

15   have mentioned this in the brief, but she is hoping to live

16   with her son and to do that before she self-reports, because

17   apparently that will make it much easier when she's out on

18   the other side to come back to be assigned to Nashville.  So

19   we will probably be petitioning the Court, if you don't

20   grant it today, for her to live with her son, who was also

21   the custodian for Eric before his girlfriend or fiance --

22   I'm sorry, now wife.

23         THE COURT:  All right.

24         All right.  I'll ask both defendants to come

25   forward then.

1          Let me start with Mr. Munchel first.  Pursuant to

2     the Sentencing Reform Act of 1984, in consideration of the

3     provisions of 18 USC Section 3553, as well as the advisory

4     Sentencing Guidelines, it is the judgment of the Court that

5     you, Eric Munchel, are hereby committed to the custody of

6     the Bureau of Prisons for a term of 57 months on each of

7     Counts 1, 2, 3, 5, and 7, and six months as to each of

8     Counts 8, 9, and 10, with all counts to be served

9     concurrently with each other.

10          You are further sentenced to serve a 36-month term

11     of supervised release as to Counts 1, 2, 3, 5, and 7, to be

12     served concurrent to each other, for a total of 36 months

13     supervised release; and to pay a special assessment of $530

14     in accordance with 18 USC Section 3013.

15          I'll come back to the other conditions in a

16     moment.

17          Pursuant to the Sentencing Reform Act of 1984 and

18     in consideration of the provisions of 18 USC Section 3553,

19     as well as the advisory Sentencing Guidelines as to the

20     defendant Lisa Marie Eisenhart, you're hereby committed to

21     the custody of the Bureau of Prisons for a term of 30 months

22     incarceration as to Counts 1 and 2 and for 6 -- one year on

23     Counts 4 and 6, and then six months on Counts 8, 9, and 10.

24     So that all will be concurrent.

25          Let me see how that -- yes, that's right.  Okay.

1    A 36-month term of supervised release as to Counts

2    1 and 2, 12 months supervised release as to Counts 4 and 6,

3    all concurrent, for a total term of 36 months supervised

4    release; and a special assessment of $280 in accordance with

5    USC 3013.

6    Now, as to Ms. Eisenhart, I find that a downward

7    departure, which I almost have never done, is justified in

8    this case.  As to Mr. Munchel, I find that a departure from

9    the guidelines would not be justified in light of the

10   overall circumstances of the case.

11   I will have to say as to both of you, the serious

12   nature of the offense is such that it's very difficult to

13   justify a departure from the guidelines ever in these

14   January 6th cases, and I have generally sentenced within the

15   guidelines.  And in both of your cases, you're getting a

16   three-point adjustment in the guidelines for your acceptance

17   of responsibility.

18   And I recognize that you both accepted

19   responsibility by the stipulated trial record and the

20   stipulated findings that you agreed to.  And your acceptance

21   of responsibility is noteworthy and appreciated by the

22   Court.  The additional benefits you would have had from a

23   guilty plea and other advantages of a plea and waiver of

24   rights to -- that might have come with the plea and rights

25   to appeal and other things that might have come might have

1    inured to your benefit as well.  But you in any event are

2    getting that three-point adjustment, which I think is

3    warranted.

4         But you still have the disadvantage, in all of

5    these cases, that even though you do not have the kind of

6    records, as I've mentioned to Mr. Smith when we were talking

7    about it, of many defendants that I've seen before me,

8    because you're basically good people, and I recognize that,

9    but it's a serious offense for our court to struggle through

10   with what do we do to make sure this kind of event never

11   happens again in the history of our country.  It was a

12   traumatic event for our country as well as for both of you,

13   of course, and it's still something I'm struggling with.

14        Both of your attorneys did a good job of

15   presenting the case as well as they could on your behalf.

16   And I have struggled with what the right thing for the Court

17   to do is, and you did not make it easy for me.

18        I know that's no solace to you, but it's -- the

19   vivid picture that you portrayed, Mr. Munchel, of the -- is

20   not something the Court can swallow very easily.  The vivid

21   picture of why, Ms. Eisenhart, you wanted to carry those --

22   the one -- even though it's only one, but what purpose you

23   could have had in having that one zip tie you were carrying

24   other than to lock up a senator and hold him hostage?

25        It's too vivid a picture for me to swallow and not

1      say that a prison sentence is justified even though I'm

2      going to depart downward because I agree, you've led a good

3      life, and you have a good background, and I don't see a

4      likelihood of repetition.  But because the Court has to

5      consider a lot of factors, including the serious nature of

6      what happened that day to our country as well as to both of

7      you, that's the sentence I've decided upon.

8              I have to read the rest of these conditions to

9      you; so if you all will wait for a minute, this will apply

10     to both of you.

11             While on supervised release you shall abide by the

12     following mandatory conditions as well as the discretionary

13     conditions recommended by the probation office in Part D,

14     "Sentencing Options of the Presentence Report," which are

15     imposed to establish the basic conditions of your conduct

16     while on supervision.

17             Mandatory conditions include:

18             One, you must not commit another federal, state,

19     or local crime.

20             Two, you must not unlawfully possess a controlled

21     substance.

22             Three, you must refrain from unlawful use of a

23     controlled substance.  You must submit to one drug test

24     within 15 days of placement on supervision and at least two

25     periodic drug tests thereafter as determined by the Court.

1          Four, you must cooperate in the collection of DNA

2     as directed by the probation officer.

3          And five, you must make restitution in accordance

4     with 18 USC Section 3663 and 3663A or any other statute

5     authorizing a sentence of restitution.

6          You shall also comply with the following special

7     conditions:

8          You're ordered to make restitution to the

9     Architect of the Capitol in the amount of $2,000.  The Court

10    determines you do not have the ability to pay interest and

11    therefore waives any interest or penalties that may accrue

12    on the balance.

13         The Court waives payment of a fine in your case as

14    to both of you and waives payment of interest or penalties

15    on the restitution to the Architect of the Capitol in both

16    of your cases.

17         The restitution payments shall be made to the

18    Clerk of the Court, U.S. District Court, District of

19    Columbia, for disbursement to the Architect of the Capitol,

20    also the chief financial officer for the House Office

21    Building, Room H2-205B, Washington, D.C., 20515, payable to

22    the Clerk of Court, U.S. District Court, 333 Constitution

23    Avenue, Northwest, Washington, D.C. 20001.

24         Within 30 days of any change of address, you shall

25    notify the Clerk of the Court of the change until such time

1    as the financial obligation is paid in full.

2         The probation office shall release the presentence

3    investigation report to all appropriate agencies, which

4    includes the probation office in the approved district of

5    residence, in order to execute the sentence of the Court.

6         Treatment agencies shall return the presentence

7    report to the probation office upon the completion or

8    termination from treatment.

9         Each of you have the right to appeal your

10   conviction of guilt to the U.S. Court of Appeals for the

11   D.C. Circuit pursuant to 18 USC Section 3742(a).  You also

12   have a statutory right to appeal your sentence to the D.C.

13   Circuit under certain circumstances, including if you think

14   the sentence was imposed in violation of law or as a result

15   of an incorrect application of the Sentencing Guidelines is

16   more severe than the maximum sentence imposed in the

17   guideline range.  You may also appeal your sentence if you

18   believe you received ineffective assistance of counsel at

19   sentencing.

20        Pursuant to 28 USC Section 2255, you also have the

21   right to challenge the conviction entered or sentence

22   imposed to the extent permitted by statute.  Any notice of

23   appeal must be filed within 14 days after the entry of

24   judgment or within 14 days of the filing of notice of appeal

25   by the government, which they could appeal since I'm doing a

1    downward departure in Ms. Eisenhart's case.

2              If you're unable to afford the cost of an appeal,

3    you may request permission from the Court to file an appeal

4    without cost to you.  On appeal you may also apply for

5    court-appointed counsel.

6              I'll ask counsel first then, are there any

7    objections to the sentence as imposed that are not already

8    noted on the record?

9              First is the United States.

10             MR. GORDON:  No, Your Honor.

11             THE COURT:  Mr. Allen?

12             MR. ALLEN:  No, Your Honor.

13             THE COURT:  Mr. Smith?

14             MR. SMITH:  Well, Your Honor, we had asked in the

15   sentencing memo that the Court change the general condition

16   about not fraternizing with other felons to allow them to

17   fraternize with each other.

18             THE COURT:  What's the wording?

19             MR. SMITH:  There's a provision that says "you

20   shall not interact with other people who have a felony

21   conviction," and we wanted an exception for them, since

22   they're mother and son, to allow them to spend time with

23   each other after release.

24             THE COURT:  What is that?  In the pretrial

25   release, you mean?  The release conditions?

```
 1                   MR. SMITH:  As a general condition of supervised
 2       release.
 3                   THE COURT:  Of supervised release.
 4                   MR. SMITH:  Yes.
 5                   THE COURT:  It's a general condition?
 6                   MR. SMITH:  Yes, Your Honor.
 7                   THE COURT:  What's the wording?
 8                   Let me get the probation officer.
 9                   THE PROBATION OFFICER:  Your Honor, if I may?
10       They're referring to -- I forget what number it is.  The
11       Standard Condition No. 8 I think for both of them.  Just a
12       special condition allowing them to associate with each other
13       will be fine.
14                   THE COURT:  Okay.
15                   THE PROBATION OFFICER:  Instead of getting --
16                   THE COURT:  So add to the J&C that Special
17       Condition 8 is modified so that they may associate with each
18       other?
19                   THE PROBATION OFFICER:  Yes, sir.  I think that
20       would be appropriate.
21                   THE COURT:  All right.  That works.
22                   All right.  Anything else?
23                   MR. SMITH:  No, Your Honor.
24                   THE COURT:  All right.  Now, defendants may be
25       seated.
```

```
 1            Did the government have a request regarding

 2    defendants' conditions now?

 3            MR. GORDON:  Conditions, Your Honor?

 4            THE COURT:  Release.

 5            MR. GORDON:  The government is --

 6            THE COURT:  Pending sentencing, I mean pending

 7    designation.

 8            MR. GORDON:  No, Your Honor.  I assume that

 9    Mr. Munchel will want to be near where his daughter will be

10    or his child will be, and the government has no objection to

11    that.  I have no objection to --

12            THE COURT:  Reporting date after?

13            MR. GORDON:  That's right, Your Honor.  And I have

14    no objection to that, nor do I object to Ms. Eisenhart

15    having her conditions modified so that she can interact with

16    Mr. Munchel.

17            THE COURT:  All right.  Okay.

18            Well, let me start with Mr. Munchel first then.

19    Any other things you want me to put in the J&C in terms of

20    recommendation?

21            MR. ALLEN:  He would like to be housed in

22    Kentucky.  There's not a federal housing facility in

23    Tennessee, so Kentucky would be the closest to his home

24    state.

25            THE COURT:  Okay.
```

```
 1              MR. ALLEN:  I think that you just mentioned this,
 2    but I'll reiterate my request to self-report after the birth
 3    of his child.
 4              And we also have a motion on file that I filed
 5    some months ago, Your Honor, for the return of his firearms.
 6    There was no forfeiture action filed by the government, and
 7    Mr. Munchel has a person who can take custody of those
 8    firearms whenever they are released.  I think that we just
 9    need an order from you to release them.
10              And when we were here for the stipulated bench
11    trial, I brought that up, and you asked me to address it at
12    sentencing.
13              THE COURT:  Okay.  Should I say designation
14    facility closest to Tennessee, or should I say Kentucky?  I
15    don't know.
16              MR. ALLEN:  I think there's certainly a facility
17    in Kentucky.  What's close to Nashville?
18              THE DEFENDANT:  I believe so, but closer to
19    Nashville.
20              THE COURT:  Okay.  I'll say to Nashville, okay?
21    Because I don't know what -- I don't know what level they're
22    going to designate, too.
23              MR. ALLEN:  Sure, sure.
24              THE COURT:  What's the expected birth date now?
25              MR. ALLEN:  December of 2023.
```

```
1                    Is there a specific date?

2             DEFENDANT MUNCHEL:  16th.

3             MR. ALLEN:  December 16th.  Thank you.

4             THE COURT:  December?

5             MR. ALLEN:  16th.

6             THE COURT:  Okay.

7             And then what was -- did you have a request

8     regarding Ms. Eisenhart?

9             MR. SMITH:  Your Honor, it would be the same

10    facility close to Nashville, and also she was hoping to have

11    voluntary surrender also after --

12            THE COURT:  I didn't hear the last one.

13            MR. SMITH:  Also -- I'm sorry, she would like to

14    have voluntary surrender after December 16th so she can see

15    her first grandchild born.

16            THE COURT:  Yes.

17            All right.  Anything else anybody wants to do

18    today?

19            MR. GORDON:  No, Your Honor.  Thank you.

20            THE COURT:  Okay.

21            All right.  The Court will be in recess.  Good

22    luck to both of you.

23                 (Whereupon the hearing was

24                  concluded at 4:00 p.m.)

25
```

1          **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3                  I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8          Dated this 22nd day of November, 2023.

9

10                                  /s/Lisa A. Moreira, RDR, CRR
                                    Official Court Reporter
11                                  United States Courthouse
                                    Room 6718
12                                  333 Constitution Avenue, NW
13                                  Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25